# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **BROADVOICE, INC.,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. **05-11435-NG** |
| | ) |
| **BELLSOUTH CORP., BELLSOUTH** | ) |
| **TELECOMMUNICATIONS, INC., and** | ) |
| **BELLSOUTH INTELLECTUAL PROPERTY** | ) |
| **CORP.,** | ) |
| | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, OR TRANSFER, OR STAY

## I.     INTRODUCTION

Defendants BellSouth Corporation, BellSouth Telecommunications, Inc., and BellSouth Intellectual Property Corporation (collectively "the BellSouth Defendants") submit this memorandum in support of their motion to dismiss for lack of personal jurisdiction and improper venue under Rules 12(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, or in the alternative, to transfer plaintiff BroadVoice, Inc.'s ("BroadVoice") complaint for declaratory judgment to the Northern District of Georgia, or in the alternative, to stay this action pending the outcome of a broader, more comprehensive Georgia action.

## II.     FACTUAL BACKGROUND

Plaintiff BroadVoice is a Delaware telecommunications company that offers and provides telecommunications services using Voice-over Internet Protocol ("VoIP").

Defendant BellSouth Corporation is a Georgia corporation and the parent company of Defendant BellSouth Telecommunications, Inc.; a Georgia corporation that provides telecommunications services in competition with BroadVoice. BellSouth Corporation holds an indirect ownership interest in Defendant BellSouth Intellectual Property Corporation, a Delaware corporation that owns all United States trademarks used by various BellSouth entities, including the famous BELL Logo. BroadVoice has sued the BellSouth Defendants seeking a declaratory judgment that BroadVoice's use of the famous BELL Logo defaced by a red circle with a slash as an "advertising image" for its communication services does not infringe or dilute BellSouth Intellectual Property Corporation's exclusive rights in this Logo.

This motion to dismiss is based on a lack of personal jurisdiction over the BellSouth Defendants and improper venue under Rules 12(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Alternatively, the BellSouth Defendants request that this Court transfer this action pursuant to 28 U.S.C. § 1404(a) to the Northern District of Georgia, where a comprehensive action that addresses both the instant and additional issues is pending. Finally, also in the alternative, the BellSouth Defendants move to stay this action in view of the pending Georgia action.

## A.    The BellSouth Defendants And The BELL Logo

Defendant BellSouth Corporation ("BSC") is a Georgia corporation with a principal place of business and corporate headquarters in Georgia. (Baker Aff. ¶ 2.) BSC is the parent corporation of Defendant BellSouth Telecommunications, Inc. and holds an indirect ownership interest in BellSouth Intellectual Property Corporation. (Baker Aff. ¶ 3.) BSC does not provide telecommunications services or compete with BroadVoice. (Baker Aff. ¶¶ 4, 5.)

2

Defendant BellSouth Intellectual Property Corporation ("BIPCO") is a Delaware corporation with its principal place of business and corporate headquarters in Delaware. (Gregorski Aff. ¶ 2.)  BIPCO owns incontestable exclusive rights in the BELL Logo, which has been judicially determined to be a famous trademark.  *BellSouth Corp. v. B.E.L-Tronics Ltd. (Canada), et al.*, Civil Action No. 1-93-CV-1714-CC, U.S.D.C. for the N.D. Georgia, *aff'd*, 107 F.3d 25 (table) (11th Cir. 1997).  BIPCO is the owner of a family of BELL marks, of which the BELL Logo is just one.  (Gregorski Aff. ¶ 3.)  Many of these marks were the subject of the divestiture of AT&T, and BIPCO owns undivided exclusive rights in the BELL Logo subject only to the concurrent rights of the other (and, in some cases, former) Regional Bell Operating Companies.  (Gregorski Aff. ¶ 4.)  BIPCO licenses the BELL marks, including the BELL Logo, for use in interstate commerce in connection with a wide variety of services, including telecommunication services.  (Gregorski Aff. ¶ 5.)

Defendant BellSouth Telecommunications ("BST") is Georgia corporation with a principal place of business and corporate headquarters in Georgia.  (Peed Aff. ¶ 2.)  BST provides a wide variety of telecommunication services in the states of Alabama, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, South Carolina, and Tennessee. (Peed Aff. ¶ 3.)  BIPCO licenses BST to use the famous BELL Logo, which it does in providing such services in, and only in, these nine (9) states.

**B.     BroadVoice's Illegal Activities**

In 2004, BST and BroadVoice entered into a "Trial Agreement"[1] for the provision of "a voice-over-IP service . . . that provides a variety of enhanced communications features

---

[1] See Exhibit 1, Trial Agreement Between BroadVoice, Inc. And BellSouth Telecommunications, Inc. ("Trial Agreement").

ATLLIB01 2078493.4

and the capability to place local, nationwide long distance, and international calls using analog phones in conjunction with specialized customer premises equipment (CPE) provided by BellSouth [Telecommunications, Inc.]"[2]  These services would be branded as "BellSouth" services and provided only in Florida, one of the nine Southeastern states in which BST offers telecommunications services.  The Agreement, which did not expire until April of 2005, specifically provided that BroadVoice "shall not affix, use, or otherwise display the [BIPCO] marks in any manner without [BIPCO's] prior written approval."  Neither BIPCO nor any other BellSouth Defendant has ever granted such approval to BroadVoice.

Despite this contract and its knowledge of BIPCO's trademark rights, BroadVoice has used and continues to use a corrupted form of the famous BELL Logo.  This corrupted form consists of the famous BELL Logo obscured by the well-known negative visual of a red circle with a crossing diagonal slash.  BST employees first saw this improper use of the BELL Logo at an Atlanta trade show in September of 2004 and immediately objected.  BroadVoice continued to use the famous BELL Logo in this manner.  BIPCO promptly corresponded with BroadVoice and confirmed these objections.  BroadVoice nonetheless continued its improper use of the corrupted BELL Logo.

BST and BIPCO had hoped to resolve this situation without resort to the Court.  For example, by an October 27, 2004 letter, BIPCO explained to counsel for BroadVoice that the Trial Agreement contained "specific language regarding the use of the BellSouth name and marks, namely that . . . all such uses [had] to be approved . . . and [BroadVoice] shall do

---

[2] See Exhibit 1, Trial Agreement, Appendix A, page 1.

ATLLIB01 2078493.4

nothing inconsistent with BIPCO's ownership of the marks."[3]    Unfortunately, on July 8, 2005, after receipt of BIPCO's most recent demand letter, BroadVoice filed this action. BroadVoice alleges that its use of the corrupted BELL Logo as "an advertising image" for BroadVoice's services does not constitute trademark infringement, dilution or unfair competition.  (See Complaint for Declaratory Relief, Introduction and ¶¶ 7, 14, 19 and 24.) Moreover, BroadVoice has agreed that Georgia is a proper forum for this action.  The Choice of Law/Venue & Arbitration provision of the Trial Agreement states:

> The laws of the State of Georgia shall govern the validity, construction, interpretation, and performance of this Agreement. The Jurisdictional venue for any legal proceeding for injunctive relief or in support of arbitration involving this Agreement shall be held in applicable local, state, or federal court located within the State of Georgia.

(Exhibit 1, ¶ 31.1, emphasis added.)

### C.    Other Legal Action Pending Between the Parties

BIPCO and BST have filed a more comprehensive action in the United States District Court for the Northern District of Georgia for trademark infringement under federal law, trademark dilution under federal law and Georgia law, and unfair competition under federal law and Georgia law.  A copy of the complaint filed in that case is attached as Exhibit 3. This broader, comprehensive action names the proper parties to this dispute in a forum that is more convenient for the parties and witnesses.  Moreover, by virtue of the Venue provision of the Trial Agreement, BroadVoice has agreed that Georgia is a proper forum for this action.  For the reasons set forth below, BroadVoice's claims should be dismissed for lack of

---

[3] See Exhibit 2, October 27, 2004 letter from Jacqueline A. Gregorski of BIPCO to Lucy D. Lovrein, Esq., counsel for BroadVoice, page 2.

personal jurisdiction and improper venue.  In the alternative, this action should be transferred

or stayed in favor of the pending Georgia action.

## III.    ARGUMENT

### A.    <u>This Action Should Be Dismissed For Lack Of Personal Jurisdiction And/Or Improper Venue</u>

The BellSouth Defendants submit that this Court should dismiss this action pursuant

to Federal Rule of Procedure 12(b)(2) for lack of personal jurisdiction and Federal Rule of

Civil Procedure 12(b)(3) for improper venue.  When the jurisdiction of the court is contested

under Rule 12(b)(2), the plaintiff has the burden of proving jurisdiction exists.  *See McNutt v.*

*Gen. Motors*, 298 U.S. 178, 189 (1936).  The plaintiff's burden to demonstrate personal

jurisdiction is met only if "there exist minimum contacts between the defendant and the

forum state."  *See World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980).

The "minimum contacts" must be sufficiently extensive that allowing a court of the forum

state to exercise personal jurisdiction over a nonresident defendant would not offend

"traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. Washington*, 326

U.S. 310, 316 (1945).  As explained below, the BellSouth Defendants do not have such

minimum contacts with this State.

The case law has recognized two ways in which a defendant may be subjected to the

personal jurisdiction of a court: "specific jurisdiction" and "general jurisdiction."  Specific

jurisdiction refers to jurisdiction over a defendant in a suit arising out or related to the

defendant's contacts with the forum.  *Helicopteros Nacionales de Colombia, S.A. v. Hall*,

466 U.S. 408, 414 n.8 (1984).  General jurisdiction is invoked in suits neither arising out of

nor related to the defendant's contacts, and it is permitted only where the defendant has

"continuous and systematic general business contacts" with the forum.  *Id.* at 416.  Neither sort of contact exists between any of the BellSouth Defendants and Massachusetts.

### 1. This Court Lacks Specific Jurisdiction Over The BellSouth Defendants

The BellSouth Defendants are not subject to "specific jurisdiction" in this case. Specific jurisdiction requires that the plaintiff's claims directly arise out of the specific contacts between the defendant and the forum state.  *Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 462-63 (1st Cir. 1990) (finding specific jurisdiction lacking).  BroadVoice's complaint does not, and cannot, allege that the BellSouth Defendants did anything in Massachusetts with respect to BroadVoice's use of the defaced BELL Logo.  None of the BellSouth Defendants offer any services in Massachusetts or have had a specific contact with BroadVoice in Massachusetts that would give rise to such jurisdiction.  (Baker Aff. ¶¶ 6-12.); (Gregorski Aff. ¶¶ 6-12.); (Peed Aff. ¶¶ 4-11.)  Because BroadVoice's claims against the BellSouth Defendants do not arise out of, and are not related to the BellSouth Defendants' activities within Massachusetts, the BellSouth Defendants are not subject to specific jurisdiction here.  *See Helicopteros*, 466 U.S. at 415.

### 2. This Court Lacks General Jurisdiction Over The BellSouth Defendants

The BellSouth Defendants plainly have not had "continuous and systematic general business contacts" with Massachusetts sufficient to establish general jurisdiction here. *Sandstrom v. Law Corp.*, 904 F.2d 83, 89-90 (1st Cir. 1990) (finding license to do business in forum, appointment of agent for services of process in the forum, and advertising in the forum not sufficiently continuous and systematic activities to establish general jurisdiction). The BellSouth Defendants have no offices or employees in Massachusetts.  (Baker Aff. ¶¶ 6,

7.); (Gregorski Aff. ¶¶ 6, 7.); (Peed Aff. ¶¶ 5, 6.)  The BellSouth Defendants do not own or lease property in Massachusetts.  (Baker Aff. ¶ 8.); (Gregorski Aff. ¶ 8.); (Peed Aff. ¶ 7.) The BellSouth Defendants have no bank accounts in Massachusetts and do not file tax returns in Massachusetts.  (Baker Aff. ¶¶ 9, 10.); (Gregorski Aff. ¶¶ 9, 10.); (Peed Aff. ¶¶ 8, 9.)  The BellSouth Defendants are not now, nor have they ever been, registered or qualified to do business in Massachusetts.  (Baker Aff. ¶ 11.); (Gregorski Aff. ¶ 11.); (Peed Aff. ¶ 10.) The BellSouth Defendants do not do business in Massachusetts.  (Baker Aff. ¶ 11.); (Gregorski Aff. ¶ 11.); (Peed Aff. ¶ 10.)  Moreover, the BellSouth Defendants have not authorized or designated any individual or corporation to accept service of process in Massachusetts or to act as their registered agent under the laws of Massachusetts (other than authorizing local counsel to represent the BellSouth Defendants for the limited and specific purpose of defending this litigation).  (Baker Aff. ¶ 12.); (Gregorski Aff. ¶ 12.); (Peed Aff. ¶ 11.)  The *Helicopteros* case is instructive.  In that case, the Supreme Court held that a Texas court could not assert general jurisdiction over a defendant that did not have a place of business in Texas and was not licensed to do business there, even though the defendant had a variety of modest contacts, including sending an officer to Texas for a contract-negotiation session and pending personnel to Texas for training.  466 U.S. 408.  Similarly, the BellSouth Defendants do not have the minimum contacts necessary to subject them to general jurisdiction in Massachusetts.

### 3.    Jurisdiction is Improper Under the Massachusetts Long-Arm Statute

The Massachusetts long-arm statute imposes constraints on personal jurisdiction that go beyond those imposed by the due process clause of the Constitution.  *Nowak v. Tak How*

*Inv., Ltd.*, 94 F.3d 708, 712 (1st Cir. 1996).  The Massachusetts long-arm statute provides in

relevant part:

> A court may exercise personal jurisdiction over a person, who acts directly or
> by an agent, as to a cause of action in law or equity arising from the person's
> (a) transacting any business in this commonwealth; (b) contracting to supply
> services or things in this commonwealth  . . .

MASS. GEN. LAWS ch. 223A § 3 (2005).  The BellSouth Defendants have not transacted

business in Massachusetts.  (Baker Aff. ¶¶ 6-12.); (Gregorski Aff. ¶¶ 6-12.); (Peed Aff. ¶¶ 4-

11.)  Moreover, the mere fact that BST contracted with BroadVoice for services in Florida

does not constitute "transacting business" within Massachusetts.  *See A-Connoisseru Transp.*

*Corp. v. Celebrity Coach, Inc.*, 742 F. Supp. 39, 43 (D. Mass. 1990) ("The mere fact that an

entity in Massachusetts executes a contract with an entity in another state does not

automatically constitute sufficient contact so as to confer a finding of personal jurisdiction.").

Moreover, the BellSouth Defendants have not "contracted to supply services or things in this

commonwealth" as the Trial Agreement provided for services in Florida, not in

Massachusetts.  *See Davis v. P. M. Video, Inc.*, 532 F. Supp. 1012 (D. Mass. 1982) (finding

the fact that plaintiff was hired in Massachusetts to perform duties on behalf of the defendant

outside of Massachusetts was insufficient to justify personal jurisdiction over a foreign

defendant).  Consequently, even if personal jurisdiction were proper under the Constitution,

this Court lacks personal jurisdiction over the BellSouth Defendants under the Massachusetts

long-arm statute.

### 4.      Venue is Improper in the District of Massachusetts

The legal requirement for dismissal under Rule 12(b)(3) of the Federal Rules of Civil

Procedure is essentially the same as that for a dismissal for lack of personal jurisdiction

under Rule 12(b)(2).  *New Life Brokerage Serv. v. Cal-Surance Assoc.*, 222 F. Supp. 94, 98 (D. Me. 2002).    Accordingly, for the reasons above, venue is improper.    Moreover, BroadVoice has agreed that venue would be appropriate in the State of Georgia.  BroadVoice has essentially conceded that venue is improper in Massachusetts and proper in Georgia.

**B.    In The Alternative, Venue Should Be Transferred To The Northern District Of Georgia For The Convenience Of The Parties And In The Interest Of Justice**

In the alternative, this declaratory judgment action should be transferred pursuant to 28 U.S.C. § 1404(a),[4] to the United States District Court for the Northern District of Georgia, which is a more convenient and proper venue for the parties and witnesses.  Moreover, Defendants BST and BIPCO have filed a complaint against BroadVoice in the United States District Court for the Northern District of Georgia, which includes every issue in this case, as well as additional claims under Georgia law that are not before the Court in this declaratory judgment action.

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. § 1404(a).  The decision to transfer a case to a more convenient forum pursuant to § 1404(a) is a matter within the discretion of the district court.  *Princess House, Inc. v. Lindsey*, 136 F.R.D. 16, 18 (D. Mass. 1991) (granting motion to transfer to defendant's place of residence).    Section 1404(a) authorizes transfer from one forum to another if the court determines that such transfer will serve the convenience of the parties and the witnesses and the interests of justice.  *Id.*; *see also Cordell Eng'g, Inc. v. Picker Int'l,*

---

[4] This argument presumes that the Court determines venue is proper.  The BellSouth Defendants contest venue. Even so, in the interest of justice, the Court may transfer this case to the Northern District of Georgia under 28 U.S.C. § 1406.

ATLLIB01 2078493.4

*Inc.*, 540 F. Supp. 1316 (D. Mass. 1982) (finding considerations of convenience and judicial economy required transfer of venue). A consideration of these factors demonstrates that this action should be transferred to the Northern District of Georgia.

### 1.    Venue Is Proper In Georgia

All of the BellSouth Defendants can be found in Georgia. BroadVoice has agreed that venue is appropriate in Georgia. Moreover, in federal actions not founded on diversity, venue is proper, among other places, where a "substantial part of the events or omissions" occurred. 28 U.S.C. § 1391(b)(2). The events giving rise to this dispute—BroadVoice's infringing and diluting use of the defaced BELL Logo in connection with VoIP services— had particularly significant effects in the Northern District of Georgia, where Defendants BSC and BST reside and conduct business. Venue is proper in the Northern District of Georgia, where BIPCO and BST have filed a comprehensive action against BroadVoice.

### 2.    The Weight Of Convenience Of The Parties And Witnesses, And The Interest of Justice, Balances In Favor Of A Transfer To Georgia

#### a.    The Balancing Test

In determining whether a transfer of venue is appropriate, courts will review all circumstances of the case. Factors the court may consider include: (1) the convenience of the parties and the witnesses; (2) the availability of documents; (3) the possibilities of consolidation and coordination; (4) plaintiffs' choice of forum; and (5) the interests of justice. *Princess House,* 136 F.R.D. at 18. Here, the balance of factors weighs heavily in favor of a transfer of this action to the United States District Court for the Northern District of Georgia.

      **b.**    **The Convenience Of the Parties And Witnesses Warrants Transferring Venue To The Northern District Of Georgia Where There Is The Possibility of Consolidation**

The convenience of the parties and witnesses as well as the possibility of consolidation with the action pending in Georgia weighs in favor of transferring this action to Georgia. BIPCO and BST have brought an action for trademark infringement under federal law, trademark dilution under federal law and Georgia law, and unfair competition under federal law and Georgia law, in the Northern District of Georgia, where BSC and BST reside and conduct business. (Baker Aff. ¶ 2.); (Peed Aff. ¶ 2.) In addition, BSC and BST are Georgia corporations with a significant number of employees working in Georgia. (Baker Aff. ¶¶ 2, 13.); (Peed Aff. ¶ 12.) Most importantly, numerous witnesses and relevant documentary evidence located in and around Georgia will certainly be involved in the case. (Baker Aff. ¶ 14.); (Gregorski Aff. ¶ 13.); (Peed Aff. ¶ 13.) In Atlanta, Georgia, BSC and BST have ongoing business operations with offices and facilities available for use during the litigation. (Baker Aff. ¶ 15.); (Peed Aff. ¶ 14.) Additionally, BSC and BST's offices and facilities in Atlanta would be available to BIPCO during the litigation. (Gregorski Aff. ¶ 14.) Therefore, the convenience of the parties and witnesses in addition to the location of the documentary evidence weighs in favor of transferring this action to Georgia.

Additionally, transfer of this action to the Northern District of Georgia provides the benefits of consolidation. This factor is particularly relevant here as the action pending in Georgia includes additional claims, such as trademark dilution under Georgia law and unfair competition under Georgia law, which are not at issue in this declaratory judgment action. Thus, the possibility of consolidation with the pending Georgia action and the preservation of judicial resources weighs in favor of transfer to the Northern District of Georgia. *See*

12

*Cordell Eng'g, Inc. v. Picker Int'l, Inc.*, 540 F. Supp. 1316, 1318 (D. Mass. 1982) (holding considerations of convenience and judicial economy required transfer).

Finally, while the plaintiff's choice of forum is a consideration, "the presumption favoring the first-filed action is not unrebuttable." *Dupont Pharm. Co. v. Sonus Pharm., Inc.*, 122 F. Supp. 2d 230, 231 (D. Mass. 2000) (granting motion to transfer declaratory judgment action). The key facts here have substantively nothing to do with this jurisdiction. In such circumstances, the plaintiff's choice of venue is entitled to less deference. *Brant Point Corp. v. Poetzach*, 671 F. Supp. 2, 5 (D. Mass. 1987).

In addition to the discretion afforded the Court in departing from the first-filed rule, the Court also has "broad discretion" under the Declaratory Judgment Act in determining whether to exercise jurisdiction over the plaintiff's action. *Dupont Pharm. Co.,* 122 F. Supp. 2d at 231. This discretion may be exercised to avoid the possibility of a "multiplicity of suits." *Subaru of New England, Inc. v. Subaru of Augusta, Inc.*, 121 F.R.D. 1, 2 (D. Mass. 1988) (finding declaratory judgment action can be transferred in order to avoid duplicative litigation even if the convenience of the parties and witnesses are in balance between the two districts). The Court should decline to exercise such jurisdiction in this case. BroadVoice has no fear of suit by BellSouth Corporation, but has acted to expand this matter beyond its true boundaries in an effort to make this matter as difficult and expensive as it can for all the BellSouth Defendants. All disputes among the proper parties can be expeditiously and relatively inexpensively litigated before the Georgia courts, as BroadVoice agreed in the Trial Agreement. Further, BroadVoice's choice of a Massachusetts forum is clearly outweighed by the convenience of the parties and witnesses, the benefits of consolidation in Georgia, and preventing a "multiplicity of suits."

Because venue is proper in the transferee court, and all other factors to be considered in deciding whether to transfer a case pursuant to 28 U.S.C. § 1404(a) weigh so heavily in favor of having this case heard in the United States District Court for the Northern District of Georgia, Defendants respectfully request that their motion to transfer this case to that forum should be granted.

### C.    In The Alternative, This Action Should Be Stayed Pending the Outcome Of The Georgia Action

"The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the ca[u]ses on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). That BroadVoice's petition for declaratory relief was filed in anticipation of BIPCO and BST's Georgia suit. This consideration weighs in favor of a stay. *See Nat'l R.R. Passenger Corp. v. Providence and Worcester R.R. Co.*, 798 F.2d 8, 10-11 (1st Cir. 1986). BroadVoice's complaint is an attempt to deprive BIPCO and BST of their status as the <u>real</u> plaintiffs in Georgia. This tactic should fail.

## IV.    CONCLUSION

The BellSouth Defendants do not have the level of minimum contacts with Massachusetts that are required to subject them to personal jurisdiction in a Massachusetts court. Venue is proper in Georgia, not Massachusetts. Accordingly, this action should be dismissed for lack of personal jurisdiction or improper venue. At a minimum, the Court should transfer this case to the Northern District of Georgia for the convenience of the parties and witnesses, and in the interest of justice.

ATLLIB01 2078493.4

Respectfully Submitted,

BELLSOUTH CORP., BELLSOUTH
TELECOMMUNICATIONS, INC., and
BELLSOUTH INTELLECTUAL PROPERTY
CORP.

By their attorneys,


/s/ Benjamin A. Goldberger
Edward P. Leibensperger (BBO# 292620)
Benjamin A. Goldberger (BBO# 654357)
McDermott Will & Emery LLP
28 State Street
Boston, Massachusetts  02109-1775
(617) 535-4000

*Of Counsel*
Stephen M. Schaetzel
Alicia G. Jones
KILPATRICK STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309-04530
Tel: 404-745-2411

Dated: September 2, 2005

ATLLIB01 2078493.4

TRIAL AGREEMENT


Between


BROADVOICE, INC.


And


BELLSOUTH TELECOMMUNICATIONS, INC.

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE

538417

## TABLE OF CONTENTS

1.  SCOPE .................................................................................................... 1
2.  NO COMMITMENT ................................................................................ 1
3.  DEEFINITIONS ...................................................................................... 1
4.  TERM AND TERMINATION ................................................................ 2
5.  SERVICES AND SUPPORT .................................................................. 2
6.  REPRESENTATIONS AND WARRANTIES ........................................ 2
7   LOCATION OF TRIAL .......................................................................... 2
8.  SUPPLIER FEE AND PAYMENT TERMS ........................................... 2
9.  SCHEDULE ............................................................................................ 3
10. TECHNICAL SUPPORT AND ASSISTANCE ...................................... 3
11. EMERGENCY SERVICE ....................................................................... 3
12. INTELLECTUAL PROPERTY DEVELOPMENT AND OWNERSHIP ... 3
13. FORECAST DATA ................................................................................. 3
14. DEFAULT AND LIMITATION OF LIABILITY .................................... 3
15. INFRINGEMENT .................................................................................... 4
16. INDEPENDENT CONTRACTOR .......................................................... 5
17. INDEMNITY .......................................................................................... 5
18. INSURANCE .......................................................................................... 5
19. LICENSES ............................................................................................. 6
20. BELLSOUTH MARKS ........................................................................... 6
21. COMPLIANCE WITH LAWS ............................................................... 6
22. PUBLICITY ........................................................................................... 7
23. EXCUSABLE DELAYS .......................................................................... 7
24. ASSIGNMENT ....................................................................................... 7
25. REGULATORY MATTERS .................................................................... 8
26. STATUS REPORT .................................................................................. 8
27. TAX ........................................................................................................ 8
28. SECURITY ............................................................................................. 8
29. FACILITY RULES AND GOVERNMENT CLEARANCE .................... 9
30. RELEASES VOID .................................................................................. 9
31. CHOICE OF LAW/VENUE & ARBITRATION ..................................... 9
32. SEVERABILITY ..................................................................................... 9
33. NOTICES ................................................................................................ 9

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE.



Table of Contents                                                          Page 2 of 2

34. RECORDS AND AUDIT ................................................................................ 10

35. NONDISCLOSURE OF INFORMATION ..................................................... 10

36. SURVIVAL OF OBLIGATIONS .................................................................... 12

37. NON-WAIVER ................................................................................................ 12

38. CONFLICT OF INTEREST ............................................................................ 12

39. NONDISCRIMINATION COMPLIANCE ..................................................... 12

40. SECTION HEADINGS ................................................................................... 12

41. INCORPORATION OF APPENDICES .......................................................... 12

42. NONSOLICITATION ...................................................................................... 12

43. ENTIRE AGREEMENT .................................................................................. 13

**Appendices**

APPENDIX A:        PROJECT STATEMENT

APPENDIX B:        CSS 400-400-TR AND CSS 400-600-TR: SECURITY REQUIREMENTS FOR SOURCED
                   WORK

APPENDIX C:        DEDICATED INTERNET ACCESS SERVICE AGREEMENTS

APPENDIX D:        LETTER OF AGREEMENT

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE

This trial agreement (the "Agreement,") is entered into as of June __15__, 2004 (the "Effective Date") by and between BroadVoice, Inc., a Delaware Corporation, ("Supplier") and BellSouth Telecommunications, Inc , a Georgia Corporation, ("BellSouth") and their respective successors and assigns. Supplier and BellSouth are each a "Party" and, collectively, the "Parties" to this Agreement.

## 1. SCOPE

1.1   This Agreement sets forth the general terms and conditions under which Supplier shall provide the Services that are defined and described more specifically in the Project Statement (as defined below) and BellSouth will market, promote, and resell the Services in its conduct of the Trial described herein.

## 2. NO COMMITMENT

**THIS AGREEMENT DOES NOT REPRESENT OR IMPLY A COMMITMENT ON THE PART OF BELLSOUTH TO PURCHASE THE SERVICES (OR ANY MATERIAL OR SOFTWARE, AS SUCH TERMS ARE DEFINED BELOW) AFTER THE CONCLUSION OF THE TRIAL.   NO SUCH COMMITMENT TO PURCHASE BY BELLSOUTH OR TO SELL BY SUPPLIER SHALL BE BINDING UNLESS AND UNTIL EXPRESSED IN A WRITING SIGNED BY AUTHORIZED REPRESENTATIVES OF BOTH PARTIES.**

## 3. DEEFINITIONS

3.1   "Affiliated Company(ies)" shall mean any company or other entity, directly or indirectly, in whole or in part controlled by, controlling or under common control with, a party hereto.

3.2   "Agreement" shall mean this agreement and any schedules, attachments, appendices, or amendments to the foregoing.

3.3   "BellSouth" shall mean BellSouth Telecommunications, Inc.

3.4   "Customers" shall mean customers who purchase the Services from BellSouth.

3.5   "Material" shall mean Supplier's equipment, systems, Software, firmware, test equipment, training materials, and other support documentation used by Supplier for purposes of the Trial.

3.6   "Marks" shall have the meaning set forth in Section 20 below.

3.7   "Project Statement" shall mean the description of the Services and each Party's respective obligation related to such Services as defined and more specifically described in Appendix A annexed hereto and incorporated herein by reference.

3.8   "Software" shall mean the computer programs proprietary to Supplier, consisting of logic instructions in machine-readable code residing in, or intended to be loaded, in Material memories which provide basic logic, operating instructions and user-related application instructions, but excluding customer data, which are integral to the Material used by Supplier for purposes of the Trial, or documentation used to describe, maintain, and use the programs.

3.9   "Trial" shall mean the marketing, technical, or operational evaluation and testing of the Services described in the Project Statement.

3.10   "Trial Period" shall have the meaning set forth in Section 4 1 below.

3.11   "Services" shall mean those services provided by Supplier for the Trial as described in the Project Statement.

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE

3.12 'Supplier" shall mean BroadVoice, Inc.

3.13 " Support" shall mean the activities related to technical assistance and other support activities provided by Supplier as defined in the Project Statement

## 4. TERM AND TERMINATION

4.1    The term of this Agreement shall commence and be effective on the Effective Date and shall, except as otherwise provided herein, continue in effect thereafter until the termination of the Trial. The Trial Period will commence on the earlier of July 16, 2004, or the date of the activation of the first Customer (Trial Start Date) and will terminate December 31, 2004, unless extended or terminated by written notice as provided in this Section 4 or Section 14 below or by written agreement of the Parties ("Trial Period"). BellSouth may, at its option, extend the Trial Period by an additional 30 or 60 days pursuant to the terms set forth in this Agreement, including the payment terms set forth in APPENDIX A that are in effect in the month prior to such extension, by providing Supplier written notice of such election not less than 30 days prior to the end of the Trial Period. BellSouth may terminate the Trial Period at any time without cause and for any reason by giving supplier 30 days prior written notice and providing full payment as specified in section 4 of APPENDIX A.

## 5. SERVICES AND SUPPORT

5.1    Subject to the terms and conditions of this Agreement, Supplier shall provide BellSouth the Services and related Support for the Trial and BellSouth shall market, promote, and resell such Services as set forth in the Project Statement.

5.2    The Parties may mutually agree to make changes in the Project Statement. If any such change causes an increase or decrease in the cost of, or the time required for the performance of the Trial, an equitable adjustment may he made in the financial arrangements, or schedules, or both, and the Project Statement shall be modified in writing accordingly

## 6. REPRESENTATIONS AND WARRANTIES

6.1    Each Party represents and warrants to the other, that it has the authority and right to enter into this Agreement and to provide the services hereunder free of all liens, security interests, or other encumbrances.

**6.2   EXCEPT AS SPECIFICALLY STATED IN THE PROJECT STATEMENT, SUPPLIER DOES NOT WARRANT THAT THE OPERATION OF THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE.**

**6.3   EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT AND TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE WARRANTIES IN THIS SECTION ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS AND IMPLIED, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND ANY AND ALL IMPLIED WARRANTIES ARISING FROM STATUTE, COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.**

## 7. LOCATION OF TRIAL

7.1 The Trial shall be conducted in South Florida, as is more specifically described in the Project Statement.

## 8. SUPPLIER FEE AND PAYMENT TERMS

8.1 BellSouth will pay Supplier and Supplier will bill BellSouth for the Service as set forth in the Project Statement.

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE

8.2 BellSouth may withhold payment for non-conforming or non-complying Service, provided that BellSouth informs Supplier of any element of non-conformity in writing following BellSouth's discovery of such non-conformance.

## 9. SCHEDULE

9.1 The Parties shall use best efforts to adhere to the Project Schedule for the Trial as provided in this Agreement . Any changes to such schedule shall be agreed to in writing.

## 10. TECHNICAL SUPPORT AND ASSISTANCE

10.1 Supplier shall provide Customer Support during the Trial as described in the Project Statement.

10.2 Supplier shall give prompt attention to resolving any customer complaints received during the Trial

10.3 BellSouth reserves the right to appoint third parties as its technical consultants authorized to participate in the Trial as BellSouth deems appropriate

## 11. EMERGENCY SERVICE

11.1 Supplier shall use all commercially reasonable efforts, within the resource and personnel limitations of Supplier, to provide corrective action at no charge within six (6) hours or less of notification of an emergency out-of-service condition in the Service furnished hereunder

11.2 Supplier shall provide BellSouth with telephone numbers to reach Supplier technicians twenty-four (24) hours a day, seven (7) days a week during the Trial Period  These emergency service telephone numbers are set forth in the Project Statement

## 12. INTELLECTUAL PROPERTY DEVELOPMENT AND OWNERSHIP

12.1 This Agreement does not encompass development by Supplier of any intellectual property for BellSouth Supplier agrees not to accept any Order for such development under the Agreement, not to bill BellSouth for any such development performed, and not to accept any payments for any such development  The foregoing is not intended to preclude Supplier's billing for the Services as set forth in the Project Statement.

12.2 Supplier shall retain all ownership, right, title, and interest in and to the Software, Materials, and Services, as well as all patents, copyrights, trademarks, other intellectual property, or proprietary rights in and to the Software Materials, and Services, including, without limitation, all content provided by Supplier hereunder for the BellSouth-branded website furnished by Supplier.

## 13. FORECAST DATA

13.1 BellSouth may furnish forecast data to Supplier  A ny such forecast does not constitute a commitment to purchase by BellSouth, and BellSouth shall not be responsible or liable for any action taken by Supplier in reliance thereon

## 14. DEFAULT AND LIMITATION OF LIABILITY

14.1 Except for provisions mutually agreed to by both Parties, in the event either BellSouth or Supplier shall be in material breach or default of any of the terms and conditions and covenants of this Agreement, and such material breach or default shall continue for a period of thirty (30) days after the giving of written notice to the Party in breach or default by the other, the aggrieved Party may terminate this Agreement and may avail itself of any and all remedies at law or equity or otherwise, subject to any limitations contained in this Agreement  BellSouth and

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE

Supplier shall cooperate with each other in every reasonable way to facilitate the remedy of a breach or default hereunder within the aforementioned thirty (30) day period.

14.2 Except as otherwise provided in this Agreement, Supplier's sole and exclusive remedy in the event of a default by BellSouth shall be the payment by BellSouth of any outstanding amounts due for Services rendered by Supplier prior to the date of cancellation

14.3 Except as otherwise provided in this Agreement, BellSouth's sole and exclusive remedy in the event of a default by Supplier shall under no circumstances exceed refund of all payments previously paid by BellSouth to Supplier and the reimbursement of any expenses paid by BellSouth to Supplier.

14.4 **Equitable Remedies.** The Parties recognize that money damages may not be an adequate remedy for any breach or threatened breach of any obligation hereunder by either Party involving Intellectual Property, Confidentiality, or Publicity. The Parties therefore agree that in addition to any other remedies available hereunder, by law or otherwise, each Party shall be entitled to obtain injunctive relief against any such continued breach of such obligations.

14.5 EXCEPT IN THE CASE OF A BREACH OF THE CONFIDENTIALITY OBLIGATIONS HEREUNDER, INDEMNITY FOR A THIRD PARTY CLAIM OF INFRINGEMENT, OR IN THE CASE OF GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, IN NO EVENT SHALL EITHER SUPPLIER OR BELLSOUTH OR EITHER PARTY'S AFFILIATED COMPANIES OR ANY OFFICER, DIRECTOR, EMPLOYEE, REPRESENTATIVE, OR AGENT OF EACH OF THEM BE LIABLE TO THE OTHER OR ANY FOR ANY INDIRECT', INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE, OR CONSEQUENTIAL DAMAGES OF ANY NATURE WHATSOEVER INCLUDING BUT NOT LIMITED TO LOST REVENUES, LOST PROFITS, LOSS OF GOODWILL, LOSS OF USE, OR RESEARCH AND DEVELOPMENT COSTS. FOR PURPOSE OF THIS SECTION 14.5, "AFFILIATED COMPANIES" OF EITHER PARTY SHALL MEAN COMPANIES OWNED OR CONTROLLED BY, EITHER DIRECTLY OR INDIRECTLY, OR UNDER COMMON CONTROL WITH SUCH PARTY.

## 15. INFRINGEMENT

15.1 The following terms shall apply to any infringement or claim of infringement of any U.S. patent, trademark, copyright, trade secret or other proprietary interest based on the development, manufacture, trial, evaluation, use, license, or sale of any Material or Software used to provide the Service hereunder or in contemplation hereof.

15.2 Supplier shall indemnify and hold BellSouth harmless for any losses, damages, expenses, or liabilities including reasonable attorneys' fees, that may result by reason of any such infringement or claim, except to the extent that such infringement or claim arises from (i) Supplier's adherence to BellSouth's specifications, written instructions or directions or (ii) BellSouth's use of the Services beyond the scope of this Agreement. Supplier shall defend or settle, at its own expense, any action or suit against BellSouth for which Supplier is responsible hereunder.

15.3 BellSouth shall indemnify and hold Supplier harmless for any losses, damages, expenses, or liabilities including reasonable attorneys' fees, that may result by reason of any such infringement or claim to the extent that such infringement or claim arises from Supplier's use of BellSouth's Marks (as defined in Section 20 below) except to the extent that such infringement or claims arises from a use of the BellSouth's Marks beyond the scope of this Agreement. BellSouth shall defend or settle, at its own expense, any action or suit against Supplier for which BellSouth is responsible under this subsection 15.3.

15.4 Each indemnity set forth above is contingent on the indemnified Party's notifying the indemnifying Party promptly of any claim of infringement for which the indemnifying Party is responsible and cooperating with the indemnifying Party in every reasonable way to facilitate the defense of any such claim.

15.5 In handling any claim hereunder, Supplier reserves the right to obtain for BellSouth the right to continue using the Services or replace or modify the Services so that they become non-infringing.

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE

## 16. INDEPENDENT CONTRACTOR

16.1  The Parties shall act as independent contractors in the performance of this Agreement and nothing contained herein shall be construed to (i) give either Party the power to direct and control the day to day activities of the other; (ii) constitute the Parties as partners, joint venturers, co-owners or otherwise as participants in a joint or common undertaking or (iii) allow either Party to create or assume any obligation on behalf of the other for any purpose whatsoever. Each Party shall be solely responsible for compliance with all rules, laws, and regulations relating to employment of its respective employees, hours of labor, working conditions, payment of wages, and payment of taxes, such as employment, social security, and other payroll taxes, including applicable contributions from such persons when required by law.

## 17. INDEMNITY

17.1  Supplier agrees, at its own expense and upon written notification by BellSouth within three (3) business days after service of process, to indemnify and hold BellSouth harmless from any and all liabilities, causes of action, lawsuits, penalties, claims, or demands (including the costs, expenses, and reasonable attorneys' fees on account thereof) that may be made by the following:

17.1.1  Anyone for injuries of any kind, including but not limited to personal injury, death, property damage, and theft, resulting from Supplier's willful acts in the performance of its obligations under this Agreement;

17.1.2  Any of either Supplier's, employees or former employees for which the Supplier's liability to such employee or former employee would otherwise be subject to payments under the state Worker's Compensation laws or an Employer's Liability policy, premises liability principles or any other law or form of legal duty or obligation; and

17.1.3  Either Supplier's employees or former employees for any and all claims arising out of the employment relationship with respect to performing under this Agreement. This includes, but is not limited to, employment discrimination charges and actions arising under Title VII of The Civil Rights Act of 1964, as amended; The Equal Pay Act; The Age Discrimination in Employment Act, as amended; The Rehabilitation Act; The Americans with Disabilities Act; The Fair Labor Standards Act; The National Labor Relations Act; and any other applicable law.

17.2  The foregoing indemnity shall be in addition to any other indemnity obligations of Supplier set forth in this Agreement.

## 18. INSURANCE

18.1  During the term of this Agreement, Supplier shall maintain all insurance or bonds required by law or this Agreement, including but not limited to the following:

18.1.1  Adequate Worker's Compensation and related insurance required by BellSouth and prescribed by the law of any state in which the work is to be performed;

18.1.2  Employer's liability insurance with limits of at least $500,000 for each occurrence; and

18.1.3  Commercial general liability insurance, including contractual liability, products liability and completed operations coverage, and if applicable, comprehensive motor vehicle liability insurance. Each shall have limits of at least $1,000,000 for bodily injury, including death, to any one person, $1,000,000 because of any one occurrence, and $1,000,000 for each occurrence of property damage.

18.4  In addition to the insurance coverage requirements outlined above, Supplier shall carry umbrella or excess liability coverage, with limits of no less than $2,000,000 per occurrence. Said umbrella or excess policy shall name BellSouth as an additional insured with respect to work performed under this agreement or state that BellSouth, as an "insured" in the underlying insurance is an "insured" under this umbrella or excess policy. In the event Supplier does not obtain contractual liability insurance covering the Supplier's indemnity requirements under this Agreement, Supplier shall provide BellSouth with specific endorsements insuring Supplier's assumed contractual liability under

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE



this Agreement. In no event shall the provisions of this section in any way limit the Supplier's obligations set forth in the section, "INDEMNITY."

## 19. LICENSES

19.1  This Agreement grants no rights to BellSouth or its Affiliated Companies to use, copy, modify, distribute, license, or create derivative works of the Materials or Software or to disassemble, reverse engineer, or otherwise derive the Software or of the Materials and Services in any manner.

19.2  Except as otherwise provided in Section 20 of this Agreement, no licenses under any patents, copyrights, trademarks, trade secrets or any other intellectual property, express or implied, are granted by BellSouth to Supplier or by Supplier to BellSouth under this Agreement. This section shall in no way modify the section on Confidential Information.

## 20. BELLSOUTH MARKS

20.1     BellSouth's and its affiliates' names, logos and trademarks are the property of BellSouth Intellectual Property Corporation ("BIPCO") in the U.S.A. BIPCO's exclusive authorized licensor, BellSouth Intellectual Property Marketing Corporation ("BIPMARK"), has specifically consented to BellSouth's and Supplier's use of certain trademarks (the "Marks") for the limited purposes stated in this Agreement. The specific Marks to be used by Supplier for purposes of the Trial shall be designated by BellSouth in writing and furnished to Supplier in accordance with the Project Statement (APPENDIX A). Subject to the limitations and procedures set forth herein, Supplier may affix the Marks to the Services as identified herein. Supplier shall not affix, use, or otherwise display the Marks in any manner without BIPMARK's prior written approval. BIPMARK may withhold its consent to the proposed usage of the Marks in its sole discretion, provided, however, that once consent is given for a type of use (e.g., use of the Marks in a specific radio commercial, in a print advertisement, on a billboard, or on a webpage), consent is not required for each subsequent use of the Marks in that specific context. However, if the use of the Marks in connection with the Services subsequently fails to meet applicable quality standards, BIPMARK may immediately cancel any such prior authorization. This right shall not be construed as a sublicense or permission to Supplier to use the Marks in any manner except as expressly provided herein. Supplier shall not use BellSouth's name or the Marks in a domain name unless the domain name is owned by BIPCO. Supplier shall strictly adhere to all graphics standards and marking requirements required by BIPMARK, as may be revised or supplemented from time to time in the sole discretion of BIPMARK. Supplier will not affix its own trademarks, trade dress, logos or names to the products and services contemplated herein without BIPMARK's prior written consent. Supplier recognizes and acknowledges BIPCO's ownership of, and shall do nothing inconsistent with BIPCO's ownership of the Marks. It is understood and agreed by Supplier that BIPCO and BIPMARK, as owner and authorized licensor of the Marks, respectively, shall have standing to enforce their rights in the Marks. Written notices and requests for consents required to be submitted to BIPMARK hereunder shall be sent to: Director – Trademarks, BellSouth Intellectual Property Management Corporation, 1155 Peachtree St., NE, Suite 500, Atlanta, Georgia 30309.

## 21. COMPLIANCE WITH LAWS

21.1  Supplier shall comply with the provisions of all applicable federal, state, county, and local laws, ordinances, regulations, and codes including, but not limited to, Supplier's obligations as an employer with regard to the health, safety, and payment of its employees, and identification and procurement of required permits, certificates, approvals, and inspections in Supplier's performance of this Agreement. Supplier shall indemnify BellSouth for, and defend BellSouth against, any loss or damage sustained because of Supplier's noncompliance.

21.2  BellSouth shall comply with the provisions of all applicable federal, state, county, and local laws, ordinances, regulations, and codes including, but not limited to, BellSouth's obligations as an employer with regard to the health, safety, and payment of its employees, and identification and procurement of required permits, certificates, approvals, and inspections in BellSouth's performance of this Agreement. BellSouth shall indemnify and hold harmless Supplier for, and defend Supplier against, any loss or damage sustained because of BellSouth's

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE



Noncompliance.

21.3   The Parties acknowledge that Supplier has entered into agreements with interexchange carriers (IXCs), competitive local exchange carriers (CLECs), and local exchange carriers (LECs) to originate and terminate enhanced voice traffic associated with the Trial Services on the public switched telephone network. Under the terms of the Agreement, Supplier is responsible for all access charges associated with the handling of such traffic, if any. The Parties specifically acknowledge that they believe that the Trial Services are enhanced services, subject to the federal exemption to access charges currently available to enhanced/information service providers (ESP access exemption). Nevertheless, the Parties acknowledge that with regard to the origination and termination of enhanced voice calls associated with the Trial Service, an issue exists as to whether the ESP access exemption applies in certain circumstances. Therefore, the Parties agree that during the Trial Period, if Supplier receives from another carrier any duly verified bill rendered to it for the payment of access charges associated with the handling of enhanced voice calls that are associated with the Trial Service, without prejudice to either Party's position as to whether the payment of access charges is legally required under current law or regulations regarding such calls, before Supplier refuses to pay any such bill on the basis of the ESP access exemption, it shall promptly tender such bill to BellSouth which shall have the right upon ten (10) days written notice to Supplier from the date of BellSouth's receipt of such bill, to cause Supplier to pay such bill in whole or in part; provided, however, in any such case BellSouth shall agree and be obligated to reimburse Supplier for the full amount of any such payment prior to Supplier's payment of same. The obligations and rights of the Parties regarding the payment of any access charges by Supplier at the request of BellSouth under this Agreement are limited to the Trial Services provided and related activities performed under this Agreement.  Any such payment of access charges by Supplier under this Agreement may not be used by BellSouth to support the position in any legal or regulatory proceeding that Supplier has thereby admitted to or agrees that such access fee payments are legally required.

## 22.  PUBLICITY

22.1 Press releases, advertisements and other publicity statements, in any medium ("Publicity") that use, mention or imply BellSouth's or its Affiliated Companies' trade names, logos, trademarks or service marks (collectively, the "Marks") are not permitted. Use or reproduction by Supplier for Publicity purposes of any testimonial quotations, thank you letters, reference letters or any other communications in any form or medium from BellSouth, BellSouth employees and/or BellSouth agents is not permitted. Exceptions to the policies outlined above must be obtained in writing solely from BellSouth Intellectual Property Marketing Corporation ("BIPMARK"). Supplier agrees to submit to BIPMARK all such requests and materials relating to this Agreement or mentioning or implying the Marks or language from or by which the connection of said Marks therewith may be inferred or implied, or mentioning or implying the names of any personnel of BellSouth Corporation and/or any of its Affiliated Companies. Supplier further agrees not to publish or use such Publicity materials without BIPMARK's prior written consent.

## 23.  EXCUSABLE DELAYS

23.1 Neither BellSouth nor Supplier shall be responsible for any delay or failure in performing hereunder caused by fires, labor disputes, flood, explosion, casualty loss, war, strike, embargoes, government requirements, civil or military authorities, acts of God or of the public enemy, terrorism, or other similar causes beyond the reasonable control of the Party whose performance is affected.

23.2 BellSouth may withhold payment of the Supplier Fee that accrues from the date of the delay forward during the continuation of any such delay.

## 24.  ASSIGNMENT

24.1  Except as other provided in Section 24.2, any assignment or delegation by either Party of the rights and obligations of this Agreement, in whole or in part, or of any other interest hereunder without the other's written consent, except an assignment confined solely to monies due or to become due, shall be void. An assignment of monies shall be void to the extent that if Supplier shall not have given BellSouth at least thirty (30) days prior

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE

written notice of such assignment, or if such assignment attempts to impose upon BellSouth obligations to the assignee additional to the payment of such money, or to preclude BellSouth from dealing solely and directly with Supplier in all matters pertaining thereto, including the negotiation of amendments or settlements of amounts due.

24.2  Upon notice to Supplier, BellSouth shall have the absolute right to assign this Agreement to BellSouth Corporation or any of its direct or indirect subsidiaries whether or not said entities are in existence on the date of execution hereof provided that BellSouth and its permitted assignee shall be and remain jointly and severally liable under the terms of this Agreement and the assignee shall commit to same in writing.  Supplier agrees not to subcontract Service to be performed, in whole or in part, for the Trial to any vendor with whom Supplier does not already have on the Effective Date of this Agreement an existing subcontract relationship to perform such subcontracted work, without written request to and prior written consent from BellSouth.  Supplier shall remain primarily liable to BellSouth for the performance of all subcontracted Service provided pursuant to the applicable Trial.

## 25.  REGULATORY MATTERS

25.1  Supplier expressly recognizes that BellSouth is a communications common carrier licensed by the Federal Communications Commission and certificated, where required, by state regulatory authorities operating under federal and state statutes, rules and regulations issued thereunder and filed tariffs.  Part of this Agreement may be subject to such changes or modifications as any such regulatory body may, from time to time, direct in the exercise of its jurisdiction.  Any material modifications or changes occasioned thereby to the Agreement shall be subject to the mutual consent of both Parties.  Failing such consent, either Party shall have the right to cancel this Agreement or any affected Trial without any liability.  BellSouth will make reasonable efforts to notify Supplier prior to initiating any regulatory action specifically pertaining to the Services and will advise Supplier within 10 business days after receiving notice of any regulatory action initiated by a third party specifically pertaining to such Services.

## 26.  STATUS REPORT

26.1  BellSouth and Supplier shall, consistent with the Project Statement and at mutually agreed upon intervals, discuss the activities performed during the Trial period, enumerate any problems encountered that may adversely affect progress, and state the projected activities for the ensuing period.

## 27.  TAX

27.1  Supplier shall add to the purchase price set forth in the Project Statement, if any, an amount equal to any applicable taxes, local, state or federal, however designated, that may be validly levied or based upon the Project Statement or the Service furnished hereunder.  Supplier shall not add to the Supplier Fee any ad valorem personal property taxes, state and local privilege and excise taxes based on gross revenue, taxes based on or measured by Supplier's net income, or any taxes or amounts in lieu thereof paid or payable by Supplier in respect of the foregoing excluded items.  Taxes attributable to Supplier payable by BellSouth shall be billed as separate items on Supplier's invoices and shall not be included in Supplier's Service fee.  If BellSouth does not have standing to contest taxes that it considers improperly levied, BellSouth shall have the right to have Supplier contest with the imposing jurisdiction, at BellSouth's expense, any such taxes that BellSouth deems are improperly levied.

27.2  Application and billing of Customer-related taxes applicable to the BellSouth Services shall be handled in accordance with the Project Statement.

## 28.  SECURITY

28.1  BellSouth may conduct, at its expense, for security reasons, a background investigation on the Supplier and its employees.  Supplier shall cooperate with BellSouth in this endeavor and shall provide any necessary information.  BellSouth is under no obligation to provide a copy of the background investigation to Supplier.

28.2  In fulfilling the obligations under this section, Supplier and BellSouth shall comply with all laws, rules, and regulations about making investigative reports and the disclosure of the information contained therein.  Supplier and

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE



BellSouth shall indemnify, defend, and hold the other harmless against any wrongful disclosure by Supplier or BellSouth, as the case may be, its employees, or agents of said reports and the information contained therein.

28.3  Each Party may request that the other promptly remove from its premises any employee, agent, or subcontractor of the other to whom such Party does not wish to grant access to its premises and the other Party will promptly comply with such request. Each Party shall also promptly remove any employee, agent, or subcontractor that the other considers unacceptable, negligent, dishonest, or otherwise unsatisfactory in performing their duties hereunder. Neither Supplier nor BellSouth shall interpret the other's request for removal from its premises as a request for the other to discipline the employee.

28.4  In addition to the foregoing, Supplier shall comply with the provisions of CSS-400-400-TR and CSS 400-600-TR: Security Requirements for Sourced Work set forth in Appendix B.

## 29.  FACILITY RULES AND GOVERNMENT CLEARANCE

29.1  Suppliers employees and representatives and those of BellSouth shall, if and while on the premises of the other, comply with all internal rules and regulations, including where required by government regulations, submission of satisfactory clearance from the U. S. Department of Defense and other federal authorities concerned.

## 30.  RELEASES VOID

30.1  Neither Party shall require waivers or releases of any personal rights from representatives of the other in connection with visits to Supplier's and BellSouth's respective premises. Neither Party shall require any representative of the other Party to sign a personal "Nondisclosure Agreement." No such releases or waivers shall be pleaded by either Party or third persons in any action or proceeding.

## 31.  CHOICE OF LAW/VENUE & ARBITRATION

31.1  The laws of the State of Georgia shall govern the validity, construction, interpretation, and performance of this Agreement. The jurisdictional venue for any legal proceedings for injunctive relief or in support of arbitration involving this Agreement shall be held in any applicable local, state, or federal court located within the State of Georgia.

## 32.  SEVERABILITY

32.1  If any of the provisions of this Agreement shall be invalid or unenforceable under the laws of the jurisdiction applicable to the entire Agreement, such invalidity or unenforceability shall not invalidate or render the entire Agreement unenforceable, but rather the entire Agreement shall be construed as if not containing the particular invalid or unenforceable provision or provisions and the rights and obligations of the Parties shall be construed and enforced accordingly, provided that, in the event either BellSouth or Supplier would not have entered into this Agreement without such provision, that Party shall have the right to terminate this Agreement without charge or liability.

## 33.  NOTICES

33.1  Except as otherwise provided herein, any notices or demands required by law or under the terms of this Agreement shall be in writing. BellSouth or Supplier shall deliver such notices or demands by hand, facsimile, telegram or similar communication, or by overnight courier or certified or registered mail, and addressed as set forth below. In the case of facsimiles, telegrams, or similar communications, the receiving Party shall consider such notices given when electronically confirmed as sent, and in the case of certified or registered mail, when deposited in the United States mail with postage prepaid.

To BellSouth:    BellSouth Telecommunications, Inc.

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE.



c/o Mass Market IP Communications
4D28
2180 Lenox Lake Blvd
Atlanta, Georgia 30319
ATTN: Laura Reid

To Supplier:    BroadVoice, Inc.
900 Chelmsford Street
Tower Three, 11th Floor
Lowell, MA  01851
ATTN: David Epstein

33.2 The Parties may change their above address at any time by giving ten (10) days prior written notice to the other as above provided.

33.3 In addition to the foregoing, copies any legal notices shall be sent to

BellSouth
Suite 4300
675 West Peachtree St., NE
Atlanta, Georgia 30375
Attention: Tom Rawls, Esq

Eric Schwartz
Mass Market IP Communications
4D62
2180 Lenox Lake Blvd
Atlanta, Georgia 30319

And

BroadVoice, Inc
900 Chelmsford Street
Tower Three, 11th Floor
Lowell, MA  01851
ATTN: Legal Department

## 34.  RECORDS AND AUDIT

34.1  Supplier shall maintain accurate and complete records relating to Customer orders, billing, payments, application of taxes, for one hundred eighty (180) days beyond the completion of the Trial.  Such records shall be maintained in accordance with recognized commercial accounting practices  Supplier shall retain all such records for a period not less than one hundred eighty (180) days after the completion of the Trial.  During the Trial period and during the 180 day period after completion of the Trial, Supplier shall, upon receipt of written request of BellSouth, permit a BellSouth auditor to examine, copy, and retain, and audit these records and will provide reasonable access to Supplier's premises as necessary for such examination during normal business hours and with reasonable notice

## 35.  NONDISCLOSURE OF INFORMATION

35.1  Scope of Confidential Information

35.1.1  Supplier acknowledges that Supplier may acquire information and material that is BellSouth's confidential, proprietary or trade secret information (collectively, "BellSouth's Information")  As used herein, "BellSouth's Information" includes, but is not limited to, the existence and terms of this Agreement, and all information and

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE



documents disclosed by BellSouth, whether written or oral, in the course of this Agreement or in contemplation hereof including, without limitation, all customer information, including customer bank account, debit card, or credit card information, specifications, drawings, sketches, schematics, models, samples, tools, algorithms, technical or business information, research and development, production and engineering processes, costs, profit and margin information, BellSouth customer lists, marketing, production, and future business plans. All of BellSouth's Information shall be in writing or other tangible form and clearly marked with a confidential, private, or proprietary legend. BellSouth's Information conveyed orally shall be designated as proprietary at the time of disclosure and shall be reduced to writing within ten (10) business days. SUPPLIER EXPRESSLY AGREES TO TREAT ITS CONTRACT RELATIONSHIP HEREUNDER AS STRICTLY CONFIDENTIAL BELLSOUTH INFORMATION AND NOT TO DISCLOSE THE EXISTENCE OR THE TERMS OF THE AGREEMENT TO ANY OF ITS SUPPLIERS OR SUBCONTRACTORS, OR TO ANY OTHER PERSON, EXCEPT TO THE LIMITED EXTENT NECESSARY TO PERFORM THE SERVICES HEREUNDER.

35.1.2 BellSouth acknowledges that BellSouth may acquire information and material that is Supplier's confidential, proprietary or trade secret information, (collectively, "Supplier's Information"). As used herein, "Supplier's Information" includes, but is not limited to, all Materials, information and documents disclosed by the Supplier, whether written or oral, in the course of this Agreement or in contemplation hereof including, without limitation, all specifications, drawings, sketches, schematics, models, samples, tools, algorithms, technical or business information, research and development, production and engineering processes, costs, profit and margin information, Supplier customer lists, marketing, production and future business plans. All of Supplier's Information shall be in writing or other tangible form and clearly marked with a confidential, private, or proprietary legend. Supplier's Information conveyed orally shall be designated as proprietary at the time of disclosure and shall be reduced to writing within ten (10) business days.

35.2 Use of Confidential Information

35.2.1 Each Party agrees to take all steps reasonably necessary to hold in trust and confidence the other Party's Information. Each Party hereby agrees to hold the other's Information in strict confidence, not to disclose it to third parties or to use it, in any way, commercially or otherwise, other than as permitted under this Agreement. Each Party will limit the disclosure of the other's Information to employees with a need to know who (i) have been advised of the proprietary nature thereof and (ii) have acknowledged the express obligation to maintain such confidentiality. The obligations set forth herein shall remain in effect for two (2) years from the receipt of the Information considered or deemed to be confidential information, but such obligation of confidentiality will not expire for any Information considered or deemed to be a trade secret under applicable law.

35.3 Exceptions

35.3.1 Notwithstanding the other provisions of this Agreement, nothing received by either Party from the other will be considered to be BellSouth's or Supplier's Information, as the case may be if: (i) it has been published or is otherwise available to the public other than by a breach of this Agreement; (ii) it has been rightfully and lawfully received by the receiving Party from a third party without confidential limitations; (iii) it has been independently developed by the receiving Party by personnel having no access to the other's Information; (iv) it was known by the receiving Party prior to its first receipt from the other; (v) it is hereafter disclosed by the disclosing Party without restriction on further disclosure; or (vi) it is disclosed pursuant to a court order, subpoena or by operation of law, provided the receiving Party has given the disclosing Party prior advance written notice in order that the disclosing Party may attempt to obtain a protective order or such other relief limiting disclosure and use of the information disclosed.

35.3.2 Nothing herein shall prevent either party from using its general knowledge and expertise, techniques, concepts or know-how to develop similar products or perform comparable services for itself or others as are provided under this Agreement, or from using any of its pre-existing materials or confidential information to develop or provide such products or services; provided that Supplier shall not (i) reference, use, incorporate or disclose BellSouth's Information in developing or providing such products or services, except to the extent such BellSouth's Information is retained and used as Residual Knowledge; or (ii) infringe any patent, copyright, trademark or other intellectual property right of BellSouth in developing or providing such products or services

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE



For purposes of this paragraph, Residual Knowledge is defined as information in non-tangible form which may be incidentally retained in the unrefreshed memory of persons who have had access to the other Party's Information, including ideas, concepts, know-how or techniques contained therein.

35.4 Each Party hereby agrees that every individual person including but not limited to employees, subcontractors, agents, representatives and other third parties who perform under this Agreement shall execute the appropriate documents to undertake obligations of confidentiality consistent with the terms set forth herein.

## 36. SURVIVAL OF OBLIGATIONS

36.1 BellSouth's and Supplier's respective obligations hereunder that by their nature would continue beyond the termination, cancellation or expiration of this Agreement or the Project Statement, shall survive. This includes, by way of example but not limited to, the obligations provided in the sections "NONDISCLOSURE OF INFORMATION"; "INDEMNITY"; "INFRINGEMENT"; "PUBLICITY"; "DEFAULT AND LIMITATIONS OF LIABILITY"; "REPRESENTATIONS AND WARRANTIES"; "INTELLECTUAL PROPERTY DEVELOP MENT AND OWNERSHIP"; and the post-Trial-Period obligations and deliverables of the Parties hereto as specifically set forth in the Project Statement.

## 37. NON-WAIVER

37.1 No waiver or failure to exercise any option, right or privilege under the terms of this Agreement on any occasion or occasions shall be construed to be a waiver of the same or any other option, right, or privilege on any other occasion.

## 38. CONFLICT OF INTEREST

38.1 Supplier stipulates no officer or employee of BellSouth has been employed, retained, induced, or directed by Supplier to solicit or secure this Agreement with BellSouth upon agreement, offer, understanding, or implication involving any form or remuneration whatsoever. Supplier agrees, in the event of an allegation of substance, (the determination of which will be solely made by BellSouth) that there has been a violation hereof, Supplier will cooperate in every reasonable manner with BellSouth in establishing whether the allegation is true. Notwithstanding any provisions of this Agreement to the contrary, if a violation of this provision is found to have occurred and is deemed material by BellSouth, BellSouth may cancel this Agreement and the Project Statement without charge or liability.

## 39. NONDISCRIMINATION COMPLIANCE

39.1 Supplier agrees to comply with all federal, and state employment rules and regulations.

## 40. SECTION HEADINGS

40.1 The headings of the sections included in this Agreement are inserted for convenience only and are not intended to affect the meaning or interpretation of this Agreement.

## 41. INCORPORATION OF APPENDICES

41. The terms and conditions contained in Appendices A through D, referred to in this Agreement and attached hereto, are integral parts of this Agreement and are fully incorporated herein by this reference. In the event of any inconsistency or conflict between this Agreement and the Appendices, this Agreement shall prevail.

## 42. NONSOLICITATION

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE.

42.1 Accordingly, each Party, during the term of this Agreement for a period of twelve (12) months thereafter, will not directly solicit for employment or knowingly employ any individual who was employed by the other for any work related to the Trial. Each Party agrees that the exclusive remedy for any breach of the foregoing provisions of this paragraph shall be injunctive relief without proof of irreparable injury and without posting bond in the event of such breach Neither Party shall tile for such injunctive relief without first providing written notice to the other of the alleged breach at least fifteen (15) days prior to filing for such relief.

### 43. ENTIRE AGREEMENT

43 1 This Agreement and the Project Statement and other Appendices attached hereto shall constitute the entire agreement between BellSouth and Supplier with regard to the Trial and may not be modified or amended other than by a written instrument executed by both Parties. This Agreement may be executed in one or more identical counterparts (including without limitation facsimile transmissions thereof) each of which shall be deemed an original, but all of which shall together constitute one and the same instrument.

| Supplier: | BellSouth: |
|---|---|
| BroadVoice, Inc. | BellSouth Telecommunications, Inc. |
| By: _____ (Authorized Signature) | By: _____ (Authorized Signature) |
| Name: _David Epstein_ (Print or Type) | Name: _____ (Print or Type) |
| Title: _President_ | Title: _____ |
| Date: _6/15/04_ | Date: _____ |

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE

## Appendix B

**BellSouth
Corporate Security Standards**

### 400-600-TR - Security Requirements for Sourced Work

## NOTICE

For the purpose of this document, the term "Contractor" referred to herein shall mean contracted individual. The term "Supplier's Employees and Subcontractors" referred to herein shall mean a supplier's employees, subcontractors, agents or representatives. The term "Supplier" referred to herein shall mean a provider of goods and/or services pursuant to a written contractual agreement with BellSouth, including outsourced and alliance agreements. The term "sourced work" referred to herein shall mean work performed by entities other than BellSouth, or its employees and contracted professionals and may include work performed where the parties are contractually allied in the offering of products and services. Such work may be performed pursuant to an agreement labeled as an "Alliance Agreement", "Strategic Agreement" or the like. The term "BellSouth" shall mean BellSouth Corporation or any of its affiliated companies.

Liability to anyone arising out of use or reliance upon any information set forth herein is expressly disclaimed, and no representations or warranties, express or implied, are made with respect to the accuracy or utility of any information set forth herein.

This document is not to be construed as a suggestion to any entity to modify or change any of its products or services, nor does this document represent any commitment by BellSouth to purchase any product or service whether or not it provides the described characteristics.

Nothing contained herein shall be construed as conferring any license or right by implication, estoppel or otherwise under any patent, whether or not the use of any information herein necessarily employs an invention of any existing or later issued patent.

BroadVoice – Project Statement                                    p.1 of 12
APPENDIX A

## Table Of Contents

1.    Scope..................................................................................................2
2.    BroadVoice Responsibilities ..............................................................4
  2.1   Product...........................................................................................4
    2.1.1   Infrastructure ..........................................................................4
    2.1.2   Features/Capabilities...............................................................5
    2.1.3   Performance ............................................................................8
    2.1.4   Reporting ................................................................................8
  2.2   Testing ...........................................................................................8
    2.2.1   System Testing .......................................................................8
    2.2.2   CPE Testing .............................................................................8
    2.2.3   Integration Testing with BellSouth ...........................................8
  2.3   Customer Provisioning ....................................................................9
  2.4   Operations .....................................................................................9
    2.4.1   Customer Support ...................................................................9
    2.4.2   Service Problems and Outages ................................................9
  2.5   Billing...........................................................................................10
    2.5.1   International Calling ...............................................................10
    2.5.2   Other Billing .........................................................................10
3.    BellSouth Responsibilities.................................................................10
4.    Fees and Payment Schedule .............................................................11

***PRIVATE/PROPRIETARY/SECURE***
*Contains Private and/or Proprietary Information  May Not Be Used Or Disclosed Outside The BellSouth Companies Except Pursuant To A Written Agreement  Must Be Securely Stored When Not In Use.*

BroadVoice – Project Statement                                    p.2 of 12
APPENDIX A

## 1.    SCOPE

The Supplier will deliver a voice-over-IP service (Service) that provides a variety of
enhanced communications features and the capability to place local, nationwide long
distance, and international calls using analog phones in conjunction with specialized
customer premises equipment (CPE) provided by BellSouth. The Service will be re-
branded as BellSouth's own voice-over-IP service (e.g., BellSouth DSL Talking
Service) and include call completion, E911 emergency service, advanced calling
features, voice mail with web and telephone interface access, and web-based feature
management capabilities, as is more specifically described in this APPENDIX A.

Customers will access the Service over the BellSouth® DSL Internet Access Trial
Service. The DSL Internet Access Trial Service will be sold to Trial customers in a
packaged offering that includes the re-branded Service provided by Supplier.  This
packaged offer will be marketed to Trial customers as BellSouth Digital Answers
service to which customers must have subscribed to qualify for participation in the
Trial.

The following diagram portrays the logical system architecture for the Trial.



The Service will be sold to Trial customers in a packaged offering that includes the
re-branded Service provided by Supplier. This packaged offer will be marketed to
Trial customers as BellSouth Digital Answers service to which customers must have
subscribed to qualify for participation in the Trial.

Customers will access the Service over the BellSouth® DSL Internet Access Trial
Service that is included in the packaged Trial offer. The Supplier will provide
telephone numbers, PSTN connectivity, and E911 service via Primary Rate Interface
circuits installed between the Supplier's IP network and the PSTN in the Trial area.

The Service will be offered off a Broadsoft Release 10 platform that will reside in the
Supplier's network.  The Media and Network Servers that are standard within this

*PRIVATE/PROPRIETARY/SECURE*
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth*
*Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

platform will be shared resources with Supplier's other operations. Supplier will provide, provision, install and support within Supplier's existing operating environment a dedicated pair of Application Servers (AS) for the Service. The dedicated AS will operate with Broadsoft Release 10 and will be configured with Supplier's standard AS configuration except as necessary to support specific requirements of the Service as herein defined. In addition, Supplier shall provide, provision, install and support within Supplier's existing operating environment a dedicated pair of servers to host the Broadsoft Web Portal (WP) Release 10. Supplier shall configure the WP with Supplier's standard WP configuration initially, and the WP shall subsequently be customized as provided herein. Supplier shall provide BellSouth with necessary technical information and authorization to enable BellSouth to provide the customization for the WP. BellSouth will design custom Web Portal pages for the dedicated BellSouth WP that will comprise the customer's user interface for the Service and the Suppler will install these pages on the WP.

The primary customer user interface for the BellSouth Digital Answers service will be via the BellSouth® Personal Desktop (BPD). BPD client software will reside on the customer's local computer and interface with a BPD Server that will reside on the BellSouth network. The BPD Server will interface with the Web Portal Server which will interface with the AS providing the customer access to web-based feature management capabilities. Some features can also be managed via a telephone interface (TUI) provided by the Broadsoft platform.

The BPD will provide the Customer access to web-based access to voice mail. The Media Server (MS) residing in the Supplier's network records voice mails and will deposit them in a message store in the BellSouth network. The BPD will access the message store to play messages via the Customer's computer. Supplier's MS will access the BellSouth message store to play messages when Customers access voice mail via a telephone.

The Supplier will install dedicated trunking circuits between the Supplier's IP network and BellSouth's IP network to provide efficient data transfer and to facilitate secure transactions between applications servers on both networks. As shown on the diagram, this connectivity will consist of two DS-3 private line connections, one between Supplier's and BellSouth's POPs in Atlanta and one between Supplier's and BellSouth's POPs in Miami, as is more fully described in the two Dedicated Internet Access (DIA) Service Agreements attached hereto in APPENDIX C and incorporated herein by reference.

Customers will be offered up to two telephone numbers capable of accessing and being accessed by the PSTN. Each number will have a unique voice mailbox and enhanced features.

The Trial will target 500 residential customers in the South Florida area. Residential customers served by the following BellSouth rate centers will be included in the Trial:

| | |
|---|---|
| West Palm Beach | Boca Raton |
| Stuart | Port Saint Lucie |
| Delray Beach | Vero Beach |
| Boynton Beach | Jupiter |
| Fort Pierce | Jensen Beach |
| Sebastian | Hobe Sound |

**PRIVATE/PROPRIETARY/SECURE**
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use*

BroadVoice – Project Statement
APPENDIX A

p.4 of 12

Bella Glade                         Pahokee

Trial customers shall be customers of BellSouth, not customers of Supplier.
BellSouth shall own all customer information pertaining to the Service rendered by
Supplier or to the Trial. All such customer information shall be deemed BellSouth's
Information as defined in Section 35 of the Agreement ("Nondisclosure of
Information"), regardless of whether it is marked as BellSouth's Information.

## 2.    BROADVOICE RESPONSIBILITIES
### 2.1    Product
Supplier agrees to use the Broadsoft Release 10 platform to deliver the Service and
to make no changes to Broadsoft releases, servers, or other software or hardware
critical to provision of the Service without prior approval from BellSouth.

### 2.1.1    *Infrastructure*
Supplier shall engineer, furnish, install, operate and maintain

- (a.) A service point of presence ("POP") in the Trial area for serving Trial
  participants and providing interconnection to the Public Switched
  Telephone Network (PSTN) access.
- (b.) Trunking from each of the BellSouth rate centers (defined in <u>Scope</u>) to
  Supplier's POP, as is more specifically described in Exhibit A to that
  certain Letter Agreement between Supplier and BellSouth, dated May 21,
  2004, a copy of which is attached to this Agreement as APPENDIX D and
  incorporated herein by reference.
- (c.) Customer ten (10) digit telephone numbers in each BellSouth rate center
  referenced above and accessible from the PSTN for assignment to Trial
  customers. Supplier shall provide BellSouth with 200 telephone numbers
  per rate center. These numbers will be reserved exclusively for use on
  the Service and may not be utilized or assigned by the Supplier for any
  other purpose.
- (d.) E911 service that routes a Trial customer's E911 call and appropriate
  automatic location identification information to the proper PSAP per the
  customer's residential address. BellSouth acknowledges that Supplier
  has purchased BellSouth's PRI Services with Pinpoint Service and is
  dependent on Pinpoint Service and further acknowledges that Supplier is
  dependent on BellSouth's management of Pinpoint Service and the
  customer's address provided by BellSouth to provide this service.
  BellSouth shall indemnify and hold Supplier harmless from all losses,
  damages or liabilities, including reasonable attorney's fees, resulting
  from any claims brought by any of BellSouth's Trial Customers against
  Supplier that result from the above mentioned BellSouth E911 support
  services used by Supplier to provide the Service, except to the extent
  any such losses, damages or claims are due to the Supplier's breach of
  some other term of this Agreement, or due to the negligent or
  intentional wrongful conduct of the Supplier. BellSouth shall have the
  right and the obligation to defend or settle, at its own expense, any
  action or suit against Supplier for which BellSouth is responsible under
  this subsection. Supplier shall provide BellSouth with prompt written
  notice of any claim that Supplier contends is covered by this indemnity
  provision.
- (e.) An applications hosting center to provide enhanced services as described
  below in <u>Features/Capabilities</u> to Trial participants.

***PRIVATE/PROPRIETARY/SECURE***
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth
Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*



(f.) Both origination and termination of Local, nationwide long distance and international voice calls for Trial participants.

(g.) A Voice mail application that stores voice mails in a BellSouth message store.

(h.) Mutually agreed upon secure access to the Broadsoft Feature Portal from the BPD.

(i.) Support SIP, non-compressed (G711).

(j.) IP network connectivity/peering to support provisioning and transport of voice services during trial.

### 2.1.2    Features/Capabilities

The following Service features and capabilities will be supported:

| Feature/Capability | Description |
| --- | --- |
| Calling Line ID (CID) | Name and number displayed when available for incoming calls. |
| Calling Line ID Blocking | |
| Calling Line ID Delivery Blocking per Call | Caller ID is displayed on outgoing calls. Feature can be turned on/off for individual calls or remain persistently on/off. Works on call waiting. |
| Calling Line ID Delivery per Call | NOTE: If customer has selected Calling Line ID Block on all outgoing calls, Calling Line ID can be delivered per call. Supplier shall take commercially reasonable steps to ensure CID is populated with CID information via a commercially available LEC database service. |
| Anonymous Call Rejection | The customer can choose to have the calls totally blocked. The called party is not aware of sequencing. Incoming CID information is retained. This feature can be turned on/off. |
| Call Forwarding Always | Incoming calls are forwarded on Busy, Always, and No Answer. Enhanced Call Forwarding version allows |
| Call Forwarding Selective | customer to forward calls based on calling number and to forward calls per a specified profile (e.g., series of numbers, schedule). From the Web Portal, customers can set a reminder that calls are forwarded. A short ring burst will emit from their home phone every time a call is forwarded. Call Forwarding Always will override Call Forwarding Busy & No Answer to Voice Mail. Call Forwarding Selective will override Call Forwarding Always, as well as Call Forwarding Busy & No Answer to Voice mail. |
| Call Waiting | During an active call, customer is notified of an incoming call. Customer may decide to put first call |
| Cancel Call Waiting | on hold and take incoming call. If not answered, the incoming call is sent to voicemail. Customer can turn off for the duration of the current call. |

**PRIVATE/PROPRIETARY/SECURE**
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

BroadVoice − Project Statement                                    p.6 of 12
APPENDIX A

| Feature/Capability | Description |
|---|---|
| 3-way Calling | Customer can establish a conference call with up to 3 parties (customer plus two parties) by dialing the parties and adding to the call via the flashhook. NOTE: Using the flashhook to connect the calls, bandwidth for two calls is required and is managed by CPE during Trial. |
| Call Return | Ability to quickly redial the number that last called. |
| Last Number Redial | Ability to have the last number dialed quickly redialed. |
| Simultaneous Ring | Enables users to have multiple phones ring simultaneously when any calls are received. The first phone to be answered is connected to the caller. For example, calls to a user's home phone also ring the user's mobile phone, in case they are away from home. |
| Do Not Disturb | Automatically forward calls to voicemail. Phone can emit a short ring burst to inform the customer when the call is being sent to voicemail by using the Ring Reminder. |
| Speed Dial 100 | Allows up to 100 speed dial numbers to be defined that can be called with the push of a few buttons. This feature can be programmed via the Web Portal or the TUI (*75). |
| Call Notify | Sends an e-mail with the CID information to a specified e-mail address when pre-defined criteria, such as phone number, time of day or day of week, are met. |
| Call Park | Place a call on hold (muted for both parties). Pick up the call from any other phone associated with the line originally called. |
| Personal Phone List | Store frequently called numbers to be dialed (click to dial) from the Call Manger. |
| Call Log (Call Manager) | Separate logs of incoming ("Missed" & "Received") & outgoing ("Dialed") calls. Click to dial from any calls on the lists. |
| Voicemail | Ability to record and store voice messages. Accessible via the BPD and Supplier provided and TUI. Can also be accessed remotely via the web. To access voicemail via the TUI, a customer will call the telephone number assigned to them for use during the Trial and enter a touchtone code (e.g., #) that will put them into their Voice Portal. The user can then select voice mail from the main menu. |
| Message Waiting Indication (MWI) | Indication of new voicemails is provided via connected MWI phones and the BPD. Stutter and visual. |

**PRIVATE/PROPRIETARY/SECURE**
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth
Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use*

BroadVoice – Project Statement
APPENDIX A

p.7 of 12

| Feature/Capability | Description |
|---|---|
| Voicemail Personal Name Announcements, "No Answer" & "Busy" Greetings Included with Voice Messaging – Personal. | The name announcement is a recorded label to personalize the mailbox. The No Answer greeting is the announcement callers will hear when the subscriber's phone is not answered. The Busy greeting is the announcement callers hear when the phone is busy. Default greetings. |
| VM Ring Count Included with Voice Messaging – Personal. Number of Rings before Greeting | The user can specify the number of rings before the calling party hears the no answer greeting. |
| Copy of VM Included with Voice Messaging – Personal. | Send copy of voice mail (WAV file) to an additional email address |
| VM "0" Transfer Included with Voice Messaging – Personal. | Caller can hit "0" during VM greeting to transfer to any number defined by the subscriber. |
| VM Notification Included with Voice Messaging – Personal. | Customer can define an e-mail notification of new voice mail messages. |
| Number of Lines | Customers may have up to two Von lines (each with their own telephone number). Each customer is a single account (defined as a group in Broadsoft). |
| CALEA- Communications Assistance for Law Enforcement Act | Supplier will provide appropriate gathering and tracking capabilities to assist and enable BellSouth to respond to any lawful request or order by law enforcement agencies or the courts to collect, produce or conduct surveillance of Trial customer communications or calling detail related to the Service. |
| Operator Services | **"0" and "411" will be directed to a BellSouth agent as mutually agreed by the parties.**<br><br>611 will be directed to Bellsouth's Trial Center Support Group. (TCSG). Access to an international operator will be provided. |
| Nationwide Calling | Nationwide call termination with unlimited local access. |
| International Calling | A list of high-fraud areas will be mutually agreed upon and blocked. |
| Web-based Feature Management | Accessed and presented via the BPD to the customer. |
| Call Manager | Pop-up client on the customer's computer providing limited call management capabilities. |

The Service will be exclusively BellSouth branded as specified and approved in writing by BellSouth. Supplier will implement such branding on but not limited to customer accessible web pages and customer materials provided as part of the Trial, subject to the provisions of Section 20 ("BellSouth Marks") of the Agreement.

*PRIVATE/PROPRIETARY/SECURE*
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

Supplier will install and maintain BellSouth-designed and supplied web pages on the Web Portal Servers.

### 2.1.3    Performance

Supplier will take all reasonable measures to make the Service available to Trial Customers 99% of the time as measured monthly. If such availability during the Trial Period becomes less than 99% for particular a month, then the monthly Customer Account charge due Supplier for Services rendered under this Agreement will be automatically reduced by 10% for that month.

Supplier will monitor its network and systems used to support the Service to ensure immediate identification of customer-affecting problems. Supplier will provide to BellSouth reports on Service outages and troubles on a monthly basis. It is understood by the parties that the monitoring and reporting obligations described herein do not include monitoring and reporting on the performance of BellSouth's DSL network and DSL services. Supplier's collection of monthly service-impacting quality metrics will include but not be limited to bandwidth utilization, packet loss, and latency and will provide monthly backhaul circuit traffic metrics.

Supplier will provide BellSouth prior to Trial Start Date with twenty (20) test accounts in addition to customer accounts for the duration of the Trial to confirm outages.

### 2.1.4    Reporting

Supplier will provide BellSouth with monthly reports that provide at least the following information: Service performance, feature usage, portal performance, and customer support. BellSouth and Supplier prior to the Trial Start Date will mutually agree upon the detailed reporting plan.

## 2.2    Testing

### 2.2.1    System Testing

As part of Supplier's responsibility for deploying dedicated AS and WP, Supplier shall test the AS and WP deployed in support of the Service. Supplier shall validate that the AS and WP are operating properly including appropriate failover in the event of a failure on the AS, WP, or shared elements within Supplier's operating environment. No later than 2 weeks after the execution of this agreement and receipt of the initial payment, Supplier shall provide BellSouth with documentation showing the results of the system testing and certifying that all Service elements are operating properly.

### 2.2.2    CPE Testing

Supplier shall perform interoperability testing with the 2wire CPE provided by BellSouth for use in the Trial and validate that such device is operational and compatible with the Service and.

### 2.2.3    Integration Testing with BellSouth

BellSouth shall be responsible for testing the integration of the Service with the BPD, BellSouth's network, and any BellSouth trial services other than the Service. Supplier shall support BellSouth's integration testing including troubleshooting of interfaces between the Service and other elements of the trial.

In addition to the 20 test accounts required in <u>Performance</u>, Supplier shall provide BellSouth no later than 20 days prior to the Trial Start Date ten (10) fully operational

**PRIVATE/PROPRIETARY/SECURE**
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

BroadVoice – Project Statement                                    p.9 of 12
APPENDIX A

test accounts for use by "friendly" Trial customers who will assist BellSouth in performing end-to-end testing of the Service.

## 2.3    Customer Provisioning

Supplier will accept customer order information including telephone number assignments from BellSouth and provision each such order for Service within 30 minutes of receipt of such information.

Supplier will modify Supplier's provisioning system to accept and provision such orders in a mechanized and secure manner.

Supplier will provide BellSouth lists of telephone numbers by BellSouth rate center that are available for assignment for use with the Service at least (2) weeks prior to Trial Start Date.

## 2.4    Operations

### 2.4.1    Customer Support

Supplier will provide Tiers2 and 3 Customer Support for the Service. Such support will focus on Service-specific issues not addressable by BellSouth's Tier 1 support. Such support will be available 24 hours a day, seven (7) days a week. Supplier will accept live calls immediately from BellSouth's TCSG via a dedicated telephone number. All customer interactions by Supplier will be branded as BellSouth.

Supplier will provide BellSouth with administrative access at the Service Provider level into customer accounts provisioned on Supplier's Broadsoft platform.

Other than Supplier communications necessary to perform Tiers 2 and 3 customer support functions under this Agreement, Supplier and its agents shall not distribute to BellSouth Trial customers any written or electronic Customer communications without prior review and approval by BellSouth.

Trial customer E-mails requesting support shall be forwarded to BellSouth's TCSG for initial action.

Supplier will provide BellSouth monthly summary reports regarding Customer support activity including but not limited to total number of calls, reasons for each customer call, resolution of the issue, duration of resolution, average call time and repeat calls. Daily reports will be provided listing recently closed and open customer trouble tickets.

Supplier will provide BellSouth with an escalation contact that is available 24 hours a day, seven (7) days a week.

### 2.4.2    Service Problems and Outages

Notification procedure – In the event of any condition that will affect the performance or availability of the Service, including but not limited to actual outages, Supplier will notify BellSouth within 15 minutes of discovering the condition by sending an email to an address(s) designated by BellSouth and by calling BellSouth's TCSG.  This notification will include a description of the condition, the anticipated impact on users of the Service and an estimated time to repair. During any such outage or service-affecting situation, BellSouth shall receive regular status updates until the situation is cleared and all customers are back in service. Upon repair of the condition, Supplier shall notify BellSouth by the same procedure described above.

**PRIVATE/PROPRIETARY/SECURE**
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

Emergency contacts – BellSouth shall provide Supplier with a designated emergency contact telephone number(s).  In the event of any emergency, Supplier shall immediately contact BellSouth at the designated number(s).  Supplier shall use best efforts to assist BellSouth and any governmental agencies involved to address any emergency; such assistance may entail access to data and operating information contained within Supplier's operating environment.  Events requiring such emergency contact and assistance shall include, but not be limited to:  a request by a Public Safety Answering Point (PSAP) or other public safety official to trace or contact an end user of the Service who has placed a 911 or similar emergency call, loss of service for both PRI circuits for any single rate center, and a lawful request by any governmental authority for assistance.

Reporting process    – On a monthly basis, Supplier shall provide BellSouth with a summary report of all service-affecting problems and outages.

## 2.5     Billing
### 2.5.1    International Calling
Supplier shall provide BellSouth monthly with a file containing all international customer-callirg records. The file format and transmittal details will be mutually agreed upon.   The file is to be provided by the 3rd day of each month for all international calls from the prior month.

Supplier shall provide BellSouth monthly with a file containing all domestic long distance customer-calling records.  The file format and transmittal details will be mutually agreed upon.  The file is to be provided by the 3rd day of each month for all domestic calls from the prior month.

### 2.5.2    Other Billing
Supplier shall render a bill by the 10th day of each month to BellSouth detailing charges for Customer Accounts, circuits, and CNAM service as detailed below in Fees and Payment Schedule. Remittance must be received by Supplier within 30 days of receipt of such bill.

## 2.6     Failure of BellSouth Services and Features; and Indemnification.

### 2.6.1    Failure of Services and Features provided by BellSouth.
Supplier shall not be in breach of this Agreement for any failure or deficiency of the Service that is caused by a failure or deficiency in the services and features provided to Supplier by BellSouth, its affiliates and its sub-contractors in connection with this Agreement.

## 3.     BELLSOUTH RESPONSIBILITIES
BellSouth shall be responsible for the following

- Customer acquisition activities including all marketing, sales, and order creation activities. BellSouth shall provide Supplier with information necessary to provision a customer on the Broadsoft platform including telephone number assignment.
- Ensuring customers are qualified, have DSL and the appropriate CPE.
- A voice mail store accessible via IMAP4 by the Media Server residing in Supplier's network.

*PRIVATE/PROPRIETARY/SECURE*
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth*
*Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

BroadVoice – Project Statement                                    p.11 of 12
APPENDIX A

- The BPD that will be the primary platform for the customer interface.
- Web pages that will comprise the customer interface residing on the Web Portal Server.
- Tier 1 customer support. Such support will provide initial screening to minimize misdirected calls to Supplier's Tier 2 support. A BellSouth representative will place calls transferred to Supplier's Tier 2 with the customer on the line. The BellSouth representative may stay on the line with the customer and Supplier's representative.
- Branding specifications for web pages and user interface changes.
- Customer billing.
- CPE will be provided to Supplier for testing.

## 4.    FEES AND PAYMENT SCHEDULE

BellSouth agrees to pay Supplier the following fees for the Services provided under the Agreement, in accordance with the terms of following payment schedule.

| | |
|---|---|
| Customer Accounts | • Minimum 500 Lines<br>• Minimum 5 months |
| $ 21.45 per customer line per month | • 5-month minimum total $ 53,625<br>• Maximum 600 accounts<br>• This price includes unlimited U.S. and Canadian calling<br>• 24x7 Customer Support<br>• Features and capabilities described in Features/Capabilities<br>• Includes test accounts per Testing |
| Dedicated Broadsoft Servers<br><br>$ 68,000 one time | • Includes Dedicated Broadsoft Application and Web Portal Servers, and any supporting hardware or software, but excludes any additional Broadsoft license fees, if<br>■ applicable Includes all Non-Broadsoft related hardware and software, set up, and maintenance for Trial |
| PRIs and Pinpoint Service<br><br>Tariff price paid plus 10% | • 14 pair of PRIs with Pinpoint Service in Miami<br>• 1 pair PRI in Atlanta for BellSouth's integration testing<br>• (Per LOA) |
| International Calls (other than Canada) | • Billed and remitted monthly |
| Per Rate Schedule (need to attach)<br>Customization & Set-Up Work<br><br>$ 35,000 one time | • OSS modifications<br>• Workflow changes<br>• Billing changes<br>• Gateway changes<br>• CDR changes<br>• Integration testing |

*PRIVATE/PROPRIETARY/SECURE*
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

BroadVoice – Project Statement                                    p.12 of 12
APPENDIX A

|                         |                                                              |
|-------------------------|--------------------------------------------------------------|
|                         | • Security modifications                                     |
|                         | • Minimum estimate                                           |
|                         | • Additional as negotiated                                   |
| CNAM                    | • CNAM dips necessary to present calling party name          |
| 1 cent per inbound call | • Billed and remitted monthly                                |

Payments shall be phased as follows:

| Amount          | Schedule                          | Description                               |
|-----------------|-----------------------------------|-------------------------------------------|
| $ 68,000        | Due upon signing                  | Dedicated Broadsoft installation          |
| TBD             | Due monthly upon installation     | PRIs and Pinpoint service                 |
| $ 35,000        | Due upon signing                  | Customization Work                        |
| $10,725         | Due upon signing                  | First month of minimum customer accounts  |
| Usage           | Billed monthly                    | International Calls                        |
| Usage           | Billed monthly                    | CNAM dips                                  |
| $10,725 per month | Remitted monthly in months 2 through 5 | Customer Accounts Beginning month 2 |

If Supplier has not completed turn-up of the Service and provided the test accounts in accordance with the schedule defined above, BellSouth may at its option delay the Trial Start Date. Regardless of whether BellSouth elects to delay the Trial Start Date, in the event that Supplier does not complete turn-up of the Service and provide test accounts in accordance with the schedule defined above, the duration of the Service shall be extended one day for each day that Supplier is delayed and the amount payable by BellSouth to Supplier shall be reduced by $400 for each day that Supplier is delayed.

In the event that Supplier is delayed by 15 or more days, BellSouth shall have the option to terminate this Agreement and Supplier shall refund to BellSouth all monies paid to Supplier by BellSouth except the cost of PRI and Pinpoint services purchased initially in pursuant to the LOA that is incorporated into this document and Dedicated Internet Access services that are referenced in this document.



<u>**Appendix B**</u>

# BellSouth
# Corporate Security Standards

---

### 400-600-TR - Security Requirements for Sourced Work

---

## Table of Contents

1.  <u>Introduction</u>
    - 1.1    General
    - 1.2    Scope
    - 1.3    Reason for Issuance
    - 1.4    Enforcement
    - 1.5    Accountability
    - 1.6    Remedies
2.  <u>Glossary</u>
3.  <u>General</u>
    - 3.1    Policy
    - 3.2    Performance of Work
4.  <u>Responsibilities</u>
    - 4.1    General
    - 4.2    Request for Waiver
    - 4.3    Waiver Submission and Approval

    - 4.4    Absence of Waiver
5.  <u>Supplier Requirements</u>
    - 5.1    General
    - 5.2    Operability
    - 5.3    Non-repudiation
6.  <u>Outsourced Web Hosting</u>
    - 6.1    General
    - 6.2    Outsourced Web Site Ultimately Hosted by a BellSouth Facility
    - 6.3    Co-Branding
7.  <u>Expiration or Termination Transition</u>
    - 7.1    General

## 1.    Introduction

**1.1    General** - The information in this document is subject to review and modification. Accordingly, this document may be subject to change at any time. Future issues of this document and/or BellSouth's internal security requirements may differ extensively in content, substance and format. In the event that this document is modified, BellSouth shall provide written notification to Contractor or Supplier along with a copy of the modified document. Upon the parties' reaching mutual agreement, the new document shall control. If no agreement is reached between the parties, then this document shall continue to be in full force and effect.

This document does not apply to contracts and agreements executed prior to February 1, 2002. Subsequent revisions will be subject to this document.

BellSouth reserves the right to select and utilize any Contractor, Supplier or any of Supplier's Employees or Subcontractors based on its own internal criteria at any time, under any circumstances, whether or not the requirements in this document are met.

*DE.*

---



**Appendix B**

# BellSouth
## Corporate Security Standards

**400-600-TR - Security Requirements for Sourced Work**

BellSouth does not recommend computer-related products or services and nothing contained herein is intended nor should it be construed as a recommendation of any product or service to anyone   Further, Contractors or Suppliers are not to relate their products, goods, services, etc , to these guidelines in order to imply that such items meet any particular standard of use or utility.

**1.2    Scope** - This standard applies to the purchase from, or delivery, development, maintenance, and/or support of BellSouth-related Information Resources by a Supplier  For the purposes of this document, Information Resources shall include but are not limited to, computers, computer peripherals, computer communications networks, computer systems/applications/software, web sites, data stores, information processing systems, public telephone network elements, and their support systems.  This includes the protection of all BellSouth corporate, employee and customer information stored, processed or transmitted on these facilities   Product trials and evaluations using BellSouth Information Resources shall also be governed by this document.

As further definition, this includes, but may not be limited to work that may:
- Include the handling, manipulation, storage, and/or transmission of BellSouth, BellSouth customer or BellSouth employee proprietary information using computers, computer applications, computer systems, and/or computer communications networks (public or private),
- Involve the provision of computer based processing, communications and/or network services to BellSouth, BellSouth's customers and/or BellSouth's personnel in their employed or contracted capacities,
- Result in the authorized provision of services using the BellSouth name to BellSouth's customers and/or BellSouth's personnel,
- Provide publicly or privately accessible web site hosting capability and/or content for BellSouth, and/or
- Involve connections to a BellSouth internal computer communications network or voice network not universally accessible from the public switched telephone network.

**1.3    Reason for Issuance -** This standard has been revised as part of the annual review process.

**1.4    Enforcement -** Supplier personnel performing sourced work shall protect BellSouth Information Resources in accordance with the terms and conditions of applicable contractual agreements between the Supplier and BellSouth.

In addition, it is the responsibility of all personnel performing sourced work to comply with federal, state, and local acts, statutes, and regulations which relate to the control and authorized use of BellSouth's information and Information Resources



**Appendix B**

# BellSouth
# Corporate Security Standards

## 400-600-TR - Security Requirements for Sourced Work

**1.5    Accountability** - Personnel performing sourced work shall be held accountable for compliance with the standards in this practice and any others which are included in the contractual agreement between the Supplier and BellSouth. System vulnerabilities identified by these personnel must be promptly reported to the BellSouth Enterprise Information Security organization.

**1.6    Remedies** - Violations of BellSouth computer, network, and information security policies and standards or governmental statutes, rules, and regulations may result in remedies up to and including termination of a contractual agreement or any other rights and remedies that BellSouth may have in equity and law.

**2.    Glossary**
- Shall - The word "shall" indicates a requirement that is to be met unless BellSouth Enterprise Information Security approves a waiver or variance.
- Must - The word "must" indicates a requirement that is to be met unless BellSouth Enterprise Information Security approves a waiver or variance.
- Should - The word "should" indicates a guideline more than a requirement. Waivers or variances are not required for noncompliance with guidelines.

**3.    General**

**3.1    Policy** - - It is the policy of BellSouth to protect its Information Resources in all situations and wherever they are located.  Protection of Information Resources in the case of sourced work includes, but is not limited to:
- Access to, and use of, BellSouth's proprietary information and BellSouth's employee and customer proprietary information,
- Return and/or disposal of BellSouth's proprietary information and BellSouth's employee and customer proprietary information,
- Access to, use, and return or disposal of computer hardware and software,
- Defacement, improper operation and/or loss of use of a system, application or web site designed for, or in support of, BellSouth, and
- Access to, and/or use of, a BellSouth network, network element, or off BellSouth premises extension to a BellSouth network, e.g., an extranet connection.

**3.2    Performance of Work** - When BellSouth work is performed by entities other than BellSouth or its employees and contracted professionals, BellSouth's Information Resources as well as its good name and character may be placed at risk. Accordingly, BellSouth expects that the performance parameters for all sourced work must be documented in the contractual agreement between the involved parties.  The documented performance parameters must include all security precautions necessary to protect BellSouth and its Information Resources



**Appendix B**

# BellSouth
# Corporate Security Standards

**400-600-TR - Security Requirements for Sourced Work**

## 4.    Responsibilities

**4.1**    **General** - It is the responsibility of each Supplier to assure BellSouth that its requirements for the security of Information Resources, and the information stored, transmitted, and/or processed on these Resources, are met.

**4.2**    **Request for Waiver** – A prospective Supplier who wishes to provide BellSouth with an Information Resource or service that is not in compliance with these standards shall document the deviations in a written request for a waiver. The request must specify the following:
- Area(s) of non-compliance
- Reason(s) for the non-compliance
- Available alternative(s)
- Reason(s) why an alternative or an omission should be accepted

> **NOTE:** A marked electronic version of this BellSouth Technical Reference with the information above is the preferred documentation for a waiver request.

**4.3**    **Waiver Submission and Approval** - Waiver requests shall be submitted through the appropriate BellSouth purchasing organization or person to the Contractual Agreement Waiver Manager listed on the BellSouth Enterprise Information Security intranet site, http://security.bls.com. The Contractual Agreement Security Waiver Manager will approve the waiver request, negotiate changes/conditions necessary for approval of the waiver request, or deny the waiver request. If a waiver request is denied, the denial may be appealed by a BellSouth management person using the variance process documented in BellSouth Corporate Security Standard (CSS) 000-100, *Security Management Process.* Failure of BellSouth Enterprise Information Security to respond to a waiver request shall not under any circumstances be considered to be approval of the waiver request.

Waiver approvals and other related correspondence might be transmitted via electronic mail or other more formal means of documentation. Approved waivers will be filed with the BellSouth copy of the Agreement and will be retained during the retention period for that Agreement. Suppliers should transmit their waiver requests sufficiently in advance of the need for a ruling on the waiver requests so that BellSouth Enterprise Information Security will have adequate time to review the waiver requests.



### Appendix B

# BellSouth
# Corporate Security Standards

## 400-600-TR - Security Requirements for Sourced Work

**4.4    Absence of Waiver** – Suppliers are hereby notified that this BellSouth Corporate Security Standard Technical Reference shall be enforced in its entirely, and the involved Supplier shall be held in breach of his/her/its agreement with BellSouth for any violation of any requirement herein, unless a waiver is approved, as noted above.

> **NOTE:** Vendors, Contractors and Suppliers are hereby notified that the BellSouth Enterprise Information Security organization has the sole responsibility for security waiver and variance approval in BellSouth. Contractors and Suppliers shall comply with these standards unless a written waiver or variance is issued as noted above by the BellSouth Enterprise Information Security organization.

**5.    Supplier Requirements**

**5.1    General** - The Supplier shall:

  A.  Currently have, or agree to implement, an internal security policy governing the protection of its own information resources and the resources of others under its control. A copy of the Supplier's security policy shall be made a part of this Agreement.

  B.  Indemnify BellSouth for any improper acts, omissions, failure to perform, and/or failure to comply with these security requirements unless specifically excluded in another part of this agreement.

  C.  Comply with all federal, state and local acts, statutes, rules and regulations for the protection of information systems and resources.

  D.  Ensure that all of Supplier's employees and representatives who will perform work associated with this agreement or have access to Information Resources associated with BellSouth, BellSouth's employees and/or BellSouth's customers are covered by a binding nondisclosure agreement.

  E.  Ensure that only persons with an approved need to know are allowed to access BellSouth information, BellSouth employee information, and/or BellSouth customer proprietary information. This shall include controls that allow a person to access only the specific information and Information Resources required to perform the work specified in the Agreement and for which that person is authorized.

  F.  For each of Supplier's employees and/or representatives who may have access to BellSouth, BellSouth employee, and/or BellSouth customer proprietary information, or a computer, computer system, or computer communications network containing such, or a computer system, application or network providing capabilities to BellSouth:

    a
    b  Perform a background investigation if requested by BellSouth.
      a) As a part of a random sampling for security verification purposes,
      b) As a part of regular screenings to strengthen BellSouth security, or



## Appendix B

# BellSouth
## Corporate Security Standards

### 400-600-TR - Security Requirements for Sourced Work

     c) If BellSouth has reasonable cause to suspect one is needed.

  c. Immediately advise BellSouth of any information of which Supplier becomes aware that would reasonably provide notice of potential threats to the Information Resources, assets or personnel of BellSouth.

> **NOTE:** For the purposes of the document, an appropriate background check shall consist of research at the county courthouse level for the felony and misdemeanor offenses described above and any pending trial dates for such offenses. Research shall be conducted in all the counties in which the Employee or Subcontractor has resided within the seven years prior to the proposed assignment.

G. Secure and protect BellSouth proprietary information, BellSouth employee proprietary information, BellSouth customer proprietary information, and/or other BellSouth Information Resources from unauthorized or improper use, theft, or accidental or unauthorized modification, disclosure or destruction.

H. Assure the reliability and integrity of all BellSouth information and Information Resources under its control, and the information processing activities performed with or for BellSouth. This includes the creation of a service level agreement.

I. Maintain the proprietary nature and if necessary, the proprietary marking of any BellSouth, BellSouth employee, and/or BellSouth customer proprietary information.

J. Comply with agreed upon written arrangements for the movement of information and data between BellSouth and Supplier, and between Supplier and any other entities authorized in the Agreement. If not otherwise specified, either return proprietary information to BellSouth or completely destroy proprietary information by shredding or burning, or in the case of proprietary information contained in electronic form, by erasure and/or overwriting in such a fashion that such proprietary information cannot be retrieved by data retrieval or other utilities.

K. Ensure that if applicable to the services provided in this Agreement, that BellSouth, BellSouth employee, and/or BellSouth customer proprietary data which are identified by BellSouth as requiring encryption, are transmitted across a public network (including the Internet, but excluding the Public Switched Telephone Network) in an encrypted format.

L. Ensure that stored data is encrypted as necessary to enforce access control. This section specifically requires the one-way encrypted storage of passwords on systems intended for BellSouth usage and for any administrative access to such systems. For systems intended for BellSouth customer use, it requires the encrypted storage, but not necessarily one-way encryption of passwords used for customer access.

M. Ensure that computer storage devices, e.g., DASD, hard or floppy disks, magnetic tape, or optical disks, containing BellSouth and BellSouth customer proprietary data are not disposed of or otherwise presented to others unless all BellSouth and BellSouth customer proprietary data has been completely obliterated. This includes media used to transmit data and to create backups.



### Appendix B

# BellSouth
# Corporate Security Standards

## 400-600-TR - Security Requirements for Sourced Work

N. Ensure that any security credentials received from the customer to enable downstream system access are verified and confirmed with the customer by a means independent of the process in which they were received. For example, if the customer supplies his security credentials via email, the verification might be via the U.S. Mail.

O. Not use or transfer BellSouth, BellSouth employee, and/or BellSouth customer information or data for any purpose not explicitly defined and authorized in the Agreement between the parties. This includes aggregate, trend and assimilated data. No individually identifiable customer data shall be transferred unless specifically authorized by the employee or customer, or as authorized by BellSouth in the performance of services ordered and being paid for by the customer.

> **NOTE:** BellSouth CPNI (Customer Proprietary Network Information) must be handled in accordance with laws and regulations governing such information.

P. Shall, unless a mechanized scanning tool is not available for the platform or operating system, complete a security scan of the system and notify BellSouth of all discovered vulnerabilities. Further, all discovered vulnerabilities shall be corrected or accepted in writing by the BellSouth Enterprise Information Security organization prior to delivery or implementation.

Q. Implement security changes, patches and upgrades in systems, applications and software in a timely manner and commensurate with the threat, as directed by the manufacturer and subject to appropriate testing, but not longer than 90 days from their release. Security changes, patches and upgrades correcting significant or immediate security issues shall be implemented immediately subject to appropriate testing under the circumstances but no later than 10 days after their release unless a longer period is recommended by the manufacturer or agreed to by the BellSouth Enterprise Information Security organization.

R. Ensure that if a commercial hosting center is used, that their computers, computer systems and computer communications networks are both physically and logically isolated from other such equipment in the hosting center.

S. Ensure that individual access and accountability controls are in place for each of Supplier's employees and representatives who will access a BellSouth system, application or other Information Resource including resources owned and/or operated by or for Supplier that may contain BellSouth proprietary information, BellSouth employee proprietary information, and/or BellSouth customer proprietary information. Accountability/audit records shall be kept for a period of no less than thirty days.

T. Ensure that authentication mechanisms are complex and not easily overcome. There shall be no known way to bypass the authentication mechanism and obtain entry into the system. Token-based authentication devices, smart cards or biometric devices are recommended. If passwords are to be used, they must.





# BellSouth
# Corporate Security Standards

### 400-600-TR - Security Requirements for Sourced Work

    a. Be at least six characters in length for users and eight characters in length for administrators and/or maintenance personnel,

    b. Contain both alphabetic and numeric characters,

    c. Be aged at least every sixty (60) days for users and every thirty (30) days for administrators, and

    d. Not be reusable. A system must employ a password reuse utility that prevents a password from being reused for at least 6 (six) months, the last 3 (three) aging cycles, or the last 5 (five) password changes, whichever is feasible and longer.

If the system/network being accessed exists solely for use by BellSouth customers, such customers may elect to disregard any or all of items noted in (a) through (d) above using an online decision process or other recordable means that warns them of the security implications, and then records the wishes of the customer. This exclusion does not apply to certain users, including but not limited to BellSouth internal users, the supplier's personnel and maintenance and/or administrative personnel

**NOTE:** Use of .rhost files, host.equiv, NT shares, NFS, etc., frequently results in bypassing authentication.

U. Ensure that Internet and other public (including public switched telephone) network connections are designed, implemented and maintained so as to secure and protect information, data, and system operation during the life of the Agreement. This includes, but is not limited to, non-repudiation, authentication, authorization, and monitoring issues. The parties agree that no Internet or other public network connections shall be implemented except as documented and approved in this Agreement or a subsequent agreement that has been accepted by the BellSouth Enterprise Information Security organization.

BellSouth requires persons using remote, e.g., in-dial, ISDN, wireless, VPN or other public switched network access for maintenance and/or administrative purposes to be individually identified and authenticated by an independent, dedicated, access control device that is a part of a network authentication infrastructure. The remote authentication process must utilize a dynamic password, such as a *token card*.

V. A system's login procedures must be designed and implemented with a mechanism that will thwart the use of repeated login attempts to guess or otherwise determine a valid login identification and authentication combination. The process must always cause the person or machine to reinitiate the login process after no more than nine successive unsuccessful attempts

W. Ensure that no connection is made to a BellSouth internal data communications network including a *control capable* channel into the BellSouth Advanced Intelligent Network (AIN) or the Public Switched Telephone Network (PSTN) without permission, in writing, from the BellSouth



## Appendix B

# BellSouth
# Corporate Security Standards

### 400-600-TR - Security Requirements for Sourced Work

Enterprise Information Security organization. Supplier shall further understand that:

    a. Any and all traffic traversing a remote access link to a BellSouth internal network is subject to monitoring at any time and without advance warning. There shall be no expectation of privacy in the use of a BellSouth internal network. BellSouth shall have the right to terminate any remote link if illegal or improper traffic is observed.

    b. The use of UDP shall be avoided where possible.

    c. Any device connected to a BellSouth internal network shall be subject to security scans (unless a firewall prevents such scans) and other security audit procedures. These scans may be conducted without prior notice. The scans will test the connected platform for security vulnerabilities and compliance with BellSouth security standards. It should be noted that the security scanners do test for denial of service vulnerabilities, and may attempt system access and perform other intrusive activities such as password cracking. BellSouth expects connected devices to resist such scanning without affecting service availability. BellSouth further expects Supplier to promptly correct discovered vulnerabilities.

    d. Remote access connections to BellSouth internal networks may be refused, disconnected or otherwise limited at any time, for any reason and without warning.

X. In the event BellSouth has a good faith belief that Supplier or it's employees or agents may have violated terms of this Security Standard OR in the normal course of BellSouth's routine audits/inspections, allow BellSouth designated parties to inspect, with one business days' notice all computer software, files and records whether resident on equipment owned, leased or controlled by Supplier and/or resident on equipment owned, or leased or controlled by Supplier's Employees and Subcontractors, in which are stored data obtained from or resulting from the use of BellSouth's Information Resources or the performance of work for BellSouth. Supplier shall not authorize the use of any equipment on a BellSouth account unless Supplier has the right to audit such equipment and authorize third party audits on such equipment. BellSouth's routine audits/inspections include but are not limited to, operating system security, application security, database security, physical security (doors, windows, walls, and card access system), network security, wardialing of phone lines for modem identification, and program change control. No inspection activities shall be undertaken that will disclose Supplier's or Supplier's other customer's Confidential Information unless BellSouth's Confidential Information cannot be reasonably obtained without disclosure of other's confidential information. In any event, prior to such inspection or audit, BellSouth's inspectors may be required to execute an appropriate nondisclosure agreement to protect confidential and/or proprietary information of, or in the custody of, Supplier that may be observed during such inspection or audit. Further, BellSouth will participate in reasonable activities implemented by Supplier in an effort to protect confidential information of others during such audits/inspections and Supplier





**Appendix B**

**BellSouth**
**Corporate Security Standards**

### 400-600-TR - Security Requirements for Sourced Work

has the right to refuse BellSouth access to data or information that requires special government-issued clearances. These audits and/or inspections may include security scans, unless a firewall prevents such scans; provided, however, that the nature, extent and scheduling of each such security scan will be negotiated and mutually agreed upon by the parties at the time of the proposed audit and such agreement shall not be unreasonably withheld or delayed. The security scans will test the platform for security vulnerabilities. It should be noted that the security scanners may test for denial of service vulnerabilities and may attempt system access and perform other intrusive activities such as password cracking. BellSouth expects devices to resist such scanning without affecting service availability. BellSouth further expects Supplier to promptly correct discovered vulnerabilities.

Y. Report to BellSouth, within one working day of discovery, any known or suspected unauthorized access, use, misuse, disclosure, destruction, theft, vandalism, modification, or transfer of BellSouth, BellSouth employee, and/or BellSouth customer proprietary information.

Z. Bargain in good faith for the provision of additional BellSouth security needs not identified in the original agreement.

AA. Have an effective change management program in place.

BB. Use the BellSouth name, logo, and any other BellSouth identifying mark only as specifically documented in this Agreement.

**5.2** **Operability** –The Supplier warrants that Information Resource(s) provided under the terms of this Agreement shall operate in a manner satisfactory to BellSouth with all required security controls and features installed and functioning.

**5.3** **Non-Repudiation** – Information Resources designed to handle electronic business-to-business functions involving bid, purchase, sale, order, payment and/or delivery of material shall ensure that the repudiation of significant facts is negated by functionality involving a secure digital signature or another form of non-repudiation approved by the BellSouth Enterprise Information Security organization at the time of the Agreement.

**6.** **Outsourced Web Hosting**

**6.1** **General** – A Supplier operating and/or hosting a web site for BellSouth shall comply with the security requirements in Paragraph 5 of this document. A Supplier providing web site services that will not be hosted by the Supplier, but rather by a third party, shall ensure that all security requirements related to hosting functions are passed through to the hosting facility. This section also addresses web sites initially hosted by an entity external to BellSouth but which are ultimately hosted by a BellSouth facility.

> **Exception** – Hosting facilities owned by BellSouth are subject to BellSouth's internal security standards and not subject to this document.

The Supplier shall ensure that:



## Appendix B

**BellSouth
Corporate Security Standards**

### 400-600-TR – Security Requirements for Sourced Work

A. BellSouth proprietary information is protected while displayed or stored on the Supplier's system using authentication and/or encryption mechanisms.

B. Web sites associated with the BellSouth name are not linked to any objectionable sites. If there is any question as to whether a potential site is objectionable, authorization must be obtained in writing from BellSouth prior to establishing the link.

C. After any significant hardware or software upgrades, a review of the Web site host is conducted to ensure compliance with these Standards has been maintained.

D. Web servers and/or web content development tools provide the capability to:
   a. Authenticate publishers prior to their placing any content onto a BellSouth web site,
   b. Authorize publishers' access only to those systems, specific directories and files necessary to publish content onto BellSouth web sites, and
   c. Ensure content publishing is done under the publisher's own unique UserID, never as a system-specific user such as "root" or "adm"
   d. Control access to web site content. Webmasters must apply the principle of minimum privilege, i.e., give users only the minimum access required, to ensure the security of their web servers.

E. Web servers provide for the capability, and webmasters ensure, that procedures are in place to test for security vulnerabilities whenever executable web content, e.g., cgi scripts, is changed.

F. Web servers have a logging capability to determine who has updated/changed content on the web server. The system must have an audit log retention period of no less than thirty (30) days. Logs should not be retained beyond 90 days unless there is a specific business purpose.

G. Web servers provide encryption to protect proprietary information. Passwords and other authentication data used to access or publish web content must be encrypted when transmitted. Passwords, encryption keys, security codes or proprietary information must not be stored in cookies unless encrypted.

H. The implementation and use of scripts and programs (e.g., applets, CGI scripts, JSP's, servlets and ASP's) is monitored and controlled.

I. Automatic indexing is disabled to prevent the browser from returning a directory index.

J. Intrusion detection software is deployed and operated in an active mode.

**6.2**    **Outsourced Web Site Ultimately Hosted by a BellSouth Facility** – For web sites developed under sourcing agreements and for which the BellSouth sponsor indicates the system will ultimately reside inside BellSouth, the Supplier shall ensure compliance with the items in <u>paragraph 6.1</u> and in addition that:

A. Web site hosts must utilize a BellSouth-approved server operating system and platform as required by the approved architecture for the proposed BellSouth data center location,

B. Web site hosts must utilize BellSouth-approved web server software as required by the approved architecture for proposed BellSouth data center location, and





**Appendix B**

**BellSouth**
**Corporate Security Standards**

---

**400-600-TR - Security Requirements for Sourced Work**

C. Web site hosts must comply with any other BellSouth-approved architecture requirements of the proposed BellSouth data center location.

**6.3    Co-branding** - For purposes of this document, co-branding is the act of identifying an entity or object, such as a Web site, by means of a mark, such as a service mark or trademark, or by any other legally recognized means, as being owned by, controlled by, produced by, or otherwise benefiting, more than one company. Whenever someone other than BellSouth co-brands their Web site with a BellSouth mark or logo, a formal review must be completed by the BellSouth Enterprise Information Security Consulting group before that site is activated and made generally available, or it must have been determined by the BellSouth Enterprise Information Security Consulting group that such a review is not necessary and appropriate. If the review uncovers any vulnerabilities affecting BellSouth, the vulnerabilities must be closed or be authorized by an approved BellSouth Security contract waiver or BellSouth Security Standards variance before the Web site is activated and made generally available.

**7.    Expiration or Termination Transition**

**7.1    General** - In the event of expiration or termination of this Agreement, Supplier shall cooperate fully, completely and in a timely manner to conclude/transition the relationship in a secure fashion. During the proceedings to conclude the relationship, which may include transition of activities to BellSouth or a third party and which may extend beyond the expiration or termination of this Agreement, the Supplier shall continue to protect all information, data, assets and capabilities in accordance with the applicable requirements in this Agreement. The BellSouth Enterprise Information Security organization shall be the final authority for issues concerning security that may arise during the conclusion of the relationship if such issues are not addressed in this Agreement or subsequent amendments, and Supplier agrees to comply fully with any decisions rendered by the BellSouth Enterprise Information Security organization.

---

JUN-14-2004(MON)  12:59  BELLSOUTH BUSINESS          (FAX)305 569 7339          P.002

APPENDIX C

05/27/2004  08:27  9544344717          JAY WILSON     95430-2316          PAGE  01
                                                                          P. 7

05/27/2004  05:24  9544344717          JAY WILSON                         PAGE  01

### BellSouth Business Internet Services
### Dedicated Internet Access Order Summary Form

Customer Legal Name: BroadVoice, Inc.

| | | |
|---|---|---|
| New Order | Customer | |
| Private Line | BellSouth | |
| Full DS3 [45 Mg] Dedicated Tiered Internet Access | 12 months | |

The undersigned Customer hereby orders from BellSouth Telecommunications, Inc. ("BellSouth") the BellSouth Business Internet Services of the type, at the location and for the prices and term specified in this Order Addendum and its related order [Order Form] (collectively, the "Order"). BellSouth Business Service is provided, and this Order is subject, in accordance with BellSouth General (Non-Regulated) Services Master Agreement, and all applicable documents and parties. This Order is valid only when accepted by an authorized representative of BellSouth. The term of the Service begins upon completion of installation and activation by BellSouth. Internet term related service is set forth herein or in accordance with the procedures set forth in the BellSouth Business Non-Regulated Services Master Agreement. This Contract will be extended for additional one year terms under the same terms and conditions herein unless either party provides written notice of its intent not to extend the Contract at least sixty [60] days prior to the expiration of the initial term of each additional one-year term.

### Order Summary Form

| Components | One Time | Monthly Recurring |
|---|---|---|
| BellSouth IP Charge | $0 | $— |
| Domain Name Registration Fee | None | N/A |
| DNS | N/A | Q [pricing Free Domain] |
| Packet Filtering | Option Not Selected | Option Not Selected |
| NewsFeed | Option Not Selected | Option Not Selected |
| Multi-homing (must complete DNS Service Inquiry) | Option Not Selected | N/A |
| Expedite Fee | Not an Expedite | N/A |
| Intelligent PVC | Option Not Selected | Option Not Selected |
| NAT (must complete NAT Optional Feature Order Form) | Option Not Selected | N/A |
| Promotion: Option Not Selected | N/A | N/A |
| Other | | |
| Total | $0 | $— |

Customer Initials: O.C.

12/2002

JUN-14-2004(MON)  12:59  BELLSOUTH BUSINESS    (FAX)305 569 7339    P.003

APPENDIX C

05/27/2004  08:27  9544344717    JAY WILSON    86430-2316    PAGE  82
                                                                    p. 6

05/27/2004  05:24  9544344717    JAY WILSON    PAGE  82

| Customers Changing Existing Service | |
|---|---|
| Start Date | End Date |

☐ For the new service, Extend Customer's Initial Term: The Minimum service term of Customer's prior Order(s) shall be extended by the contract term specified on page 1, any new services or features added shall be coterminous with the other Services under such Order(s); or

☐ For the new service, the term of the Order Summary Form shall supersede and amend the Customer's Initial Term

☐ For the new service, do not extend Customer's Initial Term. The changes set forth above will not extend the term of Customer's prior Order(s); any new services or features added shall be coterminous with the other Services under such Order(s).

**Additional Terms and Conditions**

1.  Customer shall not be charged for any of the Services ordered and provided under this Agreement.

2.  BellSouth has the right to terminate this Agreement with or without cause upon three (3) days written notice to Customer.

3.  BellSouth and Customer are in the process of negotiating a complete and mutually acceptable Voice over IP Trial Agreement. If successful, as applicable to the terms of such Trial Agreement, then it is the intent of BellSouth and Customer to use it, the terms and conditions of this Agreement and the thereto BellSouth Business Services Master Agreement as integral part of the mutually agreed to Trial Agreement. If the parties are unable to agree on such Terms, then this Agreement will be terminated without liability to Customer.

**IMPORTANT**

CUSTOMER HAS READ AND AGREES TO BE BOUND BY THIS ORDER, INCLUDING THE APPLICABLE ORDER DETAIL FORM (S) AND THE BELLSOUTH® BUSINESS SERVICES MASTER AGREEMENT AND RATE SCHEDULES, AND ALL APPLICABLE ACCEPTABLE USE POLICIES, ALL OF WHICH REPLACE AND SUPERSEDE ANY OTHER NEGOTIATIONS, AGREEMENTS, PROPOSALS AND COMMUNICATIONS (ORAL OR WRITTEN) RELATING TO THE SERVICES LISTED OR DESCRIBED ON THIS ORDER AND SHALL PREVAIL OVER ANY ADDITIONAL OR CONFLICTING TERMS IN ANY PURCHASE ORDER, INVOICE, ACKNOWLEDGMENT OR OTHER SIMILAR DOCUMENT ISSUED BY CUSTOMER.

| BellSouth Telecommunications, Inc. | BroadVoice, Inc. | 5/27/04 |
|---|---|---|
| Signature | Signature | |
| _(signature)_ 5-25-04 | _(signature)_ | |
| RICHARD A. GONZALEZ Sr. MGR | Brad Enseki | Presid ent |

**NOTE:**

The price for this Service does not include the annual Domain Name registration fee (for first two years) if the annual purchased Domain Name Registration, the charge will appear on the BellSouth bill for the registration fee for the first two years of service. After the initial two years, the customer will be responsible for paying these fees then the appropriate domain agent register.

* If Customer believes this service, BellSouth will attempt to meet the requested Installation date and Customer will be charged the additional one-time Installation fee if not early if BellSouth meets such date or would have done so but for delays caused or requested by Customer.

122003

Customer initials: _DE_ 5-27-04

JUN-14-2004(MON)  13:00  BELLSOUTH BUSINESS        (FAX)305 569 7339        P.004

APPENDIX C

05/27/2004  08:27  9544344717        JAY WILSON  9543812316        PAGE  03
                                                                    P.6

  05/27/2004  86:24  9544344717        JAY WILSON        PAGE  03

## ◎ BELLSOUTH

BellSouth® Business Services Master Agreement

CONFIDENTIAL/PROPRIETARY – NOT FOR DISCLOSURE WITHOUT WRITTEN PERMISSION
Page 1 of 5

Version 01/2004

Customer's Initials  D.C.
Date

JUN-14-2004(MON)   13:00   BELLSOUTH BUSINESS          (FAX)305 569 7339          P.005

APPENDIX C

05/27/2004  08:27   9544344717          JAY WILSON    85438:2316        PAGE  04
                                                                         P.3

05/27/2004  06:24   9544344717          JAY WILSON                      PAGE  05

@ BELLSOUTH

CONFIDENTIAL/PROPRIETARY – NOT FOR DISCLOSURE WITHOUT WRITTEN PERMISSION

Version 01/2004

JUN-14-2004(MON)   13:01   BELLSOUTH BUSINESS          (FAX)305 569 7339          P.006

APPENDIX C

05/27/2004  88:27   9544344717          JAY WILSON     9543382316          PAGE  85
                                                                           P.4

05/27/2006  86:24   9544344717          JAY WILSON                         PAGE  84

## @BELLSOUTH

CONFIDENTIAL/PROPRIETARY – NOT FOR DISCLOSURE WITHOUT WRITTEN PERMISSION
Page 2 of 6

JUN-14-2004(MON)  13:01  BELLSOUTH BUSINESS        (FAX)305 569 7339        P. 007

APPENDIX C

05/27/2004  08:27  9544344717        JAY WILSON    95498:2316        PAGE  06
                                                                     P. 2

05/27/2004  06:24  9544344717        JAY WILSON        PAGE  06

## @ BELLSOUTH

15. *Dispute Resolution - Independent Arbitration.*

16. *General.*

17. *Notices.*

18. *Credit Check.*

CONFIDENTIAL/PROPRIETARY – NOT FOR DISCLOSURE WITHOUT WRITTEN PERMISSION
Page 4 of 5

Version 810004

APPENDIX C

05/27/2004  08:27   9544344717              JAY WILSON   9544344717           PAGE  07
                                                                              P. A

05/27/2004  06:24   9544344717              JAY WILSON                        PAGE  07

@ **BELLSOUTH**

IN WITNESS WHEREOF, BellSouth and Customer have caused this Contract to be executed and delivered by their duly authorized representatives, effective upon execution by Customer and acceptance by BellSouth. The undersigned warrant and represent that they have the authority to bind Customer and BellSouth to the Agreement.

| | |
|---|---|
| Customer: Broadvision, Inc. | Accepted by BellSouth BMS, Inc. and BellSouth Telecommunications, Inc. |
| By: | By: BellSouth Business Systems, Inc. |
| | By: |
| Name: David Epstein | Name: RICHARD A. GONZALEZ |
| (Print or Type) | (Print or Type) |
| Title: President | Title: SALES MANAGER |
| Date: 5/25/04 | Date: 5/25-04 |

CONFIDENTIAL/PROPRIETARY— NOT FOR DISCLOSURE WITHOUT WRITTEN PERMISSION
Page 8 of 8

Customer's Initials D.E.
Date 5/25/04

Version 01/2004

MAY-24-04 04:54 PM     REID_HOME_OFFICE     4047959117     P.02

APPENDIX D

VIA FACSIMILE:

May 21, 2004

Mr. David Epstein
President
BroadVoice, Inc.
900 Chelmsford Street
Tower 3, Floor 11
Lowell, MA 01851

Dear David:

The purpose of this letter is to set forth the agreement of BellSouth Telecommunications, Inc. (BellSouth) and BroadVoice, Inc. (BroadVoice) to the following terms:

1. Upon signing this letter agreement, BroadVoice will proceed immediately with the placement of the order(s) necessary to order the twenty-eight (28) GSST tariffed PRIs with associated 9-1-1 PinPoint service and the OC-3/DS-3 services and facilities, more particularly described in Exhibit A which is attached to and a part of this letter agreement.

2. In return for the placement of such order(s), BellSouth's nonregulated information services operations agrees to reimburse BroadVoice for its payment of all tariffed charges incurred in association with such order(s). BroadVoice will submit a bill each month to BellSouth at [insert address] for all amounts due and owing. BellSouth agrees to pay BroadVoice all billed amounts due and owing upon receipt of such bill. BellSouth agrees to pay BroadVoice for all termination liabilities and expenses incurred by BroadVoice, in the event that BellSouth terminates service pursuant to Paragraph 4 herein.

3. It is the intent of the undersigned parties that this letter agreement will eventually be superceded by and become a part of a Voice over IP market Trial Agreement that the parties are in the process of negotiating. Notwithstanding these intentions, neither party shall be considered obligated

APPENDIX D

to enter into any such Trial Agreement, unless the parties mutually agree to all of the terms of such Agreement.

4. BellSouth shall have the right to terminate this letter agreement at any time for any reason upon sending BroadVoice three (3) business days prior written notice to the above stated address. In the event of any such termination, BellSouth will remain liable to BroadVoice for reimbursement of all amounts due and owing under this agreement, including any tariffed termination or cancellation of service charges paid by BroadVoice that may be associated with the tariffed services ordered pursuant to this letter agreement as described in Exhibit A.

5. The parties agree that this letter agreement shall remain confidential and subject to the terms of that certain Information Exchange Agreement between BellSouth's affiliate, BellSouth Business Systems, and BroadVoice, Inc., dated May 3, 2004.

If BroadVoice agrees to the above terms, please indicate your agreement by signing in the space provided below and returning a signed faxed copy to me at 404-529-0014.

Sincerely,

Bill Smith
On Behalf of
BellSouth Telecommunications, Inc.

Accepted:

David Epstein
On Behalf of BroadVoice, Inc.

May 25, 2004
Date Signed

FORM APPROVED
T. Rawls

638643

2

D.E.

MAY-24-04 04:56 PM       REID_HOME_OFFICE       4047959117       P.04

## APPENDIX D

## Exhibit A

### Locations for PRIs and PinPoint Service:

| Rate Center | PRI Central Office | NPA | NXX |
|---|---|---|---|
| South FL | WPBHFLANDS0 | 561 | 650 |
| West Palm Beach | JPTRFLMADS0 | 561 | 741 |
| Jupiter | BCRTFLSADS0 | 561 | 451 |
| Boca Raton | DLBHFLKPDS0 | 561 | 495 |
| Delray Beach | BYBHFLMADS0 | 561 | 374 |
| Boynton Beach | BLGLFLMADS0 | 561 | 992 |
| Belle Glade | remote | | |
| Pahokee | officeBLGLFLMADS0 | 561 | 924 |
| | | | |
| Hobe Sound | HBSDFLMADS0 | 772 | 545 |
| Stuart | STRTFLMADS0 | 772 | 283 |
| Jensen Beach | HTISFLMADS0 | 772 | 225 |
| Port Saint Lucie | PTSLFLMADS0 | 772 | 335 |
| Fort Pierce | FTPRFLMADS0 | 772 | 460 |
| Vero Beach | VRBHFLMADS0 | 772 | 226 |
| Sebastian | SBSTFLMADS0 | 772 | 581 |
| Atlanta, GA | | | |
| 725 West Peachtree St | | 404 | 988 |

### Service/Facilities to be ordered based on Tariff Sections A42.3 (GSST), 13.3.21 (FCC 1), 4.7 (FCC 1):

| Description | Quantity per Rate Center | Total Quantity | USOC/Code |
|---|---|---|---|
| BellSouth Primary Rate ISDN | 2 | 30 | 1LD1E |
| Access Line | 2 | 30 | PR71V |
| Interface – Voice/Data (Standard) | 46 | 690 | PR76V |
| B-Channels – Voice/Data (Standard) | 2 | 30 | PR7EX |
| D-Channels – Voice/Data (Standard) | 2 | 30 | PR71F |
| Telephone Numbers for Voice/Data & Digital | | | |
| Data Inward 2-way | 2 | 30 | PR7CN |
| Calling Name Delivery Feature | 10 | 150 | 9ZR |
| End User Common Line (EUCL) | 10 | 150 | (N/A) |
| Telecommunications Relay Service | 2 | 30 | 9ZEPR |
| Excess Line Port Charge – PRI | 2 | 30 | LHPCN |
| Local Number Portability | 2 | 30 | FUJMX |
| Federal Universal Service Charge - PRI | | | |
| Circuit Location | 2 | 30 | 1LN1A |
| Fixed Charge | (varies by rate center) | (varies by rate center) | 1LN1B |
| Charge per rate (monthly) | | | |
| | | | |
| E911 PinPoint Service | | | |
| E911 PinPoint Service per customer | 1 | 14 | E8YN1 |
| E911 PinPoint (up to "1000 records)* | 1 | 14 | E8Y61 |

*No PinPoint service needed on Atlanta PRIs

NOTE: Be sure to indicate on the orders that the 2 PRIs in a pair must use diversely-routed inter-office facilities, because this is E911 service

D.E.

Page 1 of 1

538643 – Appendix A

# FIRST AMENDMENT TO
## THE AGREEMENT

This Amendment to the Agreement, dated as of June 21, 2004, is made by and between BroadVoice, Inc. (Supplier) and BellSouth Telecommunications, Inc. (BellSouth) and their respective successors and assigns.

WHEREAS, BellSouth and Supplier entered into that certain Trial Agreement dated as of June 15, 2004 (the "Agreement"); and

WHEREAS, BellSouth and Supplier desire to amend and supplement the terms of such Agreement.

NOW, THEREFORE, the Parties hereby amend the Agreement as follows:

1. By adding to the Agreement the following new payment element to Appendix A, Section 4, table 1:

   $25,000 one time        ▪ Broadsoft licensing fees
                           ▪ To support the Trial

2. By adding to the Agreement the following new payment element to Appendix A, Section 4, table 2:

   $25,000    Due upon signing this First    Broadsoft licensing fees
              Amendment

3. All other terms and conditions of the Agreement shall remain in full force and effect.

Supplier:                              BellSouth:
BroadVoice, Inc.                       BellSouth Telecommunications, Inc.

By: _____           By: _____
    (Authorized Signature)                 (Authorized Signature)

Name: _David Epstein_____            Name: _W. L. Smith_____
      (Print or Type)                        (Print or Type)

Title: _President_____            Title: _CTO_____

Date: _6/21/04_____            Date: _6/22/04_____

FORM APPROVED
T.R.
GENERAL ATTORNEY

SECOND AMENDMENT TO
THE AGREEMENT

This Amendment to the Agreement, effective as of the date of the signature of the last party to sign below, is made by and between BroadVoice, Inc. (Supplier) and BellSouth Telecommunications, Inc. (BellSouth) and their respective successors and assigns.

WHEREAS, BellSouth and Supplier entered into that certain Trial Agreement dated as of June 15, 2004 (the "Agreement"); and

WHEREAS, BellSouth and Supplier desire to amend and supplement the terms of such Agreement.

NOW, THEREFORE, the Parties hereby amend the Agreement as follows:

1. By adding to the Agreement the following new payment element to Appendix A, Section 4, table 1:

   $5,000 one time          • BroadSoft support of trial's dedicated servers

2. By adding to the Agreement the following new payment element to Appendix A, Section 4, table 2:

   | $5,000 | Due within 10 days of the effective date of the Second Amendment | Broadsoft support of trial's dedicated servers |

3. All other terms and conditions of the Agreement shall remain in full force and effect.

Supplier:                              BellSouth:
BroadVoice, Inc.                       BellSouth Telecommunications, Inc.

By: _____             By: _____

Name: _David Epstein_                  Name: _____

Title: _President_                     Title: _____

Date: _Sept 9, 04_                     Date: _____

THIRD AMENDMENT TO
THE AGREEMENT


This Amendment to the Agreement, effective as of the date of the signature of the last
party to sign below, is made by and between BroadVoice, Inc. (Supplier) and BellSouth
Telecommunications, Inc. (BellSouth) and their respective successors and assigns


WHEREAS, BellSouth and Supplier entered into that certain Trial Agreement dated as of
June 15, 2004 (the "Agreement"), as amended, and


WHEREAS, two hurricanes unexpectedly hit the Trial area causing various delays to
starting the Trial when originally planned and that such delays were beyond the
reasonable control of the Parties hereto, and BellSouth and Supplier desire to amend and
supplement the terms of such Agreement to account for such delays.


NOW, THEREFORE, the Parties hereby amend the Agreement as follows:

1. By amending the second and third sentences of Section 4.1 of the Agreement
   to state that the Trial Start Date shall be deemed to have commenced on
   August 16, 2004; that the Agreement and the Trial Period shall each terminate
   on April 30, 2005, unless further extended under the terms of this Third
   Amendment; and that BellSouth may, at its option, extend the Trial Period and
   Agreement by an additional 30 or 60 days beyond April 30, 2005 pursuant to
   the terms set forth in the Agreement, including the payment terms that are set
   forth in APPENDIX A that are in effect in the month prior to such extension,
   by providing Supplier written notice of such election not less than 30 days
   prior to April 30, 2005.

2. By stating, for purposes of clarification, that the first $10,725 minimum
   monthly payment covering the $21.45 per customer line per month fee for
   Customer Accounts set forth in Appendix A, Section 4 of the Agreement,
   shall be for the month of August 2004; and that months 2 through 5 of such
   five month minimum fee period shall be for the months of September 2004
   through December 2004, inclusive. This $10,725 minimum monthly payment
   shall apply to each additional month of the Trial Period following December
   2004 until termination of the Trial Period.

3. All other terms and conditions of the Agreement shall remain in full force and effect.

| | |
|---|---|
| Supplier: | BellSouth: |
| BroadVoice, Inc | BellSouth Telecommunications, Inc. |
| By: _____ | By: _____ |
| Name: _David Epstein_ | Name: _W. L. Smith_ |
| Title: _President_ | Title: _CTO_ |
| Date: _11/30/04_ | Date: _12/2/04_ |

⨂ *BELLSOUTH*

BellSouth Intellectual Property Corporation
824 Market Street, Suite 901
Wilmington, DE 19801-4939
Jacqueline.gregorski@bellsouth.com

Jacqueline A. Gregorski
Vice President Patent & Trademark
Procurement
(302) 654-1686
Fax: (302) 654-2110

October 27, 2004

VIA FEDERAL EXPRESS

Lucy D. Lovrien, Esq.
Ten Winthrop Square
Boston, Massachusetts 02110

> RE:    BroadVoice, Inc.'s Use of "No Bell" Logo
>        Infringement of BellSouth Trademarks

Dear Ms. Lovrien:

I am in receipt of your letter dated October 15, 2004.

You have requested information regarding our rights in the BELL marks and also our theories that BroadVoice's use of the "No Bell" logo infringers our trademark rights.

First, all of AT&T's rights in BELL and the Bell Symbol mark were assigned to the Regional Bell Operating Companies ("RBOCs"), namely, BellSouth Corporation, American Information Technologies Corp., Bell Atlantic, NYNEX, Pacific Telesis Group, Southwestern Bell and U S West, Inc., as well as Cincinnati Bell and Southern New England Telephone Company at divestiture. See United States v. Western Electric Company, Inc. 569 F. Supp. 1057,1074 (1983). BellSouth's rights have been assigned to BellSouth Intellectual Property Corporation ("BIPCO"). Additionally, BIPCO is the owner of a family of "Bell Marks" including, but not limited to Registration No. 1,569,327 for the mark Bell Symbol, Registration No. 1,565,562 for the mark BELL, Registration Nos. 1,459,196 and 1,565,559 for the mark BELLSOUTH, Registration No. 1,459,194 for the mark SOUTH CENTRAL BELL and Registration No. 1,459,998 for the mark SOUTHERN BELL. BellSouth and its subsidiaries are currently licensed to use these marks in connection with telecommunications, telephones and telephone accessories, cellular phones, services and accessories, Internet access, web page design and web hosting, on-line and printed directory publishing and related advertising services, and other communications goods

Lucy D. Lovrien, Esq.
October 26, 2004
Page 2

and services. Copies of our federal registrations are attached for your reference. Given the extensive and exclusive use by AT&T and then by the RBOCs, the Bell Marks are very strong marks and are afforded broad protection against infringement and dilution.

Second, your understanding that BellSouth has limited rights in the Bell Symbol is incorrect. The conditions of use outlined at divestiture in no way affect our ability to enforce our rights against third party use of the Bell Marks, including the use by BroadVoice. The geographic modifiers used by the RBOC's are designed to prevent confusion when the public is sold goods and services by the various *legitimate* BELL companies. The public relies on BELL and the Bell Symbol to denote the quality and goodwill developed by the Bell System, which goodwill was assigned to the RBOC's at divestiture. No other company is entitled to share in the goodwill associated with BELL or the Bell Symbol by merely differentiating the way that the mark BELL or Bell Symbol is expressed from the various ways that it is used by the RBOC's.

BroadVoice has asserted that its use of the "No Bell" logo is different from the Bell Symbol in that they use the universal symbol for "No" over a different color bell which has no circle around it (relayed in an email from David Epstein to Kelli Beck). These modifications do not mitigate the infringement. Simply put, BroadVoice is using the Bell Symbol with a line through it. As stated above, the Bell Symbol is a famous mark and is afforded broad protection against infringement and dilution. Even though BroadVoice is trying to distinguish itself from any of the RBOCs, it is using the Bell Symbol, which is a strong source indicator and highly recognized by the public, as a purely attention getting device for its benefit and usurping the goodwill that has built up due to the extensive and exclusive use of the Bell Symbol over the past 100 years. Such use constitutes trademark infringement, dilution and unfair competition under both federal and state laws.

Finally, your client and BellSouth have entered into an agreement regarding the trial for the resale of VoIP by BellSouth. The agreement contains specific language regarding the use of the BellSouth name and marks, namely that all marks to be used by BroadVoice have to be designated in writing by BellSouth and all such uses to be approved by BellSouth. Further, BroadVoice agreed that it recognizes and acknowledges the ownership of the marks by BIPCO and shall do nothing inconsistent with BIPCO's ownership of the marks. BroadVoice's use of the "No Bell" logo is inconsistent with these terms and continued use will jeopardize the agreement and any future relationship with BellSouth.

Lucy D. Lovrien, Esq.
October 26, 2004
Page 3


Based on the foregoing, we must receive written assurances no later than November 8, 2004, that your client has (1) discontinued all use of the No Bell logo in advertising, collateral or promotional materials such as t-shirts, buttons, etc. (2) destroyed all tangible material (such as stationery, business cards, forms, fliers, coupons, t-shirts, buttons, etc.) on which this infringing usage appears, and (3) will refrain from infringing BIPCO's trademark rights in the future.  If we have not received the requested response, we will take whatever action we deem appropriate without further notice to you.


Sincerely,

Jacqueline A. Gregorski

Enclosures

cc:  Michael Bishop, Esq.

bcc:    Carol Beckham
        Amy Sherwood
        Kelli Beck
        Tom Rawls

# DUPLICATE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**BELLSOUTH INTELLECTUAL PROPERTY CORP. and BELLSOUTH TELECOMMUNICATIONS, INC.,**

      Plaintiffs,

      v.

**BROADVOICE, INC.,**

      Defendant.

Civil Action No. _____

---

## COMPLAINT

---

### INTRODUCTION

1.    This is a complaint for trademark infringement, dilution, false advertising and unfair competition by Plaintiffs BellSouth Intellectual Property Corporation ("BIPCO") and BellSouth Telecommunications, Inc. ("BST") (collectively, the "BellSouth Plaintiffs") against BroadVoice, Inc. ("BroadVoice"). The BellSouth Plaintiffs seek, *inter alia*, an injunction precluding BroadVoice's illegal use of the famous BELL Logo as an advertising image and damages for such unlawful use.

1

## PARTIES

2.    Plaintiff BIPCO is a Delaware Corporation that has a place of business at 824 Market Street, Suite 901, Wilmington, Delaware 19801.

3.    Plaintiff BST is a Georgia Corporation that has a place of business at 675 West Peachtree Street N.E., Atlanta, Georgia 30375.

4.    Defendant BroadVoice is a Delaware Corporation that has a place of business at 900 Chelmsford Street, Lowell, Massachusetts 01851.

## JURISDICTION

5.    The Court has original jurisdiction of the action pursuant to the provisions of 28 U.S.C. §§ 1331 and 1338, and 15 U.S.C. § 1121.   Further, the Court has supplemental jurisdiction over the state claims alleged herein because the claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy as provided in 28 U.S.C. § 1367.

## VENUE

6.    Venue is proper in this Court pursuant to 28 U.S.C. 1391.

ATLLIB02 191229.1

## FACTS COMMON TO ALL CLAIMS

**BIPCO Owns Exclusive Rights In The Famous Bell Logo**

7.      BIPCO is a subsidiary of BellSouth Corporation.  BIPCO owns all United States trademarks used by BellSouth Corporation and its subsidiaries. BIPCO licenses the right to use these marks to BellSouth Corporation and its United States affiliates in conjunction with their respective businesses.

8.      Prior to the divestiture of the American Telephone & Telegraph Company ("AT&T"), the "Bell System" included twenty-two (22) "Bell" operating telephone companies that provided local telecommunications exchange services. Each "Bell" operating company was owned by AT&T, and each used the mark BELL in connection with various goods and services.

9.      Two such "Bell" operating companies were Southern Bell Telephone & Telegraph Company ("Southern Bell") and South Central Bell Telephone Company ("South Central Bell").   Southern Bell first entered the telecommunications business in the 1800s, providing telephone exchange services in certain areas of the states of North Carolina, South Carolina, Georgia, Florida, Alabama, Mississippi, Louisiana, Tennessee and Kentucky.   In 1968, South Central Bell was formed and provided telephone exchange services to those areas

of Alabama, Mississippi, Louisiana, Tennessee and Kentucky previously served by Southern Bell.

10.    As a part of the Bell System, Southern Bell and South Central Bell shared in the AT&T heritage and its related goodwill, as represented in part by the mark BELL and the BELL Logo.  As a result of exclusive and extensive use of these marks by the twenty "Bell" operating companies (including Southern Bell and South Central Bell), the mark BELL and the BELL Logo acquired significant goodwill and fame.

11.    Pursuant to the opinions and orders of the United States District Court for the District of Columbia in Civil Action No. 82-0192, styled United States v. Western Elec. Co., Inc., the "Bell" operating companies were divested from AT&T on January 1, 1984.

12.    In accordance with the plan of reorganization, the twenty-two "Bell" operating companies were to be controlled by seven regional holding companies.  BellSouth Corporation is the regional holding company for Southern Bell and South Central Bell, and therefore the successor-in-interest to AT&T.

13.    AT&T sought ownership of the famous BELL Mark and Logo. The D.C. Court ordered that ownership of these marks should pass from AT&T to the regional companies.  Pursuant to the orders of the D.C. Court, AT&T assigned all of its right, title and interest within the United States in the mark BELL and the BELL Logo, together with the goodwill symbolized thereby, to the regional holding companies ("the Assignment").  BellSouth Corporation thus obtained exclusive rights in and to these marks, subject only to the concurrent use rights of the other companies that share in the AT&T heritage.

14.    The D.C. Court further ordered the issuance of concurrent federal registrations to the regional companies, including BellSouth Corporation, for the marks assigned by AT&T.  The Patent and Trademark Office subsequently issued such concurrent registrations to the regional companies.

**BellSouth Corporation And Its Affiliates Have Continued To Use and Strengthened The Famous Mark Bell**

15.    After the divestiture of AT&T, Southern Bell and South Central Bell continued to offer and provide local telecommunications services in North Carolina, South Carolina, Georgia, Tennessee, Kentucky, Louisiana, Alabama, Mississippi and Florida.

5

16.     On December 31, 1991, South Central Bell was merged into Southern Bell, and the name of the corporation was changed to BellSouth Telecommunications, Inc. ("BST"), a wholly-owned subsidiary of BellSouth Corporation. BellSouth Telecommunications, Inc. is the successor-in-interest to Southern Bell and South Central Bell. BellSouth Telecommunications, Inc., like all other BellSouth Corporation companies, share in the heritage of the former "Bell System."

17.     This "Bell System" heritage has been shown and advertised to the public. Exhibit A, for example, is a true and correct copy of an advertisement that has been placed in millions of BellSouth telephone directories published by BellSouth Advertising & Publishing Corporation. This advertisement shows chronological variations of the BELL Logo and states:

> For over 100 years, the Bell Symbol has stood for uncompromised quality and excellence in the telecommunications industry. BellSouth, as heir to the Bell Symbol and Bell trademarks, is continuing this tradition. So no matter what BellSouth product or service you're using, you can be assured that you are getting the same Bell quality that people have depended on since 1889.

ATLLIB02 191229.1

**BIPCO Owns Federal Registrations To Protect Its Rights In The Bell Marks**

18.    BellSouth Corporation was issued U.S. Trademark/Service Mark Registration No. 1,569,327 for the BELL Logo for various telecommunications-related goods and services.  This registration issued on December 5, 1989, and is valid, subsisting and unrevoked.  Pursuant to 15 U.S.C. §1065, this registration is incontestable.  BellSouth Corporation assigned this mark, registration and the associated goodwill, to BIPCO on September 1, 1998.  A copy of this registration is attached as Exhibit B.  This registration is *prima facie* evidence of BIPCO's exclusive right to use the BELL Symbol in commerce in connection with the goods and services specified in the registration, subject only to the concurrent use rights of the other companies that share in the AT&T heritage.

19.    BellSouth Corporation was issued U.S. Service Mark Registration No. 1,327,695 for the BELL Logo for telecommunication services.  This registration issued on October 5, 1971, and is valid, subsisting and unrevoked.  Pursuant to 15 U.S.C. §1065, this registration is incontestable.  BellSouth Corporation assigned this mark, registration and the associated goodwill, to BIPCO on September 1, 1998.  A copy of this registration is attached as Exhibit C.  This registration is *prima facie* evidence of BIPCO's exclusive right to use the BELL Symbol in commerce in connection with the services specified in the registration,

ATLLIB02 191229.1

subject only to the concurrent use rights of the other companies that share in the AT&T heritage.

**The BELL Logo is a Famous Trademark**

20.    BIPCO, as licensor, and BST, as a licensee, have built upon the fame of the BELL Logo through continuous use of this mark in promotion of various telecommunications goods and services.  Such use has been made in all media, including print, electronic, and outdoor.  BIPCO and BST have invested substantial sums in such promotional efforts, which have contributed to and increased the fame of the BELL Logo.  In fact, the BELL Logo has been adjudged to be famous.  See BellSouth Corp. v. B.E.L-Tronics Ltd. (Canada), et al., Civil Action No. 1-93-CV-1714-CC, U.S.D.C. for the N.D. Georgia, aff'd, 107 F.3d 25 (table) (11th Cir. 1997).

**BroadVoice's Improper Use Of The Famous BELL Logo**

21.    BroadVoice is a telecommunications company that offers and provides telecommunications services using Voice-over Internet Protocol ("VOIP").  As stated on its website:

> BroadVoice is a new kind of communications company,
> that allows consumers and businesses to make and
> receive phone calls anywhere in the world using a high

8

> speed internet connection . . . We enable anyone to make
> and receive phone calls—worldwide—with a touchtone
> phone.

See Exhibit D.

22.    In 2004, BST and BroadVoice entered into a Trial Agreement
for the provision of a Voice-over Internet Protocol service.  A copy of this Trial
Agreement is provided at Exhibit E.

23.    Pursuant to this Trial Agreement, certain BST customers in
Florida would be provided with the ability to place local, nationwide long distance,
and international calls using analog phones in conjunction with specialized
customer premises equipment provided by BST.

24.    The trial Agreement provided for services to be provided by
BroadVoice, and for the ultimate services to be provided to such customers under
BIPCO's trademarks.

25.    Regarding use of BIPCO's trademarks, the Trial Agreement
states:

> 20.1  BellSouth's and its affiliates' names, logos and
>        trademarks are the property of BellSouth
>        Intellectual Property Corporation ("BIPCO") in the
>        U.S.A.  BIPCO's exclusive authorized licensor,

> BellSouth Intellectual Property Marketing
> Corporation ("BIPMARK"), has specifically
> consented to BellSouth's and [BroadVoices] use of
> certain trademarks (the Marks) for the limited
> purposes stated in the Agreement . . .
> [BroadVoice] shall not affix, use or otherwise
> display the Marks in any manner without
> BIPMARK's prior written approval . . .
> [BroadVoice] recognizes and acknowledges
> BIPCO's ownership of, and shall do nothing
> inconsistent with BIPCO's ownership of the
> Marks.

26.     The Trial Agreement was executed by David Epstein, President of BroadVoice, on behalf of BroadVoice.

27.     The Trial Agreement did not expire until April of 2005.

28.     The Trial Agreement included a section entitled "Choice of Law/Venue & Satisfaction," which governed the location for resolving disputes. More particularly, this provision of the Trial Agreement states:

> 31.1     The laws of the State of Georgia shall govern the
> validity, construction, interpretation, and
> performance of this Agreement. The Jurisdictional
> venue for any legal proceeding for injunctive relief
> or in support of arbitration involving this
> Agreement shall be held in applicable local, state,
> or federal court located within the State of
> Georgia.

10

29.    In 2004, BroadVoice began to use the famous BELL Logo as an advertising image.

30.    BroadVoice's use of the famous BELL Logo consists of the BELL Logo superimposed by a heavy red circle with a red slash that bisects the BELL Logo.

31.    BroadVoice has referred to this use of the BELL Logo as its "No Bell" advertising image.

32.    Neither BIPCO nor BST have ever approved of this use of the BELL logo by BroadVoice.

33.    To the contrary, BST and BIPCO specifically objected to this use of the BELL logo by BroadVoice.

34.    BIPCO sent an October 27, 2004 letter to BroadVoice, confirming objections to the use of the BELL Logo by BroadVoice. This letter, in part, stated:

> Finally, [BroadVoice] and BellSouth have entered into an agreement regarding the resale of VOIP by BellSouth. The agreement contains specific language regarding the use of the BellSouth name and marks, namely that all

11

> marks to be used by BroadVoice have to be designated in writing by BellSouth and all such uses to be approved by BellSouth. Further, BroadVoice agreed that it recognizes and acknowledges the ownership of the marks by BIPCO and shall do nothing inconsistent with BIPCO's ownership of the marks. BroadVoice's use of the "No Bell" logo is inconsistent with these terms ....

35.    By no later than the date of this letter, BroadVoice was aware of BIPCO's rights in and to the BELL Logo.


# COUNT I

## TRADEMARK INFRINGEMENT UNDER FEDERAL LAW

36.    BIPCO and BST incorporate by reference the allegations contained in Paragraphs 1 through 35.


37.    By its unauthorized use of the BELL Logo, BroadVoice has and is using in commerce a reproduction, counterfeit, copy or colorable imitation of BIPCO's federally registered Bell Logo. Such use is likely to cause confusion or to cause mistake or deceive in violation of 15 U.S.C. § 1114, by creating the false and misleading impression that BroadVoice's goods and services are those of BST or BIPCO or one of BIPCO's licenses, or that they are associated or connected with BST or BIPCO or one of BIPCO's licenses, or that such goods and services have their sponsorship, endorsement or approval.

ATLLIB02 191229.1

38.    BroadVoice's actions were committed and have continued intentionally, with actual notice of BIPCO's and/or its affiliates' rights in the Bell Logo, and, on information and belief, with the knowledge that such actions are likely to cause confusion or to cause mistake or to deceive. Such actions thereby demonstrate an intentional, wrongful and bad faith intent to trade on the goodwill associated with the Bell Logo.

39.    BIPCO and its licensees, including BST, have been and will continue to be irreparably damaged by BroadVoice's actions, and have no adequate remedy at law.

40.    BroadVoice is causing and is likely to cause substantial injury to the public and to BIPCO and BST. Plaintiffs are entitled to injunctive relief and to recover Defendants' profits and Plaintiff's actual damages, costs, and reasonable attorneys fees under 15 U.S.C. §§ 1114, 1116, and 1117.

**COUNT II**

**FEDERAL TRADEMARK DILUTION**

41.    BIPCO and BST incorporate by reference the allegations contained in Paragraphs 1 through 40.

13

42.    The Bell Logo is a famous and distinctive trademark within the meaning of 15 U.S.C. § 1125(c) in this District and throughout the United States in that:

(a)    The marks possess both inherent and acquired distinctiveness;

(b)    Plaintiffs, through their predecessors-in-interest and their licensees, have made extensive, longstanding, and exclusive use of the marks in the United States;

(c)    Plaintiffs, through their predecessors-in-interest and their licensees, have extensively promoted goods and services sold under the marks in the United States;

(d)    Plaintiffs, through their predecessors-in-interest and their licensees, have used, and are currently using, the marks throughout the United States;

(e)    Plaintiffs and their licensees currently are distributing goods and services under the marks in multiple channels of trade throughout the United States;

(f)    Plaintiffs, through their predecessors-in-interest and their licensees, have successfully cultivated a high degree of recognition of the marks in the trading areas and channels of trade in which the parties' goods and services are provided; and

(g)    On information and belief, there is no unauthorized third party use of the Bell Logo in the United States.

43.    Unless enjoined by this court, BroadVoice's unauthorized commercial use of the BELL Logo will cause dilution of the distinctive quality of

14

the famous Bell Logo, and cause damage to BIPCO's and BST's good will and reputation. BroadVoice began these activities after said marks became famous in violation of § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

44.    BroadVoice's knowing and intentional use of trademarks and names incorporating BIPCO's famous Bell Logo in connection with their business constitutes willful dilution of the distinctiveness of said trademark and is likely to erode the public's exclusive identification of these marks with BIPCO, BST and its other affiliates.  On information and belief, BroadVoice's actions also will tarnish the BELL logo by associating it with goods and services of a quality that is not consistent with the high quality of BST's services and products.

45.    BIPCO and BST have been and will continue to be irreparably damaged by BroadVoice's actions and they have no adequate remedy at law.

46.    BroadVoice's conduct is causing and will continue to cause irreparable injury to BIPCO's and BST's goodwill and business reputation, and dilution of the distinctive and valuable quality of BIPCO's BELL Logo in violation of 15 U.S.C. § 1125(c).  Plaintiffs are therefore entitled to injunctive relief and to the monetary relief set forth in U.S.C. § 1125(c) and 1117.

ATLLIB02 191229.1

## COUNT III

## FEDERAL UNFAIR COMPETITION

47.    BIPCO and BST incorporate by reference the allegations contained in Paragraphs 1 through 46.

48.    By its unauthorized use of the BELL Logo, BroadVoice has used and is using a false designation of origin, false description, and false representation which is likely to cause confusion or to cause mistake or to deceive in violation of 15 U.S.C. § 1125(a), by creating the false and misleading impression that BroadVoice's services are affiliated, connected or associated with BIPCO or BST or have BIPCO's or BST's sponsorship, endorsement or approval. Such acts, which include and constitute false advertising and unfair competition, will continue to cause a likelihood of confusion and deception of the consuming public and injury to the good will and reputation symbolized by the BELL Logo unless enjoined by this Court. BIPCO and BST have no adequate remedy at law.

49.    On information and belief, BroadVoice's actions have been committed intentionally, with actual notice of BIPCO's rights in the BELL Logo and with the knowledge that such actions are likely to cause confusion or to cause mistake or to deceive. BroadVoice's actions demonstrate an intentional, willful and bad faith intent to trade on the goodwill associated with BIPCO's BELL Logo.

16

50. BIPCO and BST have been and will continue to be irreparably damaged by BroadVoice's actions and Plaintiffs have no adequate remedy at law.

51. BroadVoice is causing, and is likely to cause, substantial injury to the public and to BIPCO and BST, and Plaintiffs are entitled to injunctive relief and to recover BroadVoice's profits and BIPCO and BST's actual damages, costs and reasonable attorneys fees pursuant to 15 U.S.C. § 1125(a), 1116 and 1117.

## COUNT IV

## DECEPTIVE TRADE PRACTICES AND

## UNFAIR COMPETITION UNDER GEORGIA LAW

52. BIPCO and BST incorporate by reference the allegations contained in Paragraphs 1 through 51.

53. BroadVoice has engaged in deceptive trade practices in violation of the Georgia Uniform Deceptive Trade Practices Act, and is therefore liable in a civil action by Plaintiffs under the statutory law of the State of Georgia, O.C.G.A. § 10-1-370 et. seq.

54. BIPCO and BST have been and will continue to be irreparably damaged by BroadVoice's actions, including the incurring of attorneys fees to bring this action. Plaintiffs have no adequate remedy at law.

17

## COUNT V

## DILUTION UNDER GEORGIA LAW

55.    BIPCO and BST incorporate by reference the allegations contained in Paragraphs 1 through 56.

56.    BroadVoice has used and is using the BELL Logo in connection with the sale and advertising of its services, and such use is likely to dilute the distinctive quality of Plaintiff's famous BELL Logo, as used by BIPCO and its affiliates, including BST.

57.    Defendant is liable in a civil action by Plaintiffs under the statutory law of the State of Georgia, O.C.G.A § 10-1-451.

58.    Plaintiffs have been and will continue to be irreparably damaged by Defendant's actions, including the incurring of attorneys fees to bring this action. Plaintiffs have no adequate remedy at law.

## COUNT VI

## COMMON LAW TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION

59.    BIPCO and BST incorporate by reference the allegations contained in Paragraphs 1 through 58.

ATLLIB02 191229.1

60.    BIPCO and its predecessors and licensees have used the famous BELL Logo in the State of Georgia in association with communications products and services long prior to Defendants' adoption and first use of the BELL Logo as an advertising image in association with its goods and services. As a result of the continuing use of BELL Logo, it has become widely known and has become identified in the public mind as an indicator of the source and sponsorship of the services and products to which the Logo is applied.

61.    Defendant, without consent or authorization of BIPCO or BST, has used reproductions, copies or colorable imitations of the famous BELL Logo in connection with the production, distribution, offering for sale and sale of goods and services and such use is likely to cause confusion and mistake as to the source or origin of such goods and services.

62.    Defendant has willfully and deliberately engaged in common law trademark, infringement and unfair competition under the common law of the State of Georgia. BIPCO and BST have no adequate remedy at law for this injury.

63.    On information and belief, BroadVoice acted with full knowledge of BIPCO's rights in the BELL Logo and without regard to the likelihood of confusion of the public created by such activities.

19

64. As a result of Defendant's acts, BIPCO and BST have been damaged in an amount not yet determined or ascertainable. At a minimum, BIPCO and BST are entitled to injunctive relief and to an award of BroadVoice's profits and to BIPCO's and BST's actual damages. In light of the deliberately fraudulent and malicious imitation of the BELL Logo and the need to deter such actions, BIPCO and BST are additionally entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs BellSouth Intellectual Property Corporation and BellSouth Telecommunications, Inc. pray for the following:

1. That Defendant BroadVoice, Inc., the officers, agents, representatives, employees, and all persons acting in concert with BroadVoice, be temporarily restrained, and preliminarily and permanently enjoined from:

    (a)    use of the BELL Logo, and any other word, designation, symbol or device which includes the outline of a bell or is otherwise confusingly similar to or likely to cause dilution of the BELL Logo, as a trademark, service mark, corporate name, trade name or domain name or an element thereof;

    (b)    otherwise infringing BIPCO's federally registered and common law trademarks;

    (c)    making any express or implied description or representation that Defendant's websites, products, or services are in any way affiliated, associated, authorized,

20

sponsored, endorsed or otherwise connected with BIPCO or BST or any BIPCO licensee;

(d)     engaging in false designation of origin, false descriptions, false advertising or false representations or from otherwise engaging in unfair business or deceptive trade practices or competing unfairly with BIPCO and BST;

(e)     engaging in any conduct that is likely to dilute the distinctive quality of BIPCO's famous BELL Logo; and

(f)     any other conduct that is likely to cause confusion or to cause mistake or to deceive as to the source, affiliation, connection or association, approval or sponsorship of Defendant's products or services.

2.      That Defendant BroadVoice be ordered to disclose to the Court and Plaintiffs all other uses of any BELL Mark to permit the Court and Plaintiffs to consider whether any such other uses should be subject to relief in this matter.

3.      That Defendant be ordered to pay Plaintiffs all profits realized by Defendant by reason of the unlawful acts set forth in this Complaint.

4.      That Defendant be ordered to pay Plaintiffs all damages suffered by reason of Defendant's trademark infringement, dilution and unfair competition as set forth in this Complaint.

5.      That the Court award Plaintiffs three times the damages suffered by Plaintiffs by reason of Defendant's intentional and unlawful acts as set forth in this Complaint.

ATLLIB02 191229.1

6.    That Defendant be required to serve on the undersigned counsel for Plaintiffs, within 30 days after the entry of judgment, a written report under oath setting forth in detail the manner in which the Defendant has complied with the injunction ordered by this Court.

7.    That Defendant be ordered to pay to Plaintiffs the cost of this action and reasonable attorneys' fees.

8.    That Plaintiffs shall have such other relief as this Court may deem just and proper.

Respectfully submitted,

Stephen M. Schaetzel
Georgia Bar No. 628653
Alicia G. Jones
Georgia Bar No. 141415
KILPATRICK STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA  30309
(404) 815-6500 (telephone)
(404) 815-6555 (facsimile)

OF COUNSEL:
S. Kendall Butterworth
Georgia Bar No. 100,005
BellSouth Corporation
1155 Peachtree Street, Suite 1700
Atlanta, GA  30309
(404) 249-2720 (telephone)
(404) 249-5664 (facsimile)

22

ATLLIB02 191229.1

# BellSouth.
# Upholding the
# Bell tradition of
# quality products
# and services.



For over 100 years, the Bell Symbol has stood for uncompromised quality and excellence in the telecommunications industry.

BellSouth, as heir to the Bell Symbol and Bell trademarks, is continuing this tradition. So no matter what BellSouth product or service you're using, you can be assured you're getting the same Bell quality that people have been depending on since 1889.

**BELLSOUTH**

*Everything You Expect From A Leader™*

Telecommunications     Information Services     Mobile Communications     Advertising Services

©BellSouth Corporation, 1990. BellSouth, Bell, and the Bell Symbol are registered trademarks of BellSouth Corporation.

**EXHIBIT A**

Int. Cls.: 9, 16, 35, 37, 41 and 42

Prior U.S. Cls.: 21, 26, 38, 100, 101, 103, 104 and 107

## United States Patent and Trademark Office

Reg. No. 1,569,327
Registered Dec. 5, 1989

## TRADEMARK
## SERVICE MARK
### PRINCIPAL REGISTER



BELLSOUTH CORPORATION (GEORGIA COR-
PORATION)
SUITE 1800
1155 PEACHTREE STREET, N.E.
ATLANTA, GA 303676000

FOR: CUSTOMER PREMISES TELECOM-
MUNICATIONS NETWORKS AND PARTS
THEREFOR; TELEPHONES AND TELEPHONE
ACCESSORIES; MODEMS; COMPUTERS;
PRINTERS; FACSIMILE MACHINES; MULTI-
PLEXORS; COMPUTER TERMINALS; TELE-
PHONE ANSWERING MACHINES; VOICE
MAIL SYSTEMS COMPRISING TELEPHONE
AND COMPUTER INTERFACE, COMPUTER
PROGRAMS, AND CONTROLS FOR DELIVER-
ING AND RECEIVING MESSAGES OVER
TELEPHONE LINES; AND COMPUTER PRO-

GRAMS DEALING WITH TELECOMMUNICA-
TIONS AND BUSINESS MANAGEMENT, IN
CLASS 9 (U.S. CLS. 21, 26 AND 38).
    FIRST USE 0-0-1900; IN COMMERCE
0-0-1900.
    FOR: TELEPHONE, CLASSIFIED AND BUSI-
NESS DIRECTORIES; AND EDUCATIONAL
PRINTED PUBLICATIONS IN TELEPHONE
TELECOMMUNICATIONS SKILLS AND THE
USE OF TELECOMMUNICATIONS EQUIP-
MENT AND SERVICES, IN CLASS 16 (U.S. CL.
38).
    FIRST USE 0-0-1900; IN COMMERCE
0-0-1900.
    FOR: PROMOTING THE GOODS AND SERV-
ICES OF OTHERS THROUGH CONSULTING
ON DIRECTORY ADVERTISING PROGRAMS,
DESIGNING DIRECTORY ADVERTISEMENTS

**EXHIBIT B**

AND LISTINGS AND PLACING SUCH AD-
VERTISEMENTS AND LISTINGS IN DIREC-
TORIES; AND MANAGING TELECOMMUNI-
CATIONS SYSTEMS AND EQUIPMENT FOR
OTHERS, IN CLASS 35 (U.S. CLS. 101 AND 104).
    FIRST USE 0-0-1900; IN COMMERCE
0-0-1900.
    FOR: INSTALLING AND MAINTAINING
TELECOMMUNICATIONS SYSTEMS AND
EQUIPMENT FOR OTHERS, IN CLASS 37 (U.S.
CL. 103).
    FIRST USE 0-0-1900; IN COMMERCE
0-0-1900.
    FOR: PROVIDING EDUCATIONAL SERV-
ICES, SEMINARS AND WORKSHOPS IN TELE-
COMMUNICATIONS SKILLS AND THE USE
OF TELECOMMUNICATIONS EQUIPMENT
AND SERVICES, IN CLASS 41 (U.S. CL. 107).
    FIRST USE 1-0-1968; IN COMMERCE
1-0-1968.
    FOR: DESIGNING AND ENGINEERING
TELECOMMUNICATIONS SYSTEMS AND
EQUIPMENT FOR OTHERS AND RELATED
CONSULTING SERVICES, IN CLASS 42 (U.S.
CLS. 100 AND 104).
    FIRST USE 0-0-1900; IN COMMERCE
0-0-1900.
    THIS IS A CONCURRENT REGISTRATION
ISSUED PURSUANT TO THE OPINIONS OF
THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA IN UNITED
STATES V. WESTERN ELECTRIC CO., INC.,
CIVIL ACTION NO. 82-0192, DATED JULY 8,
1983, AND FEBRUARY 6, 1984, AND SECTIONS
2(D) AND 37 OF THE LANHAM ACT, 15 U.S.C.
SECTIONS 1052(D) AND 1119. REGISTRATION
IS NATIONWIDE, BUT IS SUBJECT TO THE
CONDITION THAT REGISTRANT SHALL USE
THE MARK ONLY IN CONJUNCTION WITH
ONE OR MORE OF THE FOLLOWING MODI-
FIERS: "SOUTHERN BELL", "SOUTH CEN-
TRAL BELL", "BELLSOUTH". USE OF A
MODIFIER SHALL BE CONSIDERED TO BE
IN CONJUNCTION WITH THE MARK IF IT IS
USED IN SUFFICIENT PROXIMITY TO THE
MARK SUCH THAT A REASONABLE OB-
SERVER WOULD NORMALLY VIEW THE
MARK AND THE MODIFIER IN A SINGLE
VISUAL IMPRESSION AND WOULD RECOG-
NIZE THAT BOTH THE MARK AND THE
MODIFIER ARE USED BY REGISTRANT.
REGISTRANT'S RIGHT TO EXCLUSIVE USE
OF THE MARK IS SUBJECT TO THE RIGHTS
OF THE FOLLOWING COMPANIES, TO
WHICH CONCURRENT REGISTRATIONS IN
THE MARK HAVE ALSO BEEN ISSUED, TO
USE THE MARK IN CONJUNCTION WITH
ONE OR MORE OF THE MODIFIERS SPECI-
FIED IN THOSE REGISTRATIONS: THE
SOUTHERN NEW ENGLAND TELEPHONE
COMPANY, 277 CHURCH STREET, NEW
HAVEN, CT 06506; SOUTHWESTERN BELL
CORPORATION, ONE BELL CENTER, ST.
LOUIS, MO 63101; U S WEST, INC., 7800 EAST
ORCHARD ROAD, ENGLEWOOD, CO 80111;
AMERICAN INFORMATION TECHNOLOGIES
CORPORATION, 30 SOUTH WACKER DRIVE,
CHICAGO, IL 60606; BELL ATLANTIC CORPO-
RATION, 1600 MARKET STREET, PHILADEL-
PHIA, PA 19103; CINCINNATI BELL INC., 201
EAST FOURTH STREET, CINCINNATI, OH
45202; NYNEX CORPORATION, 400 WEST-
CHESTER AVENUE, WHITE PLAINS, NY
10604; PACIFIC TELESIS GROUP, 130 KEARNY
STREET, SAN FRANCISCO, CA 94108.
    OWNER OF U.S. REG. NOS. 1,327,668, 1,459,998
AND OTHERS.

    SER. NO. 727,723, FILED 5-11-1988.

SHARON R. MARSH, EXAMINING ATTORNEY

Int. Cl.: 38

Prior U.S. Cl.: 104

# United States Patent and Trademark Office

Reg. No. 1,327,695
Registered Oct. 5, 1971

## SERVICE MARK
### PRINCIPAL REGISTER
### CONCURRENT USE



BELLSOUTH CORPORATION (GEORGIA CORPORATION)
675 WEST PEACHTREE STREET, N.E.
ATLANTA, GA 30375 , ASSIGNEE OF AMERICAN TELEPHONE AND TELEGRAPH COMPANY (NEW YORK CORPORATION) NEW YORK, NY 10007

FOR: TELECOMMUNICATION SERVICES, IN CLASS 38 (U.S. CL. 104).

FIRST USE 8-18-1969, FIRST USED IN A DIFFERENT FORM IN 1889; IN COMMERCE 8-18-1969, FIRST USED IN A DIFFERENT FORM IN 1889.

ORIGINALLY REGISTERED ON OCT. 5, 1971 AS REG. NO. 921,734 AND SER. NO. 381,697.

THIS IS A CONCURRENT REGISTRATION ISSUED PURSUANT TO THE OPINIONS AND ORDERS OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA IN UNITED STATES V. WESTERN ELECTRIC CO., INC., CIVIL ACTION NO. 82-0192, DATED JULY 8, 1983 AND FEBRUARY 6, 1984, AND SECTIONS 2(D) AND 37 OF THE LANHAM ACT, 15 U.S.C. SECTIONS 1052(D) AND 1119. REGISTRATION IS NATIONWIDE, BUT IS SUBJECT TO THE CONDITION THAT

**EXHIBIT C**

2                                          1,327,695

REGISTRANT SHALL USE THE MARK ONLY IN CONJUNCTION WITH ONE OR MORE OF THE FOLLOWING MODIFIERS: "BELLSOUTH," "SOUTH CENTRAL BELL," "SOUTHERN BELL." USE OF A MODIFIER SHALL BE CONSIDERED TO BE IN CONJUNCTION WITH THE MARK IF IT IS USED IN SUFFICIENT PROXIMITY TO THE MARK SUCH THAT A REASONABLE OBSERVER WOULD NORMALLY VIEW THE MARK AND THE MODIFIER IN A SINGLE VISUAL IMPRESSION AND WOULD RECOGNIZE THAT BOTH THE MARK AND THE MODIFIER ARE BEING USED BY REGISTRANT.

REGISTRANT'S RIGHT TO EXCLUSIVE USE OF THE MARK IS SUBJECT TO THE RIGHTS OF THE FOLLOWING COMPANIES, TO WHICH CONCURRENT REGISTRATIONS IN THE MARK HAVE ALSO BEEN ISSUED, TO USE THE MARK IN CONJUNCTION WITH ONE OR MORE OF THE MODIFIERS SPECIFIED IN THOSE REGISTRATIONS:

AMERICAN INFORMATION TECHNOLOGIES CORPORATION 225 WEST RANDOLPH STREET CHICAGO, IL 60606

BELL ATLANTIC CORPORATION 1310 NORTH COURT HOUSE ROAD ARLINGTON, VA 22216

CINCINNATI BELL INC. 201 EAST FOURTH STREET CINCINNATI, OH 45202

NYNEX CORPORATION 335 MADISON AVENUE NEW YORK, NY 10017

PACIFIC TELESIS GROUP 140 NEW MONTGOMERY STREET SAN FRANCISCO, CA 94105

THE SOUTHERN NEW ENGLAND TELEPHONE COMPANY 227 CHURCH STREET NEW HAVEN, CT 06506

SOUTHWESTERN BELL CORPORATION 1010 PINE STREET ST. LOUIS, MO 63101

U S WEST, INC. 7800 EAST ORCHARD ROAD ENGLEWOOD, CO 80111

OWNER OF U.S. REG. NO. 649,454.

SER. NO. 81/327,695 , FILED 1–22–1971.

KIMBERLY KREHELY, EXAMINING ATTORNEY



# ABOUT BROADVOICE

## BroadVoice makes the promise of Voice over IP a reality. Join the revolution.

BroadVoice is a new kind of communications company, that allows consumers and businesses to make and receive phone calls anywhere in the world using a high-speed Internet connection. BroadVoice offers lower rates and more innovative features than traditional phone companies, while providing crystal clear voice quality. Customers benefit from unlimited domestic calling, lower international rates, and a suite of advanced features not found with traditional telephone service.

We enable anyone to make and receive phone calls - worldwide - with a touch-tone telephone. Offering quality phone service bundled with enhanced IP communications services, our interactive communications portal is a gateway to advanced features only available through digital telephone service. Utilizing our global network and advanced routing technologies, BroadVoice is offering broadband-based, home and business phone service to anyone, anywhere in the world.

BroadVoice is a wholly-owned subsidiary of Convergent Networks, Inc. Convergent Networks manufactures robust, packet-based switching and routing platforms that provides industry-leading economics, scale and flexibility.

Convergent's products enable carriers to economically deliver innovative broadband services to residential and business customers over a common and global network infrastructure.

| BroadVoice Fact Sheet | |
|---|---|
| **Date Founded:** | December, 2003 |
| **Offices:** | BroadVoice, Inc.<br>900 Chelmsford Street<br>Tower Three<br>Lowell, MA 01851 |
| **Ownership/Investors:** | BroadVoice is privately held and is a wholly owned subsidiary of Convergent Networks, Inc. |
| **Number of Employees:** | 127 |
| **Minutes processed by Convergent Switches:** | 3.0 billion per month |
| **Regional Data Center Locations:** | Quincy, MA     Reston, VA     Charlotte, NC     Chicago, IL<br><br>New York, NY     Atlanta, GA     Miami, FL     Los Angeles, CA |

**EXHIBIT D**

> BroadVoice's most important assets are its customers and the support that it receives from over 100 dedicated engineering, programming, provisioning, billing, customer care, accounting, legal, and administrative professionals.

Company Information | Privacy Policy | Terms and Conditions | Guarantee | Warranty | Contact Us | Site Map
© 2003-2005 BroadVoice. All Rights Reserved.

The BroadVoice VoIP phone service allows any residential or small business customer to use their cable or DSL BroadBand Internet connection to make and receive Voice over IP phone calls using an ordinary, analog telephone. For advanced users, BroadVoice offers a BYOD option that allows customers to instantly connect their SIP devices, including the Cisco IP Phone ® or Asterisk PBX, and make phone calls over the Internet.

TRIAL AGREEMENT

Between

BROADVOICE, INC.

And

BELLSOUTH TELECOMMUNICATIONS, INC.

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE.

538417

**EXHIBIT E**

## TABLE OF CONTENTS

1.  SCOPE ...................................................................................................... 1
2.  NO COMMITMENT ................................................................................ 1
3.  DEEFINITIONS ...................................................................................... 1
4.  TERM AND TERMINATION .................................................................. 2
5.  SERVICES AND SUPPORT .................................................................... 2
6.  REPRESENTATIONS AND WARRANTIES ........................................... 2
7.  LOCATION OF TRIAL ........................................................................... 2
8.  SUPPLIER FEE AND PAYMENT TERMS .............................................. 2
9.  SCHEDULE ............................................................................................ 3
10. TECHNICAL SUPPORT AND ASSISTANCE ......................................... 3
11. EMERGENCY SERVICE ........................................................................ 3
12. INTELLECTUAL PROPERTY DEVELOPMENT AND OWNERSHIP ...... 3
13. FORECAST DATA .................................................................................. 3
14. DEFAULT AND LIMITATION OF LIABILITY ...................................... 3
15. INFRINGEMENT ................................................................................... 4
16. INDEPENDENT CONTRACTOR ........................................................... 5
17. INDEMNITY ........................................................................................... 5
18. INSURANCE ........................................................................................... 5
19. LICENSES .............................................................................................. 6
20. BELLSOUTH MARKS ............................................................................ 6
21. COMPLIANCE WITH LAWS .................................................................. 6
22. PUBLICITY ............................................................................................ 7
23. EXCUSABLE DELAYS ........................................................................... 7
24. ASSIGNMENT ....................................................................................... 7
25. REGULATORY MATTERS ..................................................................... 8
26. STATUS REPORT ................................................................................... 8
27. TAX ........................................................................................................ 8
28. SECURITY ............................................................................................. 8
29. FACILITY RULES AND GOVERNMENT CLEARANCE ........................ 9
30. RELEASES VOID ................................................................................... 9
31. CHOICE OF LAW/VENUE & ARBITRATION ....................................... 9
32. SEVERABILITY ..................................................................................... 9
33. NOTICES ............................................................................................... 9

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE.



34. RECORDS AND AUDIT ............................................................................................ 10

35. NONDISCLOSURE OF INFORMATION ................................................................. 10

36. SURVIVAL OF OBLIGATIONS ............................................................................. 12

37. NON-WAIVER ......................................................................................................... 12

38. CONFLICT OF INTEREST ...................................................................................... 12

39. NONDISCRIMINATION COMPLIANCE ............................................................... 12

40. SECTION HEADINGS ............................................................................................. 12

41. INCORPORATION OF APPENDICES ..................................................................... 12

42. NONSOLICITATION ............................................................................................... 12

43. ENTIRE AGREEMENT ............................................................................................ 13

**Appendices**

APPENDIX A:      PROJECT STATEMENT

APPENDIX B:      CSS 400-400-TR AND CSS 400-600-TR: SECURITY REQUIREMENTS FOR SOURCED WORK

APPENDIX C:      DEDICATED INTERNET ACCESS SERVICE AGREEMENTS

APPENDIX D:      LETTER OF AGREEMENT

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE.

This trial agreement (the "Agreement,") is entered into as of June __15__, 2004 (the "Effective Date") by and between BroadVoice, Inc., a Delaware Corporation, ("Supplier") and BellSouth Telecommunications, Inc., a Georgia Corporation, ("BellSouth") and their respective successors and assigns. Supplier and BellSouth are each a "Party" and, collectively, the "Parties" to this Agreement.

## 1. SCOPE

1.1   This Agreement sets forth the general terms and conditions under which Supplier shall provide the Services that are defined and described more specifically in the Project Statement (as defined below) and BellSouth will market, promote, and resell the Services in its conduct of the Trial described herein.

## 2. NO COMMITMENT

**THIS AGREEMENT DOES NOT REPRESENT OR IMPLY A COMMITMENT ON THE PART OF BELLSOUTH TO PURCHASE THE SERVICES (OR ANY MATERIAL OR SOFTWARE, AS SUCH TERMS ARE DEFINED BELOW) AFTER THE CONCLUSION OF THE TRIAL.   NO SUCH COMMITMENT TO PURCHASE BY BELLSOUTH OR TO SELL BY SUPPLIER SHALL BE BINDING UNLESS AND UNTIL EXPRESSED IN A WRITING SIGNED BY AUTHORIZED REPRESENTATIVES OF BOTH PARTIES.**

## 3. DEEFINITIONS

3.1   "Affiliated Company(ies)" shall mean any company or other entity, directly or indirectly, in whole or in part controlled by, controlling or under common control with, a party hereto.

3.2   "Agreement" shall mean this agreement and any schedules, attachments, appendices, or amendments to the foregoing.

3.3   "BellSouth" shall mean BellSouth Telecommunications, Inc.

3.4   "Customers" shall mean customers who purchase the Services from BellSouth.

3.5   "Material" shall mean Supplier's equipment, systems, Software, firmware, test equipment, training materials, and other support documentation used by Supplier for purposes of the Trial.

3.6   "Marks" shall have the meaning set forth in Section 20 below.

3.7   "Project Statement" shall mean the description of the Services and each Party's respective obligation related to such Services as defined and more specifically described in Appendix A annexed hereto and incorporated herein by reference.

3.8   "Software" shall mean the computer programs proprietary to Supplier, consisting of logic instructions in machine-readable code residing in, or intended to be loaded, in Material memories which provide basic logic, operating instructions and user-related application instructions, but excluding customer data, which are integral to the Material used by Supplier for purposes of the Trial, or documentation used to describe, maintain, and use the programs

3.9   "Trial" shall mean the marketing, technical, or operational evaluation and testing of the Services described in the Project Statement.

3.10  "Trial Period" shall have the meaning set forth in Section 4.1 below.

3.11  "Services" shall mean those services provided by Supplier for the Trial as described in the Project Statement.

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE.

3.12 'Supplier' shall mean BroadVoice, Inc.

3.13 " Support" shall mean the activities related to technical assistance and other support activities provided by Supplier as defined in the Project Statement.

## 4.  TERM AND TERMINATION

4.1    The term of this Agreement shall commence and be effective on the Effective Date and shall, except as otherwise provided herein, continue in effect thereafter until the termination of the Trial. The Trial Period will commence on the earlier of July 16, 2004, or the date of the activation of the first Customer (Trial Start Date) and will terminate December 31, 2004, unless extended or terminated by written notice as provided in this Section 4 or Section 14 below or by written agreement of the Parties ("Trial Period"). BellSouth may, at its option, extend the Trial Period by an additional 30 or 60 days pursuant to the terms set forth in this Agreement, including the payment terms set forth in APPENDIX A that are in effect in the month prior to such extension, by providing Supplier written notice of such election not less than 30 days prior to the end of the Trial Period. BellSouth may terminate the Trial Period at any time without cause and for any reason by giving supplier 30 days prior written notice and providing full payment as specified in section 4 of APPENDIX A.

## 5.  SERVICES AND SUPPORT

5.1    Subject to the terms and conditions of this Agreement, Supplier shall provide BellSouth the Services and related Support for the Trial and BellSouth shall market, promote, and resell such Services as set forth in the Project Statement.

5.2    The Parties may mutually agree to make changes in the Project Statement. If any such change causes an increase or decrease in the cost of, or the time required for the performance of the Trial, an equitable adjustment may he made in the financial arrangements, or schedules, or both, and the Project Statement shall be modified in writing accordingly.

## 6.  REPRESENTATIONS AND WARRANTIES

6.1  Each Party represents and warrants to the other, that it has the authority and right to enter into this Agreement and to provide the services hereunder free of all liens, security interests, or other encumbrances.

**6.2  EXCEPT AS SPECIFICALLY STATED IN THE PROJECT STATEMENT, SUPPLIER DOES NOT WARRANT THAT THE OPERATION OF THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE.**

**6.3  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT AND TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE WARRANTIES IN THIS SECTION ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS AND IMPLIED, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND ANY AND ALL IMPLIED WARRANTIES ARISING FROM STATUTE, COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.**

## 7.  LOCATION OF TRIAL

7.1 The Trial shall be conducted in South Florida, as is more specifically described in the Project Statement.

## 8.  SUPPLIER FEE AND PAYMENT TERMS

8.1 BellSouth will pay Supplier and Supplier will bill BellSouth for the Service as set forth in the Project Statement.

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE.

8.2 BellSouth may withhold payment for non-conforming or non-complying Service, provided that BellSouth informs Supplier of any element of non-conformity in writing following BellSouth's discovery of such non-conformance.

## 9. SCHEDULE

9.1 The Parties shall use best efforts to adhere to the Project Schedule for the Trial as provided in this Agreement . Any changes to such schedule shall be agreed to in writing.

## 10. TECHNICAL SUPPORT AND ASSISTANCE

10.1 Supplier shall provide Customer Support during the Trial as described in the Project Statement.

10.2 Supplier shall give prompt attention to resolving any customer complaints received during the Trial.

10.3 BellSouth reserves the right to appoint third parties as its technical consultants authorized to participate in the Trial as BellSouth deems appropriate.

## 11. EMERGENCY SERVICE

11.1 Supplier shall use all commercially reasonable efforts, within the resource and personnel limitations of Supplier, to provide corrective action at no charge within six (6) hours or less of notification of an emergency out-of-service condition in the Service furnished hereunder.

11.2 Supplier shall provide BellSouth with telephone numbers to reach Supplier technicians twenty-four (24) hours a day, seven (7) days a week during the Trial Period. These emergency service telephone numbers are set forth in the Project Statement.

## 12. INTELLECTUAL PROPERTY DEVELOPMENT AND OWNERSHIP

12.1 This Agreement does not encompass development by Supplier of any intellectual property for BellSouth. Supplier agrees not to accept any Order for such development under the Agreement, not to bill BellSouth for any such development performed, and not to accept any payments for any such development. The foregoing is not intended to preclude Supplier's billing for the Services as set forth in the Project Statement.

12.2 Supplier shall retain all ownership, right, title, and interest in and to the Software, Materials, and Services, as well as all patents, copyrights, trademarks, other intellectual property, or proprietary rights in and to the Software Materials, and Services, including, without limitation, all content provided by Supplier hereunder for the BellSouth-branded website furnished by Supplier.

## 13. FORECAST DATA

13.1 BellSouth may furnish forecast data to Supplier. A ny such forecast does not constitute a commitment to purchase by BellSouth, and BellSouth shall not be responsible or liable for any action taken by Supplier in reliance thereon.

## 14. DEFAULT AND LIMITATION OF LIABILITY

14.1 Except for provisions mutually agreed to by both Parties, in the event either BellSouth or Supplier shall be in material breach or default of any of the terms and conditions and covenants of this Agreement, and such material breach or default shall continue for a period of thirty (30) days after the giving of written notice to the Party in breach or default by the other, the aggrieved Party may terminate this Agreement and may avail itself of any and all remedies at law or equity or otherwise, subject to any limitations contained in this Agreement. BellSouth and

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE.

Supplier shall cooperate with each other in every reasonable way to facilitate the remedy of a breach or default hereunder within the aforementioned thirty (30) day period.

14.2 Except as otherwise provided in this Agreement, Supplier's sole and exclusive remedy in the event of a default by BellSouth shall be the payment by BellSouth of any outstanding amounts due for Services rendered by Supplier prior to the date of cancellation.

14.3 Except as otherwise provided in this Agreement, BellSouth's sole and exclusive remedy in the event of a default by Supplier should under no circumstances exceed refund of all payments previously paid by BellSouth to Supplier and the reimbursement of any expenses paid by BellSouth to Supplier.

14.4 **Equitable Remedies.** The Parties recognize that money damages may not be an adequate remedy for any breach or threatened breach of any obligation hereunder by either Party involving Intellectual Property, Confidentiality, or Publicity. The Parties therefore agree that in addition to any other remedies available hereunder, by law or otherwise, each Party shall be entitled to obtain injunctive relief against any such continued breach of such obligations.

14.5 EXCEPT IN THE CASE OF A BREACH OF THE CONFIDENTIALITY OBLIGATIONS HEREUNDER, INDEMNITY FOR A THIRD PARTY CLAIM OF INFRINGEMENT, OR IN THE CASE OF GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, IN NO EVENT SHALL EITHER SUPPLIER OR BELLSOUTH OR EITHER PARTY'S AFFILIATED COMPANIES OR ANY OFFICER, DIRECTOR, EMPLOYEE, REPRESENTATIVE, OR AGENT OF EACH OF THEM BE LIABLE TO THE OTHER OR ANY FOR ANY INDIRECT', INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE, OR CONSEQUENTIAL DAMAGES OF ANY NATURE WHATSOEVER INCLUDING BUT NOT LIMITED TO LOST REVENUES, LOST PROFITS, LOSS OF GOODWILL, LOSS OF USE, OR RESEARCH AND DEVELOPMENT COSTS. FOR PURPOSE OF THIS SECTION 14.5, "AFFILIATED COMPANIES" OF EITHER PARTY SHALL MEAN COMPANIES OWNED OR CONTROLLED BY, EITHER DIRECTLY OR INDIRECTLY, OR UNDER COMMON CONTROL WITH SUCH PARTY.

## 15. INFRINGEMENT

15.1 The following terms shall apply to any infringement or claim of infringement of any U.S. patent, trademark, copyright, trade secret or other proprietary interest based on the development, manufacture, trial, evaluation, use, license, or sale of any Material or Software used to provide the Service hereunder or in contemplation hereof.

15.2 Supplier shall indemnify and hold BellSouth harmless for any losses, damages, expenses, or liabilities including reasonable attorneys' fees, that may result by reason of any such infringement or claim, except to the extent that such infringement or claim arises from (i) Supplier's adherence to BellSouth's specifications, written instructions or directions or (ii) BellSouth's use of the Services beyond the scope of this Agreement. Supplier shall defend or settle, at its own expense, any action or suit against BellSouth for which Supplier is responsible hereunder.

15.3 BellSouth shall indemnify and hold Supplier harmless for any losses, damages, expenses, or liabilities including reasonable attorneys' fees, that may result by reason of any such infringement or claim to the extent that such infringement or claim arises from Supplier's use of BellSouth's Marks (as defined in Section 20 below) except to the extent that such infringement or claims arises from a use of the BellSouth's Marks beyond the scope of this Agreement. BellSouth shall defend or settle, at its own expense, any action or suit against Supplier for which BellSouth is responsible under this subsection 15.3.

15.4 Each indemnity set forth above is contingent on the indemnified Party's notifying the indemnifying Party promptly of any claim of infringement for which the indemnifying Party is responsible and cooperating with the indemnifying Party in every reasonable way to facilitate the defense of any such claim.

15.5 In handling any claim hereunder, Supplier reserves the right to obtain for BellSouth the right to continue using the Services or replace or modify the Services so that they become non-infringing.

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE.

Case 1:05-cv-11435-NG     Document 10-4     Filed 09/02/2005     Page 37 of 84

## 16. INDEPENDENT CONTRACTOR

16.1 The Parties shall act as independent contractors in the performance of this Agreement and nothing contained herein shall be construed to (i) give either Party the power to direct and control the day to day activities of the other; (ii) constitute the Parties as partners, joint venturers, co-owners or otherwise as participants in a joint or common undertaking or (iii) allow either Party to create or assume any obligation on behalf of the other for any purpose whatsoever. Each Party shall be solely responsible for compliance with all rules, laws, and regulations relating to employment of' its respective employees, hours of labor, working conditions, payment of wages, and payment of taxes, such as employment, social security, and other payroll taxes, including applicable contributions from such persons when required by law.

## 17. INDEMNITY

17.1 Supplier agrees, at its own expense and upon written notification by BellSouth within three (3) business days after service of process, to indemnify and hold BellSouth harmless from any and all liabilities, causes of action, lawsuits, penalties, claims, or demands (including the costs, expenses, and reasonable attorneys' fees on account thereof) that may be made by the following:

17.1.1 Anyone for injuries of any kind, including but not limited to personal injury, death, property damage, and theft, resulting from Supplier's willful acts in the performance of its obligations under this Agreement;

17.1 2 Any of either Supplier's, employees or former employees for which the Supplier's liability to such employee or former employee w ould otherwise be subject to payments u nder the state Worker's Compensation laws or an Employer's Liability policy, premises liability principles or any other law or form of legal duty or obligation; and

17.1.3 Either Supplier's employees or former employees for any and all claims arising out of the employment relationship with r espect t o p erforming under t his Agreement. T his i ncludes, b ut i s not l imited t o, e mployment discrimination charges and actions arising under Title VII of The Civil Rights Act of 1964, as amended; The Equal Pay Act; The Age Discrimination in Employment Act, as amended; The Rehabilitation Act; The Americans with Disabilities Act; The Fair Labor Standards Act; The National Labor Relations Act; and any other applicable law.

17.2 The foregoing indemnity shall be in addition to any other indemnity obligations of Supplier set forth in this Agreement.

## 18. INSURANCE

18.1 During the term of this Agreement, S upplier shall maintain all insurance or bonds required by law or this Agreement, including but not limited to the following:

18.1.1 Adequate Worker's Compensation and related insurance required by BellSouth and prescribed by the law of any state in which the work is to be performed;

18.1.2 Employer's liability insurance with limits of at least $500,000 for each occurrence; and

18.1.3 Commercial general liability insurance, including contractual liability, products liability and completed operations coverage, and if applicable, comprehensive motor vehicle liability insurance. Each shall have limits of at least $1,000,000 for bodily injury, including death, to any one person, $1,000,000 because of any one occurrence, and $1,000,000 for each occurrence of property damage.

18.4 In addition to the insurance coverage requirements outlined above, Supplier shall carry umbrella or excess liability coverage, with limits of no less than $2,000,000 per occurrence. Said umbrella or excess policy shall name BellSouth as an additional insured with respect to work performed under this agreement or state that BellSouth, as an "insured" in the underlying insurance is an "insured" under this umbrella or excess policy. In the event Supplier does not obtain contractual liability insurance covering the Supplier's indemnity requirements under this Agreement, Supplier shall provide BellSouth with specific endorsements insuring Supplier's assumed contractual liability under

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE.

this Agreement. In no event shall the provisions of this section in any way limit the Supplier's obligations set forth in the section, "INDEMNITY."

## 19.  LICENSES

19.1  This Agreement grants no rights to BellSouth or its Affiliated Companies to use, copy, modify, distribute, license, or create derivative works of the Materials or Software or to disassemble, reverse engineer, or otherwise derive the Software or of the Materials and Services in any manner.

19.2  E xcept a s o therwise p rovided i n Section 2 0 of t his  Agreement, no l icenses under a ny p atents, c opyrights, trademarks, trade secrets or any other intellectual property, express or implied, are granted by BellSouth to Supplier or by Supplier to BellSouth under this Agreement. This section shall in no way modify the section on Confidential Information.

## 20.  BELLSOUTH MARKS

20.1     BellSouth's and its affiliates' names, logos and trademarks are the property of BellSouth Intellectual Property Corporation ("BIPCO") in the U.S.A.  BIPCO's exclusive authorized licensor, BellSouth Intellectual Property Marketing Corporation ("BIPMARK"), has specifically consented to BellSouth's and Supplier's use of certain trademarks (the "Marks") for the limited purposes stated in this Agreement.  The specific Marks to be used by Supplier for purposes of the Trial shall be designated by BellSouth in writing and furnished to Supplier in accordance with the Project Statement (APPENDIX A).   Subject to the limitations and procedures set forth herein, Supplier may affix the Marks to the Services as identified herein.  Supplier shall not affix, use, or otherwise display the Marks in any manner without BIPMARK's prior written approval.  BIPMARK may withhold its consent to the proposed usage of the Marks in its sole discretion, provided, however, that once consent is given for a type of use (*e.g.,* use of the Marks in a specific radio commercial, in a print advertisement, on a billboard, or on a webpage), consent is not required for each subsequent use of the Marks in that specific context.  However, if the use of the Marks in connection with the Services subsequently fails to meet applicable quality standards, BIPMARK may immediately cancel any such prior authorization.  This right shall not be construed as a sublicense or permission to Supplier to use the Marks in any manner except as expressly provided herein.  Supplier shall not use BellSouth's name or the Marks in a domain name unless the domain name is owned by BIPCO.  Supplier shall strictly adhere to all graphics standards and marking requirements required by BIPMARK, as may be revised or supplemented from time to time in the sole discretion of BIPMARK.  Supplier will not affix its own trademarks, trade dress, logos or names to the products and services contemplated herein without BIPMARK's prior written consent.  Supplier recognizes and acknowledges BIPCO's ownership of, and shall do nothing inconsistent with BIPCO's ownership of the Marks.  It is understood and agreed by Supplier that BIPCO and BIPMARK, as owner and authorized licensor of the Marks, respectively, shall have standing to enforce their rights in the Marks.  Written notices and requests for consents required to be submitted to BIPMARK hereunder shall be sent to: Director – Trademarks, BellSouth Intellectual Property Management Corporation, 1155 Peachtree St., NE, Suite 500, Atlanta, Georgia 30309.

## 21.  COMPLIANCE WITH LAWS

21.1  Supplier shall comply with the provisions of all applicable federal, state, county, and local laws, ordinances, regulations, and codes including, but not limited to, Supplier's obligations as an employer with regard to the health, safety, and payment of its employees, and identification and procurement of required permits, certificates, approvals, and inspections in Supplier's performance of this Agreement.  Supplier shall indemnify BellSouth for, and defend BellSouth against, any loss or damage sustained because of Supplier's noncompliance.

21.2  BellSouth shall comply with the provisions of all applicable federal, state, county, and local laws, ordinances, regulations, and codes including, but not limited to, BellSouth's obligations as an employer with regard to the health, safety, and payment of its employees, and identification and procurement of required permits, certificates, approvals, and inspections in BellSouth's performance of this Agreement.  BellSouth shall indemnify and hold harmless Supplier for, and defend Supplier against, any loss or damage sustained because of BellSouth's

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE.



Noncompliance.

21.3  The Parties acknowledge that Supplier has entered into agreements with interexchange carriers (IXCs), competitive local exchange carriers (CLECs), and local exchange carriers (LECs) to originate and terminate enhanced voice traffic associated with the Trial Services on the public switched telephone network. Under the terms of the Agreement, Supplier is responsible for all access charges associated with the handling of such traffic, if any. The Parties specifically acknowledge that they believe that the Trial Services are enhanced services, subject to the federal exemption to access charges currently available to enhanced/information service providers (ESP access exemption). Nevertheless, the Parties acknowledge that with regard to the origination and termination of enhanced voice calls associated with the Trial Service, an issue exists as to whether the ESP access exemption applies in certain circumstances. Therefore, the Parties agree that during the Trial Period, if Supplier receives from another carrier any duly verified bill rendered to it for the payment of access charges associated with the handling of enhanced voice calls that are associated with the Trial Service, without prejudice to either Party's position as to whether the payment of access charges is legally required under current law or regulations regarding such calls, before Supplier refuses to pay any such bill on the basis of the ESP access exemption, it shall promptly tender such bill to BellSouth which shall have the right upon ten (10) days written notice to Supplier from the date of BellSouth's receipt of such bill, to cause Supplier to pay such bill in whole or in part; provided, however, in any such case BellSouth shall agree and be obligated to reimburse Supplier for the full amount of any such payment prior to Supplier's payment of same. The obligations and rights of the Parties regarding the payment of any access charges by Supplier at the request of BellSouth under this Agreement are limited to the Trial Services provided and related activities performed under this Agreement. Any such payment of access charges by Supplier under this Agreement may not be used by BellSouth to support the position in any legal or regulatory proceeding that Supplier has thereby admitted to or agrees that such access fee payments are legally required.

## 22.  PUBLICITY

22.1  Press releases, advertisements and other publicity statements, in any medium ("Publicity") that use, mention or imply BellSouth's or its Affiliated Companies' trade names, logos, trademarks or service marks (collectively, the "Marks") are not permitted. Use or reproduction by Supplier for Publicity purposes of any testimonial quotations, thank you letters, reference letters or any other communications in any form or medium from BellSouth, BellSouth employees and/or BellSouth agents is not permitted. Exceptions to the policies outlined above must be obtained in writing solely from BellSouth Intellectual Property Marketing Corporation ("BIPMARK"). Supplier agrees to submit to BIPMARK all such requests and materials relating to this Agreement or mentioning or implying the Marks or language from or by which the connection of said Marks therewith may be inferred or implied, or mentioning or implying the names of any personnel of BellSouth Corporation and/or any of its Affiliated Companies. Supplier further agrees not to publish or use such Publicity materials without BIPMARK's prior written consent.

## 23.  EXCUSABLE DELAYS

23.1  Neither BellSouth nor Supplier shall be responsible for any delay or failure in performing hereunder caused by fires, labor disputes, flood, explosion, casualty loss, war, strike, embargoes, government requirements, civil or military authorities, acts of God or of the public enemy, terrorism, or other similar causes beyond the reasonable control of the Party whose performance is affected.

23.2  BellSouth may withhold payment of the Supplier Fee that accrues from the date of the delay forward during the continuation of any such delay.

## 24.  ASSIGNMENT

24.1  Except as other provided in Section 24.2, any assignment or delegation by either Party of the rights and obligations of this Agreement, in whole or in part, or of any other interest hereunder without the other's written consent, except an assignment confined solely to monies due or to become due, shall be void. An assignment of monies shall be void to the extent that if Supplier shall not have given BellSouth at least thirty (30) days prior

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE.

written notice of such assignment, or if such assignment attempts to impose upon BellSouth obligations to the assignee additional to the payment of such money, or to preclude BellSouth from dealing solely and directly with Supplier in all matters pertaining thereto, including the negotiation of amendments or settlements of amounts due.

24.2 Upon notice to Supplier, BellSouth shall have the absolute right to assign this Agreement to BellSouth Corporation or any of its direct or indirect subsidiaries whether or not said entities are in existence on the date of execution hereof provided that BellSouth and its permitted assignee shall be and remain jointly and severally liable under the terms of this Agreement and the assignee shall commit to same in writing. Supplier agrees not to subcontract Service to be performed, in whole or in part, for the Trial to any vendor with whom Supplier does not already have on the Effective Date of this Agreement an existing subcontract relationship to perform such subcontracted work, without written request to and prior written consent from BellSouth. Supplier shall remain primarily liable to BellSouth for the performance of all subcontracted Service provided pursuant to the applicable Trial.

## 25. REGULATORY MATTERS

25.1 Supplier expressly recognizes that BellSouth is a communications common carrier licensed by the Federal Communications Commission and certificated, where required, by state regulatory authorities operating under federal and state statutes, rules and regulations issued thereunder and filed tariffs. Part of this Agreement may be subject to such changes or modifications as any such regulatory body may, from time to time, direct in the exercise of its jurisdiction. Any material modifications or changes occasioned thereby to the Agreement shall be subject to the mutual consent of both Parties. Failing such consent, either Party shall have the right to cancel this Agreement or any affected Trial without any liability. BellSouth will make reasonable efforts to notify Supplier prior to initiating any regulatory action specifically pertaining to the Services and will advise Supplier within 10 business days after receiving notice of any regulatory action initiated by a third party specifically pertaining to such Services.

## 26. STATUS REPORT

26.1 BellSouth and Supplier shall, consistent with the Project Statement and at mutually agreed upon intervals, discuss the activities performed during the Trial period, enumerate any problems encountered that may adversely affect progress, and state the projected activities for the ensuing period.

## 27. TAX

27.1 Supplier shall add to the purchase price set forth in the Project Statement, if any, an amount equal to any applicable taxes, local, state or federal, however designated, that may be validly levied or based upon the Project Statement or the Service furnished hereunder. Supplier shall not add to the Supplier Fee any ad valorem personal property taxes, state and local privilege and excise taxes based on gross revenue, taxes based on or measured by Supplier's net income, or any taxes or amounts in lieu thereof paid or payable by Supplier in respect of the foregoing excluded items. Taxes attributable to Supplier payable by BellSouth shall be billed as separate items on Supplier's invoices and shall not be included in Supplier's Service fee. If BellSouth does not have standing to contest taxes that it considers improperly levied, BellSouth shall have the right to have Supplier contest with the imposing jurisdiction, at BellSouth's expense, any such taxes that BellSouth deems are improperly levied.

27.2 Application and billing of Customer-related taxes applicable to the BellSouth Services shall be handled in accordance with the Project Statement.

## 28. SECURITY

28.1 BellSouth may conduct, at its expense, for security reasons, a background investigation on the Supplier and its employees. Supplier shall cooperate with BellSouth in this endeavor and shall provide any necessary information. BellSouth is under no obligation to provide a copy of the background investigation to Supplier.

28.2 In fulfilling the obligations under this section, Supplier and BellSouth shall comply with all laws, rules, and regulations about making investigative reports and the disclosure of the information contained therein. Supplier and

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE.



BellSouth shall indemnify, defend, and hold the other harmless against any wrongful disclosure by Supplier or BellSouth, as the case may be, its employees, or agents of said reports and the information contained therein.

28.3  Each Party may request that the other promptly remove from its premises any employee, agent, or subcontractor of the other to whom such Party does not wish to grant access to its premises and the other Party will promptly comply with such request. Each Party shall also promptly remove any employee, agent, or subcontractor that the other considers unacceptable, negligent, dishonest, or otherwise unsatisfactory in performing their duties hereunder.  Neither Supplier nor BellSouth shall interpret the other's request for removal from its premises as a request for the other to discipline the employee.

28.4  In addition to the foregoing, Supplier shall comply with the provisions of CSS-400-400-TR and CSS 400-600-TR: Security Requirements for Sourced Work set forth in Appendix B.

## 29.  FACILITY RULES AND GOVERNMENT CLEARANCE

29.1  Suppliers employees and representatives and those of BellSouth shall, if and while on the premises of the other, comply with all internal rules and regulations, including where required by government regulations, submission of satisfactory clearance from the U. S. Department of Defense and other federal authorities concerned.

## 30.  RELEASES VOID

30.1  Neither Party shall require waivers or releases of any personal rights from representatives of the other in connection with visits to Supplier's and BellSouth's respective premises.  Neither Party shall require any representative of the other Party to sign a personal "Nondisclosure Agreement."  No such releases or waivers shall be pleaded by either Party or third persons in any action or proceeding.

## 31.  CHOICE OF LAW/VENUE & ARBITRATION

31.1  The laws of the State of Georgia shall govern the validity, construction, interpretation, and performance of this Agreement.  The jurisdictional venue for any legal proceedings for injunctive relief or in support of arbitration involving this Agreement shall be held in any applicable local, state, or federal court located within the State of Georgia.

## 32.  SEVERABILITY

32.1  If any of the provisions of this Agreement shall be invalid or unenforceable under the laws of the jurisdiction applicable to the entire Agreement, such invalidity or unenforceability shall not invalidate or render the entire Agreement unenforceable, but rather the entire Agreement shall be construed as if not containing the particular invalid or unenforceable provision or provisions and the rights and obligations of the Parties shall be construed and enforced accordingly, provided that, in the event either BellSouth or Supplier would not have entered into this Agreement without such provision, that Party shall have the right to terminate this Agreement without charge or liability.

## 33.  NOTICES

33.1  Except as otherwise provided herein, any notices or demands required by law or under the terms of this Agreement shall be in writing.  BellSouth or Supplier shall deliver such notices or demands by hand, facsimile, telegram or similar communication, or by overnight courier or certified or registered mail, and addressed as set forth below.  In the case of facsimiles, telegrams, or similar communications, the receiving Party shall consider such notices given when electronically confirmed as sent, and in the case of certified or registered mail, when deposited in the United States mail with postage prepaid.

    To BellSouth:     BellSouth Telecommunications, Inc.

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE.



> c/o Mass Market IP Communications
> 4D28
> 2180 Lenox Lake Blvd.
> Atlanta, Georgia 30319
> ATTN: Laura Reid

To Supplier: BroadVoice, Inc.
> 900 Chelmsford Street
> Tower Three, 11th Floor
> Lowell, MA 01851
> ATTN: David Epstein

33.2 The Parties may change their above address at any time by giving ten (10) days prior written notice to the other as above provided.

33.3 In addition to the foregoing, copies any legal notices shall be sent to

> BellSouth
> Suite 4300
> 675 West Peachtree St., NE
> Atlanta, Georgia 30375
> Attention: Tom Rawls, Esq.

> Eric Schwartz
> Mass Market IP Communications
> 4D62
> 2180 Lenox Lake Blvd.
> Atlanta, Georgia 30319

> And

> BroadVoice, Inc.
> 900 Chelmsford Street
> Tower Three, 11th Floor
> Lowell, MA 01851
> ATTN: Legal Department

## 34. RECORDS AND AUDIT

34.1 Supplier shall maintain accurate and complete records relating to Customer orders, billing, payments, application of taxes, for one hundred eighty (180) days beyond the completion of the Trial. Such records shall be maintained in accordance with recognized commercial accounting practices. Supplier shall retain all such records for a period not less than one hundred eighty (180) days after the completion of the Trial. During the Trial period and during the 180 day period after completion of the Trial, Supplier shall, upon receipt of written request of BellSouth, permit a BellSouth auditor to examine, copy, and retain, and audit these records and will provide reasonable access to Supplier's premises as necessary for such examination during normal business hours and with reasonable notice.

## 35. NONDISCLOSURE OF INFORMATION

35.1 Scope of Confidential Information

35.1.1 Supplier acknowledges that Supplier may acquire information and material that is BellSouth's confidential, proprietary or trade secret information (collectively, "BellSouth's Information"). As used herein, "BellSouth's Information" includes, but is not limited to, the existence and terms of this Agreement, and all information and

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE.

documents disclosed by BellSouth, whether written or oral, in the course of this Agreement or in contemplation hereof including, without limitation, all customer information, including customer bank account, debit card, or credit card information, specifications, drawings, sketches, schematics, models, samples, tools, algorithms, technical or business information, research and development, production and engineering processes, costs, profit and margin information, BellSouth customer lists, marketing, production, and future business plans. All of BellSouth's Information shall be in writing or other tangible form and clearly marked with a confidential, private, or proprietary legend. BellSouth's Information conveyed orally shall be designated as proprietary at the time of disclosure and shall be reduced to writing within ten (10) business days. SUPPLIER EXPRESSLY AGREES TO TREAT ITS CONTRACT RELATIONSHIP HEREUNDER AS STRICTLY CONFIDENTIAL BELLSOUTH INFORMATION AND NOT TO DISCLOSE THE EXISTENCE OR THE TERMS OF THE AGREEMENT TO ANY OF ITS SUPPLIERS OR SUBCONTRACTORS, OR TO ANY OTHER PERSON, EXCEPT TO THE LIMITED EXTENT NECESSARY TO PERFORM THE SERVICES HEREUNDER.

35.1.2 BellSouth acknowledges that BellSouth may acquire information and material that is Supplier's confidential, proprietary or trade secret information, (collectively, "Supplier's Information"). As used herein, "Supplier's Information" includes, but is not limited to, all Materials, information and documents disclosed by the Supplier, whether written or oral, in the course of this Agreement or in contemplation hereof including, without limitation, all specifications, drawings, sketches, schematics, models, samples, tools, algorithms, technical or business information, research and development, production and engineering processes, costs, profit and margin information, Supplier customer lists, marketing, production and future business plans. All of Supplier's Information shall be in writing or other tangible form and clearly marked with a confidential, private, or proprietary legend. Supplier's Information conveyed orally shall be designated as proprietary at the time of disclosure and shall be reduced to writing within ten (10) business days.

35.2 Use of Confidential Information

35.2.1 Each Party agrees to take all steps reasonably necessary to hold in trust and confidence the other Party's Information. Each Party hereby agrees to hold the other's Information in strict confidence, not to disclose it to third parties or to use it, in any way, commercially or otherwise, other than as permitted under this Agreement. Each Party will limit the disclosure of the other's Information to employees with a need to know who (i) have been advised of the proprietary nature thereof and (ii) have acknowledged the express obligation to maintain such confidentiality. The obligations set forth herein shall remain in effect for two (2) years from the receipt of the Information considered or deemed to be confidential information, but such obligation of confidentiality will not expire for any Information considered or deemed to be a trade secret under applicable law.

35.3 Exceptions

35.3.1 Notwithstanding the other provisions of this Agreement, nothing received by either Party from the other will be considered to be BellSouth's or Supplier's Information, as the case may be if: (i) it has been published or is otherwise available to the public other than by a breach of this Agreement; (ii) it has been rightfully and lawfully received by the receiving Party from a third party without confidential limitations; (iii) it has been independently developed by the receiving Party by personnel having no access to the other's Information; (iv) it was known by the receiving Party prior to its first receipt from the other; (v) it is hereafter disclosed by the disclosing Party without restriction on further disclosure; or (vi) it is disclosed pursuant to a court order, subpoena or by operation of law, provided the receiving Party has given the disclosing Party prior advance written notice in order that the disclosing Party may attempt to obtain a protective order or such other relief limiting disclosure and use of the information disclosed.

35.3.2 Nothing herein shall prevent either party from using its general knowledge and expertise, techniques, concepts or know-how to develop similar products or perform comparable services for itself or others as are provided under this Agreement, or from using any of its pre-existing materials or confidential information to develop or provide such products or services; provided that Supplier shall not (i) reference, use, incorporate or disclose BellSouth's Information in developing or providing such products or services, except to the extent such BellSouth's Information is retained and used as Residual Knowledge; or (ii) infringe any patent, copyright, trademark or other intellectual property right of BellSouth in developing or providing such products or services.

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE.

For purposes of this paragraph, Residual Knowledge is defined as information in non-tangible form which may be incidentally retained in the unrefreshed memory of persons who have had access to the other Party's Information, including ideas, concepts, know-how or techniques contained therein.

35.4 Each Party hereby agrees that every individual person including but not limited to employees, subcontractors, agents, representatives and other third parties who perform under this Agreement shall execute the appropriate documents to undertake obligations of confidentiality consistent with the terms set forth herein.

## 36. SURVIVAL OF OBLIGATIONS

36.1 BellSouth's and Supplier's respective obligations hereunder that by their nature would continue beyond the termination, cancellation or expiration of this Agreement or the Project Statement, shall survive. This includes, by way of example but not limited to, the obligations provided in the sections "NONDISCLOSURE OF INFORMATION"; "INDEMNITY"; "INFRINGEMENT"; "PUBLICITY"; "DEFAULT AND LIMITATIONS OF LIABILITY"; "REPRESENTATIONS AND WARRANTIES"; "INTELLECTUAL PROPERTY DEVELOP MENT AND OWNERSHIP"; and the post-Trial-Period obligations and deliverables of the Parties hereto as specifically set forth in the Project Statement.

## 37. NON-WAIVER

37.1 No waiver or failure to exercise any option, right or privilege under the terms of this Agreement on any occasion or occasions shall be construed to be a waiver of the same or any other option, right, or privilege on any other occasion.

## 38. CONFLICT OF INTEREST

38.1 Supplier stipulates no officer or employee of BellSouth has been employed, retained, induced, or directed by Supplier to solicit or secure this Agreement with BellSouth upon agreement, offer, understanding, or implication involving any form or remuneration whatsoever. Supplier agrees, in the event of an allegation of substance, (the determination of which will be solely made by BellSouth) that there has been a violation hereof, Supplier will cooperate in every reasonable manner with BellSouth in establishing whether the allegation is true. Notwithstanding any provisions of this Agreement to the contrary, if a violation of this provision is found to have occurred and is deemed material by BellSouth, BellSouth may cancel this Agreement and the Project Statement without charge or liability.

## 39. NONDISCRIMINATION COMPLIANCE

39.1 Supplier agrees to comply with all federal, and state employment rules and regulations.

## 40. SECTION HEADINGS

40.1 The headings of the sections included in this Agreement are inserted for convenience only and are not intended to affect the meaning or interpretation of this Agreement.

## 41. INCORPORATION OF APPENDICES

41 The terms and conditions contained in Appendices A through D, referred to in this Agreement and attached hereto, are integral parts of this Agreement and are fully incorporated herein by this reference. In the event of any inconsistency or conflict between this Agreement and the Appendices, this Agreement shall prevail.

## 42. NONSOLICITATION

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE.

42.1 Accordingly, each Party, during the term of this Agreement for a period of twelve (12) months thereafter, will not directly solicit for employment or knowingly employ any individual who was employed by the other for any work related to the Trial. Each Party agrees that the exclusive remedy for any breach of the foregoing provisions of this paragraph shall be injunctive relief without proof of irreparable injury and without posting bond in the event of such breach Neither Party shall file for such injunctive relief without first providing written notice to the other of the alleged breach at least fifteen (15) days prior to filing for such relief.

## 43. ENTIRE AGREEMENT

43.1 This Agreement and the Project Statement and other Appendices attached hereto shall constitute the entire agreement between BellSouth and Supplier with regard to the Trial and may not be modified or amended other than by a written instrument executed by both Parties.  This Agreement may be executed in one or more identical counterparts (including without limitation facsimile transmissions thereof) each of which shall be deemed an original, but all of which shall together constitute one and the same instrument.

**Supplier:**                                                             **BellSouth:**

BroadVoice, Inc.                                                       BellSouth Telecommunications, Inc.

By: _____                          By: _____
(Authorized Signature)                                               (Authorized Signature)

Name: _David Epstein_____              Name: _____
(Print or Type)                                                           (Print or Type)

Title: _President_____                    Title: _____

Date: _6/15/04_____                  Date: _____

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE.



**BellSouth
Corporate Security Standards**

**400-600-TR - Security Requirements for Sourced Work**

## NOTICE

For the purpose of this document, the term "Contractor" referred to herein shall mean contracted individual. The term "Supplier's Employees and Subcontractors" referred to herein shall mean a supplier's employees, subcontractors, agents or representatives. The term "Supplier" referred to herein shall mean a provider of goods and/or services pursuant to a written contractual agreement with BellSouth, including outsourced and alliance agreements. The term "sourced work" referred to herein shall mean work performed by entities other than BellSouth, or its employees and contracted professionals and may include work performed where the parties are contractually allied in the offering of products and services. Such work may be performed pursuant to an agreement labeled as an "Alliance Agreement", "Strategic Agreement" or the like. The term "BellSouth" shall mean BellSouth Corporation or any of its affiliated companies.

Liability to anyone arising out of use or reliance upon any information set forth herein is expressly disclaimed, and no representations or warranties, express or implied, are made with respect to the accuracy or utility of any information set forth herein.

This document is not to be construed as a suggestion to any entity to modify or change any of its products or services, nor does this document represent any commitment by BellSouth to purchase any product or service whether or not it provides the described characteristics.

Nothing contained herein shall be construed as conferring any license or right by implication, estoppel or otherwise under any patent, whether or not the use of any information herein necessarily employs an invention of any existing or later issued patent.

BroadVoice – Project Statement                              p.1 of 12
APPENDIX A

## Table Of Contents

1.  Scope .................................................................................................. 2
2.  BroadVoice Responsibilities .................................................................. 4
    2.1   Product ........................................................................................ 4
        2.1.1   Infrastructure .................................................................... 4
        2.1.2   Features/Capabilities ........................................................ 5
        2.1.3   Performance ...................................................................... 8
        2.1.4   Reporting .......................................................................... 8
    2.2   Testing ........................................................................................ 8
        2.2.1   System Testing .................................................................. 8
        2.2.2   CPE Testing ...................................................................... 8
        2.2.3   Integration Testing with BellSouth .................................... 8
    2.3   Customer Provisioning .................................................................. 9
    2.4   Operations .................................................................................. 9
        2.4.1   Customer Support .............................................................. 9
        2.4.2   Service Problems and Outages ............................................ 9
    2.5   Billing ........................................................................................ 10
        2.5.1   International Calling .......................................................... 10
        2.5.2   Other Billing .................................................................... 10
3.  BellSouth Responsibilities .................................................................... 10
4.  Fees and Payment Schedule ................................................................ 11

***PRIVATE/PROPRIETARY/SECURE***
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth
Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

## 1.    SCOPE

The Supplier will deliver a voice-over-IP service (Service) that provides a variety of enhanced communications features and the capability to place local, nationwide long distance, and international calls using analog phones in conjunction with specialized customer premises equipment (CPE) provided by BellSouth. The Service will be re-branded as BellSouth's own voice-over-IP service (e.g., BellSouth DSL Talking Service) and include call completion, E911 emergency service, advanced calling features, voice mail with web and telephone interface access, and web-based feature management capabilities, as is more specifically described in this APPENDIX A.

Customers will access the Service over the BellSouth® DSL Internet Access Trial Service. The DSL Internet Access Trial Service will be sold to Trial customers in a packaged offering that includes the re-branded Service provided by Supplier. This packaged offer will be marketed to Trial customers as BellSouth Digital Answers service to which customers must have subscribed to qualify for participation in the Trial.

The following diagram portrays the logical system architecture for the Trial.



The Service will be sold to Trial customers in a packaged offering that includes the re-branded Service provided by Supplier. This packaged offer will be marketed to Trial customers as BellSouth Digital Answers service to which customers must have subscribed to qualify for participation in the Trial.

Customers will access the Service over the BellSouth® DSL Internet Access Trial Service that is included in the packaged Trial offer. The Supplier will provide telephone numbers, PSTN connectivity, and E911 service via Primary Rate Interface circuits installed between the Supplier's IP network and the PSTN in the Trial area.

The Service will be offered off a Broadsoft Release 10 platform that will reside in the Supplier's network.  The Media and Network Servers that are standard within this

***PRIVATE/PROPRIETARY/SECURE***
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth
Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

platform will be shared resources with Supplier's other operations. Supplier will provide, provision, install and support within Supplier's existing operating environment a dedicated pair of Application Servers (AS) for the Service. The dedicated AS will operate with Broadsoft Release 10 and will be configured with Supplier's standard AS configuration except as necessary to support specific requirements of the Service as herein defined. In addition, Supplier shall provide, provision, install and support within Supplier's existing operating environment a dedicated pair of servers to host the Broadsoft Web Portal (WP) Release 10. Supplier shall configure the WP with Supplier's standard WP configuration initially, and the WP shall subsequently be customized as provided herein. Supplier shall provide BellSouth with necessary technical information and authorization to enable BellSouth to provide the customization for the WP. BellSouth will design custom Web Portal pages for the dedicated BellSouth WP that will comprise the customer's user interface for the Service and the Supplier will install these pages on the WP.

The primary customer user interface for the BellSouth Digital Answers service will be via the BellSouth® Personal Desktop (BPD). BPD client software will reside on the customer's local computer and interface with a BPD Server that will reside on the BellSouth network. The BPD Server will interface with the Web Portal Server which will interface with the AS providing the customer access to web-based feature management capabilities. Some features can also be managed via a telephone interface (TUI) provided by the Broadsoft platform.

The BPD will provide the Customer access to web-based access to voice mail. The Media Server (MS) residing in the Supplier's network records voice mails and will deposit them in a message store in the BellSouth network. The BPD will access the message store to play messages via the Customer's computer. Supplier's MS will access the BellSouth message store to play messages when Customers access voice mail via a telephone.

The Supplier will install dedicated trunking circuits between the Supplier's IP network and BellSouth's IP network to provide efficient data transfer and to facilitate secure transactions between applications servers on both networks. As shown on the diagram, this connectivity will consist of two DS-3 private line connections, one between Supplier's and BellSouth's POPs in Atlanta and one between Supplier's and BellSouth's POPs in Miami, as is more fully described in the two Dedicated Internet Access (DIA) Service Agreements attached hereto in APPENDIX C and incorporated herein by reference.

Customers will be offered up to two telephone numbers capable of accessing and being accessed by the PSTN. Each number will have a unique voice mailbox and enhanced features.

The Trial will target 500 residential customers in the South Florida area. Residential customers served by the following BellSouth rate centers will be included in the Trial:

| | |
|---|---|
| West Palm Beach | Boca Raton |
| Stuart | Port Saint Lucie |
| Delray Beach | Vero Beach |
| Boynton Beach | Jupiter |
| Fort Pierce | Jensen Beach |
| Sebastian | Hobe Sound |

***PRIVATE/PROPRIETARY/SECURE***
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

BroadVoice – Project Statement
APPENDIX A

p.4 of 12

Bella Glade                              Pahokee

Trial customers shall be customers of BellSouth, not customers of Supplier.
BellSouth shall own all customer information pertaining to the Service rendered by
Supplier or to the Trial. All such customer information shall be deemed BellSouth's
Information as defined in Section 35 of the Agreement ("Nondisclosure of
Information"), regardless of whether it is marked as BellSouth's Information.

## 2.      BROADVOICE RESPONSIBILITIES

### 2.1      Product

Supplier agrees to use the Broadsoft Release 10 platform to deliver the Service and
to make no changes to Broadsoft releases, servers, or other software or hardware
critical to provision of the Service without prior approval from BellSouth.

### 2.1.1      Infrastructure

Supplier shall engineer, furnish, install, operate and maintain

(a.) A service point of presence ("POP") in the Trial area for serving Trial
participants and providing interconnection to the Public Switched
Telephone Network (PSTN) access.

(b.) Trunking from each of the BellSouth rate centers (defined in Scope) to
Supplier's POP, as is more specifically described in Exhibit A to that
certain Letter Agreement between Supplier and BellSouth, dated May 21,
2004, a copy of which is attached to this Agreement as APPENDIX D and
incorporated herein by reference.

(c.) Customer ten (10) digit telephone numbers in each BellSouth rate center
referenced above and accessible from the PSTN for assignment to Trial
customers. Supplier shall provide BellSouth with 200 telephone numbers
per rate center. These numbers will be reserved exclusively for use on
the Service and may not be utilized or assigned by the Supplier for any
other purpose.

(d.) E911 service that routes a Trial customer's E911 call and appropriate
automatic location identification information to the proper PSAP per the
customer's residential address. BellSouth acknowledges that Supplier
has purchased BellSouth's PRI Services with Pinpoint Service and is
dependent on Pinpoint Service and further acknowledges that Supplier is
dependent on BellSouth's management of Pinpoint Service and the
customer's address provided by BellSouth to provide this service.
BellSouth shall indemnify and hold Supplier harmless from all losses,
damages or liabilities, including reasonable attorney's fees, resulting
from any claims brought by any of BellSouth's Trial Customers against
Supplier that result from the above mentioned BellSouth E911 support
services used by Supplier to provide the Service, except to the extent
any such losses, damages or claims are due to the Supplier's breach of
some other term of this Agreement, or due to the negligent or
intentional wrongful conduct of the Supplier. BellSouth shall have the
right and the obligation to defend or settle, at its own expense, any
action or suit against Supplier for which BellSouth is responsible under
this subsection. Supplier shall provide BellSouth with prompt written
notice of any claim that Supplier contends is covered by this indemnity
provision.

(e.) An applications hosting center to provide enhanced services as described
below in Features/Capabilities to Trial participants.

*PRIVATE/PROPRIETARY/SECURE*
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth*
*Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*



BroadVoice – Project Statement
APPENDIX A

p.5 of 12

(f.) Both origination and termination of Local, nationwide long distance and
international voice calls for Trial participants.
(g.) A Voice mail application that stores voice mails in a BellSouth message
store.
(h.) Mutually agreed upon secure access to the Broadsoft Feature Portal from
the BPD.
(i.) Support SIP, non-compressed (G711).
(j.) IP network connectivity/peering to support provisioning and transport of
voice services during trial.

## 2.1.2    Features/Capabilities

The following Service features and capabilities will be supported:

| Feature/Capability | Description |
| --- | --- |
| Calling Line ID (CID) | Name and number displayed when available for incoming calls. |
| Calling Line ID Blocking | |
| | Caller ID is displayed on outgoing calls. Feature can |
| Calling Line ID Delivery Blocking per Call | be turned on/off for individual calls or remain persistently on/off. Works on call waiting. |
| | NOTE: If customer has selected Calling Line ID Block |
| Calling Line ID Delivery per Call | on all outgoing calls, Calling Line ID can be delivered per call. Supplier shall take commercially reasonable steps to ensure CID is populated with CID information via a commercially available LEC database service. |
| Anonymous Call Rejection | The customer can choose to have the calls totally blocked. The called party is not aware of sequencing. Incoming CID information is retained. This feature can be turned on/off. |
| Call Forwarding Always | Incoming calls are forwarded on Busy, Always, and No Answer. Enhanced Call Forwarding version allows |
| Call Forwarding Selective | customer to forward calls based on calling number and to forward calls per a specified profile (e.g., series of numbers, schedule). From the Web Portal, customers can set a reminder that calls are forwarded. A short ring burst will emit from their home phone every time a call is forwarded. Call Forwarding Always will override Call Forwarding Busy & No Answer to Voice Mail. Call Forwarding Selective will override Call Forwarding Always, as well as Call Forwarding Busy & No Answer to Voice mail. |
| Call Waiting | During an active call, customer is notified of an incoming call. Customer may decide to put first call |
| Cancel Call Waiting | on hold and take incoming call. If not answered, the incoming call is sent to voicemail. Customer can turn off for the duration of the current call. |

*PRIVATE/PROPRIETARY/SECURE*
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth*
*Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

BroadVoice – Project Statement
APPENDIX A

p.6 of 12

| Feature/Capability | Description |
|---|---|
| 3-way Calling | Customer can establish a conference call with up to 3 parties (customer plus two parties) by dialing the parties and adding to the call via the flashhook. NOTE: Using the flashhook to connect the calls, bandwidth for two calls is required and is managed by CPE during Trial. |
| Call Return | Ability to quickly redial the number that last called. |
| Last Number Redial | Ability to have the last number dialed quickly redialed. |
| Simultaneous Ring | Enables users to have multiple phones ring simultaneously when any calls are received. The first phone to be answered is connected to the caller. For example, calls to a user's home phone also ring the user's mobile phone, in case they are away from home. |
| Do Not Disturb | Automatically forward calls to voicemail.  Phone can emit a short ring burst to inform the customer when the call is being sent to voicemail by using the Ring Reminder. |
| Speed Dial 100 | Allows up to 100 speed dial numbers to be defined that can be called with the push of a few buttons. This feature can be programmed via the Web Portal or the TUI (*75). |
| Call Notify | Sends an e-mail with the CID information to a specified e-mail address when pre-defined criteria, such as phone number, time of day or day of week, are met. |
| Call Park | Place a call on hold (muted for both parties).  Pick up the call from any other phone associated with the line originally called. |
| Personal Phone List | Store frequently called numbers to be dialed (click to dial) from the Call Manger. |
| Call Log (Call Manager) | Separate logs of incoming ("Missed" & "Received") & outgoing ("Dialed") calls.  Click to dial from any calls on the lists. |
| Voicemail | Ability to record and store voice messages. Accessible via the BPD and Supplier provided and TUI. Can also be accessed remotely via the web. To access voicemail via the TUI, a customer will call the telephone number assigned to them for use during the Trial and enter a touchtone code (e.g., #) that will put them into their Voice Portal.  The user can then select voice mail from the main menu. |
| Message Waiting Indication (MWI) | Indication of new voicemails is provided via connected MWI phones and the BPD.  Stutter and visual. |

***PRIVATE/PROPRIETARY/SECURE***
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

BroadVoice – Project Statement
APPENDIX A                                                                p.7 of 12

| Feature/Capability | Description |
|---|---|
| Voicemail Personal Name Announcements, "No Answer" & "Busy" Greetings Included with Voice Messaging – Personal. | The name announcement is a recorded label to personalize the mailbox. The No Answer greeting is the announcement callers will hear when the subscriber's phone is not answered. The Busy greeting is the announcement callers hear when the phone is busy. Default greetings. |
| VM Ring Count Included with Voice Messaging – Personal. Number of Rings before Greeting | The user can specify the number of rings before the calling party hears the no answer greeting. |
| Copy of VM Included with Voice Messaging – Personal. | Send copy of voice mail (WAV file) to an additional email address |
| VM "0" Transfer Included with Voice Messaging – Personal. | Caller can hit "0" during VM greeting to transfer to any number defined by the subscriber. |
| VM Notification Included with Voice Messaging – Personal. | Customer can define an e-mail notification of new voice mail messages. |
| Number of Lines | Customers may have up to two Von lines (each with their own telephone number). Each customer is a single account (defined as a group in Broadsoft). |
| CALEA- Communications Assistance for Law Enforcement Act | Supplier will provide appropriate gathering and tracking capabilities to assist and enable BellSouth to respond to any lawful request or order by law enforcement agencies or the courts to collect, produce or conduct surveillance of Trial customer communications or calling detail related to the Service. |
| Operator Services | **"0" and "411" will be directed to a BellSouth agent as mutually agreed by the parties.** 611 will be directed to Bellsouth's Trial Center Support Group. (TCSG). Access to an international operator will be provided. |
| Nationwide Calling | Nationwide call termination with unlimited local access. |
| International Calling | A list of high-fraud areas will be mutually agreed upon and blocked. |
| Web-based Feature Management | Accessed and presented via the BPD to the customer. |
| Call Manager | Pop-up client on the customer's computer providing limited call management capabilities. |

The Service will be exclusively BellSouth branded as specified and approved in writing by BellSouth. Supplier will implement such branding on but not limited to customer accessible web pages and customer materials provided as part of the Trial, subject to the provisions of Section 20 ("BellSouth Marks") of the Agreement.

*PRIVATE/PROPRIETARY/SECURE*
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

Supplier will install and maintain BellSouth-designed and supplied web pages on the Web Portal Servers.

### 2.1.3    Performance

Supplier will take all reasonable measures to make the Service available to Trial Customers 99% of the time as measured monthly.  If such availability during the Trial Period becomes less than 99% for particular a month, then the monthly Customer Account charge due Supplier for Services rendered under this Agreement will be automatically reduced by 10% for that month.

Supplier will monitor its network and systems used to support the Service to ensure immediate identification of customer-affecting problems.  Supplier will provide to BellSouth reports on Service outages and troubles on a monthly basis.  It is understood by the parties that the monitoring and reporting obligations described herein do not include monitoring and reporting on the performance of BellSouth's DSL network and DSL services. Supplier's collection of monthly service-impacting quality metrics will include but not be limited to bandwidth utilization, packet loss, and latency and will provide monthly backhaul circuit traffic metrics.

Supplier will provide BellSouth prior to Trial Start Date with twenty (20) test accounts in addition to customer accounts for the duration of the Trial to confirm outages.

### 2.1.4    Reporting

Supplier will provide BellSouth with monthly reports that provide at least the following information: Service performance, feature usage, portal performance, and customer support.  BellSouth and Supplier prior to the Trial Start Date will mutually agree upon the detailed reporting plan.

## 2.2    Testing

### 2.2.1    System Testing

As part of Supplier's responsibility for deploying dedicated AS and WP, Supplier shall test the AS and WP deployed in support of the Service.  Supplier shall validate that the AS and WP are operating properly including appropriate failover in the event of a failure on the AS, WP, or shared elements within Supplier's operating environment. No later than 2 weeks after the execution of this agreement and receipt of the initial payment, Supplier shall provide BellSouth with documentation showing the results of the system testing and certifying that all Service elements are operating properly.

### 2.2.2    CPE Testing

Supplier shall perform interoperability testing with the 2wire CPE provided by BellSouth for use in the Trial and validate that such device is operational and compatible with the Service and.

### 2.2.3    Integration Testing with BellSouth

BellSouth shall be responsible for testing the integration of the Service with the BPD, BellSouth's network, and any BellSouth trial services other than the Service. Supplier shall support BellSouth's integration testing including troubleshooting of interfaces between the Service and other elements of the trial.

In addition to the 20 test accounts required in <u>Performance</u>, Supplier shall provide BellSouth no later than 20 days prior to the Trial Start Date ten (10) fully operational

*PRIVATE/PROPRIETARY/SECURE*
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth*
*Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*



test accounts for use by "friendly" Trial customers who will assist BellSouth in performing end-to-end testing of the Service.

## 2.3    Customer Provisioning

Supplier will accept customer order information including telephone number assignments from BellSouth and provision each such order for Service within 30 minutes of receipt of such information.

Supplier will modify Supplier's provisioning system to accept and provision such orders in a mechanized and secure manner.

Supplier will provide BellSouth lists of telephone numbers by BellSouth rate center that are available for assignment for use with the Service at least (2) weeks prior to Trial Start Date.

## 2.4    Operations

### 2.4.1    Customer Support

Supplier will provide Tiers2 and 3 Customer Support for the Service. Such support will focus on Service-specific issues not addressable by BellSouth's Tier 1 support. Such support will be available 24 hours a day, seven (7) days a week. Supplier will accept live calls immediately from BellSouth's TCSG via a dedicated telephone number. All customer interactions by Supplier will be branded as BellSouth.

Supplier will provide BellSouth with administrative access at the Service Provider level into customer accounts provisioned on Supplier's Broadsoft platform.

Other than Supplier communications necessary to perform Tiers 2 and 3 customer support functions under this Agreement, Supplier and its agents shall not distribute to BellSouth Trial customers any written or electronic Customer communications without prior review and approval by BellSouth.

Trial customer E-mails requesting support shall be forwarded to BellSouth's TCSG for initial action.

Supplier will provide BellSouth monthly summary reports regarding Customer support activity including but not limited to total number of calls, reasons for each customer call, resolution of the issue, duration of resolution, average call time and repeat calls. Daily reports will be provided listing recently closed and open customer trouble tickets.

Supplier will provide BellSouth with an escalation contact that is available 24 hours a day, seven (7) days a week.

### 2.4.2    Service Problems and Outages

Notification procedure – In the event of any condition that will affect the performance or availability of the Service, including but not limited to actual outages, Supplier will notify BellSouth within 15 minutes of discovering the condition by sending an email to an address(s) designated by BellSouth and by calling BellSouth's TCSG. This notification will include a description of the condition, the anticipated impact on users of the Service and an estimated time to repair. During any such outage or service-affecting situation, BellSouth shall receive regular status updates until the situation is cleared and all customers are back in service. Upon repair of the condition, Supplier shall notify BellSouth by the same procedure described above.

*PRIVATE/PROPRIETARY/SECURE*
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

Emergency contacts – BellSouth shall provide Supplier with a designated emergency contact telephone number(s).  In the event of any emergency, Supplier shall immediately contact BellSouth at the designated number(s).  Supplier shall use best efforts to assist BellSouth and any governmental agencies involved to address any emergency; such assistance may entail access to data and operating information contained within Supplier's operating environment.    Events requiring such emergency contact and assistance shall include, but not be limited to:  a request by a Public Safety Answering Point (PSAP) or other public safety official to trace or contact an end user of the Service who has placed a 911 or similar emergency call, loss of service for both PRI circuits for any single rate center, and a lawful request by any governmental authority for assistance.

Reporting process   – On a monthly basis, Supplier shall provide BellSouth with a summary report of all service-affecting problems and outages.

## 2.5    Billing
### 2.5.1    International Calling
Supplier shall provide BellSouth monthly with a file containing all international customer-calling records. The file format and transmittal details will be mutually agreed upon.   The file is to be provided by the 3rd day of each month for all international calls from the prior month.

Supplier shall provide BellSouth monthly with a file containing all domestic long distance customer-calling records.   The file format and transmittal details will be mutually agreed upon.  The file is to be provided by the 3rd day of each month for all domestic calls from the prior month.

### 2.5.2    Other Billing
Supplier shall render a bill by the 10th day of each month to BellSouth detailing charges for Customer Accounts, circuits, and CNAM service as detailed below in <u>Fees and Payment Schedule</u>. Remittance must be received by Supplier within 30 days of receipt of such bill.

## 2.6    Failure of BellSouth Services and Features; and Indemnification.

2.6.1  *Failure of Services and Features provided by BellSouth.*
Supplier shall not be in breach of this Agreement for any failure or deficiency of the Service that is caused by a failure or deficiency in the services and features provided to Supplier by BellSouth, its affiliates and its sub-contractors in connection with this Agreement.

## 3.    BELLSOUTH RESPONSIBILITIES
BellSouth shall be responsible for the following

- Customer acquisition activities including all marketing, sales, and order creation activities. BellSouth shall provide Supplier with information necessary to provision a customer on the Broadsoft platform including telephone number assignment.
- Ensuring customers are qualified, have DSL and the appropriate CPE.
- A voice mail store accessible via IMAP4 by the Media Server residing in Supplier's network.

**PRIVATE/PROPRIETARY/SECURE**
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

BroadVoice – Project Statement                                      p.11 of 12
APPENDIX A

- The BPD that will be the primary platform for the customer interface.
- Web pages that will comprise the customer interface residing on the Web Portal Server.
- Tier 1 customer support. Such support will provide initial screening to minimize misdirected calls to Supplier's Tier 2 support. A BellSouth representative will place calls transferred to Supplier's Tier 2 with the customer on the line. The BellSouth representative may stay on the line with the customer and Supplier's representative.
- Branding specifications for web pages and user interface changes.
- Customer billing.
- CPE will be provided to Supplier for testing.

## 4.    FEES AND PAYMENT SCHEDULE

BellSouth agrees to pay Supplier the following fees for the Services provided under the Agreement, in accordance with the terms of following payment schedule.

| | |
|---|---|
| Customer Accounts<br><br>$ 21.45 per customer line per month | • Minimum 500 Lines<br>• Minimum 5 months<br>• 5-month minimum total $ 53,625<br>• Maximum 600 accounts<br>• This price includes unlimited U.S. and Canadian calling<br>• 24x7 Customer Support<br>• Features and capabilities described in Features/Capabilities<br>• Includes test accounts per Testing |
| Dedicated Broadsoft Servers<br><br>$ 68,000 one time | • Includes Dedicated Broadsoft Application and Web Portal Servers, and any supporting hardware or software, but excludes any additional Broadsoft license fees, if<br>• applicable Includes all Non-Broadsoft related hardware and software, set up, and maintenance for Trial |
| PRIs and Pinpoint Service<br><br>Tariff price paid plus 10% | • 14 pair of PRIs with Pinpoint Service in Miami<br>• 1 pair PRI in Atlanta for BellSouth's integration testing<br>• (Per LOA) |
| International Calls (other than Canada)<br><br>Per Rate Schedule (need to attach) | • Billed and remitted monthly |
| Customization & Set-Up Work<br><br>$ 35,000 one time | • OSS modifications<br>• Workflow changes<br>• Billing changes<br>• Gateway changes<br>• CDR changes<br>• Integration testing |

*PRIVATE/PROPRIETARY/SECURE*
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

BroadVoice – Project Statement
APPENDIX A

p.12 of 12

| | |
|---|---|
| | • Security modifications |
| | • Minimum estimate |
| | • Additional as negotiated |
| CNAM | • CNAM dips necessary to present calling party name |
| 1 cent per inbound call | • Billed and remitted monthly |

Payments shall be phased as follows:

| Amount | Schedule | Description |
|---|---|---|
| $ 68,000 | Due upon signing | Dedicated Broadsoft installation |
| TBD | Due monthly upon installation | PRIs and Pinpoint service |
| $ 35,000 | Due upon signing | Customization Work |
| $10,725 | Due upon signing | First month of minimum customer accounts |
| Usage | Billed monthly | International Calls |
| Usage | Billed monthly | CNAM dips |
| $10,725 per month | Remitted monthly in months 2 through 5 | Customer Accounts Beginning month 2 |

If Supplier has not completed turn-up of the Service and provided the test accounts in accordance with the schedule defined above, BellSouth may at its option delay the Trial Start Date.   Regardless of whether BellSouth elects to delay the Trial Start Date, in the event that Supplier does not complete turn-up of the Service and provide test accounts in accordance with the schedule defined above, the duration of the Service shall be extended one day for each day that Supplier is delayed and the amount payable by BellSouth to Supplier shall be reduced by $400 for each day that Supplier is delayed.

In the event that Supplier is delayed by 15 or more days, BellSouth shall have the option to terminate this Agreement and Supplier shall refund to BellSouth all monies paid to Supplier by BellSouth except the cost of PRI and Pinpoint services purchased initially in pursuant to the LOA that is incorporated into this document and Dedicated Internet Access services that are referenced in this document.

***PRIVATE/PROPRIETARY/SECURE***
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*



<u>Appendix B</u>

**BellSouth**
**Corporate Security Standards**

**400-600-TR - Security Requirements for Sourced Work**

## Table of Contents

1.   <u>Introduction</u>
     1.1   General
     1.2   Scope
     1.3   Reason for Issuance
     1.4   Enforcement
     1.5   Accountability
     1.6   Remedies
2.   <u>Glossary</u>
3.   <u>General</u>
     3.1   Policy
     3.2   Performance of Work
4.   <u>Responsibilities</u>
     4.1   General
     4.2   Request for Waiver
     4.3   Waiver Submission and
           Approval

     4.4   Absence of Waiver
5.   <u>Supplier Requirements</u>
     5.1   General
     5.2   Operability
     5.3   Non-repudiation
6.   <u>Outsourced Web Hosting</u>
     6.1   General
     6.2   Outsourced Web Site Ultimately
           Hosted by a BellSouth Facility
     6.3   Co-Branding
7.   <u>Expiration or Termination Transition</u>
     7.1   General

## 1.   Introduction

**1.1   General** - The information in this document is subject to review and modification. Accordingly, this document may be subject to change at any time.  Future issues of this document and/or BellSouth's internal security requirements may differ extensively in content, substance and format.  In the event that this document is modified, BellSouth shall provide written notification to Contractor or Supplier along with a copy of the modified document.  Upon the parties' reaching mutual agreement, the new document shall control.  If no agreement is reached between the parties, then this document shall continue to be in full force and effect.

This document does not apply to contracts and agreements executed prior to February 1, 2002.  Subsequent revisions will be subject to this document.

BellSouth reserves the right to select and utilize any Contractor, Supplier or any of Supplier's Employees or Subcontractors based on its own internal criteria at any time, under any circumstances, whether or not the requirements in this document are met.

*D.E.*



**BellSouth**
**Corporate Security Standards**

### 400-600-TR - Security Requirements for Sourced Work

BellSouth does not recommend computer-related products or services and nothing contained herein is intended nor should it be construed as a recommendation of any product or service to anyone. Further, Contractors or Suppliers are not to relate their products, goods, services, etc., to these guidelines in order to imply that such items meet any particular standard of use or utility.

**1.2** **Scope** - This standard applies to the purchase from, or delivery, development, maintenance, and/or support of BellSouth-related Information Resources by a Supplier. For the purposes of this document, Information Resources shall include but are not limited to, computers, computer peripherals, computer communications networks, computer systems/applications/software, web sites, data stores, information processing systems, public telephone network elements, and their support systems. This includes the protection of all BellSouth corporate, employee and customer information stored, processed or transmitted on these facilities. Product trials and evaluations using BellSouth Information Resources shall also be governed by this document.

As further definition, this includes, but may not be limited to work that may:
- Include the handling, manipulation, storage, and/or transmission of BellSouth, BellSouth customer or BellSouth employee proprietary information using computers, computer applications, computer systems, and/or computer communications networks (public or private),
- Involve the provision of computer based processing, communications and/or network services to BellSouth, BellSouth's customers and/or BellSouth's personnel in their employed or contracted capacities,
- Result in the authorized provision of services using the BellSouth name to BellSouth's customers and/or BellSouth's personnel,
- Provide publicly or privately accessible web site hosting capability and/or content for BellSouth, and/or
- Involve connections to a BellSouth internal computer communications network or voice network not universally accessible from the public switched telephone network.

**1.3** **Reason for Issuance** - This standard has been revised as part of the annual review process.

**1.4** **Enforcement** - Supplier personnel performing sourced work shall protect BellSouth Information Resources in accordance with the terms and conditions of applicable contractual agreements between the Supplier and BellSouth.

In addition, it is the responsibility of all personnel performing sourced work to comply with federal, state, and local acts, statutes, and regulations which relate to the control and authorized use of BellSouth's information and Information Resources.

---

Revision 1: January 25, 2003                                                    Page 3 of 13



<u>**Appendix B**</u>

**BellSouth
Corporate Security Standards**

**400-600-TR - Security Requirements for Sourced Work**

**1.5    Accountability** - Personnel performing sourced work shall be held accountable for compliance with the standards in this practice and any others which are included in the contractual agreement between the Supplier and BellSouth. System vulnerabilities identified by these personnel must be promptly reported to the BellSouth Enterprise Information Security organization.

**1. 6    Remedies** - Violations of BellSouth computer, network, and information security policies and standards or governmental statutes, rules, and regulations may result in remedies up to and including termination of a contractual agreement or any other rights and remedies that BellSouth may have in equity and law.

**2.    Glossary**
- Shall - The word "shall" indicates a requirement that is to be met unless BellSouth Enterprise Information Security approves a waiver or variance.
- Must - The word "must" indicates a requirement that is to be met unless BellSouth Enterprise Information Security approves a waiver or variance.
- Should - The word "should" indicates a guideline more than a requirement. Waivers or variances are not required for noncompliance with guidelines.

**3.    General**

**3.1    Policy** - - It is the policy of BellSouth to protect its Information Resources in all situations and wherever they are located.  Protection of Information Resources in the case of sourced work includes, but is not limited to:
- Access to, and use of, BellSouth's proprietary information and BellSouth's employee and customer proprietary information,
- Return and/or disposal of BellSouth's proprietary information and BellSouth's employee and customer proprietary information,
- Access to, use, and return or disposal of computer hardware and software,
- Defacement, improper operation and/or loss of use of a system, application or web site designed for, or in support of, BellSouth, and
- Access to, and/or use of, a BellSouth network, network element, or off BellSouth premises extension to a BellSouth network, e.g., an extranet connection.

**3.2    Performance of Work** - When BellSouth work is performed by entities other than BellSouth or its employees and contracted professionals, BellSouth's Information Resources as well as its good name and character may be placed at risk. Accordingly, BellSouth expects that the performance parameters for all sourced work must be documented in the contractual agreement between the involved parties.  The documented performance parameters must include all security precautions necessary to protect BellSouth and its Information Resources.

**BellSouth**
**Corporate Security Standards**

---

**400-600-TR - Security Requirements for Sourced Work**

4. **Responsibilities**

4.1 **General** - It is the responsibility of each Supplier to assure BellSouth that its requirements for the security of Information Resources, and the information stored, transmitted, and/or processed on these Resources, are met.

4.2 **Request for Waiver** – A prospective Supplier who wishes to provide BellSouth with an Information Resource or service that is not in compliance with these standards shall document the deviations in a written request for a waiver. The request must specify the following:
- Area(s) of non-compliance
- Reason(s) for the non-compliance
- Available alternative(s)
- Reason(s) why an alternative or an omission should be accepted

> **NOTE:** A marked electronic version of this BellSouth Technical Reference with the information above is the preferred documentation for a waiver request.

4.3 **Waiver Submission and Approval** - Waiver requests shall be submitted through the appropriate BellSouth purchasing organization or person to the Contractual Agreement Waiver Manager listed on the BellSouth Enterprise Information Security intranet site, http://security.bls.com. The Contractual Agreement Security Waiver Manager will approve the waiver request, negotiate changes/conditions necessary for approval of the waiver request, or deny the waiver request. If a waiver request is denied, the denial may be appealed by a BellSouth management person using the variance process documented in BellSouth Corporate Security Standard (CSS) 000-100, *Security Management Process*. Failure of BellSouth Enterprise Information Security to respond to a waiver request shall not under any circumstances be considered to be approval of the waiver request.

Waiver approvals and other related correspondence might be transmitted via electronic mail or other more formal means of documentation. Approved waivers will be filed with the BellSouth copy of the Agreement and will be retained during the retention period for that Agreement. Suppliers should transmit their waiver requests sufficiently in advance of the need for a ruling on the waiver requests so that BellSouth Enterprise Information Security will have adequate time to review the waiver requests.

---



**Appendix B**

# BellSouth
# Corporate Security Standards

### 400-600-TR - Security Requirements for Sourced Work

**4.4    Absence of Waiver** – Suppliers are hereby notified that this BellSouth Corporate Security Standard Technical Reference shall be enforced in its entirety, and the involved Supplier shall be held in breach of his/her/its agreement with BellSouth for any violation of any requirement herein, unless a waiver is approved, as noted above.

> **NOTE:**  Vendors, Contractors and Suppliers are hereby notified that the BellSouth Enterprise Information Security organization has the sole responsibility for security waiver and variance approval in BellSouth.  Contractors and Suppliers shall comply with these standards unless a written waiver or variance is issued as noted above by the BellSouth Enterprise Information Security organization.

**5.    Supplier Requirements**

**5.1    General** - The Supplier shall:

  A.  Currently have, or agree to implement, an internal security policy governing the protection of its own information resources and the resources of others under its control.  A copy of the Supplier's security policy shall be made a part of this Agreement.

  B.  Indemnify BellSouth for any improper acts, omissions, failure to perform, and/or failure to comply with these security requirements unless specifically excluded in another part of this agreement.

  C.  Comply with all federal, state and local acts, statutes, rules and regulations for the protection of information systems and resources.

  D.  Ensure that all of Supplier's employees and representatives who will perform work associated with this agreement or have access to Information Resources associated with BellSouth, BellSouth's employees and/or BellSouth's customers are covered by a binding nondisclosure agreement.

  E.  Ensure that only persons with an approved need to know are allowed to access BellSouth information, BellSouth employee information, and/or BellSouth customer proprietary information.  This shall include controls that allow a person to access only the specific information and Information Resources required to perform the work specified in the Agreement and for which that person is authorized.

  F.  For each of Supplier's employees and/or representatives who may have access to BellSouth, BellSouth employee, and/or BellSouth customer proprietary information, or a computer, computer system, or computer communications network containing such, or a computer system, application or network providing capabilities to BellSouth:

    a.

    b.  Perform a background investigation if requested by BellSouth:

      a)  As a part of a random sampling for security verification purposes,

      b)  As a part of regular screenings to strengthen BellSouth security, or



### Appendix B

# BellSouth
# Corporate Security Standards

---

**400-600-TR - Security Requirements for Sourced Work**

     c) If BellSouth has reasonable cause to suspect one is needed.
  c. Immediately advise BellSouth of any information of which Supplier becomes aware that would reasonably provide notice of potential threats to the Information Resources, assets or personnel of BellSouth.

> **NOTE:** For the purposes of the document, an appropriate background check shall consist of research at the county courthouse level for the felony and misdemeanor offenses described above and any pending trial dates for such offenses. Research shall be conducted in all the counties in which the Employee or Subcontractor has resided within the seven years prior to the proposed assignment.

G. Secure and protect BellSouth proprietary information, BellSouth employee proprietary information, BellSouth customer proprietary information, and/or other BellSouth Information Resources from unauthorized or improper use. theft, or accidental or unauthorized modification, disclosure or destruction.

H. Assure the reliability and integrity of all BellSouth information and Information Resources under its control, and the information processing activities performed with or for BellSouth. This includes the creation of a service level agreement.

I. Maintain the proprietary nature and if necessary, the proprietary marking of any BellSouth, BellSouth employee, and/or BellSouth customer proprietary information.

J. Comply with agreed upon written arrangements for the movement of information and data between BellSouth and Supplier, and between Supplier and any other entities authorized in the Agreement. If not otherwise specified, either return proprietary information to BellSouth or completely destroy proprietary information by shredding or burning, or in the case of proprietary information contained in electronic form, by erasure and/or overwriting in such a fashion that such proprietary information cannot be retrieved by data retrieval or other utilities.

K. Ensure that if applicable to the services provided in this Agreement, that BellSouth, BellSouth employee, and/or BellSouth customer proprietary data which are identified by BellSouth as requiring encryption, are transmitted across a public network (including the Internet, but excluding the Public Switched Telephone Network) in an encrypted format.

L. Ensure that stored data is encrypted as necessary to enforce access control. This section specifically requires the one-way encrypted storage of passwords on systems intended for BellSouth usage and for any administrative access to such systems. For systems intended for BellSouth customer use, it requires the encrypted storage, but not necessarily one-way encryption of passwords used for customer access.

M. Ensure that computer storage devices, e.g., DASD, hard or floppy disks, magnetic tape, or optical disks, containing BellSouth or BellSouth customer proprietary data are not disposed of or otherwise presented to others unless all BellSouth and BellSouth customer proprietary data has been completely obliterated. This includes media used to transmit data and to create backups.

---



**Appendix B**

**BellSouth
Corporate Security Standards**

### 400-600-TR - Security Requirements for Sourced Work

N. Ensure that any security credentials received from the customer to enable downstream system access are verified and confirmed with the customer by a means independent of the process in which they were received. For example, if the customer supplies his security credentials via email, the verification might be via the U.S. Mail.

O. Not use or transfer BellSouth, BellSouth employee, and/or BellSouth customer information or data for any purpose not explicitly defined and authorized in the Agreement between the parties. This includes aggregate, trend and assimilated data. No individually identifiable customer data shall be transferred to a third party unless specifically authorized by the employee or customer, or as authorized by BellSouth in the performance of services ordered and being paid for by the customer.

> **NOTE:** BellSouth CPNI (Customer Proprietary Network Information) must be handled in accordance with laws and regulations governing such information.

P. Shall, unless a mechanized scanning tool is not available for the platform or operating system, complete a security scan of the system and notify BellSouth of all discovered vulnerabilities. Further, all discovered vulnerabilities shall be corrected or accepted in writing by the BellSouth Enterprise Information Security organization prior to delivery or implementation.

Q. Implement security changes, patches and upgrades in systems, applications and software in a timely manner and commensurate with the threat, as directed by the manufacturer and subject to appropriate testing, but not longer than 90 days from their release. Security changes, patches and upgrades correcting significant or immediate security issues shall be implemented immediately subject to appropriate testing under the circumstances but no later than 10 days after their release unless a longer period is recommended by the manufacturer or agreed to by the BellSouth Enterprise Information Security organization.

R. Ensure that if a commercial hosting center is used, that their computers, computer systems and computer communications networks are both physically and logically isolated from other such equipment in the hosting center.

S. Ensure that individual access and accountability controls are in place for each of Supplier's employees and representatives who will access a BellSouth system, application or other Information Resource including resources owned and/or operated by or for Supplier that may contain BellSouth proprietary information, BellSouth employee proprietary information, and/or BellSouth customer proprietary information. Accountability/audit records shall be kept for a period of no less than thirty days.

T. Ensure that authentication mechanisms are complex and not easily overcome. There shall be no known way to bypass the authentication mechanism and obtain entry into the system. Token-based authentication devices, smart cards or biometric devices are recommended. If passwords are to be used, they must:

## Appendix B



# BellSouth
# Corporate Security Standards

### 400-600-TR - Security Requirements for Sourced Work

a.  Be at least six characters in length for users and eight characters in length for administrators and/or maintenance personnel,

b.  Contain both alphabetic and numeric characters,

c.  Be aged at least every sixty (60) days for users and every thirty (30) days for administrators, and

d.  Not be reusable. A system must employ a password reuse utility that prevents a password from being reused for at least 6 (six) months, the last 3 (three) aging cycles, or the last 5 (five) password changes, whichever is feasible and longer.

If the system/network being accessed exists solely for use by BellSouth customers, such customers may elect to disregard any or all of items noted in (a) through (d) above using an online decision process or other recordable means that warns them of the security implications, and then records the wishes of the customer. This exclusion does not apply to certain users, including but not limited to BellSouth internal users, the supplier's personnel and maintenance and/or administrative personnel.

> **NOTE:** Use of .rhost files, host.equiv, NT shares, NFS, etc., frequently results in bypassing authentication.

U.  Ensure that Internet and other public (including public switched telephone) network connections are designed, implemented and maintained so as to secure and protect information, data, and system operation during the life of the Agreement. This includes, but is not limited to, non-repudiation, authentication, authorization, and monitoring issues. The parties agree that no Internet or other public network connections shall be implemented except as documented and approved in this Agreement or a subsequent agreement that has been accepted by the BellSouth Enterprise Information Security organization.

BellSouth requires persons using remote, e.g., in-dial, ISDN, wireless, VPN or other public switched network access for maintenance and/or administrative purposes to be individually identified and authenticated by an independent, dedicated, access control device that is a part of a network authentication infrastructure. The remote authentication process must utilize a dynamic password, such as a *token card*.

V.  A system's login procedures must be designed and implemented with a mechanism that will thwart the use of repeated login attempts to guess or otherwise determine a valid login identification and authentication combination. The process must always cause the person or machine to reinitiate the login process after no more than nine successive unsuccessful attempts.

W.  Ensure that no connection is made to a BellSouth internal data communications network including a *control capable* channel into the BellSouth Advanced Intelligent Network (AIN) or the Public Switched Telephone Network (PSTN) without permission, in writing, from the BellSouth

---



**Appendix B**

# BellSouth
# Corporate Security Standards

### 400-600-TR - Security Requirements for Sourced Work

Enterprise Information Security organization.  Supplier shall further understand that:

   a. Any and all traffic traversing a remote access link to a BellSouth internal network is subject to monitoring at any time and without advance warning.  There shall be no expectation of privacy in the use of a BellSouth internal network.  BellSouth shall have the right to terminate any remote link if illegal or improper traffic is observed.

   b. The use of UDP shall be avoided where possible.

   c. Any device connected to a BellSouth internal network shall be subject to security scans (unless a firewall prevents such scans) and other security audit procedures.  These scans may be conducted without prior notice.  The scans will test the connected platform for security vulnerabilities and compliance with BellSouth security standards.  It should be noted that the security scanners do test for denial of service vulnerabilities, and may attempt system access and perform other intrusive activities such as password cracking.  BellSouth expects connected devices to resist such scanning without affecting service availability.  BellSouth further expects Supplier to promptly correct discovered vulnerabilities.

   d. Remote access connections to BellSouth internal networks may be refused, disconnected or otherwise limited at any time, for any reason and without warning.

X. In the event BellSouth has a good faith belief that Supplier or it's employees or agents may have violated terms of this Security Standard OR in the normal course of BellSouth's routine audits/inspections, allow BellSouth designated parties to inspect, with one business days' notice all computer software, files and records whether resident on equipment owned, leased or controlled by Supplier and/or resident on equipment owned, or leased or controlled by Supplier's Employees and Subcontractors, in which are stored data obtained from or resulting from the use of BellSouth's Information Resources or the performance of work for BellSouth.  Supplier shall not authorize the use of any equipment on a BellSouth account unless Supplier has the right to audit such equipment and authorize third party audits on such equipment.  BellSouth's routine audits/inspections include but are not limited to, operating system security, application security, database security, physical security (doors, windows, walls, and card access system), network security, wardialing of phone lines for modem identification, and program change control.  No inspection activities shall be undertaken that will disclose Supplier's or Supplier's other customer's Confidential Information unless BellSouth's Confidential Information cannot be reasonably obtained without disclosure of other's confidential information.  In any event, prior to such inspection or audit, BellSouth's inspectors may be required to execute an appropriate nondisclosure agreement to protect confidential and/or proprietary information of, or in the custody of, Supplier that may be observed during such inspection or audit.  Further, BellSouth will participate in reasonable activities implemented by Supplier in an effort to protect confidential information of others during such audits/inspections and Supplier



---



**Appendix B**

**BellSouth**
**Corporate Security Standards**

### 400-600-TR - Security Requirements for Sourced Work

has the right to refuse BellSouth access to data or information that requires special government-issued clearances. These audits and/or inspections may include security scans, unless a firewall prevents such scans; provided, however, that the nature, extent and scheduling of each such security scan will be negotiated and mutually agreed upon by the parties at the time of the proposed audit and such agreement shall not be unreasonably withheld or delayed. The security scans will test the platform for security vulnerabilities. It should be noted that the security scanners may test for denial of service vulnerabilities and may attempt system access and perform other intrusive activities such as password cracking. BellSouth expects devices to resist such scanning without affecting service availability. BellSouth further expects Supplier to promptly correct discovered vulnerabilities.

Y. Report to BellSouth, within one working day of discovery, any known or suspected unauthorized access, use, misuse, disclosure, destruction, theft, vandalism, modification, or transfer of BellSouth, BellSouth employee, and/or BellSouth customer proprietary information.

Z. Bargain in good faith for the provision of additional BellSouth security needs not identified in the original agreement.

AA. Have an effective change management program in place.

BB. Use the BellSouth name, logo, and any other BellSouth identifying mark only as specifically documented in this Agreement.

**5.2     Operability** –The Supplier warrants that Information Resource(s) provided under the terms of this Agreement shall operate in a manner satisfactory to BellSouth with all required security controls and features installed and functioning.

**5.3     Non-Repudiation** – Information Resources designed to handle electronic business-to-business functions involving bid, purchase, sale, order, payment and/or delivery of material shall ensure that the repudiation of significant facts is negated by functionality involving a secure digital signature or another form of non-repudiation approved by the BellSouth Enterprise Information Security organization at the time of the Agreement.

**6.     Outsourced Web Hosting**

**6.1     General** – A Supplier operating and/or hosting a web site for BellSouth shall comply with the security requirements in Paragraph 5 of this document. A Supplier providing web site services that will not be hosted by the Supplier, but rather by a third party, shall ensure that all security requirements related to hosting functions are passed through to the hosting facility. This section also addresses web sites initially hosted by an entity external to BellSouth but which are ultimately hosted by a BellSouth facility.

> **Exception** – Hosting facilities owned by BellSouth are subject to BellSouth's internal security standards and not subject to this document.

The Supplier shall ensure that:



**Appendix B**

**BellSouth**
**Corporate Security Standards**

---

**400-600-TR - Security Requirements for Sourced Work**

A. BellSouth proprietary information is protected while displayed or stored on the Supplier's system using authentication and/or encryption mechanisms.

B. Web sites associated with the BellSouth name are not linked to any objectionable sites. If there is any question as to whether a potential site is objectionable, authorization must be obtained in writing from BellSouth prior to establishing the link.

C. After any significant hardware or software upgrades, a review of the Web site host is conducted to ensure compliance with these Standards has been maintained.

D. Web servers and/or web content development tools provide the capability to:

     a. Authenticate publishers prior to their placing any content onto a BellSouth web site,

     b. Authorize publishers' access only to those systems, specific directories and files necessary to publish content onto BellSouth web sites, and

     c. Ensure content publishing is done under the publisher's own unique UserID, never as a system-specific user such as "root" or "adm".

     d. Control access to web site content. Webmasters must apply the principle of minimum privilege, i.e., give users only the minimum access required, to ensure the security of their web servers.

E. Web servers provide for the capability, and webmasters ensure, that procedures are in place to test for security vulnerabilities whenever executable web content, e.g., cgi scripts, is changed.

F. Web servers have a logging capability to determine who has updated/changed content on the web server. The system must have an audit log retention period of no less than thirty (30) days. Logs should not be retained beyond 90 days unless there is a specific business purpose.

G. Web servers provide encryption to protect proprietary information. Passwords and other authentication data used to access or publish web content must be encrypted when transmitted. Passwords, encryption keys, security codes or proprietary information must not be stored in cookies unless encrypted.

H. The implementation and use of scripts and programs (e.g., applets, CGI scripts, JSP's, servlets and ASP's) is monitored and controlled.

I. Automatic indexing is disabled to prevent the browser from returning a directory index.

J. Intrusion detection software is deployed and operated in an active mode.

**6.2**    **Outsourced Web Site Ultimately Hosted by a BellSouth Facility** – For web sites developed under sourcing agreements and for which the BellSouth sponsor indicates the system will ultimately reside inside BellSouth, the Supplier shall ensure compliance with the items in paragraph 6.1 and in addition that:

A. Web site hosts must utilize a BellSouth-approved server operating system and platform as required by the approved architecture for the proposed BellSouth data center location,

B. Web site hosts must utilize BellSouth-approved web server software as required by the approved architecture for proposed BellSouth data center location, and

---



**Appendix B**

**BellSouth
Corporate Security Standards**

**400-600-TR - Security Requirements for Sourced Work**

C. Web site hosts must comply with any other BellSouth-approved architecture requirements of the proposed BellSouth data center location.

**6.3    Co-branding** - For purposes of this document, co-branding is the act of identifying an entity or object, such as a Web site, by means of a mark, such as a service mark or trademark, or by any other legally recognized means, as being owned by, controlled by, produced by, or otherwise benefiting, more than one company.  Whenever someone other than BellSouth co-brands their Web site with a BellSouth mark or logo, a formal review must be completed by the BellSouth Enterprise Information Security Consulting group before that site is activated and made generally available, or it must have been determined by the BellSouth Enterprise Information Security Consulting group that such a review is not necessary and appropriate.  If the review uncovers any vulnerabilities affecting BellSouth, the vulnerabilities must be closed or be authorized by an approved BellSouth Security contract waiver or BellSouth Security Standards variance before the Web site is activated and made generally available.

**7.    Expiration or Termination Transition**

**7.1    General** - In the event of expiration or termination of this Agreement, Supplier shall cooperate fully, completely and in a timely manner to conclude/transition the relationship in a secure fashion.  During the proceedings to conclude the relationship, which may include transition of activities to BellSouth or a third party and which may extend beyond the expiration or termination of this Agreement, the Supplier shall continue to protect all information, data, assets and capabilities in accordance with the applicable requirements in this Agreement.  The BellSouth Enterprise Information Security organization shall be the final authority for issues concerning security that may arise during the conclusion of the relationship if such issues are not addressed in this Agreement or subsequent amendments, and Supplier agrees to comply fully with any decisions rendered by the BellSouth Enterprise Information Security organization.   .

JUN-14-2004(MON)  12:59  BELLSOUTH BUSINESS          (FAX)305 569 7339          P.002

*APPENDIX C*

05/27/2004  08:27  9544344717              JAY WILSON    954301-2316          PAGE  01
                                                                                p. 7
   05/27/2004  06:24  9544344717              JAY WILSON                    PAGE  01

## BellSouth Business Internet Services

### Dedicated Internet Access Order Summary Form

| Customer Legal Name: BroadVoice, Inc. | |
|---|---|

| | | |
|---|---|---|
| New Order | | Customer |
| | | |
| Private Line | | BellSouth |
| | | |
| Full DS3 (45 Mg) Dedicated Tiered Internet Access | | 12 months |

The Undersigned Customer hereby orders from BellSouth Telecommunications, Inc. ("Bellsouth") the BellSouth Business Services of the kind, at the location and for the prices and term specified in (Full Order Addendum and its related order Detail Forms) (collectively, the "Order"). BellSouth Business Service is provided, and this Order is executed, subject to (and in accordance with BellSouth General of Non-Regulated Services Master Agreement, and all applicable amendments and parties. This Order is valid only when accepted by an authorized representative at BellSouth. The term of the Service begins upon completion of installation and activation by BellSouth, unless terminated earlier it is set forth herein or in accordance with the provisions set forth in the BellSouth Business Non-Regulated Services Master Agreement. This Contract will be renewed for additional one year terms Under its same terms and conditions herein unless either party provides written notice of its intent not to renew this Contract at least sixty (60) days prior to the expiration of the initial term or each additional one-year term.

## Order Summary Form

| Components | One Time | Monthly Recurring |
|---|---|---|
| BellSouth IP Charge | $0 | $... |
| Domain Name Registration Fee | None | N/A |
| DNS | N/A | Only using Free Domain |
| Packet Filtering | Option Not Selected | Option Not Selected |
| NewsFeed | Option Not Selected | Option Not Selected |
| Multi-homing (Must complete BNS Service Matrix) | Option Not Selected | N/A |
| Expedite Fee | Not an Expedite | N/A |
| Intelligent PVC | Option Not Selected | Option Not Selected |
| NAT (must complete NAT Optional Feature Order Form) | Option Not Selected | N/A |
| Promotion: Option Not Selected | N/A | N/A |
| Other: | | |
| Total | $0 | $... |

| | | |
|---|---|---|

12/2002                                      Customer Initials: O.C.

JUN-14-2004(MON) 12:59 BELLSOUTH BUSINESS (FAX)305 569 7339 P.003

APPENDIX C

05/27/2004 08:27 9544344717 JAY WILSON 06430-2316 PAGE 02 P.6

05/27/2004 05:24 9544344717 JAY WILSON PAGE 02

## Customer's Change to Existing Service

[illegible]

| Start Date | End Date |
|---|---|
| | |

[illegible]

☐ For the new service, Extend Customer's Initial Term. The minimum service term of Customer's prior Order(s) shall be extended by the contract term specified on page 1, any new services or features added shall be coterminous with the other Services under such Order(s); or

☐ For the new service, the term of this Order Summary Form shall supersede and amend the Customer's Initial Term

☐ For the new service, do not extend Customer's Initial Term. The changes set forth above will not extend the term of Customer's prior Order(s); any new services or features added shall be coterminous with the other Services under such Order(s).

## Additional Terms and Conditions

1. Customer shall not be charged for any of the services [illegible] and provided under this Agreement.
2. BellSouth has the right to terminate this Agreement with or without cause upon three (3) days written notice to Customer.
3. BellSouth and Customer are in the process of negotiating a [illegible] and mutually acceptable Voice [illegible] Trial Agreement. If successful in agreeing to the terms of such Trial Agreement, then it is the intent of BellSouth and Customer to [illegible] the terms and conditions of this Agreement and the [illegible] BellSouth Business Services Master Agreement as integral part of the [illegible] agreed to Trial Agreement. If the parties are unable to agree on such Terms, then this Agreement will be terminated without liability to Customer.

## IMPORTANT

CUSTOMER HAS READ AND AGREES TO BE BOUND BY THIS ORDER, INCLUDING THE APPLICABLE ORDER DETAIL FORM (S) AND THE BELLSOUTH® BUSINESS SERVICES MASTER AGREEMENT AND RATE SCHEDULES, AND ALL APPLICABLE ACCEPTABLE USE POLICIES, ALL OF WHICH REPLACE AND SUPERSEDE ANY OTHER NEGOTIATIONS, AGREEMENTS, PROPOSALS AND COMMUNICATIONS (ORAL OR WRITTEN) RELATING TO THE SERVICES LISTED OR DESCRIBED ON THIS ORDER AND SHALL PREVAIL OVER ANY ADDITIONAL OR CONFLICTING TERMS IN ANY PURCHASE ORDER, INVOICE, ACKNOWLEDGEMENT OR OTHER SIMILAR DOCUMENT ISSUED BY CUSTOMER.

| [illegible] | [illegible] |
|---|---|
| BellSouth Telecommunications, Inc. | BroadVoice, Inc. 5/27/04 |
| Signature / Date | Signature / Date |
| [signature] 5-25-04 | [signature] |
| Name / Title | Name / Title |
| RICHARD A. GONZALES [illegible] | David Epstein President |

## NOTE

The rates for this Service do not include the annual Domain Name registration fee (for first two years) if the customer purchases Domain Name Registration, the charge will appear on the BellSouth bill for the registration for the first two years of service. After the initial two years, the customer will be responsible for paying these fees through the appropriate domain name registrar.

* If Customer selects this option, BellSouth will attempt to meet the requested installation date and Customer will [illegible] the additional one-time installation fee if and only if BellSouth meets such date or would have done so but for delays caused or requested by Customer.

1202[illegible]

Customer initials: DE [illegible]

JUN-14-2004(MON)   13:00   BELLSOUTH BUSINESS        (FAX)305 569 7339        P.004

APPENDIX C

05/27/2004  08:27   9544344717          JAY WILSON      95438 2316       PAGE  03

05/27/2004  06:24   9544344717          JAY WILSON                       PAGE  03

# @ BELLSOUTH

### BellSouth® Business Services Master Agreement

JUN-14-2004(MON)  13:00  BELLSOUTH BUSINESS           (FAX)305 569 7339        P.005

**APPENDIX C**

05/27/2004  08:27   9544344717              JAY WILSON              PAGE  84
                                      95430-2316                      P. 9

05/27/2004  06:24   9544344717           JAY WILSON              PAGE  05

## @ *BELLSOUTH*

**11. Force Majeure.** ...

**12. Termination and Default.** ...

**13. Use of Materials, Marks and Information.** ...

**14. Confidential Information.** ...

CONFIDENTIAL/PROPRIETARY – NOT FOR DISCLOSURE WITHOUT WRITTEN PERMISSION
Page 3 of 5

Version 01/2004

JUN-14-2004(MON)  13:01  BELLSOUTH BUSINESS           (FAX)305 569 7339        P.006

APPENDIX C

05/27/2004  08:27   9544344717        JAY WILSON                    PAGE  85
                                              8543B-2316              P. 4

05/27/2004  06:24   9544344717        JAY WILSON                    PAGE  84

**@BELLSOUTH**

*[Body text illegible due to poor fax quality]*

7. Limitation and Disclaimer of Warranties: NEITHER BELLSOUTH NOR ANY OF ITS UNDERLYING SERVICE PROVIDERS, INFORMATION PROVIDERS, LICENSORS, EMPLOYEES, OR AGENTS WARRANT THAT THE SERVICE WILL BE UNINTERRUPTED OR ERROR FREE OR MAKE ANY WARRANTY AS TO THE RESULTS TO BE OBTAINED FROM USE OF THE SERVICE. THE SERVICE IS LICENSED WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF TITLE OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE, OTHER THAN THOSE WARRANTIES (IF ANY) THAT ARE IMPLIED BY AND INCAPABLE OF EXCLUSION, RESTRICTION, OR MODIFICATION UNDER THE LAW APPLICABLE TO THIS SERVICE AGREEMENT, ALL SUCH WARRANTIES BEING EXPRESSLY DISCLAIMED.

8. Limitations and Disclaimer of Liability:

*[Remaining body text illegible due to poor fax quality]*

CONFIDENTIAL/PROPRIETARY – NOT FOR DISCLOSURE WITHOUT WRITTEN PERMISSION
Page 2 of 6

JUN-14-2004(MON)  13:01  BELLSOUTH BUSINESS          (FAX)305 569 7339          P.007

APPENDIX C

05/27/2004  00:27   9544344717          JAY WILSON          05438-2316          PAGE  86
                                                                                 P.2

05/27/2004  06:24   9544344717          JAY WILSON                    PAGE  86

## @ BELLSOUTH

*[Body text illegible due to faded/degraded image quality]*

CONFIDENTIAL/PROPRIETARY – NOT FOR DISCLOSURE WITHOUT WRITTEN PERMISSION
Page 4 of 5

Version 84/2004

APPENDIX C

05/27/2004  88:27   9544344717              JAY WILSON    9543142316        PAGE  87
                                                                                     P. 1

05/27/2004  06:24   9544344717              JAY WILSON                      PAGE  87

**@ BELLSOUTH**

IN WITNESS WHEREOF, BellSouth and Customer have caused this Contract to be executed and delivered by their duly authorized representatives, whether upon execution by Customer and acceptance by BellSouth. The undersigned warrant and represent that they have the authority to bind Contractor and BellSouth to this Agreement.

Customer: BroadVoice, Inc.                     Accepted by BellSouth BMS, Inc. and
                                                certificate Telecommunications, Inc.
                                                By: BellSouth Business Systems, Inc.

By: _____                  By: _____

Name: David Ronson                             Name: RICHARD A GONZALEZ
         (Print or Type)                                  (Print or Type)

Title: President                               Title: SALES MANAGER

Date: 5/25/04                                  Date: 5/25-04

CONFIDENTIAL/PROPRIETARY — NOT FOR DISCLOSURE WITHOUT WRITTEN PERMISSION
                         Page 6 of 6

Version 01/2004                                        Customer's Initial: D.C.
                                                       Date: 5/25

MAY-24-04 04:54 PM        REID_HOME_OFFICE        4047959117        P.02

## APPENDIX D

*VIA FACSIMILE:*

May 21, 2004

Mr. David Epstein
President
BroadVoice, Inc.
900 Chelmsford Street
Tower 3, Floor 11
Lowell, MA 01851

Dear David:

The purpose of this letter is to set forth the agreement of BellSouth Telecommunications, Inc. (BellSouth) and BroadVoice, Inc. (BroadVoice) to the following terms:

1.  Upon signing this letter agreement, BroadVoice will proceed immediately with the placement of the order(s) necessary to order the twenty-eight (28) GSST tariffed PRIs with associated 9-1-1 PinPoint service and the OC-3/DS-3 services and facilities, more particularly described in Exhibit A which is attached to and a part of this letter agreement.

2.  In return for the placement of such order(s), BellSouth's nonregulated information services operations agrees to reimburse BroadVoice for its payment of all tariffed charges incurred in association with such order(s). BroadVoice will submit a bill each month to BellSouth at [insert address] for all amounts due and owing. BellSouth agrees to pay BroadVoice all billed amounts due and owing upon receipt of such bill. BellSouth agrees to pay BroadVoice for all termination liabilities and expenses incurred by BroadVoice, in the event that BellSouth terminates service pursuant to Paragraph 4 herein.

3.  It is the intent of the undersigned parties that this letter agreement will eventually be superceded by and become a part of a Voice over IP market Trial Agreement that the parties are in the process of negotiating. Notwithstanding these intentions, neither party shall be considered obligated

*D.E.*

## APPENDIX D

to enter into any such Trial Agreement, unless the parties mutually agree to all of the terms of such Agreement.

4. BellSouth shall have the right to terminate this letter agreement at any time for any reason upon sending BroadVoice three (3) business days prior written notice to the above stated address. In the event of any such termination, BellSouth will remain liable to BroadVoice for reimbursement of all amounts due and owing under this agreement, including any tariffed termination or cancellation of service charges paid by BroadVoice that may be associated with the tariffed services ordered pursuant to this letter agreement as described in Exhibit A.

5. The parties agree that this letter agreement shall remain confidential and subject to the terms of that certain Information Exchange Agreement between BellSouth's affiliate, BellSouth Business Systems, and BroadVoice, Inc., dated May 3, 2004.

If BroadVoice agrees to the above terms, please indicate your agreement by signing in the space provided below and returning a signed faxed copy to me at 404-529-0014.

Sincerely,

Bill Smith
On Behalf of
BellSouth Telecommunications, Inc.

Accepted:

David Epstein
On Behalf of BroadVoice, Inc.

FORM APPROVED
T. Rawls

MAY 25 2004
Date Signed

638643                              2

D.E.

## APPENDIX D

### Exhibit A

Locations for PRIs and PinPoint Service:

| Rate Center | PRI Central Office | NPA | NXX |
|---|---|---|---|
| Sout* FL | | | |
| West Palm Beach | WPBHFLANDS0 | 561 | 650 |
| Jupiter | JPTRFLMADS0 | 561 | 741 |
| Boca Raton | BCRTFLSADS0 | 561 | 451 |
| Delray Beach | DLBHFLKPDS0 | 561 | 495 |
| Boynton Beach | BYBHFLMADS0 | 561 | 374 |
| Belle Glade | BLGLFLMADS0 | 561 | 992 |
| Pahokee | remote officeBLGLFLMADS0 | 56* | 924 |
| Hobe Sound | HBSDFLMADS0 | 772 | 545 |
| Stuart | STRTFLMADS0 | 772 | 283 |
| Jensen Beach | HTISFLMADS0 | 772 | 225 |
| Port Saint Lucie | PTSLFLMADS0 | 772 | 335 |
| Fort Pierce | FTPRFLMADS0 | 772 | 460 |
| Vero Beach | VRBHFLMADS0 | 772 | 226 |
| Sebastian | SBSTFLMADS0 | 772 | 581 |
| Atlanta, GA | | | |
| 725 West Peachtree St* | | 404 | 988 |

Service/Facilities to be ordered based on Tariff Sections A42.3 (GSST), 13.3.21 (FCC 1), 4.7 (FCC 1):

| Description | Quantity per Rate Center | Total Quantity | USOC/Code |
|---|---|---|---|
| BellSouth Primary Rate ISDN | | | |
| Access Line | 2 | 30 | 1LD1E |
| Interface – Voice/Data (Standard) | 2 | 30 | PR7IV |
| B-Channels – Voice/Data (Standard) | 46 | 690 | PR7BX |
| D-Channels – Voice/Data (Standard) | 2 | 30 | PR7EX |
| Telephone Numbers for Voice/Data & Digital Data Inward 2-way | 2 | 30 | PR7TF |
| Calling Name Delivery Feature | 2 | 30 | PR7CN |
| End User Common Line (EUCL) | 10 | 150 | 9ZR |
| Telecommunications Relay Service | 10 | 150 | (N/A) |
| Excess Line Port Charge – PRI | 2 | 30 | 9ZEPR |
| Local Number Portability | 2 | 30 | LHPCN |
| Federal Universal Service Charge - PRI | 2 | 30 | FUJMX |
| Circuit Location | | | |
| Fixed Charge | 2 | 30 | 1LN1A |
| Charge per mile (monthly) | (varies by rate center) | (varies by rate center) | 1LN1B |
| E911 PinPoint Service | | | |
| E911 PinPoint Service per customer | 1 | 14 | E6YN1 |
| E911 PinPoint (up to 1000 records) | 1 | 14 | E6Y61 |

*No PinPoint service needed on Atlanta PRIs

NOTE: Be sure to indicate on the orders that the 2 PRIs in a pair must use diversely-routed inter-office facilities, because this is E911 service

*D.E.*

538643 – Appendix A                                    Page 1 of 1

# FIRST AMENDMENT TO
# THE AGREEMENT

This Amendment to the Agreement, dated as of June 21, 2004, is made by and between BroadVoice, Inc. (Supplier) and BellSouth Telecommunications, Inc. (BellSouth) and their respective successors and assigns.

WHEREAS, BellSouth and Supplier entered into that certain Trial Agreement dated as of June 15, 2004 (the "Agreement"); and

WHEREAS, BellSouth and Supplier desire to amend and supplement the terms of such Agreement.

NOW, THEREFORE, the Parties hereby amend the Agreement as follows:

1. By adding to the Agreement the following new payment element to Appendix A, Section 4, table 1:

    $25,000 one time    • Broadsoft licensing fees
                        • To support the Trial

2. By adding to the Agreement the following new payment element to Appendix A, Section 4, table 2:

    $25,000    Due upon signing this First    Broadsoft licensing fees
               Amendment

3. All other terms and conditions of the Agreement shall remain in full force and effect.

Supplier:                              BellSouth:
BroadVoice, Inc.                       BellSouth Telecommunications, Inc.

By: _____          By: _____
    (Authorized Signature)                 (Authorized Signature)

Name: _David Epstein_____            Name: _W.L. Smith_____
      (Print or Type)                        (Print or Type)

Title: _President_____            Title: _CTO_____

Date: _6/21/04_____            Date: _6/22/04_____

FORM
APPROVED
T.R.
GENERAL ATTORNEY

## SECOND AMENDMENT TO
## THE AGREEMENT

This Amendment to the Agreement, effective as of the date of the signature of the last party to sign below, is made by and between BroadVoice, Inc. (Supplier) and BellSouth Telecommunications, Inc. (BellSouth) and their respective successors and assigns.

WHEREAS, BellSouth and Supplier entered into that certain Trial Agreement dated as of June 15, 2004 (the "Agreement"); and

WHEREAS, BellSouth and Supplier desire to amend and supplement the terms of such Agreement.

NOW, THEREFORE, the Parties hereby amend the Agreement as follows:

    1.  By adding to the Agreement the following new payment element to Appendix A, Section 4, table 1:

        $5,000 one time        • BroadSoft support of trial's dedicated servers

    2.  By adding to the Agreement the following new payment element to Appendix A, Section 4, table 2:

| | | |
|---|---|---|
| $5,000 | Due within 10 days of the effective date of the Second Amendment | Broadsoft support of trial's dedicated servers |

    3.  All other terms and conditions of the Agreement shall remain in full force and effect.

Supplier:
BroadVoice, Inc.

By: _____

Name: _David Epstein_

Title: _President_

Date: _Sept 9, 04_

BellSouth:
BellSouth Telecommunications, Inc.

By: _____

Name: _____

Title: _____

Date: _____

THIRD AMENDMENT TO
THE AGREEMENT


This Amendment to the Agreement, effective as of the date of the signature of the last party to sign below, is made by and between BroadVoice, Inc. (Supplier) and BellSouth Telecommunications, Inc. (BellSouth) and their respective successors and assigns.


WHEREAS, BellSouth and Supplier entered into that certain Trial Agreement dated as of June 15, 2004 (the "Agreement"), as amended, and


WHEREAS, two hurricanes unexpectedly hit the Trial area causing various delays to starting the Trial when originally planned and that such delays were beyond the reasonable control of the Parties hereto, and BellSouth and Supplier desire to amend and supplement the terms of such Agreement to account for such delays.


NOW, THEREFORE, the Parties hereby amend the Agreement as follows:


1.  By amending the second and third sentences of Section 4.1 of the Agreement to state that the Trial Start Date shall be deemed to have commenced on August 16, 2004; that the Agreement and the Trial Period shall each terminate on April 30, 2005, unless further extended under the terms of this Third Amendment; and that BellSouth may, at its option, extend the Trial Period and Agreement by an additional 30 or 60 days beyond April 30, 2005 pursuant to the terms set forth in the Agreement, including the payment terms that are set forth in APPENDIX A that are in effect in the month prior to such extension, by providing Supplier written notice of such election not less than 30 days prior to April 30, 2005.


2.  By stating, for purposes of clarification, that the first $10,725 minimum monthly payment covering the $21.45 per customer line per month fee for Customer Accounts set forth in Appendix A, Section 4 of the Agreement, shall be for the month of August 2004; and that months 2 through 5 of such five month minimum fee period shall be for the months of September 2004 through December 2004, inclusive. This $10,725 minimum monthly payment shall apply to each additional month of the Trial Period following December 2004 until termination of the Trial Period.

3.  All other terms and conditions of the Agreement shall remain in full force and
    effect.

| | |
|---|---|
| Supplier: | BellSouth: |
| BroadVoice, Inc. | BellSouth Telecommunications, Inc. |
| By: _____ | By: _____ |
| Name: _Dbuid Epstein_ | Name: _W. L. Smith_ |
| Title: _President_ | Title: _CTO_ |
| Date: _11/30/04_ | Date: _12/2/04_ |