UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BROADVOICE, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 05-11435-NG |
| ) | |
| BELLSOUTH CORP., BELLSOUTH ) | |
| TELECOMMUNICATIONS, INC., ) | |
| and ) | |
| BELLSOUTH INTELLECTUAL ) | |
| PROPERTY CORP. ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS, OR TRANSFER, OR STAY

Plaintiff BroadVoice, Inc. ("BroadVoice"), by its undersigned counsel, respectfully submits this opposition to Defendants' motion to dismiss, or transfer, or stay. As set forth more fully below, Defendants' business activity in Massachusetts -- including a series of threatening letters, e-mails, telephone calls (directed to BroadVoice), contractual relationships, equipment and advertising sales, business trips, and intellectual-property exploitation -- is far more than is required for this Court to exercise personal jurisdiction over Defendants under well-settled First Circuit law. Therefore, Defendants' motion to dismiss must be denied.

Defendants' desire to litigate this matter in Georgia (their home state) notwithstanding, this Court should deny Defendants' alternative motions to stay or transfer. There is no reason why BroadVoice (a two-dozen employee Massachusetts start-up company) should bear the burden of litigating this case in Georgia. BellSouth is a self-proclaimed $20 billion-per-year

business with extensive and regular business dealings in the Commonwealth, including business activity that culminated in a series of unequivocal threats of trademark infringement and dilution directed to BroadVoice in Massachusetts. These are not the circumstances under which courts disturb the sanctity of the first-to-file principle in favor of a defendant's preferred forum state.

**STATEMENT OF FACTS**

BroadVoice is a privately-held corporation organized under the laws of Delaware, with its principal place of business in Massachusetts. See July 8, 2005 Complaint by BroadVoice ("BroadVoice Complaint"), ¶ 3. Founded in 2003, BroadVoice uses the Internet and advanced routing technologies to provide Voice over Internet Protocol ("VoIP") communications services. Id. These communications services (popularly known as "Internet telephony") are offered to customers as a less-expensive alternative to services offered by traditional "land-line" telephone companies. Id.

Defendant BellSouth Corporation ("BSC") is one of the Regional Bell Operating Companies ("RBOCs") that emerged after the 1984 break-up of AT&T. See BroadVoice Complaint, ¶ 4. BSC reports annual revenue of approximately $20 billion[1] through sales of products and services, including equipment sales in Massachusetts retail stores; BSC also sells telephone equipment over the Web into Massachusetts. See Affidavit of Sean Ploen, Esq. ("Ploen Aff."), ¶¶3-5.[2] BSC conducts other, non-sales business activity in Massachusetts as well.[3]

---

[1] See Form 10-Q, BellSouth Corp., filed August 3, 2005, <www.bellsouth.com/investor/secfilings.html>.
[2] BSC's interactive Web site also displays a live link to <www.realpages.com>, a separate site which contains an online telephone directory. See <www.bellsouth.com>. The RealPages.com site displays advertisements for Massachusetts businesses.
[3] For example, William L. Smith, the Chief Technology Officer of BSC, recently spoke at a leading VoIP conference in Massachusetts. See Ploen Aff., ¶ 6. Additionally, BSC has a significant and joint ownership interest in Cingular Wireless, which conducts regular business in Massachusetts. See Form 10-Q, BellSouth Corp., filed August 3, 2005, <www.bellsouth.com/investor/secfilings.html>.

2

Defendant BellSouth Telecommunications, Inc. ("BST") is a wholly-owned subsidiary of BSC, and part of BSC's "Communications Group." See <www.bellsouth.com/investor/ir_busprofile_coredigital.html>. BST also appears to be responsible for producing the vast majority of BSC's operating revenues. In the most recent financial reporting period, BST produced $4.212 billion of the total $5.142 billion reported operating revenues for the three months ending June 30, 2005. See BellSouth Corporation, Form 10-Q, filed August 3, 2005, "Notes to Consolidated Financial Statements -- Note M." There was no operating revenue reported for BSC itself.[4]

Defendant BellSouth Intellectual Property Corp. ("BIPCO") also is a subsidiary of BSC and is charged with protecting BSC's intellectual property. See September 2, 2005 Complaint by BIPCO and BST against BroadVoice ("BIPCO/BST Complaint"), ¶¶ 2, 7. BIPCO is an owner of a number of trademarks, including the BELL logo, which is at the center of BroadVoice's declaratory judgment action. Id. at ¶¶ 7, 18-19. BIPCO licenses the use of its marks to various entities. Id. at ¶ 7. BST and BSC are licensees of the BELL logo.[5] See BIPCO/BST Complaint, ¶¶ 20, 39.

### A.   The BellSouth/BroadVoice Relationship.

In early 2004, BSC approached BroadVoice concerning a possible partnership. See Affidavit of Les Berry ("Berry Aff."), ¶ 3. In an effort to keep pace with emerging technologies, BSC wanted BroadVoice's assistance and technology in making VoIP service available to BSC customers. Id. Early negotiations led to a May 21, 2004 Letter Agreement (the "Letter Agreement") between BroadVoice and BST. Id. at ¶ 8. The Letter Agreement was executed by

---

[4] In addition, it appears from BSC's Web site that BSC and BST share the same management team. The Web site does not show a separate listing of executive officers for BST. The only members of BST's management team who differ from BSC's are BST's "State Presidents." See <http://bellsouthcorp.com/team>.

[5] The BELL logo mark is widely displayed in Massachusetts, including on Verizon telephone vehicles and phone booths.

3

David Epstein ("Epstein"), BroadVoice's then-President, and by William L. Smith, BSC's Chief Technology Officer. The Letter Agreement contemplated further agreements between the parties. Id.

Days later, BroadVoice and BSC also entered into a Business Services Master Agreement (the "Master Agreement"). Id. at ¶ 9. The next month, on June 15, 2004, BST and BroadVoice entered into a third agreement, the Trial Agreement (the "Trial Agreement"). Id. at ¶ 10.[6] The Trial Agreement provided that BroadVoice would deliver VoIP services to BSC customers using analog telephones and specialized customer-premises equipment provided by BSC. See BIPCO/BST Complaint, ¶ 23. During the negotiation and finalization of each of these three agreements between BSC, BST and BroadVoice, the parties engaged in numerous telephone calls and exchanged numerous e-mails, many of which were directed to BroadVoice's offices in Massachusetts. See Berry Aff. at ¶ 11.

During the course of the parties' VoIP project and the duration of their agreements, BellSouth's employees initiated regular contact with BroadVoice in Massachusetts.[7] Id. at ¶ 13. Although these individuals did not specify which of the BellSouth entities employed them, several of BroadVoice's BellSouth contact persons were part of BSC's "Communications Group," and also were at various times identified as being employees of BST. Id. These individuals included Laura Reid ("Reid"), Sadie Lowry ("Lowry"), and Kelli Beck ("Beck"), each of whom initiated many telephone and e-mail communications into Massachusetts regarding various aspects of the VoIP project. Id.

---

[6] The Trial Agreement subsequently was amended on several occasions, with Epstein of BroadVoice and William L. Smith of BSC executing the amendments.
[7] Where the exact identity of the employer is unclear for individuals acting on behalf of BSC or BST, we use the generic "BellSouth" identifier.

In addition to the business-level contacts, there were weekly and sometimes daily conference calls between BroadVoice employees and members of BellSouth's technical staff. Id. at ¶ 14. Many of these conference calls were initiated by BSC/BST employees to BroadVoice employees in Massachusetts. Id. The conference calls sometimes lasted two to three hours. Id. These regular communications began in May, 2004 and lasted until at least December, 2004. Id. BellSouth personnel also sent hundreds of e-mails into Massachusetts concerning the VoIP project. Id. at ¶ 15.

Several months after the parties began working together, BroadVoice was contacted by BellSouth regarding certain BroadVoice marketing materials. Id. at ¶ 18. In the prior weeks, BroadVoice had created and begun using an advertising image which consisted of an outline of a bell surrounded by a red circle which was bisected by diagonal red line (the universal symbol for "no"). See BroadVoice Complaint, ¶ 7, 11. The so-called "no bell" image had been placed on, among other items, sales flyers, and was intended to differentiate BroadVoice's VoIP service from outdated "land-line" service as offered by the RBOCs. See Berry Aff. at ¶ 16. Initially, BellSouth personnel informed BroadVoice that they found the "no bell" image amusing. Id. at ¶ 17.

### B.  Threats by Defendants.

In September 2004, despite Defendants' initial amusement, BroadVoice's President received telephone calls from Kelli Beck and Laura Reid concerning BroadVoice's use of the "no bell" image. Id. at ¶¶ 18, 19. Those calls were followed by a slightly more formal cease and desist e-mail notice from Beck on September 23, 2004, captioned: "RE: URGENT: Stop Usage of BroadVoice Flyer with 'No' Bell Logo." Id. at ¶ 20. These were the first in a long series of communications and threats directed to BroadVoice in Massachusetts by Defendants.

On October 1, 2004, Beck sent another threatening e-mail to BroadVoice, stating that the "BellSouth Trademark and IP-Legal groups" had determined that the "no bell" image used on the BroadVoice flyer infringed the Bell Logo. Id. at ¶ 21. Beck's e-mail (apparently inadvertently) attached a chain of earlier, internal e-mail messages revealing that BIPCO, too, also was actively involved in pursuing BroadVoice over its use of the "no bell" image. Id. The chain showed that a BIPCO lawyer, Jacqueline Gregorski ("Gregorski") had circulated an internal e-mail that outlined an enforcement strategy for BIPCO and BST, noting that if the business personnel "cannot get [BroadVoice] to comply, [BIPCO] will then step in and send a cease and desist letter." Id.

On October 7, 2004, Beck again sent an e-mail to BroadVoice concerning its use of the "no bell" image. Id. at ¶ 22. In response to these calls and e-mails, on October 15, 2004, BroadVoice's counsel, Lucy Lovrien ("Lovrien"), sent a letter to Gregorski concerning the parties' dispute. Id. at ¶ 23. Days later, a BIPCO representative approached BroadVoice representatives at an industry conference in Boston, Massachusetts, making negative remarks about BroadVoice's use of the "no bell" image consistent with the recent correspondence directed to BroadVoice by Defendants. Id. at ¶ 25. On October 27, 2004, Gregorski replied to Lovrien's letter, restating Defendants' view that BroadVoice's use of the "no bell" image "constitutes trademark infringement, dilution and unfair competition under both federal and state laws." Id. at ¶ 26. The letter also alleged that BroadVoice's use of the "no bell" image was inconsistent with BroadVoice's contractual obligations to BST. Id. The letter, which demanded written assurances that BroadVoice would discontinue use of and destroy any tangible material containing the "no bell" image, concluded that if these steps were not taken, "we will take whatever action we deem appropriate without further notice to you." Id.

6

On January 14, 2005, BroadVoice's counsel again responded at length to Defendants' threatening letters. Notwithstanding BroadVoice's substantive response to Defendants' threats, Laura Reid initiated numerous additional communications with Epstein in Massachusetts concerning whether BroadVoice had destroyed all materials containing the "no bell" image. Id. at ¶ 28. Months later, on June 2, 2005, counsel for Defendants again wrote to BroadVoice, threatening legal action: "BIPCO cannot and will not sit idly by and allow a competitor to defame and misuse its famous intellectual property," and said that, absent confirmation that BroadVoice had acceded to its demands, "BIPCO will have no choice but to pursue its legal remedies." Id. at ¶ 27.

### C.    BroadVoice Files This Declaratory Judgment Action In Massachusetts.

BroadVoice grew increasingly concerned about Defendants' persistent and growing threats and wished to clarify its rights concerning use of the "no bell" image. Thus, on July 8, 2005, BroadVoice commenced litigation in this Court against BST, BIPCO, and BSC, seeking declaratory relief that its use of the "no bell" image did not constitute trademark infringement, dilution, or unfair competition. On September 2, 2005, the Defendants moved this Court to dismiss the action for lack of personal jurisdiction over all three Defendants or, in the alternative, to transfer the action to Georgia, or to stay the Massachusetts action.

### D.    BST And BIPCO Respond By Filing Suit In Georgia.

Also on September 2, 2005, and purely in response to BroadVoice's filing of the Massachusetts action, BIPCO and BST filed suit against BroadVoice in the federal District Court for the Northern District of Georgia.[8] The Georgia action raises essentially the same set of claims for which BroadVoice first sought declaratory relief in Massachusetts.

---

[8] Georgia is without question the Defendants' preferred forum, as a PACER search shows BellSouth entities have been party to at least 250 lawsuits in Georgia federal courts over the last five years.

7

## ARGUMENT

### I. THE DEFENDANTS ARE SUBJECT TO PERSONAL JURISDICTION IN MASSACHUSETTS.

In considering Defendants' motion to dismiss for lack of personal jurisdiction, courts are to examine the "specific facts affirmatively alleged by the plaintiff as true (whether or not disputed) and construe them in the light most congenial to the plaintiff's jurisdictional claim . . . [and] then add to the mix facts put forward by the defendants, to the extent that they are uncontradicted." See Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998) (citations omitted). Those specific facts may support a finding of either specific or general jurisdiction. See, e.g., Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 144 (1st Cir. 1995).[9]

As set forth more fully below, under the well-settled law of this Circuit, Defendants' contacts with Massachusetts, including: (1) repeatedly threatening a trademark infringement and dilution suit against BroadVoice and delivering those threats into Massachusetts by letter, e-mail, telephone, and in person; and (2) engaging in substantial business activity in Massachusetts by entering into various contracts (including contracts with BroadVoice), conducting retail sales, conducting Web-based sales, exploiting and protecting intellectual property rights, and other commercial activity, well exceed the minimal contacts required for this Court to exercise personal jurisdiction under the Massachusetts long-arm statute and the Constitution's due process clause.

---

[9] Specific jurisdiction arises out of a defendant's forum-based contacts. See Donatelli v. National Hockey League, 893 F.2d 459, 462 (1st Cir. 1990). General jurisdiction "exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state." United Elec., Radio, & Mach. Workers of Am. v. 163 Pleasant Street Corp., 960 F.2d 1080, 1088 (1st Cir. 1992).

### A. Defendants Are Subject To Personal Jurisdiction Based On Their Repeated Threats Against BroadVoice And Other Massachusetts Activities.

Toward the end of 2004 and into the first half of 2005, BST and BIPCO directed multiple and continued threats of litigation at BroadVoice in Massachusetts over BroadVoice's use of the "no bell" image. The twenty-year-old rule of this Circuit is that such threatening conduct in itself constitutes "transaction" of business under the long-arm statute. See Nova Biomedical Corp. v. Moller, 629 F.2d 190, 197 (1st Cir. 1980) (in declaratory judgment action, court properly exercised personal jurisdiction over defendant who had sent two threatening letters to plaintiff in Massachusetts); GSI Lumonics, Inc. v. BioDiscovery, Inc., 112 F. Supp. 2d 99 (D. Mass. 2000) (Young, C.J.) (denying motion to dismiss Massachusetts action for lack of personal jurisdiction where defendant had threatened plaintiff with a copyright infringement claim and entered into two contracts with plaintiff).

Specifically, after making multiple threatening phone calls to BroadVoice in Massachusetts, employees of BST, acting with BIPCO's guidance and direction, sent at least three threatening e-mails to BroadVoice regarding its use of the "no bell" image. This series of e-mails was in turn followed by another series of phone calls and letters to BroadVoice from BST and BIPCO. The two most recent letters were sent to Massachusetts by representatives of BIPCO for the stated purpose of protecting BIPCO's rights and BST's rights in BellSouth's intellectual property. Those letters were supplemented further by threats from BST personnel issued by phone and from BIPCO personnel delivered in person at a Boston trade show.

This constellation of threatening conduct not only confers declaratory judgment jurisdiction, but is more than sufficient to create personal jurisdiction over Defendants under the Massachusetts long-arm statute. See Nova, 629 F.2d at 195-97; The Giving Back Fund, Inc. v. Steverson, Civ. A. No. 02-10446, 2002 WL 1586994, at *2 (D. Mass. July 12, 2002) (Zobel, J.)

9

(communications by phone, e-mail to Massachusetts, and two personal visits considered a "legal slam dunk" under long-arm statute and the due process clause).

Indeed, this Court recently denied a defendant's motion to dismiss, transfer, or stay where the defendant had far fewer contacts than those of Defendants here. See GSI Lumonics, Inc. v. BioDiscovery, Inc., 112 F. Supp. 2d 99 (D. Mass. 2000) (Young, C.J.). In GSI, plaintiff and defendant were parties to two agreements concerning software distribution. After plaintiff GSI received a single letter from defendant's counsel claiming copyright infringement, GSI filed a Massachusetts declaratory judgment action against defendant and a second copyright holder. Id. at 101. The copyright-holder defendant responded -- as do Defendants here -- by filing a motion to dismiss for lack of personal jurisdiction, or to transfer the case to California, where a second suit had been filed against GSI for copyright infringement, breach of contract, and related claims. Id.

In denying that motion to dismiss, this Court held that the single threatening letter sent by the co-defendant's counsel, coupled with the defendant's other contacts with Massachusetts -- including contracts with the plaintiff GSI, just as in the instant case -- were sufficient to confer personal jurisdiction over him. Id. at 106, 110 (noting that, as here, the threatening letter "blends [defendant's] accusations of copyright infringement with accusations of violating agreements between the parties"). Moreover, the Court also found that the threatening letter sent by one defendant's counsel could be imputed to the other defendant through their "agency relationship." Id. at 106.

Unlike the plaintiff in GSI, BroadVoice was the recipient of not one but many threatening e-mails, phone calls and letters from Defendants. These communications alone satisfy the due process clause standard, as Defendants' purposeful conduct was such that they should have

10

expected that they could be hailed into a Massachusetts court. See, e.g., Hahn v. Vermont Law School, 698 F.2d 48 (1st Cir. 1983) (mailing of application information and acceptance letter to Massachusetts resident as part of school's effort to serve the Massachusetts market for legal education was sufficient for court to exercise jurisdiction); JMTR Enterprises, LLC v. Duchin, 42 F. Supp. 2d 87 (D. Mass. 1999) (Young, C.J.) (court could exercise jurisdiction over defendants where defendants sent a series of letters into Massachusetts).

Defendants' Massachusetts contacts are not limited, however, to the threatening communications alone. For example, BST has for the past year engaged in regular business activity in Massachusetts related to the VoIP project undertaken with BroadVoice. Defendants cannot dispute that individuals who work for BST (and possibly other BellSouth entities) have had extensive and regular contact with BroadVoice, including Massachusetts-based conference calls, e-mails and other day-to-day activity. Similarly, in addition to asserting its intellectual property rights in letters to BroadVoice specific to this matter, BIPCO also receives benefits from the display of the BELLSOUTH mark on products here and from third parties' use of the BELL logo on vehicles and phone booths. See GSI, 112 F. Supp. 2d at 105-06, 110 (finding that exploiting copyright in Massachusetts was a sufficient "additional contact" to satisfy the due process clause).

These direct forum state contacts by BIPCO and BST -- which are in addition to the series of threatening communications -- far exceed the minimum contacts required under the Constitutional standard as understood by this Circuit. See Ealing Corporation v. Harrods Limited, 790 F.2d 978 (1st Cir. 1986) (transacting business requirement met when defendant sent one telefax to plaintiff in Massachusetts; due process requirements met with additional contacts,

including two letters sent into Massachusetts, additional telefaxes, and a visit by defendant's agent to Massachusetts).

Similarly, BSC's Massachusetts activity (directly and through its wholly-owned subsidiaries BST and BIPCO) is more than sufficient to confer jurisdiction over BSC. As an initial matter, BST's and BIPCO's forum state activity -- including sending threatening letters -- is properly attributable to BSC. This is because, based on its public financial filings, it appears that BSC conducts its business primarily through its subsidiaries, principally BST. Moreover, BST and BSC apparently share common management. Under such circumstances, BST's contacts with Massachusetts apply with equal force to BSC. See In re Lernout, 337 F. Supp. 2d 298 (D. Mass. 2004) (Saris, J.) (subsidiary's contacts could be imputed to parent corporation where plaintiffs showed, among other things, that the parent benefited from the subsidiary's operations, subsidiary and parent shared some common officers and directors).

Moreover, BSC has its own, separate contacts with Massachusetts. For example, BSC entered into the Master Agreement with BroadVoice and BSC's CTO executed at least three agreements with BroadVoice. BSC's direct and indirect contacts with Massachusetts include equipment sales and other commercial activity as well. As noted above, telephone equipment bearing the BELLSOUTH and BELL logo trademarks is sold in Massachusetts in at least one chain of retail stores, BJ's Wholesale Club, Inc., and can be purchased in Massachusetts from the BellSouth Web site. In addition, BellSouth sells advertising space in its online telephone directory to Massachusetts businesses.[10] Although it is impossible absent discovery to determine the percentage of BSC's $20 billion in reported annual revenue that is attributable to its Massachusetts commercial activities, those activities clearly are more than sufficient to satisfy

---

[10] In addition to BSC's direct sales activity in the Commonwealth via retail and Internet channels, BSC presumably derives significant revenue and benefit from its indirect sales activity, including its joint ownership of Cingular Wireless.

the due process standard, and are difficult to reconcile with BSC's sworn affidavit stating that it does not do business in Massachusetts.[11]

Under the First Circuit standard, these additional contacts (i.e., in addition to the threatening letters) by each of the three Defendants require denial of their motion. See Nova, 629 F.2d at 197 (in addition to letters, defendant was conducting or planning on conducting patent-related activity in forum, which was sufficient contact for due process purposes).

### B. The Court Should Deny The Defendants' Motion, But, If Not, The Court Should Permit Personal Jurisdiction Discovery.

In the event that, upon consideration of this Opposition, the Court harbors any doubt about the existence of personal jurisdiction over the three Defendants, either singly or collectively, BroadVoice requests that instead of ruling with prejudice as to the existence of jurisdiction, the Court instead permit limited personal jurisdiction discovery to be completed.

Given the discrepancy between Defendants' numerous assertions that they do not "do business" in Massachusetts and the publicly-available evidence put forward by BroadVoice demonstrating Defendants' business activities in the Commonwealth, this Court should permit personal jurisdiction discovery. For instance, as a result of limited personal-jurisdiction discovery, BroadVoice expects to demonstrate further that BSC and BST have repeatedly sold telephone equipment and yellow-pages advertising in Massachusetts, both via retail channels and over the Web, which would certainly create personal jurisdiction over these entities. BroadVoice also may demonstrate that BIPCO has regularly licensed and enforced its intellectual property rights in Massachusetts, including its rights to the BELLSOUTH and BELL logo trademarks,

---

[11] Exercising jurisdiction over BSC also complies with due process requirements because BSC could reasonably expect to be hailed into a Massachusetts court due to its having purposefully availed itself of the privileges of the forum by doing business here; BSC derives significant benefits and revenue from the forum; Massachusetts has an interest in adjudicating this controversy; and it is not unduly inconvenient for a corporation such as BSC to defend itself in Massachusetts. See Donatelli, 893 F. 2d at 471-72 (listing "Gestalt" factors used in determining fairness).

13

again creating personal jurisdiction over this Defendant. To that end, BroadVoice has prepared model interrogatories, requests for document production, and Rule 30(b)(6) deposition notices all directed exclusively to the issue of personal jurisdiction. See Ploen Aff., ¶ 7, attaching copy of model discovery requests. In the event that the Court is not yet convinced that personal jurisdiction exists, BroadVoice proposes to serve these discovery requests and conduct such discovery on an expedited basis. Upon completion of that process, the parties could readdress this subject with the Court.

## II. VENUE IS PROPER HERE, AND DEFENDANTS' MOTION TO STAY OR TRANSFER SHOULD BE DENIED.

Defendants next seek dismissal for lack of venue. Defendants note that the venue analysis is "essentially the same" as that for lack of personal jurisdiction, and make their venue motion on the same grounds as their personal jurisdiction motion. Accordingly, Defendants' motion to dismiss for improper venue should be denied for the same reasons their motion to dismiss for lack of personal jurisdiction must be denied. In the alternative, and assuming venue is proper, Defendants request that this Court transfer this case to Georgia (or, at least issue a stay), where on September 2, 2005, BST and BIPCO commenced an action against BroadVoice highly similar to the previously-filed present action.

Defendants' alternative motion to transfer or stay should be denied. Although Defendants would prefer to litigate this case in Georgia, there is no good reason why this Court should upset the canon of this and the other Circuits:

> [w]here identical actions are proceeding concurrently in two federal courts, entailing duplicative litigation and a waste of judicial resources, the first filed is generally preferred in a choice of venue decision.

Cianbro Corp. v. Curran-LaVoie, Inc., 814 F.2d 7, 11 (1st Cir. 1987) (citations omitted).

Defendants make two principal arguments as to why this Court should disregard the first-filed complaint in favor of the subsequent Georgia action. First, Defendants argue that there are claims asserted in the Georgia action (state law claims for unfair competition and trademark dilution) that are not asserted in the present action. This, according to Defendants, favors litigation this case in Georgia.

Defendants are wrong. In its complaint, BroadVoice seeks declaratory relief as to Defendants' trademark dilution claims under "the Federal Trademark Dilution Act of 1995, 15 U.S.C. § 1125(c) ('FTDA'), <u>or other applicable law</u>." See BroadVoice Complaint, ¶¶ 19, 22 (emphasis added). BroadVoice included the "other applicable law" language to ensure that all disputes between the parties over BroadVoice's claimed misuse of Defendants' mark be resolved in the instant action. Similarly, BroadVoice's complaint seeks declaratory relief as to Defendants' unfair competition claims under "the Lanham Act <u>or any other applicable law</u>." See BroadVoice Complaint, ¶¶ 14, 17 (emphasis added). This declaratory judgment claim was not intended to be limited to federal, Massachusetts, or any other particular body of law. Instead, BroadVoice simply seeks to resolve all alleged claims of unfair competition asserted by Defendants. Finally, there is no reason why this Court could not apply the appropriate choice of law principles, select the applicable law, and properly adjudicate all of the disputed issues raised by the parties in their nearly-identical complaints.

The second stated ground for transfer advanced by Defendants is the "weight of convenience." While litigating in Georgia may well be more convenient for Defendants, it is certainly inconvenient for BroadVoice. As this Court has explained, "[i]t is not enough, without more, that the claim arose elsewhere or that defendants would prefer another forum. Nor should

15

a transfer be ordered if the result is merely to shift the inconvenience to the plaintiff." <u>Barrigan v. Greyhound Lines, Inc.</u>, 560 F. Supp. 165, 169 (D. Mass. 1982) (denying motion to transfer).

The relative smallness of BroadVoice compared to the gigantism of Defendants makes Defendants' "convenience" argument particularly unavailing. BroadVoice has two dozen employees, all of whom are Massachusetts-based. In contrast, BellSouth is a self-proclaimed $20 billion-a-year business. Moreover, Defendants and their employees do not have difficulty traveling to Massachusetts for commercial reasons. Just this week, William L. Smith, BSC's Chief Technology Officer, delivered a speech in Boston at a VoIP industry conference. <u>See</u> Ploen Aff., ¶ 6.

In sum, in this litigation, Defendants have all of the advantages that accompany nearly unlimited resources. BroadVoice should not be disadvantaged further by this Court rejecting its chosen forum in favor of Defendants' home forum.

## **CONCLUSION**

For the foregoing reasons, BroadVoice respectfully requests that this Court deny Defendants' motions or, in the alternative, order limited discovery directed to the issue of personal jurisdiction.

Respectfully submitted,
BroadVoice, Inc.

By its attorneys

DATE: September 23, 2005

/s/ Robert N. Feldman
BIRNBAUM & GODKIN, LLP
Robert N. Feldman (BBO # 630734)
280 Summer Street
Boston, MA 02210
Tel: 617-307-6100
Fax: 617-307-6101

BOSTON LAW GROUP, LLP
Sean C. Ploen (BBO # 641279)
20 Park Plaza, Suite 637
Boston, Massachusetts 02116
(617) 426-6800