UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BROADVOICE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.  05-11435-NG |
| | ) | |
| BELLSOUTH CORP., BELLSOUTH | ) | |
| TELECOMMUNICATIONS, INC., | ) | |
| and | ) | |
| BELLSOUTH INTELLECTUAL | ) | |
| PROPERTY CORP. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**AFFIDAVIT OF LES BERRY IN SUPPORT
OF BROADVOICE, INC.'S MOTION IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS, OR TRANSFER, OR STAY**

I, Les Berry, being duly sworn, do hereby depose and state as follows:

1.      I submit this Affidavit, which is based upon my personal knowledge, in

support of BroadVoice, Inc.'s Motion in Opposition to Defendants' Motion to Dismiss,

or Transfer, or Stay.

2.      I am currently employed by BroadVoice, Inc. ("BroadVoice") as the

company's Vice President of Customer Service.  BroadVoice's offices, formerly located

in Lowell, Massachusetts, are currently located at Nine Executive Park Drive, Billerica,

Massachusetts 01862.

3.      On information and belief, in or about March or April, 2004,

BroadVoice's then-President, David Epstein ("Epstein"), was introduced to BellSouth

Corporation ("BSC") as a potential partner in connection with BroadVoice's Voice over

Internet Protocol ("VoIP") services. BellSouth was interested in BroadVoice's technology and assistance in making VoIP services available to its customers.

4.    On information and belief, during this period, in or about March or April, 2004, Epstein initially spoke to Eric Schwartz ("Schwartz") of BellSouth via telephone from BroadVoice's offices in Massachusetts.

5.    On information and belief, Schwartz introduced Epstein to Laura Reid ("Reid") to further explore the BroadVoice/BellSouth relationship. On information and belief, Epstein received regular telephone and email communications from Reid while negotiating an agreement.

6.    In or about May, 2004, I also began to have extensive contact with representatives of BSC from my office in Massachusetts. These communications were in connection with negotiations between BellSouth Telecommunications Inc. ("BST") and BroadVoice regarding an agreement (the "Trial Agreement") for a VoIP project ("VoIP project") under which BroadVoice would deliver VoIP services to BellSouth customers using analog phones and specialized customer premises equipment provided by BellSouth.

7.    Beginning in or about May, 2004, while in my Massachusetts office, I received telephone calls and email communications from Reid of BST regarding the technical aspects of the VoIP project.

8.    On or about May 21, 2004, BroadVoice and BST entered into a Letter Agreement ("Letter Agreement") which contemplated further agreements between the parties. A true and accurate copy of the Letter Agreement is attached hereto as Exhibit A.

9.    On or about May 25, 2004, BroadVoice and BSC entered into a Business Services Master Agreement ("Master Agreement"). A true and accurate copy of the Master Agreement is attached hereto as Exhibit B.

10.    On or about June 15, 2004, BroadVoice and BST entered into the Trial Agreement. The Trial Agreement expired in or about April, 2005. A true and accurate copy of the Trial Agreement is attached hereto as Exhibit C.

11.    On information and belief, during or around March, 2004 through June, 2004, while BST, BSC, and BroadVoice were in negotiations regarding the Letter Agreement, Master Agreement, and Trial Agreement, BroadVoice received numerous telephone calls and email communications from BellSouth personnel.

12.    Beginning in or about June, 2004, I received numerous telephone calls and email communications from Sadie Lowry ("Lowry") of BST regarding the VoIP project.

13.    Throughout the duration of the VoIP project, BroadVoice business personnel were in regular contact with Reid, Lowry and Kelli Beck ("Beck"), each of whom initiated many telephone calls and email communications to Massachusetts regarding the VoIP project. I believe that Reid, Lowry and Beck are employed by BSC's Communications Group, however, BellSouth employees who contacted BroadVoice typically did not specify which BellSouth entity employed them.

14.    During the time period in or about May, 2004 through in or about December, 2004, BellSouth's technical team and BroadVoice participated in weekly, and sometimes daily, conference calls regarding the VoIP Project. BST employees initiated many of these calls to BroadVoice employees located in Massachusetts. The duration of these calls was sometimes two or three hours per day.

15.    Throughout the duration of the VoIP project, BroadVoice employees located in Massachusetts received hundreds of emails from various BellSouth employees regarding the VoIP project.

16.    On or about September 22, 2004, BroadVoice attended a VoIP trade conference. During the conference, BroadVoice had material that contained its "no bell" marketing image. BroadVoice used this "no bell" image as part of a marketing effort to distinguish its VoIP services from "land-line" services offered by traditional telephone companies.

17.    On information and belief, while at the trade conference, Reid, Lowry, and Beck saw the "no bell" image on BroadVoice marketing material, and told Epstein that they found the image amusing.

18.    On information and belief, that same day, September 22, 2004, Epstein received a telephone call from Beck in which she stated that Eric Schwartz from her office had seen the "no bell" image, did not find it amusing, and was planning on getting in touch with BellSouth's Intellectual Property Department.

19.    On information and belief, on or about September 23, 2004, Epstein received a telephone call from Reid requiring that BroadVoice stop using and destroy all material that contained the "no bell" image.

20.    Shortly thereafter, BroadVoice received an email from Beck, referencing the Reid telephone call, requiring that BroadVoice cease and desist all use of and destroy all referenced materials. A true and accurate copy of the September 23, 2004 email (as part of a chain of emails) is attached here to as Exhibit D.

4

21.    On or about October 1, 2004, Beck sent an email to BroadVoice in Massachusetts accusing BroadVoice of infringing the BELL logo through BroadVoice's use of the "no bell" image.  A true and accurate copy of the October 1, 2004 email (as part of a chain of emails) is attached here to as Exhibit D.

22.    On or about October 7, 2004, Beck sent another email to BroadVoice concerning BroadVoice's use of the "no bell" image.  A true and accurate copy of the October 7, 2004 email (as part of a chain of emails) is attached here to as Exhibit D.

23.    On or about October 15, 2004, BroadVoice's counsel, Lucy Lovrien responded on BroadVoice's behalf to the prior email communications.

24.    On or about October 18, 2004, BroadVoice had an exhibition booth at the VON Fall 2004 Conference & Expo at the Hynes Convention Center, Boston, MA.  The VON Conference is the VoIP industry trade show.  Among the visitors to the BroadVoice booth was a person from the BellSouth VoIP Business Group.

25.    On or about October 18, 2004, while at BroadVoice's exhibition booth at the VON Fall 2004 Conference in Massachusetts, I was approached by an individual who identified himself as working for BIPCO.  This individual made negative remarks to me concerning the "no bell" logo.

26.    On or about October 27, 2004, BellSouth attorney Jacqueline Gregorski sent BroadVoice a letter reasserting BIPCO's and BST's allegations of trademark infringement, trademark dilution, and unfair competition under both federal and state laws.  A true and accurate copy of an October 27, 2004 Letter From Jacqueline Gregorski To Lucy Lovrien is attached hereto as Exhibit E.

27.    On or about June 2, 2005, BellSouth sent BroadVoice another letter claiming that BroadVoice was infringing upon BIPCO and BST's rights. A true and accurate copy of a June 2, 2005 Letter From Jacqueline Gregorski To Lucy Lovrien is attached hereto as Exhibit F.

28.    On information and belief, during the time that the parties were disputing BroadVoice's use of the "no bell" image, Reid initiated numerous communications with Epstein concerning whether BroadVoice had destroyed all materials containing the "no bell" image.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 23 DAY OF SEPTEMBER, 2005.

Les Berry

6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BROADVOICE, INC.,<br><br>       Plaintiff,<br><br>v.<br><br>BELLSOUTH CORP., BELLSOUTH TELECOMMUNICATIONS, INC., and BELLSOUTH INTELLECTUAL PROPERTY CORP.<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 05-11435-NG |

**EXHIBITS TO THE AFFIDAVIT OF LES BERRY (PART 1)
IN SUPPORT OF BROADVOICE, INC.'S MOTION IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS, OR TRANSFER, OR STAY**

**EXHIBIT A**

APPENDIX D

VIA FACSIMILE:

May 21, 2004

Mr. David Epstein
President
BroadVoice, Inc.
900 Chelmsford Street
Tower 3, Floor 11
Lowell, MA 01851

Dear David:

The purpose of this letter is to set forth the agreement of BellSouth Telecommunications, Inc. (BellSouth) and BroadVoice, Inc. (BroadVoice) to the following terms:

1. Upon signing this letter agreement, BroadVoice will proceed immediately with the placement of the order(s) necessary to order the twenty-eight (28) GSST tariffed PRIs with associated 9-1-1 PinPoint service and the OC-3/DS-3 services and facilities, more particularly described in Exhibit A which is attached to and a part of this letter agreement.

2. In return for the placement of such order(s), BellSouth's nonregulated information services operations agrees to reimburse BroadVoice for its payment of all tariffed charges incurred in association with such order(s). BroadVoice will submit a bill each month to BellSouth at [insert address] for all amounts due and owing. BellSouth agrees to pay BroadVoice all billed amounts due and owing upon receipt of such bill. BellSouth agrees to pay BroadVoice for all termination liabilities and expenses incurred by BroadVoice, in the event that BellSouth terminates service pursuant to Paragraph 4 herein.

3. It is the intent of the undersigned parties that this letter agreement will eventually be superceded by and become a part of a Voice over IP market Trial Agreement that the parties are in the process of negotiating. Notwithstanding these intentions, neither party shall be considered obligated

APPENDIX D

to enter into any such Trial Agreement, unless the parties mutually agree to all of the terms of such Agreement.

4. BellSouth shall have the right to terminate this letter agreement at any time for any reason upon sending BroadVoice three (3) business days prior written notice to the above stated address. In the event of any such termination, BellSouth will remain liable to BroadVoice for reimbursement of all amounts due and owing under this agreement, including any tariffed termination or cancellation of service charges paid by BroadVoice that may be associated with the tariffed services ordered pursuant to this letter agreement as described in Exhibit A.

5. The parties agree that this letter agreement shall remain confidential and subject to the terms of that certain Information Exchange Agreement between BellSouth's affiliate, BellSouth Business Systems, and BroadVoice, Inc., dated May 3, 2004.

If BroadVoice agrees to the above terms, please indicate your agreement by signing in the space provided below and returning a signed faxed copy to me at 404-529-0014.

Sincerely,

Bill Smith
On Behalf of
BellSouth Telecommunications, Inc.

Accepted:

David Epstein
On Behalf of BroadVoice, Inc.

FORM APPROVED
T. Rawls

May 25 2004
Date Signed

638643                           2

D.E.

APPENDIX D

## Exhibit A

Locations for PRIs and PinPoint Service:

| Rate Center | PRI Central Office | NPA | NXX |
|---|---|---|---|
| South FL | | 561 | 650 |
| West Palm Beach | WPBHFLANDS0 | 561 | 741 |
| Jupiter | JPTRFLMADS0 | 561 | 451 |
| Boca Raton | BCRTFLSADS0 | 561 | 495 |
| Delray Beach | DLBHFLKPDS0 | 561 | 374 |
| Boynton Beach | BYBHFLMADS0 | 561 | 992 |
| Belle Glade | BLGLFLMADS0 | | |
| Pahokee | remote officeBLGLFLMADS0 | 56* | 924 |
| Hobe Sound | HBSDFLMADS0 | 772 | 545 |
| Stuart | STRTFLMADS0 | 772 | 263 |
| Jensen Beach | HTISFLMADS0 | 772 | 225 |
| Port Saint Lucie | PTSLFLMADS0 | 772 | 335 |
| Fort Pierce | FTPRFLMADS0 | 772 | 460 |
| Vero Beach | VRBHFLMADS0 | 772 | 226 |
| Sebastian | SBSTFLMADS0 | 772 | 581 |
| Atlanta, GA | | | |
| 725 West Peachtree St. | | 404 | 969 |

Service/Facilities to be ordered based on Tariff Sections A42.3 (GSST), 13.3.21 (FCC 1), 4.7 (FDC 1):

| Description | Quantity per Rate Center | Total Quantity | USOC/Code |
|---|---|---|---|
| BellSouth Primary Rate ISDN | 2 | 30 | 1LD1E |
| Access Line | 2 | 30 | PR71V |
| Interface – Voice/Data (Standard) | 2 | 690 | PR76V |
| B-Channels – Voice/Data (Standard) | 46 | 30 | PR7EX |
| D-Channels – Voice/Data (Standard) | 2 | 30 | PR71F |
| Telephone Numbers for Voice/Data & Digital | 2 | | |
| Data Inward 2-way | | 30 | PR7CN |
| Calling Name Delivery Feature | 2 | 150 | WZR |
| End User Common Line (EUCL) | 10 | | (N/A) |
| Telecommunications Relay Service | 10 | 150 | WZEPR |
| Excess Line Port Charge – PRI | 2 | 30 | LHPCN |
| Local Number Portability | 2 | 30 | FUAMX |
| Federal Universal Service Charge - PRI | 2 | | |
| Circuit Location | 2 | 30 | 1LN1A |
| Fixed Charge | (varies by rate center) | (varies by rate center) | 1LN1B |
| Charge per rate (monthly) | | | |
| E911 PinPoint Service | | | |
| E911 PinPoint Service per customer | 1 | 14 | EBYN1 |
| E911 PinPoint (up to 1000 records) | 1 | 14 | EBY61 |

*No PinPoint service needed on Atlanta PRIs

NOTE: Be sure to indicate on the orders that the 2 PRIs in a pair must use diversely-routed inter-office facilities, because this is E911 service

D.E.

**EXHIBIT B**

APPENDIX C

05/27/2004  08:27  9544344717                    JAY WILSON    954382316    PAGE  03
                                                                                 P. 6

05/27/2004  05:24  9544344717                    JAY WILSON                      PAGE  83

© **BELLSOUTH**

**BellSouth® Business Services Master Agreement**

This BellSouth Business Services Master Agreement (this "Agreement") is made and entered into as of _____ 2004, by and between ...

[Body text illegible due to fax degradation]

1. **The Services.** ...

2. **Term.** ...

3. **Rates and Charges.** ...

4. **Equipment.** ...

5. **Inter Services and Software.** ...

6. **Customer's Responsibilities.** ...

CONFIDENTIAL/PROPRIETARY – NOT FOR DISCLOSURE WITHOUT WRITTEN PERMISSION
Page 1 of 5

Version 042004

APPENDIX C

05/27/2004  08:27  9544344717                        JAY WILSON      9543012316                  PAGE 04
                                                                                                 P. 3

   05/27/2004  06:24  9544344717                      JAY WILSON                        PAGE  05

## @ BELLSOUTH

*(Body text illegible due to poor scan quality)*

CONFIDENTIAL/PROPRIETARY – NOT FOR DISCLOSURE WITHOUT WRITTEN PERMISSION

Version 01/2004

APPENDIX C

05/27/2004 08:27 9544344717 JAY WILSON 954301-2316 PAGE 05 P.4

05/27/2004 06:24 9544344717 JAY WILSON PAGE 04

**BELLSOUTH**

[illegible] Customer shall [illegible] Services to Customer.

7. Limitation and Disclaimer of Warranties: NEITHER BELLSOUTH NOR ANY OF ITS UNDERLYING SERVICE PROVIDERS, INFORMATION PROVIDERS, LICENSORS, EMPLOYEES, OR AGENTS WARRANT THAT THE SERVICE WILL BE UNINTERRUPTED OR ERROR FREE OR MAKE ANY WARRANTY AS TO THE RESULTS TO BE OBTAINED FROM USE OF THE SERVICE. THE SERVICE IS PROVIDED WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF TITLE OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE, OTHER THAN THOSE WARRANTIES (IF ANY) THAT ARE IMPLIED BY AND INCAPABLE OF EXCLUSION, RESTRICTION, OR MODIFICATION UNDER THE LAWS APPLICABLE TO THIS SERVICE AGREEMENT. ALL SUCH WARRANTIES BEING EXPRESSLY DISCLAIMED.

8. Limitation and Disclaimer of Liability. [illegible]

(b) NEITHER CUSTOMER NOR BELLSOUTH OR ANY OF ITS UNDERLYING SERVICE PROVIDERS, INFORMATION PROVIDERS, LICENSORS, EMPLOYEES, OR AGENTS SHALL HAVE ANY LIABILITY FOR INCIDENTAL, CONSEQUENTIAL, INDIRECT OR SPECIAL DAMAGES SUFFERED BY THE OTHER OR ANY OTHER PARTY AS A RESULT OF THIS AGREEMENT OR EITHER PARTY'S PERFORMANCE OR FAILURE TO PERFORM UNDER THIS AGREEMENT, REGARDLESS OF WHETHER OR NOT SUCH PARTIES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. CUSTOMER EXPRESSLY ACKNOWLEDGES THAT THE PROVISIONS OF THIS SECTION SHALL ALSO APPLY TO ALL CONTENT OR OTHER SERVICES AVAILABLE THROUGH THE SERVICE. CUSTOMER AGREES THAT CUSTOMER WILL NOT IN ANY WAY HOLD BELLSOUTH RESPONSIBLE FOR ANY SELECTION OR RETENTION OF, OR THE ACTS OR OMISSIONS OF, THIRD PARTIES IN CONNECTION WITH THE SERVICE.

(c) In the event that a court should hold [illegible]

9. Remedies of Customer. [illegible]

10. Indemnification. [illegible]

CONFIDENTIAL/PROPRIETARY – NOT FOR DISCLOSURE WITHOUT WRITTEN PERMISSION
Page 2 of 8

Customer's Initial [illegible]
Date [illegible]

[illegible]

APPENDIX C

# @ BELLSOUTH

*(body text illegible due to fax degradation)*

CONFIDENTIAL/PROPRIETARY — NOT FOR DISCLOSURE WITHOUT WRITTEN PERMISSION
Page 4 of 6

Version 5/12/2004

APPENDIX C

**ⓐ BELLSOUTH**

IN WITNESS WHEREOF, BellSouth and Customer have caused this Contract to be executed and delivered by their duly authorized representatives, effective upon execution by Customer and acceptance by BellSouth. The undersigned warrant and represent that they have the authority to bind Contractor and BellSouth to this Agreement.

Customer: BroadTelcos, Inc.

By: _____

Name: David Epstein _____
(Print or Type)

Title: President _____

Date: 5/25/04 _____

Accepted by BellSouth BSSI, Inc. and
subsidiary Telecommunications, Inc.
By: BellSouth Business Systems, Inc.

By: _____

Name: Richard A. Gonzalez _____
(Print or Type)

Title: Sales Manager _____

Date: 5/25-04 _____

CONFIDENTIAL/PROPRIETARY — NOT FOR DISCLOSURE WITHOUT WRITTEN PERMISSION
Page 4 of 8

Customer's Initials: D.E.
Date: 5/25/04

Version 01/2004

**EXHIBIT C**

# TRIAL AGREEMENT

Between

## BROADVOICE, INC.

And

## BELLSOUTH TELECOMMUNICATIONS, INC.

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE

538417

# TABLE OF CONTENTS

1. SCOPE........................................................................................................... 1
2. NO COMMITMENT....................................................................................... 1
3. DEFINITIONS................................................................................................ 1
4. TERM AND TERMINATION........................................................................ 2
5. SERVICES AND SUPPORT........................................................................... 2
6. REPRESENTATIONS AND WARRANTIES................................................. 2
7. LOCATION OF TRIAL.................................................................................. 2
8. SUPPLIER FEE AND PAYMENT TERMS.................................................... 2
9. SCHEDULE.................................................................................................... 3
10. TECHNICAL SUPPORT AND ASSISTANCE............................................. 3
11. EMERGENCY SERVICE............................................................................... 3
12. INTELLECTUAL PROPERTY DEVELOPMENT AND OWNERSHIP........ 3
13. FORECAST DATA......................................................................................... 3
14. DEFAULT AND LIMITATION OF LIABILITY........................................... 3
15. INFRINGEMENT........................................................................................... 4
16. INDEPENDENT CONTRACTOR.................................................................. 5
17. INDEMNITY................................................................................................... 5
18. INSURANCE................................................................................................... 5
19. LICENSES...................................................................................................... 6
20. BELLSOUTH MARKS................................................................................... 6
21. COMPLIANCE WITH LAWS........................................................................ 6
22. PUBLICITY.................................................................................................... 7
23. EXCUSABLE DELAYS.................................................................................. 7
24. ASSIGNMENT............................................................................................... 7
25. REGULATORY MATTERS........................................................................... 8
26. STATUS REPORT.......................................................................................... 8
27. TAX................................................................................................................ 8
28. SECURITY..................................................................................................... 8
29. FACILITY RULES AND GOVERNMENT CLEARANCE........................... 9
30. RELEASES VOID.......................................................................................... 9
31. CHOICE OF LAW/VENUE & ARBITRATION............................................ 9
32. SEVERABILITY............................................................................................ 9
33. NOTICES........................................................................................................ 9

PRIVATE/PROPRIETARY/LOCK-
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE.



34. RECORDS AND AUDIT.................................................................. 10
35. NONDISCLOSURE OF INFORMATION....................................... 10
36. SURVIVAL OF OBLIGATIONS................................................... 12
37. NON-WAIVER............................................................................. 12
38. CONFLICT OF INTEREST........................................................... 12
39. NONDISCRIMINATION COMPLIANCE...................................... 12
40. SECTION HEADINGS................................................................. 12
41. INCORPORATION OF APPENDICES........................................... 12
42. NONSOLICITATION.................................................................... 12
43. ENTIRE AGREEMENT................................................................ 13

**Appendices**

APPENDIX A:      PROJECT STATEMENT

APPENDIX B:      CSS 400-400-TR AND CSS 400-600-TR: SECURITY REQUIREMENTS FOR SOURCED
                 WORK

APPENDIX C:      DEDICATED INTERNET ACCESS SERVICE AGREEMENTS

APPENDIX D:      LETTER OF AGREEMENT

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE

This trial agreement (the "Agreement,") is entered into as of June _15_, 2004 (the "Effective Date") by and between BroadVoice, Inc., a Delaware Corporation, ("Supplier") and BellSouth Telecommunications, Inc., a Georgia Corporation, ("BellSouth") and their respective successors and assigns. Supplier and BellSouth are each a "Party" and, collectively, the "Parties" to this Agreement.

## 1.  SCOPE

1.1  This Agreement sets forth the general terms and conditions under which Supplier shall provide the Services that are defined and described more specifically in the Project Statement (as defined below) and BellSouth will market, promote, and resell the Services in its conduct of the Trial described herein.

## 2.  NO COMMITMENT

THIS AGREEMENT DOES NOT REPRESENT OR IMPLY A COMMITMENT ON THE PART OF BELLSOUTH TO PURCHASE THE SERVICES (OR ANY MATERIAL OR SOFTWARE, AS SUCH TERMS ARE DEFINED BELOW) AFTER THE CONCLUSION OF THE TRIAL. NO SUCH COMMITMENT TO PURCHASE BY BELLSOUTH OR TO SELL BY SUPPLIER SHALL BE BINDING UNLESS AND UNTIL EXPRESSED IN A WRITING SIGNED BY AUTHORIZED REPRESENTATIVES OF BOTH PARTIES.

## 3.  DEEFINITIONS

3.1  "Affiliated Company(ies)" shall mean any company or other entity, directly or indirectly, in whole or in part controlled by, controlling or under common control with, a party hereto.

3.2  "Agreement" shall mean this agreement and any schedules, attachments, appendices, or amendments to the foregoing.

3.3  "BellSouth" shall mean BellSouth Telecommunications, Inc.

3.4  "Customers" shall mean customers who purchase the Services from BellSouth

3.5  "Material" shall mean Supplier's equipment, systems, Software, firmware, test equipment, training materials, and other support documentation used by Supplier for purposes of the Trial.

3.6  "Marks" shall have the meaning set forth in Section 20 below.

3.7  "Project Statement" shall mean the description of the Services and each Party's respective obligation related to such Services as defined and more specifically described in Appendix A annexed hereto and incorporated herein by reference.

3.8  "Software" shall mean the computer programs proprietary to Supplier, consisting of logic instructions in machine-readable code residing in, or intended to be loaded, in Material memories which provide basic logic, operating instructions and user-related application instructions, but excluding customer data, which are integral to the Material used by Supplier for purposes of the Trial, or documentation used to describe, maintain, and use the programs

3.9  "Trial" shall mean the marketing, technical, or operational evaluation and testing of the Services described in the Project Statement.

3.10  "Trial Period" shall have the meaning set forth in Section 4.1 below.

3.11  "Services" shall mean those services provided by Supplier for the Trial as described in the Project Statement.

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE

3.12 'Supplier" shall mean BroadVoice, Inc.

3.13 " Support" shall mean the activities related to technical assistance and other support activities provided by Supplier as defined in the Project Statement.

## 4. TERM AND TERMINATION

4.1    The term of this Agreement shall commence and be effective on the Effective Date and shall, except as otherwise provided herein, continue in effect thereafter until the termination of the Trial. The Trial Period will commence on the earlier of July 16, 2004, or the date of the activation of the first Customer (Trial Start Date) and will terminate December 31, 2004, unless extended or terminated by written notice as provided in this Section 4 or Section 14 below or by written agreement of the Parties ("Trial Period"). BellSouth may, at its option, extend the Trial Period by an additional 30 or 60 days pursuant to the terms set forth in  this Agreement, including the payment terms set forth in APPENDIX A that are in effect in the month prior to such extension, by providing Supplier written notice of such election not less than 30 days prior to the end of the Trial Period. BellSouth may terminate the Trial Period at any time without cause and for any reason by giving supplier 30 days prior written notice and providing full payment as specified in section 4 of APPENDIX A.

## 5. SERVICES AND SUPPORT

5.1    Subject to the terms and conditions of this Agreement, Supplier shall provide BellSouth the Services and related Support for the Trial and BellSouth shall market, promote, and resell such Services as set forth in the Project Statement.

5.2    The Parties may mutually agree to make changes in the Project Statement. I f any such change causes an increase or decrease in the cost of, or the time required for the performance of the Trial, an equitable adjustment may be made in the financial arrangements, or schedules, or both, and the Project Statement shall be modified in writing accordingly

## 6. REPRESENTATIONS AND WARRANTIES

6.1    Each Party represents and warrants to the other, that it has the authority and right to enter into this Agreement and to provide the services hereunder free of all liens, security interests, or other encumbrances.

6.2    **EXCEPT AS SPECIFICALLY STATED IN THE PROJECT STATEMENT, SUPPLIER DOES NOT WARRANT THAT THE OPERATION OF THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE.**

6.3    **EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT AND TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE WARRANTIES IN THIS SECTION ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS AND IMPLIED, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND ANY AND ALL IMPLIED WARRANTIES ARISING FROM STATUTE, COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.**

## 7. LOCATION OF TRIAL

7.1    The Trial shall be conducted in South Florida, as is more specifically described in the Project Statement.

## 8. SUPPLIER FEE AND PAYMENT TERMS

8.1    BellSouth will pay Supplier and Supplier will bill BellSouth for the Service as set forth in the Project Statement.

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE

8.2 BellSouth may withhold payment for non-conforming or non-complying Service, provided that BellSouth informs Supplier of any element of non-conformity in writing following BellSouth's discovery of such non-conformance.

## 9.  SCHEDULE

9.1 The Parties shall use best efforts to adhere to the Project Schedule for the Trial as provided in this Agreement. Any changes to such schedule shall be agreed to in writing.

## 10.  TECHNICAL SUPPORT AND ASSISTANCE

10.1 Supplier shall provide Customer Support during the Trial as described in the Project Statement.

10.2 Supplier shall give prompt attention to resolving any customer complaints received during the Trial.

10.3 BellSouth reserves the right to appoint third parties as its technical consultants authorized to participate in the Trial as BellSouth deems appropriate.

## 11.  EMERGENCY SERVICE

11.1 Supplier shall use all commercially reasonable efforts, within the resource and personnel limitations of Supplier, to provide corrective action at no charge within six (6) hours or less of notification of an emergency out-of-service condition in the Service furnished hereunder.

11.2 Supplier shall provide BellSouth with telephone numbers to reach Supplier technicians twenty-four (24) hours a day, seven (7) days a week during the Trial Period. These emergency service telephone numbers are set forth in the Project Statement.

## 12.  INTELLECTUAL PROPERTY DEVELOPMENT AND OWNERSHIP

12.1 This Agreement does not encompass development by Supplier of any intellectual property for BellSouth. Supplier agrees not to accept any Order for such development under the Agreement, not to bill BellSouth for any such development performed, and not to accept any payments for any such development. The foregoing is not intended to preclude Supplier's billing for the Services as set forth in the Project Statement.

12.2 Supplier shall retain all ownership, right, title, and interest in and to the Software, Materials, and Services, as well as all patents, copyrights, trademarks, other intellectual property, or proprietary rights in and to the Software Materials, and Services, including, without limitation, all content provided by Supplier hereunder for the BellSouth-branded website furnished by Supplier.

## 13.  FORECAST DATA

13.1 BellSouth may furnish forecast data to Supplier. Any such forecast does not constitute a commitment to purchase by BellSouth, and BellSouth shall not be responsible or liable for any action taken by Supplier in reliance thereon.

## 14.  DEFAULT AND LIMITATION OF LIABILITY

14.1 Except for provisions mutually agreed to by both Parties, in the event either BellSouth or Supplier shall be in material breach or default of any of the terms and conditions and covenants of this Agreement, and such material breach or default shall continue for a period of thirty (30) days after the giving of written notice to the Party in breach or default by the other, the aggrieved Party may terminate this Agreement and may avail itself of any and all remedies at law or equity or otherwise, subject to any limitations contained in this Agreement. BellSouth and

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE.

Supplier shall cooperate with each other in every reasonable way to facilitate the remedy of a breach or default hereunder within the aforementioned thirty (30) day period.

14.2  Except as otherwise provided in this Agreement, Supplier's sole and exclusive remedy in the event of a default by BellSouth shall be the payment by BellSouth of any outstanding amounts due for Services rendered by Supplier prior to the date of cancellation

14.3  Except as otherwise provided in this Agreement, BellSouth's sole and exclusive remedy in the event of a default by Supplier shall under no circumstances exceed refund of all payments previously paid by BellSouth to Supplier and the reimbursement of any expenses paid by BellSouth to Supplier.

14.4  **Equitable Remedies.**  The Parties recognize that money damages may not be an adequate remedy for any breach or threatened breach of any obligation hereunder by either Party involving Intellectual Property, Confidentiality, or Publicity.  The Parties therefore agree that in addition to any other remedies available hereunder, by law or otherwise, each Party shall be entitled to obtain injunctive relief against any such continued breach of such obligations.

14.5  EXCEPT IN THE CASE OF A BREACH OF THE CONFIDENTIALITY OBLIGATIONS HEREUNDER, INDEMNITY FOR A THIRD PARTY CLAIM OF INFRINGEMENT, OR IN THE CASE OF GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, IN NO EVENT SHALL EITHER SUPPLIER OR BELLSOUTH OR EITHER PARTY'S AFFILIATED COMPANIES OR ANY OFFICER, DIRECTOR, EMPLOYEE, REPRESENTATIVE, OR AGENT OF EACH OF THEM BE LIABLE TO THE OTHER OR ANY FOR ANY INDIRECT', INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE, OR CONSEQUENTIAL DAMAGES OF ANY NATURE WHATSOEVER INCLUDING BUT NOT LIMITED TO LOST REVENUES, LOST PROFITS, LOSS OF GOODWILL, LOSS OF USE, OR RESEARCH AND DEVELOPMENT COSTS. FOR PURPOSE OF THIS SECTION 14.5, "AFFILIATED COMPANIES" OF EITHER PARTY SHALL MEAN COMPANIES OWNED OR CONTROLLED BY, EITHER DIRECTLY OR INDIRECTLY, OR UNDER COMMON CONTROL WITH SUCH PARTY.

## 15.  INFRINGEMENT

15.1  The following terms shall apply to any infringement or claim of infringement of any U.S. patent, trademark, copyright, trade secret or other proprietary interest based on the development, manufacture, trial, evaluation, use, license, or sale of any Material or Software used to provide the Service hereunder or in contemplation hereof.

15.2  Supplier shall indemnify and hold BellSouth harmless for any losses, damages, expenses, or liabilities including reasonable attorneys' fees, that may result by reason of any such infringement or claim, except to the extent that such infringement or claim arises from (i) Supplier's adherence to BellSouth's specifications, written instructions or directions or (ii) BellSouth's use of the Services beyond the scope of this Agreement.  Supplier shall defend or settle, at its own expense, any action or suit against BellSouth for which Supplier is responsible hereunder.

15.3  BellSouth shall indemnify and hold Supplier harmless for any losses, damages, expenses, or liabilities including reasonable attorneys' fees, that may result by reason of any such infringement or claim to the extent that such infringement or claim arises from Supplier's use of BellSouth's Marks (as defined in Section 20 below) except to the extent that such infringement or claims arises from a use of the BellSouth's Marks beyond the scope of this Agreement.  BellSouth shall defend or settle, at its own expense, any action or suit against Supplier for which BellSouth is responsible under this subsection 15 3.

15.4  Each indemnity set forth above is contingent on the indemnified Party's notifying the indemnifying Party promptly of any claim of infringement for which the indemnifying Party is responsible and cooperating with the indemnifying Party in every reasonable way to facilitate the defense of any such claim.

15.5  In handling any claim hereunder, Supplier reserves the right to obtain for BellSouth the right to continue using the Services or replace or modify the Services so that they become non-infringing.

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE

## 16. INDEPENDENT CONTRACTOR

16.1 The Parties shall act as independent contractors in the performance of this Agreement and nothing contained herein shall be construed to (i) give either Party the power to direct and control the day to day activities of the other; (ii) constitute the Parties as partners, joint venturers, co-owners or otherwise as participants in a joint or common undertaking or (iii) allow either Party to create or assume any obligation on behalf of the other for any purpose whatsoever. Each Party shall be solely responsible for compliance with all rules, laws, and regulations relating to employment of' its respective employees, hours of labor, working conditions, payment of wages, and payment of taxes, such as employment, social security, and other payroll taxes, including applicable contributions from such persons when required by law.

## 17. INDEMNITY

17.1 Supplier agrees, at its own expense and upon written notification by BellSouth within three (3) business days after service of process, to indemnify and hold BellSouth harmless from any and all liabilities, causes of action, lawsuits, penalties, claims, or demands (including the costs, expenses, and reasonable attorneys' fees on account thereof) that may be made by the following:

17.1.1 Anyone for injuries of any kind, including but not limited to personal injury, death, property damage, and theft, resulting from Supplier's willful acts in the performance of its obligations under this Agreement;

17.1 2 Any of either Supplier's, employees or former employees for which the Supplier's liability to such employee or former employee would otherwise be subject to payments under the state Worker's Compensation laws or an Employer's Liability policy, premises liability principles or any other law or form of legal duty or obligation; and

17.1.3 Either Supplier's employees or former employees for any and all claims arising out of the employment relationship with respect to performing under this Agreement This includes, but is not limited to, employment discrimination charges and actions arising under Title VII of The Civil Rights Act of 1964, as amended; The Equal Pay Act; The Age Discrimination in Employment Act, as amended; The Rehabilitation Act; The Americans with Disabilities Act; The Fair Labor Standards Act; The National Labor Relations Act; and any other applicable law.

17.2 The foregoing indemnity shall be in addition to any other indemnity obligations of Supplier set forth in this Agreement.

## 18. INSURANCE

18.1 During the term of this Agreement, Supplier shall maintain all insurance or bonds required by law or this Agreement, including but not limited to the following:

18.1.1 Adequate Worker's Compensation and related insurance required by BellSouth and prescribed by the law of any state in which the work is to be performed;

18.1.2 Employer's liability insurance with limits of at least $500,000 for each occurrence; and

18 1.3 Commercial general liability insurance, including contractual liability, products liability and completed operations coverage, and if applicable, comprehensive motor vehicle liability insurance. Each shall have limits of at least $1,000,000 for bodily injury, including death, to any one person, $1,000,000 because of any one occurrence, and $1,000,000 for each occurrence of property damage.

18.4 In addition to the insurance coverage requirements outlined above, Supplier shall carry umbrella or excess liability coverage, with limits of no less than $2,000,000 per occurrence. Said umbrella or excess policy shall name BellSouth as an additional insured with respect to work performed under this agreement or state that BellSouth, as an "insured" in the underlying insurance is an "insured" under this umbrella or excess policy In the event Supplier does not obtain contractual liability insurance covering the Supplier's indemnity requirements under this Agreement, Supplier shall provide BellSouth with specific endorsements insuring Supplier's assumed contractual liability under

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE

this Agreement. In no event shall the provisions of this section in any way limit the Supplier's obligations set forth in the section, "INDEMNITY."

## 19. LICENSES

19.1 This Agreement grants no rights to BellSouth or its Affiliated Companies to use, copy, modify, distribute, license, or create derivative works of the Materials or Software or to disassemble, reverse engineer, or otherwise derive the Software or of the Materials and Services in any manner.

19.2 Except as otherwise provided in Section 20 of this Agreement, no licenses under any patents, copyrights, trademarks, trade secrets or any other intellectual property, express or implied, are granted by BellSouth to Supplier or by Supplier to BellSouth under this Agreement. This section shall in no way modify the section on Confidential Information.

## 20. BELLSOUTH MARKS

20.1    BellSouth's and its affiliates' names, logos and trademarks are the property of BellSouth Intellectual Property Corporation ("BIPCO") in the U.S.A. BIPCO's exclusive authorized licensor, BellSouth Intellectual Property Marketing Corporation ("BIPMARK"), has specifically consented to BellSouth's and Supplier's use of certain trademarks (the "Marks") for the limited purposes stated in this Agreement. The specific Marks to be used by Supplier for purposes of the Trial shall be designated by BellSouth in writing and furnished to Supplier in accordance with the Project Statement (APPENDIX A). Subject to the limitations and procedures set forth herein, Supplier may affix the Marks to the Services as identified herein. Supplier shall not affix, use, or otherwise display the Marks in any manner without BIPMARK's prior written approval. BIPMARK may withhold its consent to the proposed usage of the Marks in its sole discretion, provided, however, that once consent is given for a type of use (e.g., use of the Marks in a specific radio commercial, in a print advertisement, on a billboard, or on a webpage), consent is not required for each subsequent use of the Marks in that specific context. However, if the use of the Marks in connection with the Services subsequently fails to meet applicable quality standards, BIPMARK may immediately cancel any such prior authorization. This right shall not be construed as a sublicense or permission to Supplier to use the Marks in any manner except as expressly provided herein. Supplier shall not use BellSouth's name or the Marks in a domain name unless the domain name is owned by BIPCO. Supplier shall strictly adhere to all graphics standards and marking requirements required by BIPMARK, as may be revised or supplemented from time to time in the sole discretion of BIPMARK. Supplier will not affix its own trademarks, trade dress, logos or names to the products and services contemplated herein without BIPMARK's prior written consent. Supplier recognizes and acknowledges BIPCO's ownership of, and shall do nothing inconsistent with BIPCO's ownership of the Marks. It is understood and agreed by Supplier that BIPCO and BIPMARK, as owner and authorized licensor of the Marks, respectively, shall have standing to enforce their rights in the Marks. Written notices and requests for consents required to be submitted to BIPMARK hereunder shall be sent to: Director – Trademarks, BellSouth Intellectual Property Management Corporation, 1155 Peachtree St., NE, Suite 500, Atlanta, Georgia 30309.

## 21. COMPLIANCE WITH LAWS

21.1 Supplier shall comply with the provisions of all applicable federal, state, county, and local laws, ordinances, regulations, and codes including, but not limited to, Supplier's obligations as an employer with regard to the health, safety, and payment of its employees, and identification and procurement of required permits, certificates, approvals, and inspections in Supplier's performance of this Agreement. Supplier shall indemnify BellSouth for, and defend BellSouth against, any loss or damage sustained because of Supplier's noncompliance.

21.2 BellSouth shall comply with the provisions of all applicable federal, state, county, and local laws, ordinances, regulations, and codes including, but not limited to, BellSouth's obligations as an employer with regard to the health, safety, and payment of its employees, and identification and procurement of required permits, certificates, approvals, and inspections in BellSouth's performance of this Agreement. BellSouth shall indemnify and hold harmless Supplier for, and defend Supplier against, any loss or damage sustained because of BellSouth's

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE



Noncompliance.

21.3    The Parties acknowledge that Supplier has entered into agreements with interexchange carriers (IXCs), competitive local exchange carriers (CLECs), and local exchange carriers (LECs) to originate and terminate enhanced voice traffic associated with the Trial Services on the public switched telephone network. Under the terms of the Agreement, Supplier is responsible for all access charges associated with the handling of such traffic, if any. The Parties specifically acknowledge that they believe that the Trial Services are enhanced services, subject to the federal exemption to access charges currently available to enhanced/information service providers (ESP access exemption). Nevertheless, the Parties acknowledge that with regard to the origination and termination of enhanced voice calls associated with the Trial Service, an issue exists as to whether the ESP access exemption applies in certain circumstances. Therefore, the Parties agree that during the Trial Period, if Supplier receives from another carrier any duly verified bill rendered to it for the payment of access charges associated with the handling of enhanced voice calls that are associated with the Trial Service, without prejudice to either Party's position as to whether the payment of access charges is legally required under current law or regulations regarding such calls, before Supplier refuses to pay any such bill on the basis of the ESP access exemption, it shall promptly tender such bill to BellSouth which shall have the right upon ten (10) days written notice to Supplier from the date of BellSouth's receipt of such bill, to cause Supplier to pay such bill in whole or in part; provided, however, in any such case BellSouth shall agree and be obligated to reimburse Supplier for the full amount of any such payment prior to Supplier's payment of same. The obligations and rights of the Parties regarding the payment of any access charges by Supplier at the request of BellSouth under this Agreement are limited to the Trial Services provided and related activities performed under this Agreement. Any such payment of access charges by Supplier under this Agreement may not be used by BellSouth to support the position in any legal or regulatory proceeding that Supplier has thereby admitted to or agrees that such access fee payments are legally required.

## 22.  PUBLICITY

22.1    Press releases, advertisements and other publicity statements, in any medium ("Publicity") that use, mention or imply BellSouth's or its Affiliated Companies' trade names, logos, trademarks or service marks (collectively, the "Marks") are not permitted. Use or reproduction by Supplier for Publicity purposes of any testimonial quotations, thank you letters, reference letters or any other communications in any form or medium from BellSouth, BellSouth employees and/or BellSouth agents is not permitted. Exceptions to the policies outlined above must be obtained in writing solely from BellSouth Intellectual Property Marketing Corporation ("BIPMARK"). Supplier agrees to submit to BIPMARK all such requests and materials relating to this Agreement or mentioning or implying the Marks or language from or by which the connection of said Marks therewith may be inferred or implied, or mentioning or implying the names of any personnel of BellSouth Corporation and/or any of its Affiliated Companies. Supplier further agrees not to publish or use such Publicity materials without BIPMARK's prior written consent.

## 23.  EXCUSABLE DELAYS

23.1    Neither BellSouth nor Supplier shall be responsible for any delay or failure in performing hereunder caused by fires, labor disputes, flood, explosion, casualty loss, war, strike, embargoes, government requirements, civil or military authorities, acts of God or of the public enemy, terrorism, or other similar causes beyond the reasonable control of the Party whose performance is affected.

23.2    BellSouth may withhold payment of the Supplier Fee that accrues from the date of the delay forward during the continuation of any such delay.

## 24.  ASSIGNMENT

24.1    Except as other provided in Section 24.2, any assignment or delegation by either Party of the rights and obligations of this Agreement, in whole or in part, or of any other interest hereunder without the other's written consent, except an assignment confined solely to monies due or to become due, shall be void. An assignment of monies shall be void to the extent that if Supplier shall not have given BellSouth at least thirty (30) days prior

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE



written notice of such assignment, or if such assignment attempts to impose upon BellSouth obligations to the assignee additional to the payment of such money, or to preclude BellSouth from dealing solely and directly with Supplier in all matters pertaining thereto, including the negotiation of amendments or settlements of amounts due.

24.2 Upon notice to Supplier, BellSouth shall have the absolute right to assign this Agreement to BellSouth Corporation or any of its direct or indirect subsidiaries whether or not said entities are in existence on the date of execution hereof provided that BellSouth and its permitted assignee shall be and remain jointly and severally liable under the terms of this Agreement and the assignee shall commit to same in writing. Supplier agrees not to subcontract Service to be performed, in whole or in part, for the Trial to any vendor with whom Supplier does not already have on the Effective Date of this Agreement an existing subcontract relationship to perform such subcontracted work, without written request to and prior written consent from BellSouth Supplier shall remain primarily liable to BellSouth for the performance of all subcontracted Service provided pursuant to the applicable Trial.

## 25. REGULATORY MATTERS

25.1 Supplier expressly recognizes that BellSouth is a communications common carrier licensed by the Federal Communications Commission and certificated, where required, by state regulatory authorities operating under federal and state statutes, rules and regulations issued thereunder and filed tariffs. Part of this Agreement may be subject to such changes or modifications as any such regulatory body may, from time to time, direct in the exercise of its jurisdiction. Any material modifications or changes occasioned thereby to the Agreement shall be subject to the mutual consent of both Parties. Failing such consent, either Party shall have the right to cancel this Agreement or any affected Trial without any liability. BellSouth will make reasonable efforts to notify Supplier prior to initiating any regulatory action specifically pertaining to the Services and will advise Supplier within 10 business days after receiving notice of any regulatory action initiated by a third party specifically pertaining to such Services.

## 26. STATUS REPORT

26.1 BellSouth and Supplier shall, consistent with the Project Statement and at mutually agreed upon intervals, discuss the activities performed during the Trial period, enumerate any problems encountered that may adversely affect progress, and state the projected activities for the ensuing period.

## 27. TAX

27.1 Supplier shall add to the purchase price set forth in the Project Statement, if any, an amount equal to any applicable taxes, local, state or federal, however designated, that may be validly levied or based upon the Project Statement or the Service furnished hereunder. Supplier shall not add to the Supplier Fee any ad valorem personal property taxes, state and local privilege and excise taxes based on gross revenue, taxes based on or measured by Supplier's net income, or any taxes or amounts in lieu thereof paid or payable by Supplier in respect of the foregoing excluded items Taxes attributable to Supplier payable by BellSouth shall be billed as separate items on Supplier's invoices and shall not be included in Supplier's Service fee If BellSouth does not have standing to contest taxes that it considers improperly levied, BellSouth shall have the right to have Supplier contest with the imposing jurisdiction, at BellSouth's expense, any such taxes that BellSouth deems are improperly levied.

27.2 Application and billing of Customer-related taxes applicable to the BellSouth Services shall be handled in accordance with the Project Statement.

## 28. SECURITY

28.1 BellSouth may conduct, at its expense, for security reasons, a background investigation on the Supplier and its employees. Supplier shall cooperate with BellSouth in this endeavor and shall provide any necessary information. BellSouth is under no obligation to provide a copy of the background investigation to Supplier.

28.2 In fulfilling the obligations under this section, Supplier and BellSouth shall comply with all laws, rules, and regulations about making investigative reports and the disclosure of the information contained therein. Supplier and

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE



BellSouth shall indemnify, defend, and hold the other harmless against any wrongful disclosure by Supplier or BellSouth, as the case may be, its employees, or agents of said reports and the information contained therein.

28.3    Each Party may request that the other promptly remove from its premises any employee, agent, or subcontractor of the other to whom such Party does not wish to grant access to its premises and the other Party will promptly comply with such request. Each Party shall also promptly remove any employee, agent, or subcontractor that the other considers unacceptable, negligent, dishonest, or otherwise unsatisfactory in performing their duties hereunder. Neither Supplier nor BellSouth shall interpret the other's request for removal from its premises as a request for the other to discipline the employee.

28.4   In addition to the foregoing, Supplier shall comply with the provisions of CSS-400-400-TR and CSS 400-600-TR: Security Requirements for Sourced Work set forth in Appendix B.

## 29.   FACILITY RULES AND GOVERNMENT CLEARANCE

29.1   Suppliers employees and representatives and those of BellSouth shall, if and while on the premises of the other, comply with all internal rules and regulations, including where required by government regulations, submission of satisfactory clearance from the U. S. Department of Defense and other federal authorities concerned.

## 30.   RELEASES VOID

30.1   Neither Party shall require waivers or releases of any personal rights from representatives of the other in connection with visits to Supplier's and BellSouth's respective premises. Neither Party shall require any representative of the other Party to sign a personal "Nondisclosure Agreement." No such releases or waivers shall be pleaded by either Party or third persons in any action or proceeding.

## 31.   CHOICE OF LAW/VENUE & ARBITRATION

31.1   The laws of the State of Georgia shall govern the validity, construction, interpretation, and performance of this Agreement. The jurisdictional venue for any legal proceedings for injunctive relief or in support of arbitration involving this Agreement shall be held in any applicable local, state, or federal court located within the State of Georgia.

## 32.   SEVERABILITY

32 1   If any of the provisions of this Agreement shall be invalid or unenforceable under the laws of the jurisdiction applicable to the entire Agreement, such invalidity or unenforceability shall not invalidate or render the entire Agreement unenforceable, but rather the entire Agreement shall be construed as if not containing the particular invalid or unenforceable provision or provisions and the rights and obligations of the Parties shall be construed and enforced accordingly, provided that, in the event either BellSouth or Supplier would not have entered into this Agreement without such provision, that Party shall have the right to terminate this Agreement without charge or liability.

## 33.   NOTICES

33.1   Except as otherwise provided herein, any notices or demands required by law or under the terms of this Agreement shall be in writing. BellSouth or Supplier shall deliver such notices or demands by hand, facsimile, telegram or similar communication, or by overnight courier or certified or registered mail, and addressed as set forth below. In the case of facsimiles, telegrams, or similar communications, the receiving Party shall consider such notices given when electronically confirmed as sent, and in the case of certified or registered mail, when deposited in the United States mail with postage prepaid.

To BellSouth:     BellSouth Telecommunications, Inc.

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE.

                              c/o Mass Market IP Communications
                              4D28
                              2180 Lenox Lake Blvd.
                              Atlanta, Georgia 30319
                              ATTN: Laura Reid

          To Supplier:        BroadVoice, Inc.
                              900 Chelmsford Street
                              Tower Three, 11th Floor
                              Lowell, MA 01851
                              ATTN: David Epstein

**33.2** The Parties may change their above address at any time by giving ten (10) days prior written notice to the other as above provided.

**33.3** In addition to the foregoing, copies any legal notices shall be sent to

          BellSouth
          Suite 4300
          675 West Peachtree St., NE
          Atlanta, Georgia 30375
          Attention: Tom Rawls, Esq.

          Eric Schwartz
          Mass Market IP Communications
          4D62
          2180 Lenox Lake Blvd.
          Atlanta, Georgia 30319

          And

          BroadVoice, Inc.
          900 Chelmsford Street
          Tower Three, 11th Floor
          Lowell, MA 01851
          ATTN: Legal Department

## 34. RECORDS AND AUDIT

**34.1** Supplier shall maintain accurate and complete records relating to Customer orders, billing, payments, application of taxes, for one hundred eighty (180) days beyond the completion of the Trial. Such records shall be maintained in accordance with recognized commercial accounting practices. Supplier shall retain all such records for a period not less than one hundred eighty (180) days after the completion of the Trial. During the Trial period and during the 180 day period after completion of the Trial, Supplier shall, upon receipt of written request of BellSouth, permit a BellSouth auditor to examine, copy, and retain, and audit these records and will provide reasonable access to Supplier's premises as necessary for such examination during normal business hours and with reasonable notice.

## 35. NONDISCLOSURE OF INFORMATION

**35.1** Scope of Confidential Information

**35.1.1** Supplier acknowledges that Supplier may acquire information and material that is BellSouth's confidential, proprietary or trade secret information (collectively, "BellSouth's Information"). As used herein, "BellSouth's Information" includes, but is not limited to, the existence and terms of this Agreement, and all information and

PRIVATE/PROPRIETARY/LOCK.
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE

documents disclosed by BellSouth, whether written or oral, in the course of this Agreement or in contemplation hereof including, without limitation, all customer information, including customer bank account, debit card, or credit card information, specifications, drawings, sketches, schematics, models, samples, tools, algorithms, technical or business information, research and development, production and engineering processes, costs, profit and margin information, BellSouth customer lists, marketing, production, and future business plans. All of BellSouth's Information shall be in writing or other tangible form and clearly marked with a confidential, private, or proprietary legend. BellSouth's Information conveyed orally shall be designated as proprietary at the time of disclosure and shall be reduced to writing within ten (10) business days. SUPPLIER EXPRESSLY AGREES TO TREAT ITS CONTRACT RELATIONSHIP HEREUNDER AS STRICTLY CONFIDENTIAL BELLSOUTH INFORMATION AND NOT TO DISCLOSE THE EXISTENCE OR THE TERMS OF THE AGREEMENT TO ANY OF ITS SUPPLIERS OR SUBCONTRACTORS, OR TO ANY OTHER PERSON, EXCEPT TO THE LIMITED EXTENT NECESSARY TO PERFORM THE SERVICES HEREUNDER.

35.1.2  BellSouth acknowledges that BellSouth may acquire information and material that is Supplier's confidential, proprietary or trade secret information, (collectively, "Supplier's Information"). As used herein, "Supplier's Information" includes, but is not limited to, all Materials, information and documents disclosed by the Supplier, whether written or oral, in the course of this Agreement or in contemplation hereof including, without limitation, all specifications, drawings, sketches, schematics, models, samples, tools, algorithms, technical or business information, research and development, production and engineering processes, costs, profit and margin information, Supplier customer lists, marketing, production and future business plans. All of Supplier's Information shall be in writing or other tangible form and clearly marked with a confidential, private, or proprietary legend. Supplier's Information conveyed orally shall be designated as proprietary at the time of disclosure and shall be reduced to writing within ten (10) business days.

35.2  Use of Confidential Information

35.2.1  Each Party agrees to take all steps reasonably necessary to hold in trust and confidence the other Party's Information. Each Party hereby agrees to hold the other's Information in strict confidence, not to disclose it to third parties or to use it, in any way, commercially or otherwise, other than as permitted under this Agreement. Each Party will limit the disclosure of the other's Information to employees with a need to know who (i) have been advised of the proprietary nature thereof and (ii) have acknowledged the express obligation to maintain such confidentiality. The obligations set forth herein shall remain in effect for two (2) years from the receipt of the Information considered or deemed to be confidential information, but such obligation of confidentiality will not expire for any Information considered or deemed to be a trade secret under applicable law.

35.3  Exceptions

35.3.1  Notwithstanding the other provisions of this Agreement, nothing received by either Party from the other will be considered to be BellSouth's or Supplier's Information, as the case may be if: (i) it has been published or is otherwise available to the public other than by a breach of this Agreement; (ii) it has been rightfully and lawfully received by the receiving Party from a third party without confidential limitations; (iii) it has been independently developed by the receiving Party by personnel having no access to the other's Information; (iv) it was known by the receiving Party prior to its first receipt from the other; (v) it is hereafter disclosed by the disclosing Party without restriction on further disclosure; or (vi) it is disclosed pursuant to a court order, subpoena or by operation of law, provided the receiving Party has given the disclosing Party prior advance written notice in order that the disclosing Party may attempt to obtain a protective order or such other relief limiting disclosure and use of the information disclosed.

35.3.2  Nothing herein shall prevent either party from using its general knowledge and expertise, techniques, concepts or know-how to develop similar products or perform comparable services for itself or others as are provided under this Agreement, or from using any of its pre-existing materials or confidential information to develop or provide such products or services; provided that Supplier shall not (i) reference, use, incorporate or disclose BellSouth's Information in developing or providing such products or services, except to the extent such BellSouth's Information is retained and used as Residual Knowledge; or (ii) infringe any patent, copyright, trademark or other intellectual property right of BellSouth in developing or providing such products or services.

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION.
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE



For purposes of this paragraph, Residual Knowledge is defined as information in non-tangible form which may be incidentally retained in the unrefreshed memory of persons who have had access to the other Party's Information, including ideas, concepts, know-how or techniques contained therein.

35.4  Each Party hereby agrees that every individual person including but not limited to employees, subcontractors, agents, representatives and other third parties who perform under this Agreement shall execute the appropriate documents to undertake obligations of confidentiality consistent with the terms set forth herein.

## 36.  SURVIVAL OF OBLIGATIONS

36.1  BellSouth's and Supplier's respective obligations hereunder that by their nature would continue beyond the termination, cancellation or expiration of this Agreement or the Project Statement, shall survive.  This includes, by way of example but not limited to, the obligations provided in the sections "NONDISCLOSURE OF INFORMATION"; "INDEMNITY"; "INFRINGEMENT"; "PUBLICITY"; "DEFAULT AND LIMITATIONS OF LIABILITY"; "REPRESENTATIONS AND WARRANTIES"; "INTELLECTUAL PROPERTY DEVELOP MENT AND OWNERSHIP"; and the post-Trial-Period obligations and deliverables of the Parties hereto as specifically set forth in the Project Statement

## 37.  NON-WAIVER

37.1  No waiver or failure to exercise any option, right or privilege under the terms of this Agreement on any occasion or occasions shall be construed to be a waiver of the same or any other option, right, or privilege on any other occasion.

## 38.  CONFLICT OF INTEREST

38.1  Supplier stipulates no officer or employee of BellSouth has been employed, retained, induced, or directed by Supplier to solicit or secure this Agreement with BellSouth upon agreement, offer, understanding, or implication involving any form or remuneration whatsoever  Supplier agrees, in the event of an allegation of substance, (the determination of which will be solely made by BellSouth) that there has been a violation hereof, Supplier will cooperate in every reasonable manner with BellSouth in establishing whether the allegation is true. Notwithstanding any provisions of this Agreement to the contrary, if a violation of this provision is found to have occurred and is deemed material by BellSouth, BellSouth may cancel this Agreement and the Project Statement without charge or liability.

## 39.  NONDISCRIMINATION COMPLIANCE

39.1  Supplier agrees to comply with all federal, and state employment rules and regulations.

## 40.  SECTION HEADINGS

40.1  The headings of the sections included in this Agreement are inserted for convenience only and are not intended to affect the meaning or interpretation of this Agreement.

## 41.  INCORPORATION OF APPENDICES

41  The terms and conditions contained in Appendices A through D, referred to in this Agreement and attached hereto, are integral parts of this Agreement and are fully incorporated herein by this reference.  In the event of any inconsistency or conflict between this Agreement and the Appendices, this Agreement shall prevail.

## 42.  NONSOLICITATION

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE.

42.1 Accordingly, each Party, during the term of this Agreement for a period of twelve (12) months thereafter, will not directly solicit for employment or knowingly employ any individual who was employed by the other for any work related to the Trial. Each Party agrees that the exclusive remedy for any breach of the foregoing provisions of this paragraph shall be injunctive relief without proof of irreparable injury and without posting bond in the event of such breach Neither Party shall tile for such injunctive relief without first providing written notice to the other of the alleged breach at least fifteen (15) days prior to filing for such relief.

### 43. ENTIRE AGREEMENT

43 1 This Agreement and the Project Statement and other Appendices attached hereto shall constitute the entire agreement between BellSouth and Supplier with regard to the Trial and may not be modified or amended other than by a written instrument executed by both Parties. This Agreement may be executed in one or more identical counterparts (including without limitation facsimile transmissions thereof) each of which shall be deemed an original, but all of which shall together constitute one and the same instrument.

Supplier:                                                BellSouth:

BroadVoice, Inc.                                         BellSouth Telecommunications, Inc.

By: _____                            By: _____
    (Authorized Signature)                                   (Authorized Signature)

Name: _David Epstein_____                                Name: _____
    (Print or Type)                                          (Print or Type)

Title: _President_____                               Title: _____

Date: _6/15/04_____                                Date: _____

PRIVATE/PROPRIETARY/LOCK
CONTAINS PRIVATE OR PROPRIETARY INFORMATION
MAY NOT BE USED OR DISCLOSED OUTSIDE THE BELLSOUTH COMPANIES
EXCEPT PURSUANT TO A WRITTEN AGREEMENT.
MUST BE STORED IN LOCKED FILES WHEN NOT IN USE.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| BROADVOICE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.  05-11435-NG |
| | ) | |
| BELLSOUTH CORP., BELLSOUTH | ) | |
| TELECOMMUNICATIONS, INC., | ) | |
| and | ) | |
| BELLSOUTH INTELLECTUAL | ) | |
| PROPERTY CORP. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**EXHIBITS TO THE AFFIDAVIT OF LES BERRY (PART 2)
IN SUPPORT OF BROADVOICE, INC.'S MOTION IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS, OR TRANSFER, OR STAY**

**EXHIBIT C**
**(Continued)**

BroadVoice – Project Statement                                          p.1 of 12
APPENDIX A

## Table Of Contents

1.    Scope.............................................................................................................2
2.    BroadVoice Responsibilities .........................................................................4
   2.1    Product.............................................................................................4
      2.1.1   Infrastructure ..........................................................................4
      2.1.2   Features/Capabilities................................................................5
      2.1.3   Performance .............................................................................8
      2.1.4   Reporting .................................................................................8
   2.2    Testing ............................................................................................8
      2.2.1   System Testing ........................................................................8
      2.2.2   CPE Testing .............................................................................8
      2.2.3   Integration Testing with BellSouth ...........................................8
   2.3    Customer Provisioning ......................................................................9
   2.4    Operations .......................................................................................9
      2.4.1   Customer Support ....................................................................9
      2.4.2   Service Problems and Outages ..................................................9
   2.5    Billing ............................................................................................10
      2.5.1   International Calling ................................................................10
      2.5.2   Other Billing...........................................................................10
3.    BellSouth Responsibilities...........................................................................10
4.    Fees and Payment Schedule ......................................................................11

*PRIVATE/PROPRIETARY/SECURE*
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth*
*Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

BroadVoice – Project Statement                                    p.2 of 12
APPENDIX A

## 1.    SCOPE

The Supplier will deliver a voice-over-IP service (Service) that provides a variety of enhanced communications features and the capability to place local, nationwide long distance, and international calls using analog phones in conjunction with specialized customer premises equipment (CPE) provided by BellSouth. The Service will be re-branded as BellSouth's own voice-over-IP service (e.g., BellSouth DSL Talking Service) and include call completion, E911 emergency service, advanced calling features, voice mail with web and telephone interface access, and web-based feature management capabilities, as is more specifically described in this APPENDIX A.

Customers will access the Service over the BellSouth® DSL Internet Access Trial Service. The DSL Internet Access Trial Service will be sold to Trial customers in a packaged offering that includes the re-branded Service provided by Supplier.  This packaged offer will be marketed to Trial customers as BellSouth Digital Answers service to which customers must have subscribed to qualify for participation in the Trial.

The following diagram portrays the logical system architecture for the Trial.



The Service will be sold to Trial customers in a packaged offering that includes the re-branded Service provided by Supplier. This packaged offer will be marketed to Trial customers as BellSouth Digital Answers service to which customers must have subscribed to qualify for participation in the Trial.

Customers will access the Service over the BellSouth® DSL Internet Access Trial Service that is included in the packaged Trial offer. The Supplier will provide telephone numbers, PSTN connectivity, and E911 service via Primary Rate Interface circuits installed between the Supplier's IP network and the PSTN in the Trial area.

The Service will be offered off a Broadsoft Release 10 platform that will reside in the Supplier's network.  The Media and Network Servers that are standard within this

*PRIVATE/PROPRIETARY/SECURE*
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

BroadVoice – Project Statement                                    p.3 of 12
APPENDIX A

platform will be shared resources with Supplier's other operations. Supplier will provide, provision, install and support within Supplier's existing operating environment a dedicated pair of Application Servers (AS) for the Service. The dedicated AS will operate with Broadsoft Release 10 and will be configured with Supplier's standard AS configuration except as necessary to support specific requirements of the Service as herein defined. In addition, Supplier shall provide, provision, install and support within Supplier's existing operating environment a dedicated pair of servers to host the Broadsoft Web Portal (WP) Release 10. Supplier shall configure the WP with Supplier's standard WP configuration initially, and the WP shall subsequently be customized as provided herein. Supplier shall provide BellSouth with necessary technical information and authorization to enable BellSouth to provide the customization for the WP. BellSouth will design custom Web Portal pages for the dedicated BellSouth WP that will comprise the customer's user interface for the Service and the Suppler will install these pages on the WP.

The primary customer user interface for the BellSouth Digital Answers service will be via the BellSouth® Personal Desktop (BPD). BPD client software will reside on the customer's local computer and interface with a BPD Server that will reside on the BellSouth network. The BPD Server will interface with the Web Portal Server which will interface with the AS providing the customer access to web-based feature management capabilities. Some features can also be managed via a telephone interface (TUI) provided by the Broadsoft platform.

The BPD will provide the Customer access to web-based access to voice mail. The Media Server (MS) residing in the Supplier's network records voice mails and will deposit them in a message store in the BellSouth network. The BPD will access the message store to play messages via the Customer's computer. Supplier's MS will access the BellSouth message store to play messages when Customers access voice mail via a telephone.

The Supplier will install dedicated trunking circuits between the Supplier's IP network and BellSouth's IP network to provide efficient data transfer and to facilitate secure transactions between applications servers on both networks. As shown on the diagram, this connectivity will consist of two DS-3 private line connections, one between Supplier's and BellSouth's POPs in Atlanta and one between Supplier's and BellSouth's POPs in Miami, as is more fully described in the two Dedicated Internet Access (DIA) Service Agreements attached hereto in APPENDIX C and incorporated herein by reference.

Customers will be offered up to two telephone numbers capable of accessing and being accessed by the PSTN. Each number will have a unique voice mailbox and enhanced features.

The Trial will target 500 residential customers in the South Florida area. Residential customers served by the following BellSouth rate centers will be included in the Trial:

| | |
|---|---|
| West Palm Beach | Boca Raton |
| Stuart | Port Saint Lucie |
| Delray Beach | Vero Beach |
| Boynton Beach | Jupiter |
| Fort Pierce | Jensen Beach |
| Sebastian | Hobe Sound |

*PRIVATE/PROPRIETARY/SECURE*
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth
Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

Bella Glade                                  Pahokee

Trial customers shall be customers of BellSouth, not customers of Supplier.
BellSouth shall own all customer information pertaining to the Service rendered by
Supplier or to the Trial. All such customer information shall be deemed BellSouth's
Information as defined in Section 35 of the Agreement ("Nondisclosure of
Information"), regardless of whether it is marked as BellSouth's Information.

## 2.    BROADVOICE RESPONSIBILITIES
### 2.1    Product
Supplier agrees to use the Broadsoft Release 10 platform to deliver the Service and
to make no changes to Broadsoft releases, servers, or other software or hardware
critical to provision of the Service without prior approval from BellSouth.

### 2.1.1    Infrastructure
Supplier shall engineer, furnish, install, operate and maintain

- (a.) A service point of presence ("POP") in the Trial area for serving Trial
  participants and providing interconnection to the Public Switched
  Telephone Network (PSTN) access.
- (b.) Trunking from each of the BellSouth rate centers (defined in Scope) to
  Supplier's POP, as is more specifically described in Exhibit A to that
  certain Letter Agreement between Supplier and BellSouth, dated May 21,
  2004, a copy of which is attached to this Agreement as APPENDIX D and
  incorporated herein by reference.
- (c.) Customer ten (10) digit telephone numbers in each BellSouth rate center
  referenced above and accessible from the PSTN for assignment to Trial
  customers. Supplier shall provide BellSouth with 200 telephone numbers
  per rate center. These numbers will be reserved exclusively for use on
  the Service and may not be utilized or assigned by the Supplier for any
  other purpose.
- (d.) E911 service that routes a Trial customer's E911 call and appropriate
  automatic location identification information to the proper PSAP per the
  customer's residential address. BellSouth acknowledges that Supplier
  has purchased BellSouth's PRI Services with Pinpoint Service and is
  dependent on Pinpoint Service and further acknowledges that Supplier is
  dependent on BellSouth's management of Pinpoint Service and the
  customer's address provided by BellSouth to provide this service.
  BellSouth shall indemnify and hold Supplier harmless from all losses,
  damages or liabilities, including reasonable attorney's fees, resulting
  from any claims brought by any of BellSouth's Trial Customers against
  Supplier that result from the above mentioned BellSouth E911 support
  services used by Supplier to provide the Service, except to the extent
  any such losses, damages or claims are due to the Supplier's breach of
  some other term of this Agreement, or due to the negligent or
  intentional wrongful conduct of the Supplier. BellSouth shall have the
  right and the obligation to defend or settle, at its own expense, any
  action or suit against Supplier for which BellSouth is responsible under
  this subsection. Supplier shall provide BellSouth with prompt written
  notice of any claim that Supplier contends is covered by this indemnity
  provision.
- (e.) An applications hosting center to provide enhanced services as described
  below in Features/Capabilities to Trial participants.

***PRIVATE/PROPRIETARY/SECURE***
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth
Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

BroadVoice – Project Statement                                    p.5 of 12
APPENDIX A

(f.)  Both origination and termination of Local, nationwide long distance and
      international voice calls for Trial participants.
(g.)  A Voice mail application that stores voice mails in a BellSouth message
      store.
(h.)  Mutually agreed upon secure access to the Broadsoft Feature Portal from
      the BPD.
(i.)  Support SIP, non-compressed (G711).
(j.)  IP network connectivity/peering to support provisioning and transport of
      voice services during trial.

2.1.2    Features/Capabilities
The following Service features and capabilities will be supported:

| Feature/Capability | Description |
|---|---|
| Calling Line ID (CID) | Name and number displayed when available for incoming calls. |
| Calling Line ID Blocking | |
| Calling Line ID Delivery Blocking per Call | Caller ID is displayed on outgoing calls. Feature can be turned on/off for individual calls or remain persistently on/off. Works on call waiting. |
| Calling Line ID Delivery per Call | NOTE: If customer has selected Calling Line ID Block on all outgoing calls, Calling Line ID can be delivered per call. Supplier shall take commercially reasonable steps to ensure CID is populated with CID information via a commercially available LEC database service. |
| Anonymous Call Rejection | The customer can choose to have the calls totally blocked. The called party is not aware of sequencing. Incoming CID information is retained. This feature can be turned on/off. |
| Call Forwarding Always | Incoming calls are forwarded on Busy, Always, and No Answer. Enhanced Call Forwarding version allows |
| Call Forwarding Selective | customer to forward calls based on calling number and to forward calls per a specified profile (e.g., series of numbers, schedule). From the Web Portal, customers can set a reminder that calls are forwarded. A short ring burst will emit from their home phone every time a call is forwarded. Call Forwarding Always will override Call Forwarding Busy & No Answer to Voice Mail. Call Forwarding Selective will override Call Forwarding Always, as well as Call Forwarding Busy & No Answer to Voice mail. |
| Call Waiting | During an active call, customer is notified of an incoming call. Customer may decide to put first call |
| Cancel Call Waiting | on hold and take incoming call. If not answered, the incoming call is sent to voicemail. Customer can turn off for the duration of the current call. |

*PRIVATE/PROPRIETARY/SECURE*
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth*
*Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

BroadVoice – Project Statement                    p.6 of 12
APPENDIX A

| Feature/Capability | Description |
| --- | --- |
| 3-way Calling | Customer can establish a conference call with up to 3 parties (customer plus two parties) by dialing the parties and adding to the call via the flashhook. NOTE: Using the flashhook to connect the calls, bandwidth for two calls is required and is managed by CPE during Trial. |
| Call Return | Ability to quickly redial the number that last called. |
| Last Number Redial | Ability to have the last number dialed quickly redialed. |
| Simultaneous Ring | Enables users to have multiple phones ring simultaneously when any calls are received. The first phone to be answered is connected to the caller. For example, calls to a user's home phone also ring the user's mobile phone, in case they are away from home. |
| Do Not Disturb | Automatically forward calls to voicemail. Phone can emit a short ring burst to inform the customer when the call is being sent to voicemail by using the Ring Reminder. |
| Speed Dial 100 | Allows up to 100 speed dial numbers to be defined that can be called with the push of a few buttons. This feature can be programmed via the Web Portal or the TUI (*75). |
| Call Notify | Sends an e-mail with the CID information to a specified e-mail address when pre-defined criteria, such as phone number, time of day or day of week, are met. |
| Call Park | Place a call on hold (muted for both parties). Pick up the call from any other phone associated with the line originally called. |
| Personal Phone List | Store frequently called numbers to be dialed (click to dial) from the Call Manger. |
| Call Log (Call Manager) | Separate logs of incoming ("Missed" & "Received") & outgoing ("Dialed") calls. Click to dial from any calls on the lists. |
| Voicemail | Ability to record and store voice messages. Accessible via the BPD and Supplier provided and TUI. Can also be accessed remotely via the web. To access voicemail via the TUI, a customer will call the telephone number assigned to them for use during the Trial and enter a touchtone code (e.g., #) that will put them into their Voice Portal. The user can then select voice mail from the main menu. |
| Message Waiting Indication (MWI) | Indication of new voicemails is provided via connected MWI phones and the BPD. Stutter and visual. |

*PRIVATE/PROPRIETARY/SECURE*
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth*
*Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

BroadVoice – Project Statement                                        p.7 of 12
APPENDIX A

| Feature/Capability | Description |
|---|---|
| Voicemail Personal Name Announcements, "No Answer" & "Busy" Greetings Included with Voice Messaging – Personal. | The name announcement is a recorded label to personalize the mailbox. The No Answer greeting is the announcement callers will hear when the subscriber's phone is not answered. The Busy greeting is the announcement callers hear when the phone is busy. Default greetings. |
| VM Ring Count Included with Voice Messaging – Personal. Number of Rings before Greeting | The user can specify the number of rings before the calling party hears the no answer greeting. |
| Copy of VM Included with Voice Messaging – Personal. | Send copy of voice mail (WAV file) to an additional email address |
| VM "0" Transfer Included with Voice Messaging – Personal. | Caller can hit "0" during VM greeting to transfer to any number defined by the subscriber. |
| VM Notification Included with Voice Messaging – Personal. | Customer can define an e-mail notification of new voice mail messages. |
| Number of Lines | Customers may have up to two Von lines (each with their own telephone number). Each customer is a single account (defined as a group in Broadsoft). |
| CALEA- Communications Assistance for Law Enforcement Act | Supplier will provide appropriate gathering and tracking capabilities to assist and enable BellSouth to respond to any lawful request or order by law enforcement agencies or the courts to collect, produce or conduct surveillance of Trial customer communications or calling detail related to the Service. |
| Operator Services | **"0" and "411" will be directed to a BellSouth agent as mutually agreed by the parties.** 611 will be directed to Bellsouth's Trial Center Support Group. (TCSG). Access to an international operator will be provided. |
| Nationwide Calling | Nationwide call termination with unlimited local access. |
| International Calling | A list of high-fraud areas will be mutually agreed upon and blocked. |
| Web-based Feature Management | Accessed and presented via the BPD to the customer. |
| Call Manager | Pop-up client on the customer's computer providing limited call management capabilities. |

The Service will be exclusively BellSouth branded as specified and approved in writing by BellSouth. Supplier will implement such branding on but not limited to customer accessible web pages and customer materials provided as part of the Trial, subject to the provisions of Section 20 ("BellSouth Marks") of the Agreement.

*PRIVATE/PROPRIETARY/SECURE*
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

Supplier will install and maintain BellSouth-designed and supplied web pages on the Web Portal Servers.

*2.1.3    Performance*
Supplier will take all reasonable measures to make the Service available to Trial Customers 99% of the time as measured monthly.  If such availability during the Trial Period becomes less than 99% for particular a month, then the monthly Customer Account charge due Supplier for Services rendered under this Agreement will be automatically reduced by 10% for that month.

Supplier will monitor its network and systems used to support the Service to ensure immediate identification of customer-affecting problems.  Supplier will provide to BellSouth reports on Service outages and troubles on a monthly basis.  It is understood by the parties that the monitoring and reporting obligations described herein do not include monitoring and reporting on the performance of BellSouth's DSL network and DSL services. Supplier's collection of monthly service-impacting quality metrics will include but not be limited to bandwidth utilization, packet loss, and latency and will provide monthly backhaul circuit traffic metrics.

Supplier will provide BellSouth prior to Trial Start Date with twenty (20) test accounts in addition to customer accounts for the duration of the Trial to confirm outages.

*2.1.4    Reporting*
Supplier will provide BellSouth with monthly reports that provide at least the following information: Service performance, feature usage, portal performance, and customer support.  BellSouth and Supplier prior to the Trial Start Date will mutually agree upon the detailed reporting plan.

**2.2    Testing**
*2.2.1    System Testing*
As part of Supplier's responsibility for deploying dedicated AS and WP, Supplier shall test the AS and WP deployed in support of the Service.  Supplier shall validate that the AS and WP are operating properly including appropriate failover in the event of a failure on the AS, WP, or shared elements within Supplier's operating environment. No later than 2 weeks after the execution of this agreement and receipt of the initial payment, Supplier shall provide BellSouth with documentation showing the results of the system testing and certifying that all Service elements are operating properly.

*2.2.2    CPE Testing*
Supplier shall perform interoperability testing with the 2wire CPE provided by BellSouth for use in the Trial and validate that such device is operational and compatible with the Service and.

*2.2.3    Integration Testing with BellSouth*
BellSouth shall be responsible for testing the integration of the Service with the BPD, BellSouth's network, and any BellSouth trial services other than the Service. Supplier shall support BellSouth's integration testing including troubleshooting of interfaces between the Service and other elements of the trial.

In addition to the 20 test accounts required in <u>Performance</u>, Supplier shall provide BellSouth no later than 20 days prior to the Trial Start Date ten (10) fully operational

*PRIVATE/PROPRIETARY/SECURE*
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth
Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

test accounts for use by "friendly" Trial customers who will assist BellSouth in performing end-to-end testing of the Service.

## 2.3    Customer Provisioning

Supplier will accept customer order information including telephone number assignments from BellSouth and provision each such order for Service within 30 minutes of receipt of such information.

Supplier will modify Supplier's provisioning system to accept and provision such orders in a mechanized and secure manner.

Supplier will provide BellSouth lists of telephone numbers by BellSouth rate center that are available for assignment for use with the Service at least (2) weeks prior to Trial Start Date.

## 2.4    Operations

### 2.4.1    Customer Support

Supplier will provide Tiers2 and 3 Customer Support for the Service. Such support will focus on Service-specific issues not addressable by BellSouth's Tier 1 support. Such support will be available 24 hours a day, seven (7) days a week. Supplier will accept live calls immediately from BellSouth's TCSG via a dedicated telephone number. All customer interactions by Supplier will be branded as BellSouth.

Supplier will provide BellSouth with administrative access at the Service Provider level into customer accounts provisioned on Supplier's Broadsoft platform.

Other than Supplier communications necessary to perform Tiers 2 and 3 customer support functions under this Agreement, Supplier and its agents shall not distribute to BellSouth Trial customers any written or electronic Customer communications without prior review and approval by BellSouth.

Trial customer E-mails requesting support shall be forwarded to BellSouth's TCSG for initial action.

Supplier will provide BellSouth monthly summary reports regarding Customer support activity including but not limited to total number of calls, reasons for each customer call, resolution of the issue, duration of resolution, average call time and repeat calls. Daily reports will be provided listing recently closed and open customer trouble tickets.

Supplier will provide BellSouth with an escalation contact that is available 24 hours a day, seven (7) days a week.

### 2.4.2    Service Problems and Outages

Notification procedure – In the event of any condition that will affect the performance or availability of the Service, including but not limited to actual outages, Supplier will notify BellSouth within 15 minutes of discovering the condition by sending an email to an address(s) designated by BellSouth and by calling BellSouth's TCSG. This notification will include a description of the condition, the anticipated impact on users of the Service and an estimated time to repair. During any such outage or service-affecting situation, BellSouth shall receive regular status updates until the situation is cleared and all customers are back in service. Upon repair of the condition, Supplier shall notify BellSouth by the same procedure described above.

*PRIVATE/PROPRIETARY/SECURE*
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

BroadVoice – Project Statement                                         p.10 of 12
APPENDIX A

Emergency contacts – BellSouth shall provide Supplier with a designated emergency
contact telephone number(s).  In the event of any emergency, Supplier shall
immediately contact BellSouth at the designated number(s).  Supplier shall use best
efforts to assist BellSouth and any governmental agencies involved to address any
emergency; such assistance may entail access to data and operating information
contained within Supplier's operating environment.    Events requiring such
emergency contact and assistance shall include, but not be limited to:  a request by
a Public Safety Answering Point (PSAP) or other public safety official to trace or
contact an end user of the Service who has placed a 911 or similar emergency call,
loss of service for both PRI circuits for any single rate center, and a lawful request by
any governmental authority for assistance.

Reporting process    – On a monthly basis, Supplier shall provide BellSouth with a
summary report of all service-affecting problems and outages.

**2.5     Billing**
*2.5.1     International Calling*
Supplier shall provide BellSouth monthly with a file containing all international
customer-calling records. The file format and transmittal details will be mutually
agreed upon.   The file is to be provided by the 3rd day of each month for all
international calls from the prior month.

Supplier shall provide BellSouth monthly with a file containing all domestic long
distance customer-calling records.  The file format and transmittal details will be
mutually agreed upon.  The file is to be provided by the 3rd day of each month for all
domestic calls from the prior month.

*2.5.2     Other Billing*
Supplier shall render a bill by the 10th day of each month to BellSouth detailing
charges for Customer Accounts, circuits, and CNAM service as detailed below in <u>Fees
and Payment Schedule</u>. Remittance must be received by Supplier within 30 days of
receipt of such bill.

**2.6     Failure of BellSouth Services and Features; and Indemnification.**

*2.6.1  Failure of Services and Features provided by BellSouth.*
Supplier shall not be in breach of this Agreement for any failure or deficiency of the
Service that is caused by a failure or deficiency in the services and features provided
to Supplier by BellSouth, its affiliates and its sub-contractors in connection with this
Agreement.

**3.     BELLSOUTH RESPONSIBILITIES**
BellSouth shall be responsible for the following

- Customer acquisition activities including all marketing, sales, and order creation
  activities. BellSouth shall provide Supplier with information necessary to provision
  a customer on the Broadsoft platform including telephone number assignment.
- Ensuring customers are qualified, have DSL and the appropriate CPE.
- A voice mail store accessible via IMAP4 by the Media Server residing in Supplier's
  network.

*PRIVATE/PROPRIETARY/SECURE*
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth
Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

BroadVoice – Project Statement                                           p.11 of 12
APPENDIX A

- The BPD that will be the primary platform for the customer interface.
- Web pages that will comprise the customer interface residing on the Web Portal Server.
- Tier 1 customer support. Such support will provide initial screening to minimize misdirected calls to Supplier's Tier 2 support. A BellSouth representative will place calls transferred to Supplier's Tier 2 with the customer on the line. The BellSouth representative may stay on the line with the customer and Supplier's representative.
- Branding specifications for web pages and user interface changes.
- Customer billing.
- CPE will be provided to Supplier for testing.

## 4.    FEES AND PAYMENT SCHEDULE

BellSouth agrees to pay Supplier the following fees for the Services provided under the Agreement, in accordance with the terms of following payment schedule.

| | |
|---|---|
| Customer Accounts<br><br>$ 21.45 per customer line per month | • Minimum 500 Lines<br>• Minimum 5 months<br>• 5-month minimum total $ 53,625<br>• Maximum 600 accounts<br>• This price includes unlimited U.S. and Canadian calling<br>• 24x7 Customer Support<br>• Features and capabilities described in <u>Features/Capabilities</u><br>• Includes test accounts per <u>Testing</u> |
| Dedicated Broadsoft Servers<br><br>$ 68,000 one time | • Includes Dedicated Broadsoft Application and Web Portal Servers, and any supporting hardware or software, but excludes any additional Broadsoft license fees, if applicable Includes all Non-Broadsoft related hardware and software, set up, and maintenance for Trial |
| PRIs and Pinpoint Service<br><br>Tariff price paid plus 10% | • 14 pair of PRIs with Pinpoint Service in Miami<br>• 1 pair PRI in Atlanta for BellSouth's integration testing<br>• (Per LOA) |
| International Calls (other than Canada)<br><br>Per Rate Schedule (need to attach) | • Billed and remitted monthly |
| Customization & Set-Up Work<br><br>$ 35,000 one time | • OSS modifications<br>• Workflow changes<br>• Billing changes<br>• Gateway changes<br>• CDR changes<br>• Integration testing |

*PRIVATE/PROPRIETARY/SECURE*
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*

BroadVoice – Project Statement                                    p.12 of 12
APPENDIX A

|  |  |
|---|---|
|  | • Security modifications |
|  | • Minimum estimate |
|  | • Additional as negotiated |
| CNAM | • CNAM dips necessary to present calling party name |
| 1 cent per inbound call | • Billed and remitted monthly |

Payments shall be phased as follows:

| Amount | Schedule | Description |
|---|---|---|
| $ 68,000 | Due upon signing | Dedicated Broadsoft Installation |
| TBD | Due monthly upon installation | PRIs and Pinpoint service |
| $ 35,000 | Due upon signing | Customization Work |
| $10,725 | Due upon signing | First month of minimum customer accounts |
| Usage | Billed monthly | International Calls |
| Usage | Billed monthly | CNAM dips |
| $10,725 per month | Remitted monthly in months 2 through 5 | Customer Accounts Beginning month 2 |

If Supplier has not completed turn-up of the Service and provided the test accounts in accordance with the schedule defined above, BellSouth may at its option delay the Trial Start Date. Regardless of whether BellSouth elects to delay the Trial Start Date, in the event that Supplier does not complete turn-up of the Service and provide test accounts in accordance with the schedule defined above, the duration of the Service shall be extended one day for each day that Supplier is delayed and the amount payable by BellSouth to Supplier shall be reduced by $400 for each day that Supplier is delayed.

In the event that Supplier is delayed by 15 or more days, BellSouth shall have the option to terminate this Agreement and Supplier shall refund to BellSouth all monies paid to Supplier except the cost of PRI and Pinpoint services purchased initially in pursuant to the LOA that is incorporated into this document and Dedicated Internet Access services that are referenced in this document.

*PRIVATE/PROPRIETARY/SECURE*
*Contains Private and/or Proprietary Information. May Not Be Used Or Disclosed Outside The BellSouth Companies Except Pursuant To A Written Agreement. Must Be Securely Stored When Not In Use.*



<u>**Appendix B**</u>

**BellSouth**
**Corporate Security Standards**

---

**400-600-TR - Security Requirements for Sourced Work**

## NOTICE

For the purpose of this document, the term "Contractor" referred to herein shall mean contracted individual. The term "Supplier's Employees and Subcontractors" referred to herein shall mean a supplier's employees, subcontractors, agents or representatives. The term "Supplier" referred to herein shall mean a provider of goods and/or services pursuant to a written contractual agreement with BellSouth, including outsourced and alliance agreements. The term "sourced work" referred to herein shall mean work performed by entities other than BellSouth, or its employees and contracted professionals and may include work performed where the parties are contractually allied in the offering of products and services. Such work may be performed pursuant to an agreement labeled as an "Alliance Agreement", "Strategic Agreement" or the like. The term "BellSouth" shall mean BellSouth Corporation or any of its affiliated companies.

Liability to anyone arising out of use or reliance upon any information set forth herein is expressly disclaimed, and no representations or warranties, express or implied, are made with respect to the accuracy or utility of any information set forth herein.

This document is not to be construed as a suggestion to any entity to modify or change any of its products or services, nor does this document represent any commitment by BellSouth to purchase any product or service whether or not it provides the described characteristics.

Nothing contained herein shall be construed as conferring any license or right by implication, estoppel or otherwise under any patent, whether or not the use of any information herein necessarily employs an invention of any existing or later issued patent.

---



**Appendix B**

**BellSouth**
**Corporate Security Standards**

**400-600-TR - Security Requirements for Sourced Work**

## Table of Contents

1.    Introduction
 1 1 General
 1.2 Scope
 1.3 Reason for Issuance
 1.4 Enforcement
 1.5 Accountability
 1 6 Remedies
2.    Glossary
3.    General
 3.1 Policy
 3.2 Performance of Work
4.    Responsibilities
 4.1 General
 4.2 Request for Waiver
 4.3 Waiver Submission and
   Approval

 4.4 Absence of Waiver
5.    Supplier Requirements
 5.1 General
 5.2 Operability
 5.3 Non-repudiation
6 Outsourced Web Hosting
 6.1 General
 6 2 Outsourced Web Site Ultimately
   Hosted by a BellSouth Facility
 6.3 Co-Branding
7.    Expiration or Termination Transition
 7 1 General

## 1.    Introduction

**1.1** **General** - The information in this document is subject to review and modification. Accordingly, this document may be subject to change at any time. Future issues of this document and/or BellSouth's internal security requirements may differ extensively in content, substance and format. In the event that this document is modified, BellSouth shall provide written notification to Contractor or Supplier along with a copy of the modified document. Upon the parties' reaching mutual agreement, the new document shall control. If no agreement is reached between the parties, then this document shall continue to be in full force and effect.

This document does not apply to contracts and agreements executed prior to February 1, 2002. Subsequent revisions will be subject to this document.

BellSouth reserves the right to select and utilize any Contractor, Supplier or any of Supplier's Employees or Subcontractors based on its own internal criteria at any time, under any circumstances, whether or not the requirements in this document are met.



**Appendix B**

**BellSouth**
**Corporate Security Standards**

**400-600-TR - Security Requirements for Sourced Work**

BellSouth does not recommend computer-related products or services and nothing contained herein is intended nor should it be construed as a recommendation of any product or service to anyone. Further, Contractors or Suppliers are not to relate their products, goods, services, etc., to these guidelines in order to imply that such items meet any particular standard of use or utility.

1.2     **Scope** - This standard applies to the purchase from, or delivery, development, maintenance, and/or support of BellSouth-related Information Resources by a Supplier. For the purposes of this document, Information Resources shall include but are not limited to, computers, computer peripherals, computer communications networks, computer systems/applications/software, web-sites, data stores, information processing systems, public telephone network elements, and their support systems. This includes the protection of all BellSouth corporate, employee and customer information stored, processed or transmitted on these facilities. Product trials and evaluations using BellSouth Information Resources shall also be governed by this document.

As further definition, this includes, but may not be limited to work that may:
- Include the handling, manipulation, storage, and/or transmission of BellSouth, BellSouth customer or BellSouth employee proprietary information using computers, computer applications, computer systems, and/or computer communications networks (public or private),
- Involve the provision of computer based processing, communications and/or network services to BellSouth, BellSouth's customers and/or BellSouth's personnel in their employed or contracted capacities,
- Result in the authorized provision of services using the BellSouth name to BellSouth's customers and/or BellSouth's personnel,
- Provide publicly or privately accessible web site hosting capability and/or content for BellSouth, and/or
- Involve connections to a BellSouth internal computer communications network or voice network not universally accessible from the public switched telephone network.

1.3     **Reason for Issuance** - This standard has been revised as part of the annual review process.

1.4     **Enforcement** - Supplier personnel performing sourced work shall protect BellSouth Information Resources in accordance with the terms and conditions of applicable contractual agreements between the Supplier and BellSouth.

In addition, it is the responsibility of all personnel performing sourced work to comply with federal, state, and local acts, statutes, and regulations which relate to the control and authorized use of BellSouth's information and Information Resources

*D.4.*

---



**Appendix B**

**BellSouth**
**Corporate Security Standards**

## 400-600-TR - Security Requirements for Sourced Work

**1.5 Accountability** - Personnel performing sourced work shall be held accountable for compliance with the standards in this practice and any others which are included in the contractual agreement between the Supplier and BellSouth. System vulnerabilities identified by these personnel must be promptly reported to the BellSouth Enterprise Information Security organization.

**1.6 Remedies** - Violations of BellSouth computer, network, and information security policies and standards or governmental statutes, rules, and regulations may result in remedies up to and including termination of a contractual agreement or any other rights and remedies that BellSouth may have in equity and law.

**2. Glossary**
- Shall - The word "shall" indicates a requirement that is to be met unless BellSouth Enterprise Information Security approves a waiver or variance.
- Must - The word "must" indicates a requirement that is to be met unless BellSouth Enterprise Information Security approves a waiver or variance.
- Should - The word "should" indicates a guideline more than a requirement. Waivers or variances are not required for noncompliance with guidelines.

**3. General**

**3.1 Policy** - - It is the policy of BellSouth to protect its Information Resources in all situations and wherever they are located. Protection of Information Resources in the case of sourced work includes, but is not limited to:
- Access to, and use of, BellSouth's proprietary information and BellSouth's employee and customer proprietary information,
- Return and/or disposal of BellSouth's proprietary information and BellSouth's employee and customer proprietary information,
- Access to, use, and return or disposal of computer hardware and software,
- Defacement, improper operation and/or loss of use of a system, application or web site designed for, or in support of, BellSouth, and
- Access to, and/or use of, a BellSouth network, network element, or off BellSouth premises extension to a BellSouth network, e.g., an extranet connection.

**3.2 Performance of Work** - When BellSouth work is performed by entities other than BellSouth or its employees and contracted professionals, BellSouth's Information Resources as well as its good name and character may be placed at risk. Accordingly, BellSouth expects that the performance parameters for all sourced work must be documented in the contractual agreement between the involved parties. The documented performance parameters must include all security precautions necessary to protect BellSouth and its Information Resources



**Appendix B**

# BellSouth
# Corporate Security Standards

---

### 400-600-TR - Security Requirements for Sourced Work

**4.    Responsibilities**

4.1    **General** - It is the responsibility of each Supplier to assure BellSouth that its requirements for the security of Information Resources, and the information stored, transmitted, and/or processed on these Resources, are met.

4.2    **Request for Waiver** – A prospective Supplier who wishes to provide BellSouth with an Information Resource or service that is not in compliance with these standards shall document the deviations in a written request for a waiver. The request must specify the following:

- Area(s) of non-compliance
- Reason(s) for the non-compliance
- Available alternative(s)
- Reason(s) why an alternative or an omission should be accepted

> **NOTE:** A marked electronic version of this BellSouth Technical Reference with the information above is the preferred documentation for a waiver request.

4.3    **Waiver Submission and Approval** - Waiver requests shall be submitted through the appropriate BellSouth purchasing organization or person to the Contractual Agreement Waiver Manager listed on the BellSouth Enterprise Information Security intranet site, http://security.bls.com. The Contractual Agreement Security Waiver Manager will approve the waiver request, negotiate changes/conditions necessary for approval of the waiver request, or deny the waiver request. If a waiver request is denied, the denial may be appealed by a BellSouth management person using the variance process documented in BellSouth Corporate Security Standard (CSS) 000-100, *Security Management Process*. Failure of BellSouth Enterprise Information Security to respond to a waiver request shall not under any circumstances be considered to be approval of the waiver request.

Waiver approvals and other related correspondence might be transmitted via electronic mail or other more formal means of documentation. Approved waivers will be filed with the BellSouth copy of the Agreement and will be retained during the retention period for that Agreement. Suppliers should transmit their waiver requests sufficiently in advance of the need for a ruling on the waiver requests so that BellSouth Enterprise Information Security will have adequate time to review the waiver requests

---



**Appendix B**

**BellSouth**
**Corporate Security Standards**

**400-600-TR - Security Requirements for Sourced Work**

4.4    **Absence of Waiver** – Suppliers are hereby notified that this BellSouth Corporate Security Standard Technical Reference shall be enforced in its entirety, and the involved Supplier shall be held in breach of his/her/its agreement with BellSouth for any violation of any requirement herein, unless a waiver is approved, as noted above.

> **NOTE:** Vendors, Contractors and Suppliers are hereby notified that the BellSouth Enterprise Information Security organization has the sole responsibility for security waiver and variance approval in BellSouth. Contractors and Suppliers shall comply with these standards unless a written waiver or variance is issued as noted above by the BellSouth Enterprise Information Security organization.

5.    **Supplier Requirements**

5.1    **General** - The Supplier shall:
   A. Currently have, or agree to implement, an internal security policy governing the protection of its own information resources and the resources of others under its control. A copy of the Supplier's security policy shall be made a part of this Agreement.
   B. Indemnify BellSouth for any improper acts, omissions, failure to perform, and/or failure to comply with these security requirements unless specifically excluded in another part of this agreement.
   C. Comply with all federal, state and local acts, statutes, rules and regulations for the protection of information systems and resources.
   D. Ensure that all of Supplier's employees and representatives who will perform work associated with this agreement or have access to Information Resources associated with BellSouth, BellSouth's employees and/or BellSouth's customers are covered by a binding nondisclosure agreement.
   E. Ensure that only persons with an approved need to know are allowed to access BellSouth information, BellSouth employee information, and/or BellSouth customer proprietary information. This shall include controls that allow a person to access only the specific information and Information Resources required to perform the work specified in the Agreement and for which that person is authorized.
   F. For each of Supplier's employees and/or representatives who may have access to BellSouth, BellSouth employee, and/or BellSouth customer proprietary information, or a computer, computer system, or computer communications network containing such, or a computer system, application or network providing capabilities to BellSouth:
      a.
      b. Perform a background investigation if requested by BellSouth:
         a) As a part of a random sampling for security verification purposes,
         b) As a part of regular screenings to strengthen BellSouth security, or



**Appendix B**

**BellSouth**
**Corporate Security Standards**

Corporate Security Standards (logo)

---

**400-600-TR - Security Requirements for Sourced Work**

    c) If BellSouth has reasonable cause to suspect one is needed.

  c. Immediately advise BellSouth of any information of which Supplier becomes aware that would reasonably provide notice of potential threats to the Information Resources, assets or personnel of BellSouth.

> **NOTE:** For the purposes of the document, an appropriate background check shall consist of research at the county courthouse level for the felony and misdemeanor offenses described above and any pending trial dates for such offenses. Research shall be conducted in all the counties in which the Employee or Subcontractor has resided within the seven years prior to the proposed assignment.

G. Secure and protect BellSouth proprietary information, BellSouth employee proprietary information, BellSouth customer proprietary information, and/or other BellSouth Information Resources from unauthorized or improper use, theft, or accidental or unauthorized modification, disclosure or destruction.

H. Assure the reliability and integrity of all BellSouth information and Information Resources under its control, and the information processing activities performed with or for BellSouth. This includes the creation of a service level agreement.

I. Maintain the proprietary nature and if necessary, the proprietary marking of any BellSouth, BellSouth employee, and/or BellSouth customer proprietary information.

J. Comply with agreed upon written arrangements for the movement of information and data between BellSouth and Supplier, and between Supplier and any other entities authorized in the Agreement. If not otherwise specified, either return proprietary information to BellSouth or completely destroy proprietary information by shredding or burning, or in the case of proprietary information contained in electronic form, by erasure and/or overwriting in such a fashion that such proprietary information cannot be retrieved by data retrieval or other utilities.

K. Ensure that if applicable to the services provided in this Agreement, that BellSouth, BellSouth employee, and/or BellSouth customer proprietary data which are identified by BellSouth as requiring encryption, are transmitted across a public network (including the Internet, but excluding the Public Switched Telephone Network) in an encrypted format.

L. Ensure that stored data is encrypted as necessary to enforce access control. This section specifically requires the one-way encrypted storage of passwords on systems intended for BellSouth usage and for any administrative access to such systems. For systems intended for BellSouth customer use, it requires the encrypted storage, but not necessarily one-way encryption of passwords used for customer access.

M. Ensure that computer storage devices, e.g., DASD, hard or floppy disks, magnetic tape, or optical disks, containing BellSouth or BellSouth customer proprietary data are not disposed of or otherwise presented to others unless all BellSouth and BellSouth customer proprietary data has been completely obliterated. This includes media used to transmit data and to create backups.



---



**Appendix B**

# BellSouth
# Corporate Security Standards

### 400-600-TR - Security Requirements for Sourced Work

N. Ensure that any security credentials received from the customer to enable downstream system access are verified and confirmed with the customer by a means independent of the process in which they were received. For example, if the customer supplies his security credentials via email, the verification might be via the U.S. Mail.

O. Not use or transfer BellSouth, BellSouth employee, and/or BellSouth customer information or data for any purpose not explicitly defined and authorized in the Agreement between the parties. This includes aggregate, trend and assimilated data. No individually identifiable customer data shall be transferred to a third party unless specifically authorized by the employee or customer, or as authorized by BellSouth in the performance of services ordered and being paid for by the customer.

> **NOTE:** BellSouth CPNI (Customer Proprietary Network Information) must be handled in accordance with laws and regulations governing such information.

P. Shall, unless a mechanized scanning tool is not available for the platform or operating system, complete a security scan of the system and notify BellSouth of all discovered vulnerabilities. Further, all discovered vulnerabilities shall be corrected or accepted in writing by the BellSouth Enterprise Information Security organization prior to delivery or implementation.

Q. Implement security changes, patches and upgrades in systems, applications and software in a timely manner and commensurate with the threat, as directed by the manufacturer and subject to appropriate testing, but not longer than 90 days from their release. Security changes, patches and upgrades correcting significant or immediate security issues shall be implemented immediately subject to appropriate testing under the circumstances but no later than 10 days after their release unless a longer period is recommended by the manufacturer or agreed to by the BellSouth Enterprise Information Security organization.

R. Ensure that if a commercial hosting center is used, that their computers, computer systems and computer communications networks are both physically and logically isolated from other such equipment in the hosting center.

S. Ensure that individual access and accountability controls are in place for each of Supplier's employees and representatives who will access a BellSouth system, application or other Information Resource including resources owned and/or operated by or for Supplier that may contain BellSouth proprietary information, BellSouth employee proprietary information, and/or BellSouth customer proprietary information. Accountability/audit records shall be kept for a period of no less than thirty days.

T. Ensure that authentication mechanisms are complex and not easily overcome. There shall be no known way to bypass the authentication mechanism and obtain entry into the system. Token-based authentication devices, smart cards or biometric devices are recommended. If passwords are to be used, they must.



**Appendix B**

# BellSouth
# Corporate Security Standards

### 400-600-TR - Security Requirements for Sourced Work

a. Be at least six characters in length for users and eight characters in length for administrators and/or maintenance personnel,

b. Contain both alphabetic and numeric characters,

c. Be aged at least every sixty (60) days for users and every thirty (30) days for administrators, and

d. Not be reusable   A system must employ a password reuse utility that prevents a password from being reused for at least 6 (six) months, the last 3 (three) aging cycles, or the last 5 (five) password changes, whichever is feasible and longer.

If the system/network being accessed exists solely for use by BellSouth customers, such customers may elect to disregard any or all of items noted in (a) through (d) above using an online decision process or other recordable means that warns them of the security implications, and then records the wishes of the customer.  This exclusion does not apply to certain users, including but not limited to BellSouth internal users, the supplier's personnel and maintenance and/or administrative personnel

> **NOTE:**  Use of .rhost files, host.equiv, NT shares, NFS, etc., frequently results in bypassing authentication.

U. Ensure that Internet and other public (including public switched telephone) network connections are designed, implemented and maintained so as to secure and protect information, data, and system operation during the life of the Agreement.  This includes, but is not limited to, non-repudiation, authentication, authorization, and monitoring issues   The parties agree that no Internet or other public network connections shall be implemented except as documented and approved in this Agreement or a subsequent agreement that has been accepted by the BellSouth Enterprise Information Security organization.

BellSouth requires persons using remote, e.g., in-dial, ISDN, wireless, VPN or other public switched network access for maintenance and/or administrative purposes to be individually identified and authenticated by an independent, dedicated, access control device that is a part of a network authentication infrastructure.  The remote authentication process must utilize a dynamic password, such as a *token card*.

V  A system's login procedures must be designed and implemented with a mechanism that will thwart the use of repeated login attempts to guess or otherwise determine a valid login identification and authentication combination.  The process must always cause the person or machine to reinitiate the login process after no more than nine successive unsuccessful attempts

W. Ensure that no connection is made to a BellSouth internal data communications network including a *control capable* channel into the BellSouth Advanced Intelligent Network (AIN) or the Public Switched Telephone Network (PSTN) without permission, in writing, from the BellSouth



**Appendix B**

# BellSouth
## Corporate Security Standards

### 400-600-TR - Security Requirements for Sourced Work

Enterprise Information Security organization.  Supplier shall further understand that:

a. Any and all traffic traversing a remote access link to a BellSouth internal network is subject to monitoring at any time and without advance warning.  There shall be no expectation of privacy in the use of a BellSouth internal network  BellSouth shall have the right to terminate any remote link if illegal or improper traffic is observed.

b. The use of UDP shall be avoided where possible.

c. Any device connected to a BellSouth internal network shall be subject to security scans (unless a firewall prevents such scans) and other security audit procedures.  These scans may be conducted without prior notice.  The scans will test the connected platform for security vulnerabilities and compliance with BellSouth security standards.  It should be noted that the security scanners do test for denial of service vulnerabilities, and may attempt system access and perform other intrusive activities such as password cracking.  BellSouth expects connected devices to resist such scanning without affecting service availability.  BellSouth further expects Supplier to promptly correct discovered vulnerabilities.

d. Remote access connections to BellSouth internal networks may be refused, disconnected or otherwise limited at any time, for any reason and without warning.

X. In the event BellSouth has a good faith belief that Supplier or it's employees or agents may have violated terms of this Security Standard OR in the normal course of BellSouth's routine audits/inspections, allow BellSouth designated parties to inspect, with one business days' notice all computer software, files and records whether resident on equipment owned, leased or controlled by Supplier and/or resident on equipment owned, or leased or controlled by Supplier's Employees and Subcontractors, in which are stored data obtained from or resulting from the use of BellSouth's Information Resources or the performance of work for BellSouth.  Supplier shall not authorize the use of any equipment on a BellSouth account unless a Supplier has the right to audit such equipment and authorize third party audits on such equipment. BellSouth's routine audits/inspections include but are not limited to, operating system security, application security, database security, physical security (doors, windows, walls, and card access system), network security, wardialing of phone lines for modem identification, and program change control  No inspection activities shall be undertaken that will disclose Supplier's or Supplier's other customer's Confidential Information unless BellSouth's Confidential Information cannot be reasonably obtained without disclosure of other's confidential information.  In any event, prior to such inspection or audit, BellSouth's inspectors may be required to execute an appropriate nondisclosure agreement to protect confidential and/or proprietary information of, or in the custody of, Supplier that may be observed during such inspection or audit.  Further, BellSouth will participate in reasonable activities implemented by Supplier in an effort to protect confidential information of others during such audits/inspections and Supplier



**Appendix B**

# BellSouth
## Corporate Security Standards

### 400-600-TR - Security Requirements for Sourced Work

has the right to refuse BellSouth access to data or information that requires special government-issued clearances. These audits and/or inspections may include security scans, unless a firewall prevents such scans; provided, however, that the nature, extent and scheduling of each such security scan will be negotiated and mutually agreed upon by the parties at the time of the proposed audit and such agreement shall not be unreasonably withheld or delayed. The security scans will test the platform for security vulnerabilities. It should be noted that the security scanners may test for denial of service vulnerabilities and may attempt system access and perform other intrusive activities such as password cracking. BellSouth expects devices to resist such scanning without affecting service availability. BellSouth further expects Supplier to promptly correct discovered vulnerabilities.

Y.  Report to BellSouth, within one working day of discovery, any known or suspected unauthorized access, use, misuse, disclosure, destruction, theft, vandalism, modification, or transfer of BellSouth, BellSouth employee, and/or BellSouth customer proprietary information.

Z.  Bargain in good faith for the provision of additional BellSouth security needs not identified in the original agreement.

AA. Have an effective change management program in place.

BB. Use the BellSouth name, logo, and any other BellSouth identifying mark only as specifically documented in this Agreement.

5.2  **Operability** –The Supplier warrants that Information Resource(s) provided under the terms of this Agreement shall operate in a manner satisfactory to BellSouth with all required security controls and features installed and functioning

5.3  **Non-Repudiation** – Information Resources designed to handle electronic business-to-business functions involving bid, purchase; sale; order, payment and/or delivery of material shall ensure that the repudiation of significant facts is negated by functionality involving a secure digital signature or another form of non-repudiation approved by the BellSouth Enterprise Information Security organization at the time of the Agreement.

6.  **Outsourced Web Hosting**

6.1  **General** – A Supplier operating and/or hosting a web site for BellSouth shall comply with the security requirements in Paragraph 5 of this document. A Supplier providing web site services that will not be hosted by the Supplier, but rather by a third party, shall ensure that all security requirements related to hosting functions are passed through to the hosting facility This section also addresses web sites initially hosted by an entity external to BellSouth but which are ultimately hosted by a BellSouth facility.

**Exception** – Hosting facilities owned by BellSouth are subject to BellSouth's internal security standards and not subject to this document.

The Supplier shall ensure that:



**Appendix B**

**BellSouth**
**Corporate Security Standards**

### 400-600-TR - Security Requirements for Sourced Work

A. BellSouth proprietary information is protected while displayed or stored on the Supplier's system using authentication and/or encryption mechanisms.

B. Web sites associated with the BellSouth name are not linked to any objectionable sites. If there is any question as to whether a potential site is objectionable, authorization must be obtained in writing from BellSouth prior to establishing the link.

C. After any significant hardware or software upgrades, a review of the Web site host is conducted to ensure compliance with these Standards has been maintained.

D. Web servers and/or web content development tools provide the capability to:
   a. Authenticate publishers prior to their placing any content onto a BellSouth web site,
   b. Authorize publishers' access only to those systems, specific directories and files necessary to publish content onto BellSouth web sites, and
   c. Ensure content publishing is done under the publisher's own unique UserID, never as a system-specific user such as "root" or "adm"
   d. Control access to web site content. Webmasters must apply the principle of minimum privilege, i.e., give users only the minimum access required, to ensure the security of their web servers.

E. Web servers provide for the capability, and webmasters ensure, that procedures are in place to test for security vulnerabilities whenever executable web content, e.g., cgi scripts, is changed.

F. Web servers have a logging capability to determine who has updated/changed content on the web server. The system must have an audit log retention period of no less than thirty (30) days. Logs should not be retained beyond 90 days unless there is a specific business purpose.

G. Web servers provide encryption to protect proprietary information. Passwords and other authentication data used to access or publish web content must be encrypted when transmitted. Passwords, encryption keys, security codes or proprietary information must not be stored in cookies unless encrypted.

H. The implementation and use of scripts and programs (e.g., applets, CGI scripts, JSP's, servlets and ASP's) is monitored and controlled.

I. Automatic indexing is disabled to prevent the browser from returning a directory index.

J. Intrusion detection software is deployed and operated in an active mode.

**6.2    Outsourced Web Site Ultimately Hosted by a BellSouth Facility** -- For web sites developed under sourcing agreements and for which the BellSouth sponsor indicates the system will ultimately reside inside BellSouth, the Supplier shall ensure compliance with the items in <u>paragraph 6.1</u> and in addition that:

A. Web site hosts must utilize a BellSouth-approved server operating system and platform as required by the approved architecture for the proposed BellSouth data center location,

B. Web site hosts must utilize BellSouth-approved web server software as required by the approved architecture for proposed BellSouth data center location, and





### Appendix B

## BellSouth
## Corporate Security Standards

**400-600-TR - Security Requirements for Sourced Work**

C. Web site hosts must comply with any other BellSouth-approved architecture requirements of the proposed BellSouth data center location.

6.3 **Co-branding** - For purposes of this document, co-branding is the act of identifying an entity or object, such as a Web site, by means of a mark, such as a service mark or trademark, or by any other legally recognized means, as being owned by, controlled by, produced by, or otherwise benefiting, more than one company. Whenever someone other than BellSouth co-brands their Web site with a BellSouth mark or logo, a formal review must be completed by the BellSouth Enterprise Information Security Consulting group before that site is activated and made generally available, or it must have been determined by the BellSouth Enterprise Information Security Consulting group that such a review is not necessary and appropriate. If the review uncovers any vulnerabilities affecting BellSouth, the vulnerabilities must be closed or be authorized by an approved BellSouth Security contract waiver or BellSouth Security Standards variance before the Web site is activated and made generally available.

7. **Expiration or Termination Transition**

7.1 **General** - In the event of expiration or termination of this Agreement, Supplier shall cooperate fully, completely and in a timely manner to conclude/transition the relationship in a secure fashion. During the proceedings to conclude the relationship, which may include transition of activities to BellSouth or a third party and which may extend beyond the expiration or termination of this Agreement, the Supplier shall continue to protect all information, data, assets and capabilities in accordance with the applicable requirements in this Agreement. The BellSouth Enterprise Information Security organization shall be the final authority for issues concerning security that may arise during the conclusion of the relationship if such issues are not addressed in this Agreement or subsequent amendments, and Supplier agrees to comply fully with any decisions rendered by the BellSouth Enterprise Information Security organization.

# FIRST AMENDMENT TO
# THE AGREEMENT

This Amendment to the Agreement, dated as of June 21, 2004, is made by and between BroadVoice, Inc. (Supplier) and BellSouth Telecommunications, Inc. (BellSouth) and their respective successors and assigns.

WHEREAS, BellSouth and Supplier entered into that certain Trial Agreement dated as of June 15, 2004 (the "Agreement"); and

WHEREAS, BellSouth and Supplier desire to amend and supplement the terms of such Agreement.

NOW, THEREFORE, the Parties hereby amend the Agreement as follows:

1. By adding to the Agreement the following new payment element to Appendix A, Section 4, table 1:

   $25,000 one time
   - Broadsoft licensing fees
   - To support the Trial

2. By adding to the Agreement the following new payment element to Appendix A, Section 4, table 2:

   $25,000    Due upon signing this First Amendment    Broadsoft licensing fees

3. All other terms and conditions of the Agreement shall remain in full force and effect.

Supplier:
BroadVoice, Inc.

By: _____
(Authorized Signature)

Name: _David Epstein_____
(Print or Type)

Title: _President_____

Date: _6/21/04_____

BellSouth:
BellSouth Telecommunications, Inc.

By: _____
(Authorized Signature)

Name: _W. L. Smith_____
(Print or Type)

Title: _CTO_____

Date: _6/22/04_____

FORM APPROVED
T.R.
GENERAL ATTORNEY

## SECOND AMENDMENT TO
## THE AGREEMENT

This Amendment to the Agreement, effective as of the date of the signature of the last party to sign below, is made by and between BroadVoice, Inc. (Supplier) and BellSouth Telecommunications, Inc. (BellSouth) and their respective successors and assigns.

WHEREAS, BellSouth and Supplier entered into that certain Trial Agreement dated as of June 15, 2004 (the "Agreement"); and

WHEREAS, BellSouth and Supplier desire to amend and supplement the terms of such Agreement.

NOW, THEREFORE, the Parties hereby amend the Agreement as follows:

1. By adding to the Agreement the following new payment element to Appendix A, Section 4, table 1:

   $5,000 one time          • BroadSoft support of trial's dedicated servers

2. By adding to the Agreement the following new payment element to Appendix A, Section 4, table 2:

   | $5,000 | Due within 10 days of the effective date of the Second Amendment | Broadsoft support of trial's dedicated servers |

3. All other terms and conditions of the Agreement shall remain in full force and effect.

Supplier:                                BellSouth:
BroadVoice, Inc.                         BellSouth Telecommunications, Inc.

By: _David Epstein_ (signature)          By: _____

Name: _David Epstein_                    Name: _____

Title: _President_                       Title: _____

Date: _Sept 9, 04_                       Date: _____

### THIRD AMENDMENT TO
### THE AGREEMENT

This Amendment to the Agreement, effective as of the date of the signature of the last party to sign below, is made by and between BroadVoice, Inc. (Supplier) and BellSouth Telecommunications, Inc. (BellSouth) and their respective successors and assigns.

WHEREAS, BellSouth and Supplier entered into that certain Trial Agreement dated as of June 15, 2004 (the "Agreement"), as amended, and

WHEREAS, two hurricanes unexpectedly hit the Trial area causing various delays to starting the Trial when originally planned and that such delays were beyond the reasonable control of the Parties hereto, and BellSouth and Supplier desire to amend and supplement the terms of such Agreement to account for such delays.

NOW, THEREFORE, the Parties hereby amend the Agreement as follows:

1. By amending the second and third sentences of Section 4.1 of the Agreement to state that the Trial Start Date shall be deemed to have commenced on August 16, 2004; that the Agreement and the Trial Period shall each terminate on April 30, 2005, unless further extended under the terms of this Third Amendment; and that BellSouth may, at its option, extend the Trial Period and Agreement by an additional 30 or 60 days beyond April 30, 2005 pursuant to the terms set forth in the Agreement, including the payment terms that are set forth in APPENDIX A that are in effect in the month prior to such extension, by providing Supplier written notice of such election not less than 30 days prior to April 30, 2005.

2. By stating, for purposes of clarification, that the first $10,725 minimum monthly payment covering the $21.45 per customer line per month fee for Customer Accounts set forth in Appendix A, Section 4 of the Agreement, shall be for the month of August 2004; and that months 2 through 5 of such five month minimum fee period shall be for the months of September 2004 through December 2004, inclusive. This $10,725 minimum monthly payment shall apply to each additional month of the Trial Period following December 2004 until termination of the Trial Period.

3.  All other terms and conditions of the Agreement shall remain in full force and
    effect.

Supplier:                              BellSouth:
BroadVoice, Inc.                       BellSouth Telecommunications, Inc.

By: _____            By: _____

Name: _David Epstein_                  Name: _W. L. Smith_

Title: _President_                     Title: _CTO_

Date: _11/30/04_                       Date: _12/2/04_

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BROADVOICE, INC.,

        Plaintiff,

v.

BELLSOUTH CORP., BELLSOUTH
TELECOMMUNICATIONS, INC.,
and
BELLSOUTH INTELLECTUAL
PROPERTY CORP.

        Defendants.

Civil Action No.  05-11435-NG

**EXHIBITS TO THE AFFIDAVIT OF LES BERRY (PART 3)
IN SUPPORT OF BROADVOICE, INC.'S MOTION IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS, OR TRANSFER, OR STAY**

**EXHIBIT D**

Fw: URGENT: Stop Usage of BroadVoice Flyer with "N...

**From:** Beck, Kelli [mailto:Kelli.Beck@BELLSOUTH.COM]
**Sent:** Friday, October 01, 2004 12:48 PM
**To:** David Epstein
**Cc:** Reid, Laura; Lowry, Sadie
**Subject:** FW: URGENT: Stop Usage of BroadVoice Flyer with "No" Bell Logo

David,
After reviewing a copy of the BroadVoice flyer, BellSouth Trademark and IP-Legal groups
have determined that the Bell graphic being used on the flyer is an infringement of the Bell
Symbol. We do need BroadVoice to comply with discontinuing use of and destroy the the
Bell graphic.
Thanks,
Kelli


-----Original Message-----
**From:** Sherwood, Amy
**Sent:** Thursday, September 30, 2004 5:11 PM
**To:** Beck, Kelli
**Cc:** Reid, Laura; Lowry, Sadie
**Subject:** RE: URGENT: Stop Usage of BroadVoice Flyer with "No" Bell Logo


Kelli,

Please see the message below from Jackie in our IP-Legal Group.  Basically, IP-Legal does not need to contact them at this time since it is better for the communication to come from BroadVoice's BellSouth contact.  If they refuse to comply, then IP-Legal would need to be involved.  Also, regardless of David Epstein's opinion, the Bell graphic that appears on BroadVoice's flyer is an infringement of the Bell Symbol.

Please let me know if they push back.  It doesn't sound like they will.

Thanks.
Amy

-----Original Message-----
**From:** Gregorski, Jacqueline
**Sent:** Thursday, September 30, 2004 4:40 PM
**To:** Sherwood, Amy
**Subject:** RE: URGENT: Stop Usage of BroadVoice Flyer with "No" Bell Logo

Amy.

I have reviewed the matter. Since we have a relationship with this vendor, we do not think a C&D letter is necessary at this time.  We have found that resolving these things along the business channels is more productive.  With that said, if the business contacts cannot get them to comply, we will then step in and send a cease and desist letter.

Thanks,

Jackie
-----Original Message-----
**From:** Beck, Kelli
**Sent:** Friday, September 24, 2004 4:45 PM
**To:** Sherwood, Amy
**Cc:** Reid, Laura; Lowry, Sadie
**Subject:** FW: URGENT: Stop Usage of BroadVoice Flyer with "No" Bell Logo

Amy.
I just thought this would be easy! Eric has instructed me to follow-up with our trademark attorneys on this issue   Would you please advise who I should talk to?
Thanks!
Kelli

-----Original Message-----
**From:** Schwartz, Eric
**Sent:** Friday, September 24, 2004 3:58 PM
**To:** Beck, Kelli; Reid, Laura
**Subject:** FW: URGENT: Stop Usage of BroadVoice Flyer with "No" Bell Logo

Please follow up with our trademark attorneys on this. This is their call. In these situations, being vigilant about pursuing any possible infringement is as important as the actual outcome.

Eric

-----Original Message-----
**From:** David Epstein [mailto:depstein@broadvoice.com]
**Sent:** Friday, September 24, 2004 1:52 PM
**To:** Beck, Kelli
**Cc:** Schwartz, Eric; Reid, Laura; Lowry, Sadie; Sherwood, Amy
**Subject:** RE: URGENT: Stop Usage of BroadVoice Flyer with "No" Bell Logo

Kellii, sorry for my delay in getting back to you, I've been on the road.

We are not the itty bitty machine company stamping IBM on our PC's - we are in fact saying that we are NOT a Bell. We are taking great pains to make sure that people don't confuse us with their traditional land-line service. You have a trademark witch is all in one color and depicts a circle around a bell. We have the universal symbol for "No" over a different color bell which has no circle around it. You attorneys may feel differently but I hope that they will agree

D-

----------------------------------------------------------------------

**From:** Beck, Kelli [mailto:Kelli.Beck@BELLSOUTH.COM]
**Sent:** Thursday, September 23, 2004 2:50 PM
**To:** David Epstein
**Cc:** Schwartz, Eric; Reid, Laura; Lowry, Sadie; Sherwood, Amy
**Subject:** RE: URGENT: Stop Usage of BroadVoice Flyer with "No" Bell Logo

David,
As Laura alerted you a few minutes ago, I was informed by our trademark group that you will need to stop using and destroy the brochures/flyers and any other materials you are currently using for the tradeshow that includes the "No" Bell symbol. The Blue Bell symbol rights are jointly owned by the RBOCs and can only be used with approved extensions (e.g. BellSouth, SBC) and only when approved by the appropriate RBOC.

Please reply back to this email to confirm that you have stopped using & destroyed all such materials.

I appreciate your quick response!

*Kelli Cates Beck*
*Sr. Manager*

*BellSouth IP Product Strategy/Development*
*2180 Lake Blvd., NE, 4th Floor*
*Atlanta, GA 30319*
*phone: 404-829-8293*
*fax: 404-829-8413*
*e-mail: kelli.beck@bellsouth.com*
*i-pager: kcbeck@imcingular.com*

*\*\*\*\*\**

"The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential, proprietary, and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from all computers." 118

**Subject:** Broadvoice
**From:** Lucy Lovrien <lovrien@wn.net>
**Date:** Tue, 05 Oct 2004 13:59:50 -0400
**To:** Kelli.Beck@BELLSOUTH.COM

Dear Ms. Beck:

I represent Broadvoice, Inc.  The email correspondence between you
and David Epstein of Broadvoice, concerning the BellSouth logo, has
been brought to my attention and I will be sending a substantive
response to BellSouth's demand in the next few days.

Would you provide me with the name, title, address, and fax number
of the person at BellSouth to whom I should direct my letter?
Thank you very much.

Sincerely,

Lucy D. Lovrien
Attorney at Law
Ten Winthrop Square
Boston, MA  02110
(617) 423-4050  tel.
(617) 426-5251  fax

**Subject:** FW: Broadvoice
**From:** "Beck, Kelli" <Kelli.Beck@BELLSOUTH.COM>
**Date:** Thu, 7 Oct 2004 14:14:20 -0500
**To:** <lovrien@wn.net>
**CC:** "Reid, Laura" <Laura.Reid@BELLSOUTH.COM>,
<david@broadvoice.com>

Lucy,
Please send your correspondence to Jacqueline Gregorski.  Her
information is listed below.
Thanks,
Kelli Cates Beck
BellSouth IP Product Strategy/Development

-----Original Message-----
From: Gregorski, Jacqueline
Sent: Thursday, October 07, 2004 12:37 PM
To: Beck, Kelli; Sherwood, Amy
Cc: Reid, Laura
Subject: RE: Broadvoice


The letter should be sent to me.

Jacqueline Gregorski
Vice President Patent and Trademark Procurement
BellSouth Intellectual Property Corporation
824 Market Street, Suite 901
Wilmington, DE  19801
Phone:  (302) 654-1686
Fax:  (302) 654-2110
Tpager:  jgregorski@imcingular.com



-----Original Message-----
From: Beck, Kelli
Sent: Thursday, October 07, 2004 12:08 PM
To: Sherwood, Amy; Gregorski, Jacqueline
Cc: Reid, Laura
Subject: FW: Broadvoice


Amy & Jackie,
See response from BroadVoice legal representative below.  Please
provide
to me and/or Lucy Lovrien the contact information she is requesting.
Thanks, Kelli

-----Original Message-----

**EXHIBIT E**

## ⊕ *BELL*SOUTH

BellSouth Intellectual Property Corporation
824 Market Street, Suite 901
Wilmington, DE 19801-4939
jacqueline.gregorski@bellsouth.com

Jacqueline A. Gregorski
Vice President Patent & Trademark
Procurement
(302) 654-1686
Fax: (302) 654-2110

October 27, 2004

VIA FEDERAL EXPRESS

Lucy D. Lovrien, Esq.
Ten Winthrop Square
Boston, Massachusetts 02110

      RE:   BroadVoice, Inc.'s Use of "No Bell" Logo
              Infringement of BellSouth Trademarks

Dear Ms. Lovrien:

     I am in receipt of your letter dated October 15, 2004.

     You have requested information regarding our rights in the BELL marks and also our theories that BroadVoice's use of the "No Bell" logo infringers our trademark rights.

     First, all of AT&T's rights in BELL and the Bell Symbol mark were assigned to the Regional Bell Operating Companies ("RBOCs"), namely, BellSouth Corporation, American Information Technologies Corp., Bell Atlantic, NYNEX, Pacific Telesis Group, Southwestern Bell and U S West, Inc., as well as Cincinnati Bell and Southern New England Telephone Company at divestiture. See United States v. Western Electric Company, Inc. 569 F. Supp. 1057,1074 (1983). BellSouth's rights have been assigned to BellSouth Intellectual Property Corporation ("BIPCO"). Additionally, BIPCO is the owner of a family of "Bell Marks" including, but not limited to Registration No. 1,569,327 for the mark Bell Symbol, Registration No. 1,565,562 for the mark BELL, Registration Nos. 1,459,196 and 1,565,559 for the mark BELLSOUTH, Registration No. 1,459,194 for the mark SOUTH CENTRAL BELL and Registration No. 1,459,998 for the mark SOUTHERN BELL. BellSouth and its subsidiaries are currently licensed to use these marks in connection with telecommunications, telephones and telephone accessories, cellular phones, services and accessories, Internet access, web page design and web hosting, on-line and printed directory publishing and related advertising services, and other communications goods

Lucy D. Lovrien, Esq.
October 26, 2004
Page 2

and services. Copies of our federal registrations are attached for your reference. Given the extensive and exclusive use by AT&T and then by the RBOCs, the Bell Marks are very strong marks and are afforded broad protection against infringement and dilution.

Second, your understanding that BellSouth has limited rights in the Bell Symbol is incorrect. The conditions of use outlined at divestiture in no way affect our rights to enforce our rights against third party use of the Bell Marks, including the use by BroadVoice. The geographic modifiers used by the RBOC's are designed to prevent confusion when the public is sold goods and services by the various *legitimate* BELL companies. The public relies on BELL and the Bell Symbol to denote the quality and goodwill developed by the Bell System, which goodwill was assigned to the RBOC's at divestiture. No other company is entitled to share in the goodwill associated with BELL or the Bell Symbol by merely differentiating the way that the mark BELL or Bell Symbol is expressed from the various ways that it is used by the RBOC's.

BroadVoice has asserted that its use of the "No Bell" logo is different from the Bell Symbol in that they use the universal symbol for "No" over a different color bell which has no circle around it (relayed in an email from David Epstein to Kelli Beck). These modifications do not mitigate the infringement. Simply put, BroadVoice is using the Bell Symbol with a line through it. As stated above, the Bell Symbol is a famous mark and is afforded broad protection against infringement and dilution. Even though BroadVoice is trying to distinguish itself from any of the RBOCs, it is using the Bell Symbol, which is a strong source indicator and highly recognized by the public, as a purely attention getting device for its benefit and usurping the goodwill that has built up due to the extensive and exclusive use of the Bell Symbol over the past 100 years. Such use constitutes trademark infringement, dilution and unfair competition under both federal and state laws.

Finally, your client and BellSouth have entered into an agreement regarding the trial for the resale of VoIP by BellSouth. The agreement contains specific language regarding the use of the BellSouth name and marks, namely that all marks to be used by BroadVoice have to be designated in writing by BellSouth and all such uses to be approved by BellSouth. Further, BroadVoice agreed that it recognizes and acknowledges the ownership of the marks by BIPCO and shall do nothing inconsistent with BIPCO's ownership of the marks. BroadVoice's use of the "No Bell" logo is inconsistent with these terms and continued use will jeopardize the agreement and any future relationship with BellSouth.

Lucy D. Lovrien, Esq.
October 26, 2004
Page 3

Based on the foregoing, we must receive written assurances no later than November 8, 2004, that your client has (1) discontinued all use of the No Bell logo in advertising, collateral or promotional materials such as t-shirts, buttons, etc. (2) destroyed all tangible material (such as stationery, business cards, forms, fliers, coupons, t-shirts, buttons, etc.) on which this infringing usage appears, and (3) will refrain from infringing BIPCO's trademark rights in the future. If we have not received the requested response, we will take whatever action we deem appropriate without further notice to you.

Sincerely,

Jacqueline A. Gregorski

Enclosures

cc: Michael Bishop, Esq.

**EXHIBIT F**



**KILPATRICK STOCKTON LLP**

Attorneys at Law

Suite 2800  1100 Peachtree St.
Atlanta GA 30309-4530
t 404 815 6500  f 404 815 6555
www.KilpatrickStockton.com

direct dial 404 745 2411
direct fax 404 541 3379
SSchaetzel@KilpatrickStockton.com

June 2, 2005

**VIA FACSIMILE & U.S. MAIL**

Lucy D. Lovrien, Esq,
Ten Winthrop Square
Boston, MA  02110

> Re:    BroadVoice, Inc.'s Use of "No Bell" Logo
> Infringement of BellSouth Trademarks
> KS file: 51090-316490

Dear Ms. Lovrien:

We are trademark counsel to BellSouth Intellectual Property Corporation ("BIPCO") Your January 14, 2005 letter to Ms. Gregorski has been forwarded to us for reply.  BIPCO will not be drawn into an academic debate.  This matter is straightforward.

BIPCO owns incontestable exclusive rights in the famous BELL Symbol, as reflected in U.S. Trademark Registration No. 1,569,327.  That mark is and has been judicially determined to be a famous trademark.  See BellSouth Corporation v. B.E.L-Tronics Limited (Canada), et al., Civil Action No. 1-98-CV-1714-CC, United States District Court for the Northern District of Georgia, aff'd, 107 F.3d 25 (11th Cir. 1997).  In fact, BIPCO owns a family of BELL marks that identify BIPCO and its affiliate licensees as the source of services and goods offered and sold in association therewith.  See BellSouth Corporation v. B.E.L-Tronics Limited, Opposition No. 87,654, United States Patent and Trademark Office, Trademark Trial and Appeal Board, July 27, 1994 Order, p. 6 ("Opposer [BellSouth] has a well known group of marks based on the famous 'BELL' mark.")

BroadVoice is a telecommunications company that, using a high-speed Internet connection, "allows customers to make and receive phone calls anywhere in the world."  See BroadVoice Press Release, dated April 1, 2004.  BroadVoice is therefore a competitor of BIPCO and its licensee, BellSouth Telecommunications, Inc.  Rather than promote its services on their own merit under its own marks, BroadVoice, a new entry into this market,

ATLLIB02 184819.1

Lucy D. Lovrien, Esq.
June 2, 2005
Page 2

has elected to deface the famous BELL Symbol in order to gain the benefit of the public's association with that famous trademark. BIPCO cannot and will not sit idly by and allow a competitor to defame and misuse its famous intellectual property.

We make three points. First, BroadVoice's use of the famous BELL Symbol is likely to cause confusion, as consumers will at a minimum believe that BellSouth has permitted or sanctioned this use. As you know, courts traditionally apply a multi-factor likelihood of confusion test, including: (1) the strength of the plaintiff's mark; (2) the similarity of the marks at issue; (3) the similarity of the products the marks represent; (4) the similarity of the parties' retail outlets and customers; (5) the nature of the parties' advertising; (6) the defendant's intent; and (7) the extent of actual confusion. Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc., 833 F.2d 1484 (11th Cir. 1987). Your analysis underestimates the strength of the BELL Symbol and ignores several other factors. While you claim that use of the "negative" circle plus diagonal line will ameliorate the likelihood of confusion, you offer no evidence to support this claim. In contrast, we rely, in part, on the proven fame of this mark. None of the confusion factors favor BroadVoice's intentional and knowing use of the famous BELL Symbol for its own competitive gain.

Second, BroadVoice's use is commercial and not a "fair use." To the contrary, it is an attention-getting use that is by definition unfair. See Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947 (7th Cir. 1992). There is nothing descriptive about BroadVoice's use, as perhaps best shown by your frequent reference to "BellSouth" and the "RBOC's" without use of the famous Bell Symbol. Moreover, this is the commercial use of a logo. The authorities you cite have found the fair use defense to be inapplicable to logos. See New Kids, 971 F.2d at 802 (finding that defendant used only the words without the group's distinctive logo); Playboy Enters. Inc. v. Welles, 279 F.3d 796 (9th Cir. 2002) (finding that the defendant used only the words, not the font or symbols. Cairns, 292 F.3d at 1154 (finding that the defendant had not used any distinctive letter or any particular image of Princess Diana "intimately associated" with the plaintiffs). BroadVoice can inform the public that it is an alternative service provider without use of the famous BELL Symbol.

Third, BroadVoice's use of the famous BELL Symbol constitutes dilution under Section 43(c) of the Lanham Act (15 U.S.C. 1125). The elements of a dilution claim are: (1) the plaintiff is the owner of a mark which qualifies as a "famous" mark; (2) the defendant is making commercial use; (3) in interstate commerce; (4) of a mark or trade name; (5) defendant's use began after the plaintiff's mark became famous; and (6) defendant's use causes dilution by lessening the capacity of plaintiff's mark to identify and distinguish goods or services. Nike Inc. v. Variety Wholesalers, Inc., 274 F. Supp.2d 1352, 1372 (S.D. Ga. 2003), aff'd 2004 WL 1121546 (11th Cir. 2004). The BELL Symbol is a famous trademark. You admit that the instant use is commercial by arguing that it identifies BroadVoice as an

ATLLIB02 184819.1

Lucy D. Lovrien, Esq.
June 2, 2005
Page 3

alternative service provider. Further, by admitting that this is also a "negative" use, you concede that BroadVoice is tarnishing the BELL Symbol. Finally, since BroadVoice is using the identical mark, we have already met the standard of <u>Mosely v. V. Secret Catalogue, Inc.</u>, 537 U.S. 418 (2003). If forced, please be advised that BIPCO stands ready to present additional evidence of actual dilution.

Accordingly, BIPCO renews its demand that BroadVoice stop all use of the "No Bell" symbol. Unless we receive written confirmation within fifteen (15) days that BroadVoice has discontinued all use of this negative symbol, BIPCO will have no choice but to pursue its legal remedies.

Sincerely,

KILPATRICK STOCKTON LLP

Stephen M. Schaetzel

SMS:jp

ATLLIB02 184819.1